UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ATLANTIC RECORDING
CORPORATION, LAFACE
RECORDS LLC, SONY MUSIC
ENTERTAINMENT, UMG
RECORDINGS, INC., WARNER
BROS. RECORDS INC., ARISTA
MUSIC, ARISTA RECORDS LLC,
BAD BOY RECORDS LLC,
CAPITOL RECORDS, LLC,
ELEKTRA ENTERTAINMENT
GROUP INC., ROC-A-FELLA
RECORDS, LLC, SONY MUSIC
ENTERTAINMENT US LATIN LLC,
ZOMBA RECORDING LLC,

     Plaintiffs,

     v.

SPINRILLA, LLC and JEFFERY
DYLAN COPELAND,

     Defendants.

Civil Action No.
1:17-CV-00431-AT

## **AMENDED COMPLAINT**

Plaintiffs, by and through their counsel, hereby allege the following:

## INTRODUCTION

1.      This is a case about the willful infringement of Plaintiffs' copyrights by Defendant Spinrilla, LLC ("Spinrilla") and its founder, Defendant Jeffery Dylan Copeland ("Copeland").

2.      Plaintiffs are record companies that produce, manufacture, distribute, sell and license the great majority of all legitimate commercial sound recordings in this country.  Spinrilla and Copeland (collectively "Defendants") own and operate a website, http://www.spinrilla.com ("Spinrilla.com" or the "Spinrilla website"), and associated mobile apps for the iOS and Android operating systems (the "apps"). Since at least 2013, Defendants have willfully engaged in, and have knowingly contributed to, profited from, and induced, the widespread infringement of Plaintiffs' sound recording copyrights through the Spinrilla website and apps.  Taken together, these acts of copyright infringement have resulted in Plaintiffs' copyrighted sound recordings being downloaded and/or streamed by the public *millions* of times, without Plaintiffs' permission and without payment of any compensation whatsoever to Plaintiffs.

3.      Through the Spinrilla website and apps, users with an artist account can upload content that any other user can then download or stream on demand for free, an unlimited number of times.  A substantial amount of content uploaded to the Spinrilla website and apps consists of popular sound recordings whose copyrights

are owned by Plaintiffs.  Defendants know this and yet allow the infringing activity to continue unabated.  Indeed, Defendants have themselves uploaded and publicly advertised the availability of Plaintiffs' popular and highly valued copyrighted works, as a means to draw users to the Spinrilla website and apps.

4.      By offering free access to copyrighted content, Defendants drive a tremendous and growing number of visitors to their website and apps.  Spinrilla.com receives nearly two million visits a month, a majority from U.S.-based visitors.  The Spinrilla apps have been downloaded millions of times.  Users like Spinrilla's service for obvious reasons.  To quote one reviewer of the Spinrilla app:  "It has all the hot music for free."

5.      Spinrilla converts its millions of monthly visits into profit.  The Spinrilla app currently makes use of high-quality banner and "pop up" advertising that drives revenue for the company.  Advertisements from established companies and products ranging from Amazon to Zyrtec appear on the Spinrilla app.  In addition, Spinrilla offers its users the option to purchase a "Pro Membership," driving additional revenue.

6.      Plaintiffs invest millions of dollars and enormous creative energies to produce their copyrighted sound recordings.  Defendants' unauthorized use of Plaintiffs' copyrighted works in connection with the Spinrilla website and apps has caused—and is continuing to cause—Plaintiffs significant and irreparable harm.

Defendants' willful acts of infringement have eroded the authorized sales and distribution of Plaintiffs' copyrighted sound recordings through physical and digital channels. Plaintiffs are entitled to permanent injunctive relief to stop Defendants' ongoing violation of Plaintiffs' rights, as well as damages resulting from Defendants' egregious infringing conduct.

## NATURE OF THE ACTION

7.     This is an action for copyright infringement under the Copyright Act of the United States, Title 17, United States Code §§ 101, *et seq.*

## THE PARTIES

*The Plaintiffs*

8.     Plaintiffs are well-known record companies. They are in the business of producing, manufacturing, distributing, selling, licensing, and facilitating authorized uses of sound recordings (*i.e.*, recorded music) in the United States. The considerable artistic and technical quality of Plaintiffs' sound recordings is well known in Georgia, throughout the United States, and throughout the world.

9.     Together, Plaintiffs are the copyright owners or owners of exclusive rights with respect to the great majority of copyrighted sound recordings sold in the United States. Those sound recordings contain the performances of some of the most popular and successful musicians of all time—such as Beyoncé, Michael Jackson, and Kanye West—as well as notable artists based out of Atlanta—such as

2 Chainz, Future, and Outkast.  Plaintiffs have invested and continue to invest significant money, time, effort, and creative talent to create, promote, sell, and license these sound recordings.

10.     Plaintiffs distribute and/or sell their sound recordings in the form of CDs and other tangible media throughout the United States, including in Georgia. Plaintiffs also sell, distribute, and/or publicly perform their sound recordings in the form of digital audio files through legitimate and authorized Internet services, such as iTunes, Amazon, Apple Music, Rhapsody, and Spotify, which are available throughout the United States, including in Georgia.

11.     Under the Copyright Act, Plaintiffs have the exclusive rights, among other things, to "reproduce the copyrighted work[s]," to "distribute copies or phonorecords of the copyrighted work[s] to the public," to "perform the copyrighted work[s] publicly by means of a digital audio transmission," and to authorize or license such activities.  17 U.S.C. § 106.

12.     Plaintiff Arista Music is a New York partnership with its principal place of business in New York, New York.

13.     Plaintiff Arista Records LLC is a Delaware limited liability company with its principal place of business in New York, New York.

14.     Plaintiff Atlantic Recording Corporation ("Atlantic") is a Delaware corporation with its principal place of business in New York, New York.

15.     Plaintiff Bad Boy Records LLC is a Delaware limited liability company with its principal place of business in New York, New York.

16.     Plaintiff Capitol Records, LLC is a Delaware limited liability company with its principal place of business in Santa Monica, California.

17.     Plaintiff Elektra Entertainment Group Inc. is a Delaware corporation with its principal place of business in New York, New York.

18.     Plaintiff LaFace Records LLC ("LaFace") is a Delaware limited liability company with its principal place of business in New York, New York.

19.     Plaintiff Roc-A-Fella Records, LLC is a New York limited liability company, with its principal place of business in New York, New York.

20.     Plaintiff Sony Music Entertainment ("Sony") is a Delaware partnership with its principal place of business in New York, New York.

21.     Plaintiff Sony Music Entertainment US Latin LLC ("Sony Latin") is a Delaware limited liability company with its principal place of business in Coconut Grove, Florida.

22.     Plaintiff UMG Recordings, Inc. ("UMG") is a Delaware corporation with its principal place of business in Santa Monica, California.  UMG is registered to do business in Georgia.

23.    Plaintiff Warner Bros. Records Inc. is a Delaware corporation with its principal place of business in Burbank, California.  Warner Bros. Records Inc. is registered to do business in Georgia.

24.    Plaintiff Zomba Recording LLC ("Zomba") is a Delaware limited liability company with its principal place of business in New York, New York.

### The Defendants

25.    Spinrilla is a Georgia domestic limited liability company with its principal place of business in Atlanta, Georgia.  Spinrilla is the business entity behind the Spinrilla website and apps.

26.    Copeland resides in Atlanta, Georgia.  Copeland is the founder, organizer, registered agent, manager, principal officer, and key employee of Spinrilla.  Upon information and belief, Copeland is also the sole member of the Spinrilla limited liability company.

27.    Upon information and belief, since at least 2014, Copeland has supported himself financially by running Spinrilla.  Copeland wrote the programming code that runs the Spinrilla interface, which enables infringers to upload, download, and stream on demand Plaintiffs' copyright-protected works, and designed the two Spinrilla apps.  He directs, controls, ratifies, and participates in every business, technological, and management decision of Spinrilla, and maintains Facebook and Twitter pages for Spinrilla.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a), as it is a suit arising under the federal Copyright Act.

29.     This Court has personal jurisdiction over Defendants.  Defendants are residents of Georgia and/or maintain their principal place of business in Georgia, have transacted business within Georgia, have committed the tortious act of copyright infringement within Georgia, have caused tortious injuries within Georgia resulting from acts occurring outside of Georgia, regularly do business in Georgia, and use real property situated within Georgia.

30.     Venue in the Northern District of Georgia is proper under 28 U.S.C. §§ 1391 and 1400(a) because it is the judicial district in which at least one of the Defendants resides, and because all of the Defendants are residents of Georgia. Venue in the Northern District of Georgia is also proper because it is the judicial district in which a substantial portion of the events or omissions giving rise to the claims herein occurred.

## FACTS

### *Spinrilla.com*

31.     In early 2013, Defendant Copeland launched Spinrilla.com, marketing the website as "the 800-lb. gorilla of free hip-hop mixtapes."  Spinrilla.com features hip-hop music organized into three categories: "Mixtapes," "Singles," and "Charts."

32.     The "Mixtapes" section of Spinrilla.com displays thumbnail images that correspond to playlists of various sound recordings (referred to as "mixtapes" by Spinrilla).  When a user clicks on a thumbnail, he or she is brought to a track-listing page for the particular playlist.  This page shows the cover art for the playlist, identifies the specific sound recordings included in the playlist, and displays a running tally of the views, streams, and downloads that the playlist has received to date.  From this page, a user is able to stream tracks, download tracks, or download the entire playlist by clicking a green button labeled "Download Now!"

33.     The "Singles" section of Spinrilla.com is organized differently.  When entering this section of the website, a user is presented with a list of individual tracks by individual artists.  When a user clicks on a track, he or she is brought to a new page of the Spinrilla website from which he or she can stream or download that particular recording.

34.     Finally, the "Charts" section of Spinrilla.com allows users to search for content by daily, monthly, or all-time popularity on the service.  When a user clicks

on a particular playlist, he or she is brought to the track-listing page for that playlist, from which songs can again be downloaded or streamed.

35.     In addition to allowing users to browse sound recordings in a variety of ways, Spinrilla.com also features a search bar, which is accessible from any page within the site.  Users can type in the name of a particular artist, or a particular track, into the search bar.  Spinrilla.com then locates and pulls up the corresponding artist or track.  The search bar features an "autocomplete" function that suggests entries to a user.  For instance, a user who types in "Emin" into the search bar will be prompted with the suggestion "Eminem" (a major recording artist who records for one of Plaintiff UMG Recordings, Inc.'s family of record labels) as well as playlists featuring tracks by that artist.

36.     Spinrilla.com provides its users with the option of "sharing" content contained on the website, through various social media platforms.  When viewing the contents of a playlist, or when streaming a particular song, a user is presented with buttons that allow him or her to share links to the recordings on Twitter, Facebook, and/or Google Plus.  Users can also click a button labeled "Embed" that reveals a hyperlink to sound recordings hosted on the Spinrilla website.  Users can then embed this hyperlink on other websites, allowing the play of sound recordings through those websites.

37.     Spinrilla.com provides its users with the option of commenting on particular tracks or playlists.  To do so, however, a user is required to "sign in," by first registering a unique username and password with Spinrilla.

38.     Spinrilla.com receives approximately two million visits a month via web browsers on desktop and mobile platforms.

### The Spinrilla Apps

39.     In early 2013, Copeland created an "app" version of Spinrilla.com that is specifically packaged, designed, and optimized for mobile phones.  The Spinrilla app is maintained by Spinrilla and Copeland.

40.     The Spinrilla app launched on the iOS platform on or around May 10, 2013.  Since then, over thirty updates or versions of the app have been released, the latest of which was released on June 6, 2016.  The Spinrilla app can be downloaded for free from the Apple App store.

41.     The Spinrilla app launched on the Android platform in early 2014. Since then, over thirty updates or versions of the app have been released, the latest of which was released on September 20, 2016.  The Spinrilla app can be downloaded for free from the Google Play store, as well as other online sources.  Spinrilla maintains a separate website, http://madebyappolis-spinrilla.andro.io, which links to the Spinrilla app on the Google Play store.  This website features a dropdown menu

allowing the viewer to translate the page into multiple languages, including German, French, Spanish, Italian, Chinese, Japanese, Russian, and Portuguese.

42.    The Spinrilla apps offer roughly the same functionality as Spinrilla.com.  Unlike Spinrilla.com, however, it is not possible to use the apps without first creating an account.  After downloading and installing the app, users are prompted to create a unique username and password.  Once a user logs in, he or she can access the full library of sound recordings available at Spinrilla.com.

43.    The Spinrilla apps feature hip-hop music organized into several categories, including "Explore," "My Library," "Playlists," and "Radio."

44.    The "Explore" section of the Spinrilla app provides users with several ways to browse sound recordings.  The subsection entitled "New Releases" displays thumbnails of various "newly released" playlists.  The subsection entitled "Popular" is similar, but displays thumbnails according to the popularity of the corresponding playlist as of "[t]oday," "[t]his month," and "[a]ll time."  The subsection entitled "Singles" displays thumbnails that correspond to individual tracks rather than playlists.

45.    When a user touches a thumbnail corresponding to a playlist, he or she is brought to a track-listing page, which shows the playlist's cover art and identifies the specific sound recordings included in the playlist.  When a user touches a thumbnail corresponding to an individual track, he or she is brought to a page that

begins immediately streaming the track and that displays art associated with the track.

46.    When viewing a playlist or track, a user is given the option to download or stream the playlist or track for free.  Tracks streamed from a user's smartphone are played using the Spinrilla app's built-in media player.  Tracks downloaded to a user's smartphone are stored in a section of the app entitled "My Library" and may be accessed and listened to offline.  Users can further organize these tracks into custom-created playlists, which then appear in a section of the app entitled "Playlists."  Users of the Spinrilla app are also given the ability to "comment" on playlists or tracks, and to "share" links to playlists or tracks via text message, email, or social media.

47.    The "Radio" section of the Spinrilla app allows users to select various "stations" organized into topical categories, such as "Top Hits," "R&B," "Atlanta," and "New York."  When a user selects one of these "stations," individual sound recordings begin to stream.  Users are allowed to skip a track after listening to it for at least thirty seconds.

48.    Like Spinrilla.com, the Spinrilla apps feature a search bar that allows users to search for sound recordings by keyword.

49.    Spinrilla offers two tiers of membership to users of its apps—a free membership and a "Pro" membership.

50.     The free version of the Spinrilla apps contains advertising in the form of high quality banners, videos, and "interstitials" (advertisements played during or in between songs).  Advertisers on the apps include a wide range of companies and products, including such established names as Amazon, EA Sports, Flonase, Hulu, REI, Samsung, Seamless, Uber, and Zyrtec.   Advertisements are displayed throughout the free version of the Spinrilla app.

51.     In addition to offering a free version, the Spinrilla app offers users the option of upgrading to a "Pro Membership."  The "Pro Membership" costs a monthly fee of $0.99 USD.  On the Apple App Store, Spinrilla quotes prices for the Pro Membership in a variety of international currencies, ranging from the Danish Krone to the Hong Kong Dollar.

52.     Spinrilla promises a number of benefits to upgrading from a free membership to a "Pro Membership."  First, Spinrilla promises its Pro users "the best listening experience" and claims that a Pro Membership is "the best way to listen to limitless mixtapes."    Second, upgrading to a Pro Membership removes all advertisements from the Spinrilla app.  Third, users who purchase a Pro Membership are not subject to downloading or streaming limits.  By contrast, free members using the Spinrilla app on the Android platform are limited to 75 streams and 75 downloads a day.

53.    The Spinrilla Android app has been downloaded and installed between 5 and 10 million times.  It is among the most popular music apps offered on the Google Play store and ranks higher than the Apple Music app, the Amazon Music app, and the SiriusXM Radio app.  Over 65,000 users have reviewed the Spinrilla app on the Google Play store, earning it a rating of 4.3/5.0 stars.  Positive reviewers have noted that Spinrilla "has ever[y] album I want," that it "[a]lways ha[s] the latest hits," and that it's "[g]ot all the music I like."  Reviewers have also noted that the Spinrilla app is the "[b]est way to get free new music!," that "[i]t has all the hot music for free," that "I love this app because I could get all the new albums for free," and that "YOU CAN DOWNLOAD THEM instantly."

54.    The Spinrilla iOS app is within the top 1% most popular iOS apps worldwide.  Over 13,000 users have reviewed the Spinrilla app on the Apple App Store, earning the app a rating of 4.5/5.0 stars.  One reviewer described her experience in detail, noting that he or she "was a little skeptical at first about it and wondered if it was going to be another vast collection of garbage mixed tapes with wack mixes," but "[b]oy was I wrong … this has such a dope collection of every track from the '90s till now.  I'm loving it, and I love that you can download each track to your library within the app to play later."  Another reviewer noted that "spinrilla is a contender with apple music, Spotify, tidal, [and] all the other paid subscription music apps.  [Y]ou can find virtually any song you want and the only

down side is that it may have a diffrent [sic] album cover and it may say the producer or dj once or twice in the song."  Other reviewers have put the matter more bluntly. According to one, the app has allowed him or her to download "AS MUCH MUSIC AS I WANT!"  According to another, "[h]onestly, this app has saved me hundreds of dollars, and is always up to date."

### *Spinrilla's Access To Sound Recordings*

55.    Spinrilla.com and the Spinrilla apps obtain sound recordings in part from users with "artist accounts."  A user can apply for an "artist account" by visiting http://spinrilla.com/apply, where the user is directed to provide his or her Twitter handle, a "Stage Name," and links to music.  Spinrilla claims to employ a "rigorous artist screening process" in vetting users who apply for an artist account.

56.    Once approved by Spinrilla, a user with an "artist account" can upload "mixtapes" (playlists comprised of various sound recordings) to Defendants' servers.  According to Spinrilla's website, "[u]ploading mixtapes doesn't cost a cent" and "[w]e don't charge and we never will."

57.    A playlist that has been uploaded by a Spinrilla "artist" is identified as being "hosted by" that artist.  For example, a track-listing page for the playlist entitled "Volume 274" by "Ljiggy" is identified as "Hosted by Ljiggy."  This means that the tracks were uploaded by a user with an artist account whose username is "Ljiggy":



58.     "Volume 274" by Ljiggy includes numerous sound recordings whose copyrights are owned or exclusively controlled by one or more Plaintiffs.  This playlist has been streamed or downloaded approximately 4,000 times.

59.     Not all of the music available through Spinrilla.com and the Spinrilla apps is uploaded by users with "artist accounts."  Indeed, a substantial amount of playlists are not identified as having been uploaded by an "artist" or "DJ."  For example, a track listing page for a playlist entitled "Luv Is Rage" by Lil Uzi Vert provides no information identifying the uploading user:



60.    Upon information and belief, some or all of the playlists that do not identify a specific "artist" or "DJ" were uploaded by Defendants.

61.    "Luv Is Rage" by Lil Uzi Vert is an album that was released on October 30, 2015 by Atlantic.  Atlantic owns or exclusively controls copyrights to "Luv Is Rage," all sixteen of the sound recordings contained on that album, and the cover artwork to that album—all of which Defendants unlawfully posted, or knowingly allowed to be posted, to Spinrilla.com and the Spinrilla apps for free and unlimited

on-demand streaming and download.  "Luv Is Rage" has been unlawfully streamed or downloaded from Spinrilla over two million times.

***Defendants' Willful Infringement of Plaintiffs' Copyrights***

62.     An overwhelming amount of the material available on Spinrilla.com and the Spinrilla apps consists of infringing copies of Plaintiffs' sound recordings.

63.     Plaintiffs have identified over 2,000 sound recordings, the copyrights to which are owned or exclusively controlled by Plaintiffs, that are available on Spinrilla.com and the Spinrilla apps.  These sound recordings include, for instance, the top fifteen tracks from the Billboard R&B and Hip Hop charts for the week of June 2, 2016.   A non-exhaustive, illustrative sampling of Plaintiffs' federally copyrighted sound recordings that Defendants have illegally reproduced, distributed and/or performed to their users is attached hereto as Exhibit A.  Plaintiffs have received Certificates of Copyright Registration from the Register of Copyrights for each of the copyrighted sound recordings listed in Exhibit A.  Plaintiffs intend to amend the Complaint at an appropriate time to provide an expanded list of works infringed by Defendants.

64.     All of these sound recordings can be freely downloaded and streamed on demand an unlimited number of times via Spinrilla.com and the Spinrilla apps. Furthermore, Defendants encourage Spinrilla's users to share "free" access to Plaintiffs' copyrighted sound recordings, by enabling users to post links to these

tracks on social media platforms like Facebook and Twitter, and by providing users with the ability to "embed" links to these tracks on other websites.

65.     Defendants designed Spinrilla.com and the Spinrilla apps to allow easy and open access to infringing material.  The keyword search feature, for example, allows a user to search for and easily find infringing content.  A user who wishes to access recordings by major-label recording artist Beyoncé simply needs to type "Beyonce" into the search bar.  Among the top results for this search is a playlist entitled "Best of Beyoncé."  This playlist is nothing more than a collection of Beyoncé's most popular tracks, including the hit singles "Single Ladies" and "Irreplaceable."  Nearly 100,000 users have downloaded Beyoncé songs for free through this Spinrilla page:



66.     The copyrights to all of these Beyoncé tracks are owned or exclusively controlled by Plaintiff Sony.

67.     The "Singles" section of the Spinrilla website and apps similarly allows users to easily and openly access infringing material.  For example, shortly after the release of the new single by major-label recording artist Chris Brown, "Keep You

In Mind (feat. Bryson Tiller)," the "Singles" section of Spinrilla.com prominently

featured a thumbnail and link to the track:



68.    The copyright to "Keep You In Mind (feat. Bryson Tiller)" by Chris

Brown is owned or exclusively controlled by Plaintiff Sony.

69.    The "Mixtapes" section of Spinrilla.com and the "Explore" sections of

the Spinrilla apps also allow users to easily find, download, and stream infringing

content.  For example, one of the most viewed "mixtapes" (which, again, are in fact

merely playlists of sound recordings) available through Spinrilla.com is the album

"By Any Means" by Kevin Gates.  This so-called "mixtape" has been streamed over

a million times, and downloaded over 800,000 times:



70.    Atlantic owns or exclusively controls the copyrights to "By Any

Means" by Kevin Gates, all sixteen of the sound recordings contained on that album,

and the cover artwork to that album—all of which has been unlawfully posted to the

Spinrilla website, for free and unlimited on-demand streaming and download by the public.

71.    Defendants have actual and constructive knowledge of the infringement of Plaintiffs' copyrights by Spinrilla users, including, without limitation, by means of Plaintiffs' repeated notices to Defendants concerning the infringing files on the Spinrilla website and apps.

72.    Defendants' actual knowledge of infringement by Spinrilla's users is in addition to Defendants' own, direct infringement of Plaintiffs' copyrights. Defendants have flagrantly advertised and promoted access to Plaintiffs' copyrighted sound recordings on Spinrilla.com, the Spinrilla apps, and Spinrilla's social media pages in order to draw users to the Spinrilla website and apps.

73.    Plaintiffs' copyrighted sound recordings are among the most popular and sought-after sound recordings in the world.  Accordingly, when Plaintiffs' sound recordings are uploaded to Spinrilla.com and the Spinrilla apps, they attract significant interest among the public.  That heightened interest means more views, downloads, and streams on Spinrilla's services.  It also means more user registrations and more subscriptions to Spinrilla "Pro Membership."  All of this translates directly into increased advertising and subscription revenue for the Defendants, which Defendants specifically intend.

74.    Plaintiffs have not been paid a dime—by Defendants, by Spinrilla's "artist" uploaders, or by any of Spinrilla's end users—for the unlawful reproduction, distribution, and performance of the thousands of Plaintiffs' copyrighted sound recordings identified in Exhibit A, nor have Plaintiffs granted permission to Defendants to use their copyrighted works in this manner.

## COUNT I – Direct Copyright Infringement

75.    Plaintiffs repeat, reallege, and fully incorporate by reference the allegations set forth in paragraphs 1 through 73 above.

76.    Defendants, without permission or consent of Plaintiffs, reproduce and distribute unauthorized reproductions of Plaintiffs' copyrighted sound recordings, and engage in unauthorized public performances of copyrighted sound recordings, including but not limited to those copyrighted sound recordings identified above and listed in Exhibit A hereto.   Such reproduction, distribution and performance constitute infringement of Plaintiffs' registered copyrights and the exclusive rights under copyright in violation of 17 U.S.C. § 106(1), (3) and (6).

77.    The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

78.    Defendants' acts of infringement are willful, intentional and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

79.   As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).  In the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages, including Defendants' profits from infringement, in amounts to be proven at trial.

80.   Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

81.   Defendants' conduct is causing, and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money.  Because Plaintiffs have no adequate remedy at law, Plaintiffs are entitled to a preliminary injunction and a permanent injunction pursuant to 17 U.S.C. § 502, prohibiting infringement of Plaintiffs' copyrights and exclusive rights under copyright.

## COUNT II – Secondary Copyright Infringement

82.   Plaintiffs repeat, reallege, and fully incorporate by reference the allegations set forth in paragraphs 1 through 80 above.

83.    The users of the Spinrilla website and its associated apps are engaged in repeated and pervasive infringement of Plaintiffs' exclusive rights to reproduce, distribute, and publicly perform their copyrighted recordings.

84.    Defendants are liable for inducing their users' infringement of Plaintiffs' copyrighted sound recordings.  Defendants operate the Spinrilla website and Spinrilla apps with the object of promoting its use to infringe Plaintiffs' copyrights.  Defendants advertise and promote free access to Plaintiffs' copyrighted recordings, inducing its users to unlawfully download and stream those recordings. Defendants further encourage its users to infringe Plaintiffs' copyrights by unlawfully sharing those copyrighted recordings on other websites.  Finally, Defendants knowingly and intentionally induce, entice, persuade, and cause its users to upload content to the Spinrilla website and apps that infringes Plaintiffs' copyrights, including but not limited to those sound recordings identified above and listed in Exhibit A hereto.

85.    Defendants have actual and constructive knowledge of the infringing activity of Spinrilla's users.  Defendants have knowingly caused and materially contributed to these unauthorized reproductions, distributions, and public performances of Plaintiffs' copyrighted sound recordings, including but not limited to those sound recordings identified above and listed in Exhibit A hereto.

86.    Defendants have the right and ability to supervise and control the infringing activities that occur through the use of their website.  Despite their actual and constructive knowledge of users' unlawful activity, and despite their ability to control that activity, Defendants have refused to take any meaningful action to prevent their users' widespread infringement of Plaintiffs' copyrights.  Furthermore, at all relevant times, Defendants have derived a direct financial benefit from their users' infringement of Plaintiffs' copyrights.  Defendants are therefore vicariously liable for the unauthorized reproduction, distribution, and public performance of Plaintiffs' copyrighted sound recordings, including but not limited to those sound recordings identified above and listed in Exhibit A hereto.

87.    The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

88.    Defendants' acts of infringement are willful, intentional and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

89.    As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).  In the alternative, at Plaintiffs' election pursuant

to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages, including Defendants' profits from infringement, in amounts to be proven at trial.

90.    Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

91.    Defendants' conduct is causing, and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money.  Because Plaintiffs have no adequate remedy at law, Plaintiffs are entitled to a preliminary injunction and a permanent injunction pursuant to 17 U.S.C. § 502, prohibiting infringement of Plaintiffs' copyrights and exclusive rights under copyright.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray that judgment be entered in their favor and against Defendants as follows:

(a)    for a declaration that Defendants, both directly and secondarily, willfully infringed and continue to infringe Plaintiffs' copyrights;

(b)    for statutory damages pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 per infringed work, arising from Defendants' violations of Plaintiffs' rights under the Copyright Act or, in the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs' actual damages, including Defendant's profits from infringement, in amounts to be proven at trial;

(c)      for a permanent injunction requiring that Defendants and their officers, agents, servants, employees, attorneys, and others in active concert or participation with each or any of them, cease infringing, or causing, enabling, facilitating, encouraging, promoting and inducing or participating in the infringement of, any of Plaintiffs' copyrights protected by the Copyright Act, whether now in existence or hereafter created;

(d)      for such other equitable relief under Titles 17 and 28 as is necessary to prevent or restrain infringement of Plaintiffs' copyrights;

(e)      for Plaintiffs' costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505 and otherwise;

(f)      for prejudgment and post-judgment interest; and

(g)      for such other relief as the Court may deem just and proper.

September 27, 2017

Respectfully submitted,

JENNER & BLOCK LLP

/s/ *Kenneth L. Doroshow*
KENNETH L. DOROSHOW
(*Admitted Pro Hac Vice*)
SCOTT B. WILKENS
(*Admitted Pro Hac Vice*)
PREVIN WARREN
(*Admitted Pro Hac Vice*)
1099 New York Ave., N.W. Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

AVA U. MCALPIN
(*Admitted Pro Hac Vice*)
919 Third Avenue
New York, NY 10022
Telephone: (212) 891-1600
Facsimile: (212) 891-1699

TROUTMAN SANDERS LLP
/s/ *James A. Lamberth*
JAMES A. LAMBERTH
james.lamberth@troutmansanders.com
Georgia Bar No. 431851
600 Peachtree Street, N.E.
Suite 5200, Bank of America Plaza
Atlanta, GA 30308-2216
Telephone: (404) 885-3362
Facsimile: (404) 962-6611

*Attorneys for Plaintiffs*