IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ATLANTIC RECORDING   :
CORPORATION, et al.,    :
            :
   Plaintiff,     :
            :
v.           :   CIVIL ACTION NO.
            :    1:17-cv-00431-AT
SPINRILLA, LLC, and JEFFERY :
DYLAN COPELAND,    :
            :
   Defendants.   :

## ORDER

   This is an all-out, knock-down, drag-out fight between the "800-pound Gorilla" of the recording industry in one corner of the room vs. "Spinrilla" the self-proclaimed "800-pound Gorilla of free hip-hop mixtapes" in the other corner. Plaintiffs, a collection of the largest record companies in the country, have sued the owner and operator of the music streaming website and app, "Spinrilla," for the alleged infringement of thousands of Plaintiffs' sound recordings. Plaintiffs, through the Recording Industry Association of America, Inc., undertook an investigation of the Spinrilla online music streaming/download service. Defendants accuse Plaintiffs of hiding the data resulting from this investigation, lying to the Court about its existence, and improperly asserting the work product privilege to prevent further disclosure of their misdeeds. As a sanction, Defendants

seek dismissal of Plaintiffs copyright infringement claims, or several alternative lesser sanctions.

Plaintiffs in turn accuse Defendants of withholding tens of thousands of documents responsive to Plaintiffs' discovery requests and seek to compel an order from the Court requiring Defendants to comply with their discovery obligations.

In the midst of this mudslinging, Defendants also filed a motion for summary judgment, asserting Plaintiffs lack any evidence that Defendants engaged in copying of Plaintiffs' sound recordings.   Finally, Plaintiffs seek leave to amend their Complaint to include an additional 2,000 songs in their list of the alleged infringed sound recordings made available for streaming and/or download on Spinrilla.

## I.      Defendants' Motion for Sanctions [Doc. 100][1]

Defendants' Motion for Sanctions centers on Plaintiffs' failure to disclose earlier in discovery the existence of and produce spreadsheets containing the results of Plaintiffs' detailed investigation into Spinrilla's alleged infringement of songs for which Plaintiffs claim to own valid copyrights.  Defendants assert that Plaintiffs lied to this Court about the extent of their access to information on the Spinrilla website.  This lie, Defendants' contend, was manufactured to convince this Court to provide Plaintiffs with complete unfettered access to Spinrilla's internal database and program source code, and to allow them to add thousands

---

[1] The Court **GRANTS** Plaintiffs' Motion for Leave to File Surreply in Opposition to Defendants' Motion for Sanctions [Doc. 146].

of additional allegedly infringed sound recordings to their Complaint.  And the effect of this lie, according to Defendants' motion, has been to completely derail discovery and ultimately this litigation.

Plaintiffs in response admit that "it was an overstatement to analogize their investigative capacities to those of an ordinary user, to whom automated evidence collection processes may not be available."  (Resp., Doc. 130.)  But Plaintiffs contend that Defendants' motion greatly exaggerates the issue.

Defendants seek as a sanction the dismissal of Plaintiffs' Complaint. Alternatively, Defendants request that Plaintiffs not be allowed to (1) further add to the list of sound recordings they claim have been infringed, or (2) offer Mr. Linares's testimony or use any information from their investigation at trial.

### A. Background

<u>The RIAA Investigation</u>

Prior to filing this lawsuit, Plaintiffs hired the Recording Industry Association of America, Inc. (RIAA) to conduct an investigation into online infringement of the Plaintiffs' copyrighted sound recordings on Spinrilla. (*See generally*, Declaration of Carlos Linares, Doc. 42-3.) Plaintiffs rely on the findings of this investigation in support of a Motion for Partial Summary Judgment previously filed on July 28, 2017.  Carlos Linares, Vice President, Anti-Piracy Legal Affairs for the RIAA, began the investigation into Spinrilla, referred to as the "Repeat Infringer Study," in the spring of 2016.  (Linares Decl. ¶ 5.)  Linares and his team identified hundreds of sound recordings, uploaded by "DJs" on

"mixtapes," that were identical or near identical copies of Plaintiffs' copyrighted sound recordings.  (*Id.* ¶¶ 12-15.)

The Parties' Discovery Disputes

In August 2017, late in the discovery period, the parties raised multiple contentious discovery disputes.  Plaintiffs sought a broad swath of information, including complete access to the Spinrilla computer program and database, an executable copy of the computer program source code, as well as access to the universe of sound recordings available on the Spinrilla service.  Defendants obviously opposed these requests.

The Court held a lengthy hearing on August 16, 2017 to address the parties' disputes.  At the hearing, Plaintiffs' counsel represented that while they were waiting for Defendants to produce the logs and databases that would indicate the various sound recordings accessible on Spinrilla, Plaintiffs had been engaging in a sort of "manual hunting trying to find more infringements."  (August 18, 2017 Tr., Doc. 52 at 8.)  Through their own search methods, Plaintiffs indicated they had located thousands of infringing sound recordings.

The Court issued an Order on August 28, 2017, limiting much of the discovery sought by Plaintiffs, but requiring Defendants to:

> (1) provide Spinrilla user data reports showing the downloading and/or streaming of copyrighted content on the Spinrilla site, including any data analytics maintained by Defendants by user, produce any monthly and annual data reports that exist or may be produced based on existing software capacity that provide information on the number of customer downloads of identifiably copyrighted material – specifically the songs identified by Plaintiffs in their Complaint, and

to produce a report on the total number of song downloads (to the extent the information was retained by and was available to Defendants);

(2)     produce "reports showing the activity between Audible Magic and Spinrilla" that will go to the efficacy of Defendants' "implementation of Audible Magic" to block infringing content from being uploaded onto the Spinrilla site, along with any other reports and other documents that exist that Defendants contend show how the Spinrilla system works or that replace the need for the source code;

(3)     produce, as agreed, the text version of the source code as it relates to the implementation of Audible Magic; and

(4)     identify what other reports Defendants routinely create or produce that reflect statistical reporting on upload or download activity by song, user, or DJ to describe the information available on such reports, and to to search for and produce such reports.

(*See* August 28, 2017 Order, Doc. 58.)  The Court granted Plaintiffs leave to depose Dylan Copeland, the owner/operator/programmer of Spinrilla, regarding Spinrilla's software operations in connection with the detection, blocking, and reporting of copyrighted material and the implementation of Spinrilla's software interface with Audible Magic.  It additionally directed Defendant Copeland to be prepared to provide deposition testimony regarding the statistical reports ordered, or other efforts undertaken by Defendants to retain or track this type of information.

Less than a month later, the parties were back before the Court again.  The Court held another hearing on September 19, 2017, where Plaintiffs were again requesting access to the Spinrilla source code and the database of sound recordings on the Spinrilla site. Plaintiffs, however, failed to take the deposition of Mr. Copeland as allowed by the Court as a substitute for the full access to the source code and database.

In persisting in their request for access to the Spinrilla database to determine the extent of alleged infringement, Plaintiff's counsel engaged in the following exchange with the Court:

> MR. DOROSHOW: Your Honor, the simple solution to this problem is if we have the database, the database would have the universe of sound recordings. Once we have the database, we will know what is on the system.
>
> THE COURT: Well, what do you say to [Defense Counsel] saying you already have access to the database because you have the sign-in?
>
> MR. DOROSHOW: We have as much access to the database as Your Honor would have to YouTube. For you to know exactly what is on YouTube, you would have to sit in front of a computer and enter search queries at random to try to find out what is on there. That is the problem . . . The only entity who knows what is on the system here is Spinrilla. We have found what we found through the process of reviewing the website as best we can from the outside looking in. But that is not a fair substitute for the actual data that will tell us what is on the website.

(September 19, 2017 Tr., Doc. 87 at 52.)  According to their counsel, Plaintiffs were able to find an additional 2,000 infringing sound recordings "on [their] own in the blind."  (September 19, 2017 Transcript, Doc. 87 at 10.)

The Court declined to order Defendants to open up the entire internal database to Plaintiffs, but ordered Defendants' counsel to determine what information, in addition to a list of the titles of all sound recordings available on Spirilla, Defendants could provide to Plaintiffs.[2]   (September 19, 2017 Transcript,

---

[2] Plaintiffs indicated they were " happy to take this in steps, Your Honor, and work with the names -- track name, title name -- track name, artist, length, the metadata. Not the file itself. He doesn't have to produce 1.1 million MP3 files to us. But the metadata for what is on the system, which is the track, the title, the artist name, the album name if it is available, the track length. The things that would indicate what the track purports to be.  And then we could go through that list. And if we identify works that are owned by our clients, we could then say, okay, we want the MP3 files for these to confirm that they are what they purport to be. That would be a reasonable process." (September 19, 2017 Transcript, Doc. 87 at 59.)

Doc. 87 at 60-62.)  The Court also ordered Plaintiffs to proceed with the deposition of Mr. Copeland in an effort to gain the information Defendants had been unable to provide in the form of reports and other documentation (because they claimed that such documentation was not reproducible).  (September 19, 2017 Transcript, Doc. 87 at 40, 55.)

At the time the Complaint was filed, Plaintiffs included a list of 210 infringing recordings, but indicated they intended to supplement and anticipated the number to rise to nearly 12,000 recordings.  In the meantime, Plaintiffs had moved to amend their Complaint to add an additional 2,000 sound recordings as being subject to claims of infringement by Defendants.  In response to Plaintiffs' stated plans at the hearing to continually increase the number of alleged infringing sound recordings at issue in the litigation, Defendants requested that the Court set a deadline for Plaintiffs to amend their Complaint to finalize the number.  The Court allowed the amendment to include the additional 2,000 songs identified in the proposed amendment.  The Court indicated that there needed to be a deadline for further amendments by Plaintiffs to include additional sound recordings, but declined to set such a deadline until there was more information from Defendants about the universe of sound recordings available on Spinrilla.

The Deposition of Carlos Linares

Three days after the hearing on September 22, 2017, Defendants took the deposition of Carlos Linares who led the Plaintiffs' investigation into Spinrilla.  Mr. Linares admitted, contrary to Plaintiffs' counsels' representations in Court, that

since September 2016 RIAA had been using automated computer processes to collect as much data as possible from Spinrilla.  (Deposition of Carlos Linares, Doc. 102-5 at 79-80 (testifying that RIAA obtained data on the sound recordings on Spinrilla using an automated process and that "technology was applied to obtain that data").  More specifically, Mr. Linares testified that RIAA used an automated process to obtain and compile information from Spinrilla on three occasions.  First, in September 2016, RIAA used an automated process to collect as much data from Spinrilla concerning the mixtapes available on the site at that time.  (*Id.* at 75, 79, 81, 85-89, 97-98, 99-100.)   Second, in October 2016, RIAA used another automated process to collect data concerning only those individual tracks (collected from the mixtapes in September 2016) based on artist and title identified in each file name to compare to a set of Plaintiffs' copyrighted sound recordings.  (*Id.* at 98-100, 183, 228.)  Third, in July, 2017 RIAA collected additional data for sound recordings credited to certain DJs whom RIAA had identified as repeat infringers.  (*Id.* at 117-118.)

The data obtained by RIAA included the name of a given mixtape, the identity of a DJ credited with uploading that mixtape, stream counts for that item, download counts for that item, the tracks included on that mixtape, track lengths, and downloaded MP3 audio files.  (*Id.* at 79, 86, 88, 100, 120.)  Mr. Linares testified that this information was compiled into multiple spreadsheets and given to Plaintiffs' counsel.  (*Id.* at 59-60, 88-107, 119-20, 206.)  When asked by Defendants during the deposition whether these spreadsheets had been produced, Plaintiffs

claimed they had not because they contained protected work product. (*Id.* at 152.) Plaintiffs' counsel also made several objections to and instructed Mr. Linares not to offer certain testimony about the repeat infringer study on the grounds that Defendants' questions "touched on" or called for information subject to privilege and work product protection. (Linares Dep. at 103, 105, 165.)

Nevertheless, Plaintiffs agreed to produce the spreadsheets during the Linares deposition for the purpose of "moving forward" and "giving Defendants the information they wanted," subject to an agreement that by providing the documents the RIAA and Plaintiffs had not waived the work product privilege with respect to other documents. (*Id.* at 214-15.) Plaintiffs' counsel still maintained the spreadsheets constituted work product but were willing to provide them in the spirit of cooperation. (*Id.*) Plaintiffs produced three spreadsheets, one each for the data obtained in September 2016, October 2016, and July 2017. (*Id.* at 215.) According to Defendants, the spreadsheets had been redacted, i.e. only certain columns within the spreadsheet were shown while other columns appeared to be hidden/missing from view.

At the time Defendants filed their Motion for Sanctions on October 3, 2017, Plaintiffs had refused Defendants' request for a privilege log for information redacted from the spreadsheets. As noted during the September 19, 2017 hearing

before the Court, the parties had previously agreed not to undergo the burden and expense of creating and producing privilege logs.[3]

Defendants filed a Supplemental Brief in Support of their Motion for Sanctions on October 11, 2017.  (Supp. Br., Doc. 114.)  According to Defendants, after they filed their Motion for Sanctions, Plaintiffs (Sony, Warner, and UMG) served additional interrogatory responses containing data from the RIAA spreadsheets.[4]  (*Id.* at 2; *see also* Pls.' October 4, 2017 Certificate of Service of Discovery, Doc. 104.)  The data produced on October 4th in response to Defendants' Second Interrogatories included URLs for the 210 sound recordings identified in Plaintiffs' original Complaint and the 2,100 additional sound recordings identified in Plaintiffs' October 2, 2017 Amended Complaint.  According to Plaintiffs, the October 4th spreadsheet is the "RIAA's working master spreadsheet." (Pls.' Resp., Doc. 130 at 19.)

On October 23, 2017, Plaintiffs produced a privilege log identifying a total of 68 spreadsheets (65 in addition to the 3 spreadsheets that were produced during Mr. Linares's deposition) that had been withheld (in full or in part) from discovery.[5]  (*See* Ex. A to Reply, Doc. 132-1.)  According to Plaintiffs, the additional 65 spreadsheets referenced on the Privilege Log are protected work product.

---

[3] Defendants do not dispute this representation by Plaintiffs (made both at the hearing and in their Response brief).

[4] Defendants imply that this information was not timely produced and was served as a supplemental response to interrogatories.  Plaintiffs state that spreadsheet produced on October 4, 2017, was produced in response to Defendants' Second Interrogatories served on August 25, 2017, and therefore was timely produced.  (Pls.' Resp., Doc. 130 at 25.)

[5] Defendants asserted in their Reply that the Privilege Log identifies 65 additional spreadsheets of information on Spinrilla dating back to 2015.  (See Ex. A to Reply, Doc. 132-1.)  However,

Defendants filed their Motion for Sanctions under Federal Rule of Civil Procedure 37, seeking dismissal of Plaintiffs' claims as a result of: (1) Plaintiffs' "lies" to the Court about the extent and level of access Plaintiffs had to Spinrilla; (2) Plaintiffs' failure to timely produce the spreadsheets containing the results of their sweeping investigation; and (3) Plaintiffs' bad faith failure to comply with their discovery obligations and in asserting the work product protection over documents relied on by the RIAA investigators on whose testimony Plaintiffs offer in support of a motion for summary judgment.

### B. Standard

Federal Rule of Civil Procedure 37(b) authorizes the Court to sanction a party who fails to obey a court order to provide discovery. *See* Fed. R. Civ. P. 37(b)(2)(A)(i)&(ii). District courts have broad discretion to fashion appropriate sanctions for violations of discovery orders. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1048 (11th Cir. 1994). "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 2, 44-45 (1991).

However, dismissal is the most severe sanction and is appropriate only as a last resort where lesser sanctions will not suffice. *Flurry v. Daimler Chrysler*

---

Jeremy Landis, who was deposed two days after Defendants filed their Reply, testified that the 2015 date on the second entry of the Privilege Log was an error, and should have been 2016. (Deposition of Jeremy Landis at 85-88.)

*Corp.*, 427 F.3d 939, 944 (11th Cir. 2005); *Navarro v. Cohan*, 856 F.2d 141, 142 (11th Cir. 1988) (affirming dismissal after plaintiff failed to appear for his deposition where the district court "restrained from ordering dismissal until after other lesser sanctions had failed," including admonishment and imposition of monetary fine). Dismissal as a sanction "requires a willful or bad faith failure to obey a discovery order." *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993). A party demonstrates bad faith by "delaying or disrupting the litigation or hampering enforcement of a court order." *Eagle Hospital Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009); *Byrne v. Nezhat*, 261 F.3d 1075, 1121 (11th Cir. 2001). Under *Malautea*, there must be a predicate discovery order that is "definite enough to support" dismissal under Rule 37. 987 F.2d at 1543.

A court may also "impose sanctions for litigation misconduct under its inherent power." *Eagle Hospital Physicians,* 561 F.3d at 1306. This power "derives from the court's need to manage its own affairs so as to achieve the orderly . . . disposition" of a case, but must be "exercised with restraint and discretion." *Id.* (internal punctuation and citations omitted). "The key to unlocking a court's inherent power is a finding of bad faith." *Id.*; *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir.1998). Two common fact patterns reappear in cases involving findings of bad faith: willful misconduct that corrupts the adversary process or repeated failures to obey the court's discovery orders.

For example, in *Eagle Hospital*, the Eleventh Circuit held that a district court appropriately entered a default judgment in favor of the plaintiff and struck the defendant's answer and counterclaims after finding that a defendant had been "secretly monitoring [the plaintiff's] confidential e-mail communications." *Id.* at 1301. Although the defendant had not violated any court order in particular, the harsh sanction of a default judgment was necessary because permitting the case to continue would be "an open invitation to others to abuse the judicial process" and because it would be "untenable for [the plaintiff] to continue litigating against the" defendant after its confidential communications had been intercepted. *Id.* at 1306-07; *see also In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006) (describing federal courts' inherent power to impose sanctions and upholding bankruptcy court's use of inherent power to enter default against Bank of New York over objection that it was not properly notified of consequences of its actions; bank had failed to comply with multiple court orders over the span of eighteen months in an attempt to block discovery into whether or not it complied with its fiduciary obligations to provide an accounting of debtor's funds and pay interest on those funds).

In *Malautea*, the Eleventh Circuit upheld the district court's sanction of striking the defendants' answers and entering default judgment against them on the issue of liability as a result of the defendants' "grave and repeated abuses of the discovery process," including their deliberate withholding discoverable information the court had ordered them to produce. 987 F.2d at 1538. The case

arose out of a traffic accident in which the plaintiff's husband sustained serious head and spinal cord injuries when his vehicle rolled over during a collision. Suzuki conducted testing on the vehicle prior to its release, which plaintiffs sought in discovery. *Id.* at 1539. After the plaintiffs moved to compel the tests and other documents related to the vehicle's design, the district court ordered the defendants to produce all discovery pertaining to rollover accidents, seat-belt failures, design and testing materials, and materials relating to marketing for the vehicle. *Id.* The defendants, however, delayed in producing the information despite repeated and multiple warnings by the court, and improperly refused to answer interrogatories, and arbitrarily limiting their responses in order to avoid revealing a great deal of discoverable information regarding testing and changes in the design of the vehicle. *Id.* Even when warned by the Court of the prospect of sanctions hearing, the defendants failed to produce much of the information they twice had been ordered to produce. *Id.*

The district court concluded that the defendants had delayed producing documents and had given misleading answers to interrogatories and requests to produce, "using a number of techniques to obfuscate the truth" and that "no sanction [would] change this aspect of the Defendants' conduct." *Id.* at 1540. As the prime example of the defendants' resistance to discovery, the district court cited their deliberate cover up of damaging evidence regarding General Motors' refusal to market the vehicle in the United States. In response to the plaintiff's specific requests for the information, the defendants responded that they were

unaware of any such decision by General Motors. *Id.* The plaintiffs ultimately obtained documents from General Motors (under court order) showing that after defendants suggested that General Motors market the vehicle in the U.S., General Motors performed tests on the vehicle, which led General Motors to decline to market the vehicle because of "perceived rollover tendencies." *Id.* at 1541. The district court found that the defendants' responses which disclaimed knowledge of, and even the existence of, General Motors' decision not to market the Samurai were, "if not completely false, at least misleading." The order imposed the sanction of default judgment because the defendants' "actions, as a whole, reveal[ed] a bad faith decision to avoid revealing the truth at all costs [and] because no other sanction will deter the Defendants, and similarly situated parties, from repeating this egregious conduct." *Id.*

The Eleventh Circuit affirmed, stating the "defendants richly deserved the sanction of a default judgment," because the court's discovery orders "clearly encompassed the General Motors information and were definite enough to support Rule 37 sanctions," yet the defendants failed to offer any credible explanation for their failure to comply. *Id.* at 1543. The Eleventh Circuit further determined that the sanction for the defendant's willful violations of the court's clear discovery orders was just because the "defendants received ample notice of the possibility of a default judgment sanction and liberal opportunity to show why the sanction was not deserved [but] failed to demonstrate any injustice in the default judgment

sanction due to lack of adequate notice or opportunity to show a legitimate excuse for failing to comply with the court's orders." *Id.* at 1543-44.

## C. Discussion

Defendants' motion is in a slightly odd posture from the typical motion for sanctions. The impetus behind Defendants' motion is the alleged "lie" told by Plaintiffs' counsel to justify Plaintiffs' discovery requests. But the uncovering of this "lie" led to the uncovering of Plaintiffs' alleged attempts to "hide" the existence of their own evidence from discovery by Defendants.

As Plaintiffs aptly summarize in their Response, Defendants' Motion for Sanctions boils down to two contentions. First, Defendants assert that Plaintiffs' repeated representations to this Court that they do not have access to the databases, reports, server logs and other information from the Spinrilla service to which Defendants have access, and that Plaintiffs "can only see what we can see from the outside looking in," were revealed to be a lie. Second, Defendants claim that Plaintiffs should have handed over, at an earlier point than they did, the four spreadsheets of data about Spinrilla that were created by RIAA as part of the repeat infringer study. Specifically, Defendants contend that: (1) the spreadsheets were allegedly "hidden" under the guise of a "bad faith" assertion of work product protection; (2) the spreadsheets allegedly belie Plaintiffs' claim that they need Defendants' database and server log data to fully substantiate their claims; and (3) the spreadsheets allegedly reveal that various discovery responses by Plaintiffs were misleading.

The court must address in turn whether: (1) Defendants' discovery requests covered the late-produced spreadsheets; (2) whether Plaintiffs violated a discovery order so that a dismissal sanction (or some lesser sanction) could be ordered under Rule 37; (3) whether or not Defendants have made the showing of bad faith necessary to invoke the Court's inherent powers to sanction Plaintiffs' alleged misconduct; and (4) if dismissal is not appropriate, whether other lesser sanctions are warranted under the circumstances.

### 1.   Did Defendants' Discovery Requests Encompass the Data Contained in the Spreadsheets?

According to Defendants, the spreadsheets compiled by RIAA were directly responsive to several of Defendants' discovery responses[6], including: (1) a document subpoena to RIAA; (2) Defendants' Requests for Production of Documents; and (3) Defendants' Interrogatories.[7]

On September 7, 2017, Defendants served a Subpoena for documents on RIAA, commanding the production of the requested documents by September 19,

---

[6] Defendants also complain about Plaintiffs' Responses to Defendants' Requests for Admission as exhibiting a pattern of deceit by Plaintiffs in hiding the extent of their knowledge of the contents of the Spinrilla database.  However, the select Requests for Admission discussed by Defendants ask for Plaintiffs to "Admit that Spinrilla hosts hundreds of thousands of sound recordings which [Plaintiffs] do not own or exclusively control" and to "Admit that Spinrilla hosts millions of sound recordings." (Mot., Doc. 100 at 20-21.)  Plaintiffs responded to these requests by stating that they were unable to admit or deny the request based on Defendants' failure to identify in the course of discovery the number and nature of sound recordings hosted on Spinrilla.  (Ex. H to Mot., Doc. 101-7.)  The Court does not agree with Defendants' characterization of these responses as deceitful.

[7] Defendants do not identify these Interrogatories specifically.  Instead, Defendants contend that in response to 13 of the initial 20 Interrogatories from Spinrilla, Plaintiffs provided limited information and stated that the requested information "is known to Defendants and not known to" Plaintiffs. (Mot., Doc. 100 at 18.)  It is not the Court's duty to scour the discovery record in search of information necessary to support a party's sanctions motion.

2017, four days in advance of Mr. Linares's scheduled deposition. (Doc. 67.) Request No. 5 of Defendants' Document Subpoena to RIAA requested "All documents created as part of the Repeat Infringer Study discussed in the Linares Declaration." (*Id.* at 11.) Plaintiffs' counsel, on behalf of RIAA, responded to the subpoena, stating

> RIAA objects to Request No. 5 insofar as it calls for the production of documents protected by the attorney-client privilege, the work product doctrine, and other applicable privileges or doctrines. In particular, documents created as part of the Repeat Infringer Study include (1) confidential communications containing legal advice pertaining to this litigation and (2) strategies and legal impressions of RIAA's attorneys and Plaintiffs' attorneys related to this litigation.
>
> Moreover, Plaintiffs object to Request No.4 because it calls for the disclosure of materials covered by Rule 26(b)(3) of the Federal Rules of Civil Procedure, which protects against the disclosure of documents created by a party's agent or representative in anticipation of litigation or for trial. See Fed. R. Civ. P. 26(b)(3).
>
> To the extent that this Request seeks non-privileged documents that are relevant to the claims and defenses at issue in this lawsuit, and without waiver of and subject to the objections stated above, RIAA responds that it has already produced all responsive documents currently within its possession, custody, or control.

(Ex. D to Mot., Doc. 101-4 at 8-9.) Defendants assert that since Plaintiffs had not produced (or identified as existing) the Excel spreadsheets, the response that all responsive documents had already been produced "was a lie." (Mot., Doc. 100 at 11-12.)

Defendants' Requests for Production of Documents sought the following information from Plaintiffs:

**REQUEST NO. 36:**
All documents that support or contradict Your contention that Defendants' alleged actions have resulted in "Plaintiffs' copyrighted sound recordings being downloaded and/or streamed by the public millions of times, without Plaintiffs' permission and without payment of any compensation whatsoever to Plaintiffs." (Complaint, ¶ 2).

**REQUEST NO. 37:**
All documents that support Your contention that the "amount of content uploaded to the Spinrilla website and apps consists of popular sound recordings whose copyrights are owned by Plaintiffs" is "substantial." (Complaint, ¶ 3).

(Ex. E to Mot., Doc. 101-5 at 35-36.)  On July 31, 2017, Plaintiffs responded to these requests as follows:

**RESPONSE:**
Plaintiffs object to this Request insofar as a large number of the documents requested are in the possession and control of Defendants, not Plaintiffs. Plaintiffs further object to the extent that producing all documents supporting or contradicting the contention in this Request will lead to the disclosure of (1) confidential communications containing legal advice pertaining to this litigation and (2) Plaintiffs' attorneys' strategies and legal impressions in the context of this litigation. Without waiver of and subject to their Objections to Definitions and their Objection to this Request, and upon entry of an appropriate protective order, Plaintiffs will produce responsive, non-privileged documents, dated from January 1, 2012 through February 3, 2017, that have been located after a reasonable search, with the exception of documents that they obtain solely by virtue of Defendants' disclosures through discovery.

(*Id.*)  Defendants assert that because Plaintiff had greater access to the Spinrilla database than they were letting on, these responses were "obviously lies."  (Mot., Doc. 100 at 17-18.)

Plaintiffs do not dispute that the spreadsheets were fairly encompassed by and are responsive to the RIAA Document Subpoena or Defendants' Requests for

Production of Documents.  Rather, Plaintiffs contend that the spreadsheets are "classic, core Rule 26 work product, prepared in direct anticipation of, and as part of, the prosecution of this litigation," and that they were not required to produce the spreadsheets in response to Defendants' discovery requests.  Plaintiffs also contend they were not required to identify the existence of the spreadsheets in responding to Defendants' requests because the parties agreed not to prepare privilege logs.  Finally, Plaintiffs assert that Defendants have not been prejudiced because Plaintiffs produced (before the close of discovery) the spreadsheets containing the actual data obtained by the RIAA investigators from Spinrilla, as opposed to other spreadsheets which contain various analyses of the data.

### 2.    Did Plaintiffs Violate a Court Discovery Order?

Defendants have not shown that Plaintiffs violated a discovery order so that sanctions under Rule 37 are appropriate.  *Malautea*, 987 F.2d at 1542 (bad faith violation of predicate discovery order necessary to impose ultimate sanction of dismissal under Rule 37).  Defendants contend this Court's Scheduling Order should be considered a discovery order for purposes of imposing dismissal under Rule 37(b)(2) as a sanction for failing to obey a discovery order.  Defendants assert that "[b]y approving the parties' Joint Preliminary Report,[8] Plaintiffs were under

---

[8] Defendants note that in their Joint Preliminary Planning Report, the parties agreed "to include with service of their initial disclosures all documents identified in their respective disclosures if such documents are reasonably accessible to that party at that time its disclosures are served," and that Plaintiffs' Attachment C to their Initial Disclosures, provided, "[a]t this time, Plaintiffs identify the following relevant categories of documents, which may be obtained through counsel for Plaintiffs: B. Documents evidencing Defendants' and their users' infringement of Plaintiffs' copyright sound recordings and Defendants' knowledge thereof." (Doc. 25 at 10; Pls.' Initial Disclosures.)

an order to produce documents relating to the alleged infringement and which were "reasonably accessible" to Plaintiffs." (Defs.' Supp. Br., Doc. 114 at 10-11.) This argument falls short. The Scheduling Order merely adopts the vague representations by the parties in their Joint Preliminary Report and Discovery Plan and addresses only in the most general of terms, the scope of discovery. It did not directly or clearly address the parties' obligations to produce the specific documents at issue in Defendants' sanctions motion. *Cf. Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d at 1542–43 (affirming sanction of default judgment, and finding that "[t]he discovery orders of July 24, July 26, and August 30 clearly encompassed the General Motors information and were definite enough to support Rule 37 sanctions. The plaintiff specifically requested the General Motors information pertaining to testing, design, and marketing of the Samurai and similar vehicles. In Judge Edenfield's orders, he expressly referred to these materials. Therefore, the judge's orders undoubtedly compelled the defendants to provide the General Motors information"). Defendants have offered no authority to support a reliance on the Scheduling Order to justify dismissal of Plaintiffs' claims Rule 37(b)(2).[9]

---

[9] Because Defendants' motion focuses on Rule 37 as the basis for sanctions, the Court declines to view this motion under the prism of Rule 11.

### 3.    Have Defendants Shown Bad Faith?

The Court finds that Defendants demonstrated bad faith on the part of Plaintiffs but not the severe level of bad faith required as a predicate for the imposition of the dismissal sanction requested by Defendants.

Plaintiffs' clear misrepresentations to the Court during the August and September 2017 discovery hearings are extremely troubling.

At the outset of the August 16, 2017 discovery hearing, Plaintiffs told this Court that without Defendants' production of "logs and databases that would indicate all the various sound recordings that have been on the [Spinrilla] system. [Plaintiffs] have been through some sort of hunting for -- almost *a manual hunting* trying to find more infringements." (August 16, 2017 Tr., Doc. 52 at 8) (emphasis added).  Although Plaintiffs admitted to having identified roughly 2,000 allegedly infringing sound recordings, Plaintiffs explained at the September hearing "[t]his is what we were able to find just *on our own kind of in the blind*, as it were." (September 19, 2017 Tr., Doc. 87 at 9-10) (emphasis added).  In direct response to the Court's question about Plaintiffs' level of access to the Spinrilla database, Plaintiffs stated "[w]e have as much access to the database as Your Honor would have to YouTube. For you to know exactly what is on YouTube, you would have to sit in front of a computer and enter search queries at random to try to find out what is on there. That is the problem." (*Id.* at 52.)

But these representations were not accurate, as Carlos Linares testified that RIAA employed a technology assisted automated process to download data from Spinrilla. (Linares Dep. at 79-80, 82, 85, 121.)

And Plaintiffs falsely implied that only Defendants had access to statistical data concerning the sound recordings in terms of the number of streams and downloads of critical importance to making out the Plaintiffs' case. As Defendants point out in their motion, Plaintiffs repeatedly claimed at the August 16, 2017 discovery hearing that they were significantly handicapped because Defendants had not provided this statistical information in response to their discovery requests for Spinrilla's "databases, reports and server logs." When asked by the Court during the August hearing why they needed server logs, Plaintiffs stated:

> If you look at the Spinrilla website, you'll see -- for the various sound recordings that are on there, you'll see view counts, streams -- the number of times it has been streamed or downloaded. That is all based on the server logs. Now, the server log data is extremely important for us to be able to [detect] infringement, which we need to do to be able to rely on our secondary infringement theories, contributory infringement, vicarious infringement, and inducement. We need to be able to show -- you know, each time that a person, a user, requested that a song be downloaded, be streamed, that is all reflected in the server logs. And although the defendants have said, okay, we don't preserve our server logs more than 30 days -- and they have said that in the joint statement that was submitted to the Court -- we have written them and said they should certainly begin to preserve that information because they have an obligation to do so. . . . In terms of importance, I would say the server log data is -- source code may be the most important. Server log data, I would put it right after that.

(August 16, 2017 Tr., Doc. 52 at 39-41.)  Subsequently, at the September discovery hearing, Plaintiffs again raised the issue of the stream and download counts and the server logs:

> MR. DOROSHOW: Now, the defendants have told us that they don't have server logs; that they didn't retain them for more than 30 days. But there is still the question of -- and I believe Your Honor's order directs the production of this -- databases and related reports that would indicate the sound recordings that are on the system and the, I guess for lack of a better way to say it, statistical information.
>
> THE COURT: The statistical information and reports. Not the databases themselves.
>
> MR. DOROSHOW: Yes. That is right. What we're looking for -- well, the database is important inasmuch as –
>
> THE COURT: I know you want it. I just didn't order it.
>
> MR. DOROSHOW: Right. No. I understand. But documents sufficient to show the sound recordings that are on the system so that we can know what else is out there. Because no one knows better than they do what is on the system. We can only see what we can see from the outside looking in.  So that is a broader category, something that is still in dispute, the statistical data concerning those sound recordings in terms of the number of streams, the number of downloads, and so forth.

(September 19, 2017 Tr., Doc. 87 at 10-11.)

In all of this discussion with the Court, however, Plaintiffs never directly or expressly acknowledged having detailed information on the stream and download counts for thousands of songs for which Plaintiffs were claiming infringement.  But three days later, in the deposition of Carlos Linares, Defendants discovered that during its investigation the RIAA team had obtained download and stream counts

for mixtapes and tracks directly from Spinrilla and included the information in spreadsheets provided to Plaintiffs' counsel.  (Linares Dep. at 78-82.)

Defendants asked Mr. Linares about the statement in the declaration he gave in support of Plaintiffs' Motion for Partial Summary Judgment that he was concerned about certain DJs who were,

> responsible for uploading some of the most streamed and downloaded 'mixtapes' on Spinrilla, according to charts published on the service. For example, as of August 10, 2016, five of the ten most popular mixtapes on Spinrilla were uploaded by DJ Miles, DJ Dirty Dollarz, and DJ Fiestaboii [and his] research has revealed that the 'mixtapes' of DJ Dirty Dollarz, DJ Miles, DJ 837, and DJ Trey Cash generated higher cumulative download and stream counts than 99% of those credited to all other 'mixtape artists' and 'mixtape hosts' on Spinrilla.

(Linares Decl. ¶ 14; Linares Dep. at 75.)   Defendants asked Mr. Linares what information he relied upon to conclude that these DJs were responsible for uploading some of the most streamed and downloaded mixtapes.  (Linares Dep. at 75.)  Mr. Linares reluctantly responded over Plaintiffs' counsel's objection:

> A. My team analyzed data from the Spinrilla service offering insight into the number of mixtapes that were credited to certain DJs and the number of times cumulatively that those mixtapes have been streamed or downloaded. When comparing the number of total streams and downloads from those mixtapes against those of the other DJs on the service, the DJs referenced were amongst those whose mixtapes had been streamed and downloaded the most.

> Q. Did you reach any -- so were there calculations to this or was this more of an estimate?

> MR. DOROSHOW: Objection to form.

> A. As I -- as I just explained, we added the numbers.

Q. Oh, you did, okay. Sorry, I missed that part. So are those numbers that you added, are those numbers in your declaration?· Do you recall putting them in the declaration?

A. No.

Q. Do you -- does the RIAA still have those numbers?

A. I have possession of those numbers, yes.

Q. How did you get the numbers?

A. As I just explained, we reviewed Spinrilla and the mixtapes made available on Spinrilla, and with the information we had to work with, totaled the number of mixtapes credited to each DJ and then added the download and stream counts for those collections of mixtapes and then placed them in order to determine which DJ's mixtapes were among those most downloaded and streamed. . . .

Q. Are there names for those documents?

A.  I don't –

MR. DOROSHOW:· Objection to form.

A.      They're documents in my possession that have file names. I can't tell you what their file names are, no.

Q. How are they referred to?

A.  I don't recall. . .

Q. Well, this was a study of the quantity of downloads and the quantity of streams. Right?

MR. DOROSHOW:· Objection to form.

A. The study that you're asking me about, again, refers to the number of downloads and streams credited to the mixtapes of these DJs when we calculated them and placed them in order.

(Linares Dep. at 75-78; 88) (confirming that the facts he relied on in support of his declaration were the data collected from the Spinrilla service contained in an excel spreadsheet).

But Plaintiffs told this court at the September 19th hearing that their review "from the outside looking in" was not a suitable substitute because only the actual data will tell not only "what is on the website but how popular it is, how often it has been streamed, how much it has been downloaded." (September 19, 2017 Tr., Doc. 87 at 52-53.)   Those representations were misleading.   As the spreadsheets ultimately produced to Defendants showed, Plaintiffs had access to a significant amount of data on Spinrilla to support their claims of infringement.   The data obtained by RIAA in September 2016, October 2016, and July 2017 included all of the types of data Plaintiffs were requesting via direct internal access to Spinrilla's database (claiming the information was only available to Defendants), including the name of a given mixtape, the identity of a DJ credited with uploading that mixtape, stream counts for that item, download counts for that item, the tracks included on that mixtape, track lengths, and downloaded MP3  audio files. (Linares Dep. at 79, 86, 88, 100, 120.)   Even now, despite all this information Plaintiffs were able to download from Spinrilla, they still assert in Response to the Motion for Sanctions that "[i]t has been and remains the case that . . . Plaintiffs and their investigators have been *on our own kind of in the blind*, as it were.'" (Pls.' Resp., Doc. 130 at 15) (emphasis added.)

From all appearances, Plaintiffs' goal was to downplay before this Court the sophistication of their outside efforts and ability to access information directly from Spinrilla's applications in order to persuade this Court to grant them broad ranging and invasive discovery into Spinrilla's proprietary software programs.

Plaintiffs admit that "[w]ith the benefit of hindsight, having reviewed their remarks to the Court about this issue, Plaintiffs' counsel now recognize that it was an overstatement to analogize Plaintiffs' investigative capabilities to those of an ordinary user, to whom automated evidence collection processes may not be available." (Pls.' Resp., Doc. 130 at 4-5.) Yet Plaintiffs maintain that they did not lie, and that it was and still remains true that "Defendants possess more, and more complete information about the contents and activities of their own Spinrilla service" than Plaintiffs could gather in their investigative efforts. [10] According to Plaintiffs, the testimony of Dylan Copeland on October 2, 2017, and documents produced by Defendants in December 2017 confirm that Defendants possess nearly 100,000 sound recordings that were once publicly accessible on Spinrilla but that Defendants disabled from public view and thus could not be captured even

---

[10] Defendants have repeatedly asserted that Plaintiffs have information as a result of their investigation that Spinrilla no longer has access to because the users have removed the content from Spinrilla and there is no record of the data for those audio files retained in the Spinrilla database. According to Defendants, this belies Plaintiffs' representations that only Defendants know everything that is on the Spinrilla database. Defendants' position may evidence the existence of flaws in Defendants' information retention practices but it is not persuasive as evidence that Plaintiffs have lied with respect to their characterization of who has more information about the Spinrilla service.

in Plaintiffs' automated searches of the website.[11]     (Pls.' Resp., Doc. 130 at 12) (citing Copeland Deposition.)

Plaintiffs are correct that even if they had been able to collect the complete universe of data on their own from Spinrilla, it would not have relieved Defendants from their independent discovery obligations to produce the requested information about the sound recordings, including the tracks, URLs, and stream and download data. *See e.g., Am. Deli Int'l, Inc. v. Boa Cho Corp.*, 1:12-CV-4031-JEC-JSA, 2014 WL 11822765, at *2 (N.D. Ga. July 22, 2014) (Anand, M.J.) ("Plaintiffs are not prohibited from discovering what documents are in Defendant's possession, regardless of whether Plaintiffs may already independently possess some or all of those documents."); *Jones v. Alta Colleges, Inc.*, 1:08-CV-1027-CAM-RGV, 2009 WL 10665816, at *6 (N.D. Ga. Aug. 25, 2009) (Vineyard, M.J.) ("[P]laintiffs' responses that the information is already in the possession of defendant is inadequate, since "the fact that the information sought might already be in the possession of the requesting party or obtainable from another source is not a bar to discovery of relevant information.").

As the Court advised Defendants at the September 2017 discovery hearing, Defendants cannot have their cake and eat it too. In other words, Defendants could not continue to block Plaintiffs' access to the database while simultaneously declining to produce information obviously available to them about the songs

---

[11] Defendants acknowledge that these sound recordings, which Defendants refer to as "grayed out," are a category of information for which Defendants have more data than Plaintiffs. (Defs.' Reply, Doc. 132 at 12.)

hosted on their platform.  It was not reasonable for Defendants to expect Plaintiffs to provide a final list of infringing content for purpose of amending their Complaint without information from Defendants regarding the full list of content available (or previously posted) on Spinrilla. Nor was it reasonable for Defendants to suggest that Plaintiffs were required to cull through the entire Spinrilla website to find every single song to determine what may or may not be infringing.  Thus, the Court ordered Defendants to begin to undertake efforts to provide the information to Plaintiffs.  (September 19, 2017 Transcript, Doc. 87 at 60-62.) (*See also* August 28, 2017 Order, Doc. 58 at 7) ("Defendants are ORDERED to provide Spinrilla user data reports showing the downloading and/or streaming of copyrighted content on the Spinrilla site, including any data analytics maintained by Defendants by user as detailed here.")

On the one hand it appears that by making misrepresentations to the court and withholding the spreadsheets as protected work product, Plaintiffs may have been attempting to hide from Defendants and this Court the extent of the evidence of their investigation.  Indeed, Plaintiffs' counsel's argument to the Court on behalf of expansive requests for Defendants' proprietary data and software was expressly linked to their purported inability to effectively access Defendants' files and recordings.  On the other hand, it was no secret that Plaintiffs had conducted an investigation of Spinrilla and its alleged infringing conduct.  Plaintiffs indicated at both discovery hearings that they had been able to locate thousands of infringing songs on Spinrilla on their own, if only manually, and the Linares declaration

contained some detail into RIAA's repeat infringer study. The existence of the spreadsheets containing extensive data downloaded from Spinrilla came to light just three days after the September discovery hearing.  Plaintiffs produced the three spreadsheets containing the information from the September 2016, October 2016, and July 2017 data pulls during the Linares deposition (subject to an agreement with Defendants that they were waiving the work product protection for these spreadsheets but not as to other documents).  And, Plaintiffs produced a fourth "master spreadsheet" of the RIAA investigation two weeks after the Linares deposition.

Even so, Plaintiffs delayed in producing the spreadsheets for the majority of the discovery period and had never expressly acknowledged their existence either to Defendants or this Court.  Plaintiffs still maintain that the four spreadsheets that were produced are proper work product but were produced only as a compromise. Despite having now produced them (and using that as justification for denying Defendants' sanctions motion), Plaintiffs do not concede that these materials were properly discoverable in response to Defendants' discovery requests.   And Plaintiffs continue to withhold 65 additional spreadsheets under the guise of work product, as discussed below in section I(C)(4) *infra*.

But there are other facts to consider in determining whether Plaintiffs engaged in bad faith as necessary to warrant dismissal.  First, these issues were not brought front and center through a request to compel the discovery via the Court's informal discovery process prior to Defendants' Motion for Sanctions.  Rather,

Defendants jumped the gun in filing this Motion for Sanctions.  At the same time, the Court recognizes that at the time the sanctions motion was filed, Plaintiffs had not produced the privilege log and Defendants had no concrete information that additional documentation had *actually* been withheld.  But there were reasonable clues as Plaintiffs had made their privilege assertions in their written discovery responses, and in response to the RIAA Document Subpoena and required Defendants to agree that Plaintiffs were not generally waiving the privilege over all documents by producing the spreadsheets during the Linares deposition.

Second, despite withholding the 65 spreadsheets detailing its investigation into Spinrilla, Plaintiffs have produced a significant number of documents in this case, such that the Court cannot find that they have consistently failed to observe their discovery obligations.   And Plaintiffs came to the Linares deposition apparently prepared to disclose the spreadsheets (albeit in a redacted form) knowing that Mr. Linares would be forced to testify regarding the data collected during the RIAA investigation.  Thus, there is mixed evidence as to the Plaintiffs' proclivity towards hiding evidence in support of their claims.

Third, while Plaintiffs did in fact delay in producing the spreadsheets in response to Defendants' first set of interrogatories and in advance of the Linares deposition (rather than during the deposition after he grudgingly revealed their existence), Plaintiffs clearly made their privilege assertions in their written discovery responses and the parties did originally agree to forego preparing privilege logs.  But Plaintiffs production of the spreadsheets (in redacted form)

implicitly acknowledges (in the Court's view) that their assertion of work product privilege was not entirely proper under the circumstances. And unfortunately, Plaintiffs waited until the last month of discovery to produce the three spreadsheets. Although Defendants did have the spreadsheets for some portion of Mr. Linares's deposition, their surprise production necessarily left Defendants ill equipped and ill prepared to adequately and thoroughly examine Mr. Linares about the details of the investigation. Presumably in recognition of the disadvantage to which they placed Defendants in during the Linares deposition, Plaintiffs are willing to allow Defendants to re-examine Mr. Linares about the spreadsheets. Given these facts, the Court finds that Plaintiffs (1) did delay in their production of the spreadsheets (though not inordinately so) and (2) should have more promptly and expressly flagged the general existence of the spreadsheets in response to Defendants' discovery requests.

Fourth, Defendants may overstate their position when discussing how they have been harmed. (*See* Defs.' Mot, Doc. 100 at 9-21; Defs.' Supp. Br., Doc. 114 at 2-7; Defs.' Reply, Doc. 132 at 20-23.) In response to Defendants' complaints about Plaintiffs' failure to produce the spreadsheets earlier in the discovery period, Plaintiffs assert Defendants make much ado about their alleged prejudice. Defendants fail to acknowledge that Plaintiffs produced "an enormous number of documents concerning the same subject matter of the spreadsheets," including:

> (1) detailed lists of more than 12,000 recordings on the Spinrilla site that Plaintiffs believed potentially infringed Plaintiffs' copyrights (produced in July 2017); (2) thousands of pages of screenshots

showing infringing activity on Spinrilla, including many showing names of infringing tracks and mixtapes, the DJs who hosted them, and the URLs where they were located on the site (produced in August 2017); (3) a detailed list of the more than 2,000 copyrighted sound recordings that Plaintiffs have since verified as infringing and are now works in suit (produced in September 2017); and (4) copies of over 7,000 actual infringing sound recordings corresponding to the works in suit that Plaintiffs downloaded from the Spinrilla site (also produced in September 2017).

(Pls.' Resp., Doc. 130 at 5-6.)

Defendants contend that by hiding the evidence of the extent of their investigative efforts, Plaintiffs caused unnecessary discovery disputes and prejudiced Defendants in a number of ways.  Defendants assert that had Plaintiffs provided the spreadsheets earlier in the litigation, "Defendants' development of the facts would be much further along and Defendants would be better prepared for the next phases of this litigation."  But as the saying goes, "time heals all wounds," and Defendants have now had a significant amount of time to digest the already unearthed information.  And a brief extension of discovery affords an adequate remedy for these harms.

Defendants argue that by hiding and lying about the RIAA data, Plaintiffs forced Defendants to spend precious time and money fumbling through discovery because Defendants focused much of their discovery on trying to identify which sound recordings Plaintiffs alleged were infringed and where on Spinrilla's platform the allegedly infringing versions could be found.  Instead, Defendants could have focused on testing, analyzing, and understanding how the infringement, if any, had occurred.  As of the time of Defendants' sanctions motion,

Plaintiffs had identified over 2,000 allegedly infringing sound recordings that Defendants could have been evaluating.[12]  Defendants further contend that "by forcing Defendants to try to figure out which sound recordings were allegedly infringed and where on the Spinrilla platform the allegedly infringing version was, rather than just giving Defendants that information, Plaintiffs maliciously sent Defendants down an expensive and unnecessary rabbit hole from which . . . Defendants cannot recover."  (Defs' Supp. Br., Doc. 114 at 2.)  But Plaintiffs requested that Defendants be required to identify the universe of sound recordings available on Spinrilla so that *Plaintiffs* could engage in the task of determining whether they infringed Plaintiffs' copyrights.  Defendants have failed to point to a single request by Plaintiffs that Defendants self-identify the infringement in this manner.  Defendants cannot manufacture harm to justify the extreme sanction of dismissal.

Defendants contend that Plaintiffs lied to convince the Court they should be allowed to amend their complaint to add 2,000 additional sound recordings to their original list of 210 allegedly infringing songs.  But, that is not really accurate. The Court granted Plaintiffs leave to amend the complaint at the September 19th hearing based on sound recordings Plaintiffs had already identified, not because of

---

[12] Although Defendants assert that without the URLs for these songs (that were not produced by Plaintiffs until October 4) Defendants had no way of knowing which of the more than one million songs on its platform "was the allegedly infringing song."  This argument rings hollow.  If Plaintiffs identified Beyonce's *Single Ladies*, Defendants could search their database for the song, run it through Audible Magic, and determine whether any sound recordings uploaded on Spinrilla were flagged by Audible Magic as infringing.  (*See generally* Copeland Dep.)

their alleged lack of access to identify all potentially infringing sound recordings available on Spinrilla.

Defendants also contend that if they had been provided timely copies of the spreadsheets, the 30(b)(6) deposition of Sony would have *in theory* been more productive. While the Court can understand how this may *in theory* be true, Defendants have failed to point to any *actual* portion of the Sony 30(b)(6) deposition that was incomplete, insufficient, or inadequate as would be expected by the Court.

> According to Defendants,
>
> remedying the prejudice is impractical as it would require a complete overhaul of this case's remaining timeline. Defendant would need two or three months more of fact discovery, including leave to serve more interrogatories on Plaintiffs, to redepose Sony and re-depose Mr. Linares. Between the filing of this Brief and the Court's ruling on the Motion for Sanctions, more depositions will take place while Plaintiffs still have not produced non-redacted versions of the RIAA spreadsheets or provided the requested privilege log related to the RIAA spreadsheets. If the case were to continue in a fair way, Plaintiffs should also be required to reimburse Defendants for the attorney fees and expenses they incurred doing unnecessary discovery. Without these allowances, Defendants will forever be handicapped by Plaintiffs' dishonesty.

(Defs.' Supp. Br., Doc. 114 at 7.) The Court just does not see it that way and believes with some guidance and oversight this case can be set back on track.

Obviously, had Defendants been provided the spreadsheets prior to the deposition of Mr. Linares, Defendants would have been better prepared to depose Mr. Linares about the contents of the spreadsheet and the details of the RIAA investigation. Therefore, an additional deposition of Mr. Linares, targeting the

spreadsheets, is warranted.  This is true also for any of the Plaintiffs' 30(b)(6) witnesses who were deposed prior to the production of the spreadsheets.  The Court will consider allowing some additional interrogatories, but Defendants must submit a proposal identifying the actual subject matter of the proposed interrogatories along with an explanation of why they are necessary and not otherwise covered by Defendants' existing requests.[13]   Finally, the Court cannot sufficiently judge the merits of Defendants' contention that having some or all of the 68 spreadsheets earlier in discovery would have prompted Defendants to work with more or different expert witnesses or consultants.  The Court does not have a handle on what the status of the expert disclosures was when this case essentially stalled as a result of the onslaught of motions filed by the parties over these various disputes.  Accordingly, the Court will consider this request, but will require further information from the parties about where this case stands in terms of expert discovery, as well as more specific information from Defendants about the nature of the expert discovery they are envisioning.

The Court finds that Plaintiffs' behavior, while extremely problematic in some respects, their bad faith does not rise to the level of severity required to authorize the sanction of dismissal.  *Malautea*, 987 F.2d at 1542.  The harm Defendants suffered can be remedied by a less extreme sanction than dismissal.

---

[13] Defendants assert, without any explanation, that "there were many interrogatories Defendants propounded which they did not need to propound" and that Defendants could have instead "reserved their limited interrogatory requests to different and/or more finely tuned topics." (Defs.' Reply, Doc. 132 at 21.)

The Court is deeply troubled by Plaintiffs' representations about their feigned lack of access to data and information from Spinrilla, when in fact they had a wealth of detailed information about hundreds of thousands of sound recordings. And the Court is also troubled by Plaintiffs' withholding this evidence from Defendants until they were caught with a hand in the cookie jar during Mr. Linares's deposition. Any similar conduct shall not be tolerated. This Order thus serves as a warning.

### 4.    Whether Other Lesser Sanctions Are Warranted?

While dismissal is not warranted, the Court does find that lesser sanctions are appropriate under the circumstances. According to Plaintiffs, the additional 65 spreadsheets identified on the Privilege Log[14] did not each represent a separate collection of data from Spinrilla. (Pls.' Surreply, Doc. 147 at 2-3.) Rather, Plaintiffs contend,

> to the extent that those spreadsheets include data downloaded from the Spinrilla website at all, [Jeremy] Landis[15] [of RIAA] stated that they "appear to be based on the data that [he] collected" in or around September 2016, October 2016, and July 2017 – data that has already been produced to Defendants. (*Landis Dep.* at 90:3-12.) Mr. Landis explained that he was frequently asked to organize and provide data from those existing collections to the RIAA investigators so they could conduct further analysis and build Plaintiffs' case against Defendants, as reflected in those spreadsheets. (*Id.* at 27:14-6; 84:10-13; 90:14-24.)

---

[14] Although the parties originally agreed to forego the burden and expense of creating privilege logs, Plaintiffs' produced the privilege log for the 68 spreadsheets on October 23, 2017 in response to Defendants' request as the dispute about the spreadsheets started coming to a head.
[15] Jeremy Landis is the "Head of Development" of the RIAA, and was involved in the technical side of the RIAA investigation into Spinrilla.

(Pls.' Surreply, Doc. 147 at 2-3.)   Plaintiffs contend that, "[a]s the titles of the spreadsheets identified in the privilege log suggest, many of the spreadsheets do not contain any data downloaded from Spinrilla and instead consist entirely of the investigators' notes and observations."   (*Id.* at n. 2.)   Therefore, Plaintiffs assert that the information in the 65 spreadsheets is "classic, core work product, which Plaintiffs properly withheld and then timely identified on their privilege log."[16]  (*Id.* at 4.)

None of this is obvious from the privilege log.  The only entries on the privilege log that Plaintiffs specifically identify as consisting "entirely of the investigators' notes and observations" are numbers 10 and 49.  Entry number 10 on Plaintiffs' privilege log is identified as "Chart – Tracks That Did Not Immediately Have Full Compliance.xlsx" and is described only as "Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance."  (Ex. A to Defs.' Reply, Doc. 132-1 at 4.)  Entry number 49 is identified as "Prominent Spinrilla DJs and their Social Media.xlsx"_and is described only as "Investigative material prepared by the RIAA to collect evidence in anticipation of this litigation."  (*Id.* at 7.)

Other representative entries on the privilege log are identified as follows:

---

[16] The privilege log also tags each document as "Attorney-Client Privilege," however, Plaintiffs have not argued here that the documents are subject to attorney-client privilege.  Accordingly, the Court will address only the work product privilege.

| Number | File Name | Privilege Description |
|---|---|---|
| 4 | Spinrilla DMCA Study – Repeat Infringers (6) – August 2016.xlsx | Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |
| 11 | Spinrilla – Evidence Collection – Sony Music Entertainment.xlsx | Investigative material prepared by the RIAA to collect evidence in anticipation of this litigation |
| 15 | Young Thug.xlsx | Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |
| 17 | Spinrilla Scrape 8.22.2016.xlsx | Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |
| 25 | Compliance Check Spreadsheet.xlsx | Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |
| 29 | Spinrilla DMCA Study – Hot This Week – October 2016.xlsx | Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |
| 33 | Exhibit A Chart – Master.xlsx | Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |
| 34 | Top 100 DL Tracks – Short Form (12.5.2016).xlsx | Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |
| 38 | recheck.xlsx | Investigative material prepared by the RIAA to collect evidence in anticipation of this litigation |
| 39 | spinlegal.xlsx | Investigative material prepared by the RIAA to collect evidence in anticipation of this litigation |
| 40 | top100.xlsx | Investigative material prepared by the RIAA to collect evidence in anticipation of this litigation |
| 41 | Spinrilla DMCA Studies – Short Form.xlsx | Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |
| 58 | Spinrilla DMCA Study – Tracks Downloaded Post Filing – February 2017.xlsx | Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |
| 59 | Spinrilla DMCA Studies – Long Form.xlsx | Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |

| 62 | Spinrilla Compliance Study DJs' Most Recent Uploads of Member Content During 2017.xlsx | Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |
|---|---|---|
| 64 | Spinrilla DMCA Studies – Master.xlsx | Investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |
| 65 | spinrilla_chart.xlsx | Investigative or evidentiary material, which pertains to repeated infringing activity on Spinrilla.com and which was prepared after Plaintiffs filed this lawsuit. |
| 66 | spinrilla_data.xlsx | Investigative or evidentiary material, which pertains to repeated infringing activity on Spinrilla.com and which was prepared after Plaintiffs filed this lawsuit. |

(Ex. A to Defs.' Reply, Doc. 132-1.)

The privilege log also appears to identify 3 of the 4 spreadsheets produced to Defendants as follows:

| Number | File Name | Privilege Description |
|---|---|---|
| 27 | Spinrilla_mixtapes_9_13_16.xlsx [Bates PL000040477] | Redacted tabs and columns contain investigative material the RIAA prepared in anticipation of this lawsuit pertaining to infringement on Spinrilla.com and Spinrilla's legal noncompliance. |
| 67 | Copy of spinrilla_original_7-24-17 (002).xlsx [Bates PL000046641] | Redacted text of tab contains investigative material which was prepared after Plaintiffs filed this lawsuit. |
| 68 | Spinrilla Scrape 7.20.2017 – Mixtapes re DMCA DJs Tracks Analyzed per LCL Declaration.xlsx [Bates PL000040478] | Redacted tabs contains investigative or evidentiary material, which pertains to repeated infringing activity on Spinrilla.com and which was prepared after Plaintiffs filed this lawsuit. |

(*Id.*)

Plaintiffs' privilege log is wholly inadequate to allow Defendants or the Court to evaluate the validity of the assertion of the work product privilege.  *Meade v.*

41

*General Motors, LLC*, 250 F.Supp.3d 1387, 1393-96 (N.D. Ga. 2017) (Totenberg, J.); *Williams v. Taser Int'l. Inc.*, 274 F.R.D. 694, 697 (N.D. Ga. 2008); Fed. R. Civ. P. 26(b)(5)(A)(ii) (requiring a party asserting privilege to "describe the nature of the documents" not disclosed "in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim"). The party asserting the privilege bears the burden to provide a factual basis for its assertions. *Meade*, 250 F.Supp.3d at 1393; *Spirit Master Funding, LLC v. Pike Nurseries Acquisition, LLC*, 287 F.R.D. 680, 684 (N.D. Ga. 2012); *Carnes v. Crete Carrier Corp.*, 244 F.R.D. 694, 698 (N.D. Ga. 2007). "This burden is met when the party produces a detailed privilege log stating the basis of the claimed privilege for each document in question, together with an accompanying explanatory affidavit from counsel." *Meade*, 250 F.Supp.3d at 1393 (quoting *Carnes*, 244 F.R.D. at 698); *Spirit Master Funding,* 287 F.R.D. at 684 ("This burden may be satisfied through a detailed privilege log and affidavits from counsel, the party, or the expert, and also by any of the traditional ways in which proof is produced in pretrial proceedings."). "The work product privilege 'must be specifically raised and demonstrated rather than asserted in a blanket fashion.'" *Spirit Master Funding,* 287 F.R.D. at 684 (quoting *Carnes*, 244 F.R.D. at 698). Blanket and general assertions of a claim of privilege do not provide sufficient detail about the documents to enable the plaintiff or the court to determine whether the withheld documents were privileged. *Meade*, 250 F.Supp.3d at 1393; *Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*, 230 F.R.D. 688, 695 (M.D. Fla. 2005);

*Williams*, 274 F.R.D. at 697; *Digecor, Inc. v. E.Digital Corp.*, 2008 WL 803108 *2 (D. Utah 2008) (privilege can only be asserted as an express claim accompanied by a detailed privilege log that can be assessed by the requesting party); *Nat'l Union Fire Ins. Co. v. Midland Bancor, Inc.*, 159 F.R.D. 562, 567 (D. Kan. 1994) (general allegation of privilege insufficient; if privilege is not specified and substantiated it may be lost); *Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 664 (S.D. Ind. 1991) (requiring the log to list, for each separate document, the authors and their capacities, the recipients (including copy recipients) and their capacities, the subject matter of the document, the purpose for its production, and a detailed, specific explanation of why the document is privileged or immune from discovery).

The court may impose as a sanction the waiver of privilege for cases of unjustifiable delay, inexcusable conduct, and bad faith in responding to discovery requests by improperly withholding documents on the basis of privilege, and failing to provide an adequate privilege log in compliance with Rule 26. *Meade*, 250 F.Supp.3d at 1393-94; *Williams*, 274 F.R.D. at 697 (citing *Jones v. Am. Gen. Life and Accident Ins. Co.*, No. CV 101–003, 2002 WL 32073037, at *6 (S.D. Ga. Dec. 4, 2002); *Pensacola Firefighters' Relief Pension Fund Bd. of Trustees v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 265 F.R.D. 589, 592 (N.D. Fla. 2010) (noting abundance of district court case law holding that a party claiming privilege is obliged to produce a privilege log and its failure to do so means the privilege is waived); *see also Carnes v. Crete Carrier Corp.*, 244 F.R.D. at 698 (stating that proponent of privilege cannot assert privilege in blanket fashion and holding that

the failure to specify documents in privilege log constitutes a waiver of attorney-client privilege for those documents); *Ameritrust Co., N.A. v. White*, Civ. No. 1:90-CV-2691-JEC, 1993 WL 819124, *3 (N.D. Ga. Oct. 20, 1993) (Carnes, J.) ("The mere conclusory assertion that material sought is covered by . . . work product privilege is not sufficient to render such material undiscoverable.").

Plaintiffs used broad categorical descriptions of privilege that were uninformative. Many of these titles of the spreadsheets are indistinguishable from the titles of the spreadsheets Plaintiffs did produce to Defendants.  Plaintiffs have failed to satisfy their burden under Fed. R. Civ. P. 26(b)(5)(A) of demonstrating that the information is properly subject to a claim of work product privilege. The privilege log provided is entirely useless for this purpose.  And based on their admitted track record of making overstatements to the Court, the Court declines Plaintiffs' implied invitation to take their word for it.

Plaintiffs only offer the most generic arguments about why these spreadsheets constitute protected work product, reciting the basic principles that (a) a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative, (b) that courts universally agree that a document whose purpose is to assist in preparation for litigation is within the scope of Rule 26's work product protection, and (c) that litigation need not be imminent as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation.  (Pls.' Resp., Doc. 130 at 17-18.)  Plaintiffs cite this Court's decision in

*Spirit Master Funding, LLC* and Judge May's decision in *State Street Bank & Trust Co. v. Canal Ins. Co.*, and then simply assert that "Plaintiffs properly withheld these documents as classic work product under Rule 26 – they were created by an investigating agent for the parties, in direct anticipation of litigation, as part of a prefiling and ongoing investigation into their claims." (*Id.* at 18.)

Plaintiffs fail to address the crux of Defendants' arguments that because Plaintiffs have put the data in the spreadsheets at issue via the testimony of Mr. Linares, the documents are not properly subject to protection as work product. For this reason, the *Spirit Master Funding* and *State Street Bank* cases are distinguishable and do not support Plaintiffs' arguments in support of the application of work product to the spreadsheets. In *Spirit Master Funding*, this Court concluded that the Plaintiffs' non-testifying consulting experts' investigative findings and opinions provided to counsel were protected work product pursuant to Fed. R. Civ. P. 26(b)(4)(D). There, the court rejected the defendant's argument that the work product protection was waived because the consulting experts' investigations were directly at issue in the case:

> There is no indication that Spirit expressly intends to rely on the specific findings and results of those investigations in support of its claims and defenses to Pike's counterclaims. Several experts inspected the property at issue and issued reports documenting the condition of the property which were known by Spirit at the time, including the Gwinnett County Building Inspector. As Spirit has not designated either Mr. Ramos or Mr. Hercules as testifying experts, it would appear that Spirit does not intend to rely on their reports to support its claims and defenses, but rather intends to rely on these other reports. However, if Spirit ultimately uses or refers to the reports of Mr. Ramos or Mr. Hercules in its presentation of evidence at trial or

> summary judgment, the Court would consider anew Pike's waiver
> contention as an appropriate argument.

*Spirit Master Funding,* 287 F.R.D. at 687, n.5.  Similarly, in *State Street Bank*, Judge May noted that unlike the situation before her court, where a party places privileged information at issue by relying on the information in support of its claim or defense, the work product privilege may be waived.  *State Street Bank & Tr. Co. v. Canal Ins. Co.*, 1:14-CV-2080-LMM, 2015 WL 11347587, at *2 (N.D. Ga. Sept. 23, 2015) (citing *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1417 (11th Cir. 1994) ("[T]he attorney-client privilege is waived when a litigant places information protected by it in issue through some affirmative act for his own benefit."), and *QBE Ins. Corp. v. Jorda Enter., Inc.*, 286 F.R.D. 661, 664 (S.D. Fla. 2012) ("The waiver-by-affirmative-reliance doctrine arises in both the attorney-client privilege and work-product doctrine scenarios." (citing *In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006))).

"The privilege derived from the work-product doctrine is not absolute." *United States v. Nobles*, 422 U.S. 225, 239 (1975). The work product privilege provides only a qualified immunity from discovery.  *Spirit Master Funding,* 287 F.R.D. at 684.  As the esteemed Professor Wright noted:

> It protects only documents and tangible things.  It does not protect facts learned from the documents or things. There is no shield against discovery, by interrogatories or by deposition, of the facts that the opponent has acquired, or the person from whom he obtained the facts, or the existence or nonexistence of documents, even though the documents themselves have a qualified immunity from discovery.

*Lott v. Seaboard Systems Railroad, Inc.*, 109 F.R.D. 554 (S.D. Ga. 1985) (quoting Wright, The Law of Federal Courts, § 82, at 556 (4th ed. 1983) and 8 Wright and Miller, Federal Practice and Procedure § 2023.4.  The protections of Rule 26(b)(3) do not prevent discovery of facts relevant to an action. *Id.* (citing cases); *Spirit Master Funding,* 287 F.R.D. at 687 ("underlying facts do not enjoy the protection of the work product doctrine"); *AAB Joint Venture v. U.S.*, 75 Fed.Cl. 448, 454 (2007) ("Although the work product privilege protects work product created by the attorney, the privilege does not protect facts contained within or underlying attorney work product."); *cf. Hickman v. Taylor*, 329 U.S. 495, 513 (1947) (discussing pre-Rule 26(b)(3) denial of discovery into what is effectively both opinion and fact work product, and noting that such denial will not "unduly hinder" the petitioner in "the discovery of facts").

As work product is a "qualified privilege," it can thus be waived "when the covered materials are used in a manner that is inconsistent with the protection." *Kallas v. Carnival Corp.*, No. 06-20115, 2008 WL 2222152, 2008 A.M.C. 2076, 2081 (S.D. Fla. May 27, 2008) (quoting *Bank of Am., N.A. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 170 (S.D.N.Y. 2002)).  "Clearly a witness cannot offer testimony based on documents that he or she simultaneously claims are protected by the work product privilege." *Id.*; *see also In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 472-73 (S.D.N.Y. 1996) (party cannot use work product as a sword and at the same time invoke the work product doctrine as a shield to prevent disclosure of the same or related materials); *Harding v. Dana Transport, Inc.*, 914 F. Supp. 1084,

1098 (D.N.J. 1996) ("litigants must not manipulate the work product doctrine for their own benefit by attempting to selectively disclose their attorney's work product."). The "[t]estimonial use of work product is a classic example of an inconsistent use of materials that belie continuing work product protection." *Kallas*, 2008 WL 2222152, 2008 A.M.C. at 2081; *Nobles*, 422 U.S. at 239. Therefore, when the party claiming the privilege elects to use an investigator as a witness to present testimony about his investigation and then attempts to prevent discovery of materials prepared by the investigator on the subject of his testimony, this waives the privilege with respect to matters covered by the testimony. *Nobles*, 422 U.S. at 239; *Kallas*, 2008 WL 2222152, 2008 A.M.C. at 2082.

Plaintiffs can either immediately turn over complete unredacted copies of all 68 spreadsheets to Defendants or be precluded from offering any testimony or other evidence at trial based on any of the data in those spreadsheets. To the extent Plaintiffs legitimately contend that some portion of the spreadsheets contain pure opinion work product, they may seek leave to provide that portion to the Court for in camera review to determine whether to compel their production to Defendants. Plaintiffs are advised, however, that the Court will not look favorably on any overreaching as to what constitutes opinion work product as opposed to facts which are clearly discoverable. If Plaintiffs elect to seek leave to provide these select documents for in camera review, they must **NOTIFY THE COURT** of the volume of documents to be submitted **WITHIN 5 DAYS** of this order and the Court will set a schedule for the production.

For these reasons, Defendants' Motion for Sanctions [Doc. 100] is therefore **DENIED** with respect to the request for dismissal and **GRANTED** with respect to the request for other lesser sanctions.  The Court will reopen discovery for a period of 60 days, beginning on October 8, 2018, to allow for the additional depositions and discover requests addressed in Section I(C)(3) *supra*.

## II.   Plaintiffs' Motion for Leave to File Motion to Compel [Doc. 133]

While Defendants' sanctions motion was pending, Plaintiffs moved for leave to file a motion to compel production of various outstanding discovery materials from Defendants.   Plaintiffs filed their motion for leave in lieu of following this Court's procedure for efficient presentation of discovery disputes to avoid delays in discovery caused by formal, lengthy motions practice.  (*See* Standing Order, Doc. 5, at 20-21.)   After reviewing the parties' briefs, there is no good reason these discrete disputes could not have been raised via the Consolidated Discovery Dispute Statement format required by the Court's Standing Order.  While the Court accepts a hefty portion of the blame for the significant delay in resolving the glut of issues slathered on the Court by the parties, Plaintiffs' conduct in seeking to bypass this Court's standard procedures is not acceptable.  That said, in the interest of efficiency, the Court will rule on the Plaintiffs' pending motion.

For the following reasons, the Court **GRANTS** Plaintiffs' Motion for Leave to File Motion to Compel [Doc. 133], and **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion to Compel [Doc. 134-2].

### A. Potentially Infringing Sound Recordings

Plaintiffs' motion, filed on October 27, 2017, seeks to compel: (1) the actual sound recordings Defendant Copeland identified as having been blocked from the Spinrilla website after being flagged by Audible Magic as containing copyrighted material; and (2) data associated with these sound recordings.

Over a month after briefing on this motion was complete, on December 14, 2017, Defendants produced a hard drive containing the MP3 audio files for 98,675 sound recordings identified as having been blocked by Audible Magic. Accordingly, as the audio recordings have been produced, although belatedly, Plaintiffs' Motion to Compel the audio recordings is **DENIED AS MOOT**.

In response to Plaintiffs' motion for the data associated with the sound recordings, on October 27, 2017, Defendants produced an Excel spreadsheet containing a list of 98,675 "hidden and/or blocked" sound recordings, including the following data fields: (1) uploader name, (2) mixtape title, (3) track title, (4) artist name, (5) duration, (6) stream count, (7) download count, and (8) upload date. (Defs.' Resp., Doc. 138 at 2; Declaration of Kaitlyn Hasse, Doc. 138-1 ¶¶ 1-22.)

In their Reply, Plaintiffs assert that the spreadsheet is deficient in two respects. First, Plaintiffs contend the spreadsheet does not contain all of the data that Defendants have in their possession for the sound recordings, specifically it omits the "file name" of each sound recording and whether each sound recording

received an Audible Magic flag.[17]   Second, Plaintiffs contend that because the spreadsheet is marked "highly confidential," counsel cannot share it with Plaintiffs, whose access to the spreadsheet is essential to the determination of additional infringements.

These issues also appear to be moot.

First, on November 6, 2017, Defendants produced a "revised" spreadsheet containing "additional data" for the 98,675 audio files.   (February 13, 2018, Declaration of Scott Wilkens, Doc. 178-2 ¶ 9.)  According to the February 13, 2018 declaration of Plaintiffs' counsel, Scott Wilkens, (attached to an unrelated brief) the only complaint Plaintiffs had regarding the revised spreadsheet was that it was lacking information regarding whether the audio files were "featured" or "sponsored" on Spinrilla.  (*Id.* ¶ 10.)  No further disputes appear to have persisted regarding the information at issue in the motion to compel, which sought to compel "metadata," not information about whether the audio files were "featured" or "sponsored."

Second, on April 11, 2018, Plaintiffs moved for leave to amend Exhibit A to their Complaint to add 2,000 newly discovered works in suit.  Plaintiffs were able to determine these alleged infringements from a review of Defendants' production

---

[17] As the Court understands it, this spreadsheet was the listing of sound recordings that had been blocked by Audible Magic; therefore, all the sound recordings would have been flagged by Audible Magic.  Indeed, Plaintiffs' own motion states Mr. Copeland explained "Spinrilla disabled from public access approximately 46,000 sound recordings *because they were identified as potentially infringing by Audible Magic*" and that "these recordings were identified during a 'legacy scan' of Spinrilla's back catalog (all sound recordings available on Spinrilla at that time)."  (Doc. 134-2 at 7; 9 ("By Mr. Copeland's admission, *these recordings were caught by Audible Magic* during a scan. . .") (emphasis added.)

of the 98,000 blocked sound recordings, by running the audio files through Audible Magic.  (*See* Pls.' Mot., Doc. 195.)  Accordingly, the designation of the spreadsheet as "Highly Confidential" does not appear to have prevented Plaintiffs from determining additional infringements.

Accordingly, Plaintiffs' Motion to Compel regarding the spreadsheet is **DENIED AS MOOT**.

### B. Source Code Related to Audible Magic

On August 28, 2017, the Court ordered Defendants "to produce, as agreed, the text version of the source code as it relates to the implementation of Audible Magic."  (August 28, 2017 Order, Doc. 58 at 12.)  The Court further ordered the deposition of Defendant Copeland to provide testimony "regarding Spinrilla's software operations in connection with the detection, blocking, and reporting of copyrighted material and the implementation of Spinrilla's software interface with Audible Magic."  (*Id.*)  In response to the Court's Order, Defendants produced a three-page PDF excerpt of code, which Plaintiffs found to be insufficient to explain how Spinrilla implements Audible Magic to identify and block potentially infringing content from its website.  Plaintiffs raised these concerns at the September 19, 2017 discovery hearing, but before taking the deposition of Defendant Copeland.  Therefore, the Court declined to issue any further rulings regarding the source code at that time, unless or until Defendant Copeland's testimony was shown to be insufficient to address Plaintiff's questions.

Plaintiffs contend that Defendants have failed to produce the *full* version of the source code for Audible Magic implementation.  (Pls' Mot., Doc. 134-2 at 11-13.)  According to Plaintiffs, Mr. Copeland admitted at his deposition that he may have removed lines of code and/or comments from the excerpt that was produced. (*Id.* at 11) (citing Copeland Dep. at 65-67.) In response, Plaintiffs requested the full version of the source code excerpt, "without deletions of any lines of code or comments." (*Id.*) (citing Ex. 9 to Wilkens Decl., Doc. 136-2 at 2-3.) Plaintiffs also assert that Defendants have failed to produce all modified portions of the source code identified as having been changed by Mr. Copeland during his deposition. Plaintiffs assert that, as of October 27, 2017, Defendants had not produced the full version of the source code excerpt in response to this request and had not produced a "version control log" confirming whether or not Mr. Copeland in fact made changes to the excerpt of the source code that was produced. (*Id.*)

With regard to deletions or changes to the source code, Mr. Copeland testified:

Q. Were any lines removed in preparing this document?

A. Not that I can think of.

Q. Were any programmer comments removed in preparing this document?

A. I'm not sure. I'd have to go back and check. Is there none in here? I'm not sure.

Q. How would you find out -- be able to find out whether there were lines or comments removed?

A. I'd just look at the source code and see.

Q. Has this code changed over time?

A. Yes. So the -- the hop rate went down, the last line, down to 60 to essentially just scan more of the song.  Let's see. The -- the caching stuff probably changed, too, with use just like the cache keys.  That's probably about it that I can recall.

(Copeland Dep. at 66-67.)   In email correspondence with Plaintiffs' counsel subsequent to the deposition, counsel for Defendants informed Plaintiffs:

> For the additional code, Defendants provided source code showing implementation of Type 4, Encore Processing, and the section of code that shows where in the Spinrilla upload/publishing process the Audible Magic check occurs. *It is our understanding* that Mr. Copeland reviewed the Type 3 portion of code that was previously produced and Spinrilla's repository and *there were no deletions* made to the original Type 3 provided to Plaintiffs. However, *we will double check this again with Mr. Copeland. Mr. Copeland is also going to provide a change log*, which will show any changes made to the source code module that was previously produced (i.e. the portion showing Spinrilla's implementation of Audible Magic's Type 3 service).

(Ex. 9 to Wilkens Decl., Doc. 136-2 at 2-3) (emphasis added).  However, no further communications appear in the record, and Defendants have not squarely addressed these issues other than to say, "Defendants produced additional Audible Magic source code to Plaintiffs on October 12, 2017; therefore the issue is resolved." (Defs.' Resp., Doc. 138 at 3.)  It appears that Mr. Copeland had not made any deletions to the source code produced and had agreed to provide a change log, as requested. However, it is unclear whether Defendants' counsel ever actually followed up on these issues.  Thus, Plaintiff's Motion to Compel is **GRANTED** to the extent there remains live disputes about whether Defendants ever confirmed

that the source code provided in fact did not contain any deletions or whether Defendants failed to produce the change log as promised.  Unless they have already done so, Defendants are **ORDERED** to (a) either confirm there were no deletions, or alternatively, produce the text version of the source code documenting any deletions, (b) to produce the change logs for the portion of the source code related to Audible Magic **WITHIN 14 DAYS** of this Order, and (c) to produce any modified version of the source code as referenced by Mr. Copeland in his deposition **WITHIN 14 DAYS** of this Order.

Finally, Plaintiffs assert that Defendants have failed to produce source code showing at what point during the upload of a sound recording an Audible Magic check occurs, i.e. whether Audible Magic scans an uploaded sound recording before or after that sound recording is made public on Spinrilla.  (Pls.' Mot., doc. 134-2 at 12; Pls.' Reply, Doc. 141 at 5.)  According to Plaintiffs "[t]his module of source code is critically important, because it will show whether Defendants allowed sound recordings to become publicly available on Spinrilla for streaming and/or download before running an Audible Magic scan."  (Pls.' Mot., doc. 134-2 at 12.)  In support of their request, Plaintiffs point to Mr. Copeland's testimony that the three-page excerpt of source code that Defendants provided is called on by other parts of Spinrilla's source code:

Q. What other modules of code call on the code in Exhibit 56?

A. It's -- so there's like the framework that it's built on, like it's set up so that this calls after a track is made. It's like one line that just says like after this is made, then this gets called, Exhibit 56.

Q. So this -- there -- there will be code showing when the code in Exhibit 56 is called?

A. To some extent, yes.

Q. Is there a name for that module of code?

A. Yeah. The method is just called like "after create."

 (Copeland Dep. 79:2-80:14.)

Defendants respond that after the deposition, on October 12, 2017 Defendants produced additional source code related to implementation of Audible Magic, including: (1) source code demonstrating how Spinrilla runs a back-catalog scan through Audible Magic; (2) code that is used to scan a song through Audible Magic's services, which included Audible Magic Type 4 implementation along with programming comments; (3) *code that calls the Audible Magic scan when a new song is created on the Spinrilla site*; and (4) code for implementation of Audible Magic Encore Processing service. (Haase Decl., Doc. 138-1 ¶ 7) (emphasis added). In addition, Mr. Copeland testified that

Q. Now, when you first implemented Audible -- Audible Magic, where in the Spinrilla work flow was the identification request to Audible Magic made?

A. After a track was uploaded. Is that what you're talking about?

Q. Yes. So the identification request to Audible Magic would be made after the track was uploaded?

A. Yep.

Q. Was it made before the track was made public?

A. Yes.

Q. Were there cases in which a track would be made public before an Audible Magic check?

A. No, there shouldn't be. Not that I can think of.

(Copeland Dep. at 52-53.)  He further explained during his deposition where this implementation appears in the source code that was produced:

Q. (By Mr. Wilkens) Does this code show whether a file is checked by Audible Magic before it's made public on the Spinrilla website?

THE WITNESS: Yeah. So, I mean, it's all -- that first line on the last page, that's the -- the juicy piece.

Q. (By Mr. Wilkens) This is the line that begins with "track.update..."?

A. Yep.

Q. And can you please explain what that line of code does?

THE WITNESS: That changes the flag from null, what it starts out as, to either true or false.

Q. (By Mr. Wilkens) And -- and what is the impact of changing the flag to true or false?

A. It determines whether or not the page will work and the song will work.

Q. If -- if it's true, the song will work, and if it's —

A. Yes.

Q. Is there other code that shows what you just testified to, what happens when there's a true or a false?

THE WITNESS: Yes.

Q. (By Mr. Wilkens) What is the module -- what is the -- that source code module called?

A. I have no idea -- off the top of my head.

Q. (By Mr. Wilkens) Does this code show what happens to a file that the Audible Magic check shows is a match?

A. Yes.

Q. And where does it show that?

A. It's about halfway down, middle page, "if (id_status==2006)."

Q. And can you explain in layman's terms what this code does?

A. Yeah. So if Audible Magic finds a match, it says 2006. And so we basically say, "Audible Magic, did you find a match?" And if it does, then it continues execution into the block below it.

Q. And if it doesn't find a match, what happens then?

A. It keeps scanning until it does. And if it doesn't at all, then it just marks the flag as being compliant.

Q. And does this code show how much of an audio file is checked for an Audible Magic match?

A. Yep.

Q. Where is that?

A. "lookup_count...," almost at the bottom of the last page -- or first page. Sorry.

Q. And so according to this, again in layman's terms, how much of the file is checked?

A. How much? It depends on the length.

Q. Okay. Can you explain how that – how that works, depending on how long a song is, how much is checked?

A. Yeah. So according to Audible Magic, you have to skip the first 35 seconds, so that's why it subtracts that, and then it just divides it by a

minute, since that's what the hop rate is. So if there's a three-minute song, it will get scanned twice, assuming there's no match the first time.

(*Id.* at 68-71.)

As it appears to the Court that the information Plaintiffs requested has been produced, either via the additional source code text or via the testimony of Mr. Copeland, Plaintiffs' Motion to Compel this portion of the source code is **DENIED**.

### C. Social Media and Text Communications

Mr. Copeland testified that his primary method of communication with Spinrilla artists and users was through his various social media accounts. However, Defendants have failed to produce copies of all private communications via social media channels with their DJs.

Defendants hired a vendor to facilitate this process, but the vendors encountered problems with the Twitter, Instagram and Facebook software for private messaging and were unable to capture all messages. Defendants' vendors contend that the only way to obtain the thousands of remaining messages is to do a manual screenshot of each message. The vendors estimate that this search would take 20-46 hours to complete at an hourly rate of $350/hour for a total cost of up to $16,000. (*See* Haase Decl. ¶¶ 13-24.) Defendants assert that engaging in this screenshot collection is an overly burdensome endeavor which is not proportional to the claims in the case because the burden and expense of the discovery outweighs its likely benefit. Defendants contend that the "social media posts on each page have already been produced" but fail to explain what this means or how

these "posts" are an adequate substitute for what the Court understands are separate private communications.

The Court finds that Defendants have failed to demonstrate undue burden based on the expense associated with conducting the screenshot search and collection.   The financial information in the record for each Defendant demonstrates that the cost for the search is not significant or substantial in comparison to the Defendants' "healthy" financial condition.   Accordingly, Plaintiffs' Motion to Compel the social media communications is **GRANTED**. Defendants are **ORDERED** to produce the screenshots **WITHIN 14 DAYS** of this Order.   In the event the search and production costs turn out to exceed $20,000, Defendants can request that the Court allocate some measure of the costs beyond $20,000 to Plaintiffs.

According to Plaintiffs' motion, Defendants have also failed to produce copies of Mr. Copeland's text messages with DJs and other Spinrilla employees. Defendants' response to the motion is silent on the issue of the production of text messages.   Accordingly, Plaintiffs' Motion to Compel the text messages is **GRANTED**.  Defendants are **ORDERED** to produce copies of all responsive text messages **WITHIN 14 DAYS** of this Order.

### D. Operating Agreement

In response to Plaintiffs' Request for Production No. 25, Defendants produced a redacted copy of Spinrilla's Operating Agreement.   According to Defendants, "the only redactions made were to attorney-client communications

between Spinrilla and its corporate counsel that were contained within the document." (Haase Decl., Doc. 138-1 ¶¶ 9-10.)  Defendants contend they do not possess a version of the Operating Agreement that does not contain these communications.  (Ex. A to Haase Decl., Doc. 138-1 at 8.)  Spinrilla's corporate counsel has been unable to locate a "clean version" of the Operating Agreement. (*Id.*)  Defense counsel "requested Spinrilla's corporate counsel sign an affidavit explaining the nature of the comments and his inability to locate the clean document," but no affidavit was produced in conjunction with Defendant's response. (*Id.*)

Defendants are **ORDERED** to produce an unredacted copy of the Operating Agreement to the Court for in camera review to determine the nature of the redactions and whether they are properly designated as attorney-client communications **WITHIN 14 DAYS** of this Order.  The Court will therefore reserve ruling on this portion of Plaintiffs' Motion to Compel pending review of the unredacted version of the document.

For the foregoing reasons, Plaintiffs' Motion to Compel [Doc. 134-2] is **GRANTED IN PART** and **DENIED IN PART**.

### III. Plaintiffs' Motion for Leave to Amend Exhibit A to the Amended Complaint [Doc. 194][18]

Plaintiffs have consistently represented to both Defendants and this Court their intention to amend the list of "works in suit" which they allege Defendants to have infringed by posting their copyrighted sound recordings on Spinrilla without Plaintiffs' consent (i.e. Exhibit A) once they had identified the universe of Spinrilla's content.  In their original Complaint, Plaintiffs alleged they had "identified over 21,000 sound recordings, the copyrights to which are owned or exclusively controlled by Plaintiffs, that are available on Spinrilla.com and the Spinrilla apps," but provided a "non-exhaustive, illustrative sampling" in Exhibit A of only 201 allegedly infringing sound recordings.  On September 19, 2017, the Court granted Plaintiffs leave to amend Exhibit A to identify an additional 2,043 sound recordings to the "non-exhaustive, illustrative sampling of works in suit." However, at the September 2017 discovery hearing, at Defendants' urging, the Court advised there would come a time when Plaintiffs would be cut off from perpetual amendments and would be required to provide a final list of the allegedly infringing songs.  That time has come.

On April 11, 2018, Plaintiffs moved for leave to amend Exhibit A to the Amended Complaint to add approximately 2,000 "newly discovered works in suit," following Defendants' production of over 98,000 audio files which had been

---

[18] The Court **DENIES AS MOOT** Defendants' Motion to Stay Ruling on Plaintiffs' Motion for Leave to Amend Exhibit A to the Amended Complaint pending the Court's ruling on the Motion for Sanctions [Doc. 197].

blocked by Audible Magic.  Defendants vehemently oppose Plaintiffs' claiming it is too late to do so over five months after the close of discovery.  However, the Court agrees with Plaintiffs that the delay in seeking the amendment was due primarily to Defendants' belated production of the sound recordings in December 2017,[19] produced eight months after they were first requested and three months after the Court ordered them to get working on the production.  Defendants' delay is entirely unjustified and inexcusable.

Accordingly, the Court finds that Plaintiffs' amendment is timely and should be **GRANTED**.  However, as there must be some end in sight to the potential extent of the Defendants' alleged liability, the Court will not allow further amendments and will hold Plaintiffs to this final list.

## IV.   Defendant's Motion for Summary Judgment [Doc. 173][20]

In the midst of all this sound and fury, Defendants moved for summary judgment in their favor on both counts of Plaintiffs' Complaint for direct and secondary copyright infringement.  The motion is four and a half pages.  It contains a single paragraph of argument applying "law to facts."  Defendants' Statement of Facts, under Local Rule 56.1(B), consists entirely of the following "facts":

---

[19] Plaintiffs engaged in a lengthy and time-consuming process to compare Defendants' audio recordings to Plaintiffs' library of copyrighted music.

[20] Plaintiffs' Motion to Strike Defendants' Untimely and Overlength Summary Judgment Reply Brief [Doc. 187] is **DENIED**.  The Court will not strike Defendants' Reply because it was filed one day late and is two pages over the permitted page length.  However, Defendants are admonished that the Court expects Defendants to abide by this Court's deadlines and page limitations in the future.  The Court **DENIES AS MOOT** Defendants' Motion to Stay Briefing on Plaintiffs' Motion to Strike [Doc. 190] and Defendants' Motion for Leave for Court to Accept Reply Brief Out-of-Time [Doc. 191].  Plaintiffs' alternative Motion for Leave to File a Surreply [Doc. 187] is **GRANTED**.

     1.  The Amended Complaint alleges that both Defendants copied works owned or controlled by at least one Plaintiff. (Amended Complaint, Dkt. 91-1, Counts 1, 2).

     2.  Plaintiffs have failed to provide any evidence that any work they own or control has been directly or indirectly copied by either Defendant. (Declaration of David M. Lilenfeld, ¶ 4).

(Doc. 173-1.)   In support of their motion, Defendants rely entirely on the unsubstantiated opinion of their lead litigation counsel that "Plaintiffs have not provided any evidence that any work they own or control has been directly or indirectly copied by either Defendant." (Lilenfeld Decl., Doc. 173-2 ¶ 4).  Because "copying" is a prima facie element of a claim for copyright infringement, and because "Plaintiffs have failed to provide any evidence that either Defendant directly or indirectly copied any work owned or controlled by any Plaintiff," Defendants argue they are entitled to summary judgment.  (Defs.' Mot., Doc. 173 at 3-5.)

Taking their duty on summary judgment seriously, Plaintiffs filed a substantive response to Defendants' meager motion. Plaintiffs characterize Defendants' motion as "baffling" and "utterly groundless."  (Pls.' Resp., Doc. 178 at 2-3.)  This Court is hard pressed to disagree.

Defendants have failed to come close to satisfying their burden on summary judgment.  As Defendants' motion literally lacks any basis in law or fact, it is **DENIED**.

## V.    CONCLUSION

While the conduct in this case does not rise to the level of the circumstances in *Malautea*, the Court is stirred to repeat here the Eleventh Circuit's concluding sentiment in *Malautea*:

> All attorneys, as "officers of the court," owe duties of complete candor and primary loyalty to the court before which they practice. An attorney's duty to a client can never outweigh his or her responsibility to see that our system of justice functions smoothly. This concept is as old as common law jurisprudence itself. In England, the first licensed practitioners were called "Servants at law of our lord, the King" and were absolutely forbidden to "decei[ve] or beguile the Court." . . . Unfortunately, the American Bar Association's current Model Rules of Professional Conduct underscore the duty to advocate zealously while neglecting the corresponding duty to advocate within the bounds of the law. As a result, too many attorneys have forgotten the exhortations of these century-old canons . . . We must return to the original principle that, as officers of the court, attorneys are servants of the law rather than servants of the highest bidder. We must rediscover the old values of our profession. The integrity of our justice system depends on it.

*Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1546–47 (11th Cir. 1993).

The Court's rulings on the pending motions addressed in this Order are summarized below:

| | |
|---|---|
| Defendants' Motion for Sanctions [Doc. 100] | **GRANTED IN PART** and **DENIED IN PART** |
| Plaintiffs' Motion for Leave to File Motion to Compel [Doc. 133] | **GRANTED** |
| Plaintiffs' Motion to Compel [Doc. 134-2] | **GRANTED IN PART** and **DENIED IN PART** |
| Plaintiffs' Motion for Leave to File Surreply in Opposition to Defendants' Motion and Brief for Sanctions [Doc. 146] | **GRANTED** |
| Defendants' Motion for Summary Judgment [Doc. 173] | **DENIED** |

| Plaintiffs' Motion to Strike Reply Brief [Doc. 187] | **DENIED** |
| Plaintiffs' Motion for Leave to File Surreply [Doc. 187] | **GRANTED** |
| Defendants' Motion to Stay Briefing on Plaintiffs' Motion to Strike [Doc. 190] | **DENIED AS MOOT** |
| Defendants' Motion for Leave for Court to Accept the Defendants' Out-of-Time Reply Brief [Doc. 191] | **DENIED AS MOOT** |
| Plaintiffs' Motion for Leave to Amend Exhibit A to Amended Complaint [Doc. 194] | **GRANTED** |
| Defendants' Motion to Stay Ruling on Plaintiffs' Motion for Leave to Amend Exhibit A to Amended Complaint [Doc. 197] | **DENIED AS MOOT** |

Finally, the Court will reopen discovery for a period of 60 days, beginning on October 8, 2018, to allow for the additional depositions and discovery requests addressed in Section I(C)(3) *supra*.

**IT IS SO ORDERED** this 28th day of September, 2018.

_____
**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**