# Defendants' Brief in Support of Their Motion for Summary Judgment on Plaintiffs' Claims of Direct and Secondary Copyright Infringement (Dkt. 263)

# Plaintiffs' and Defendants' Redactions

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ATLANTIC RECORDING CORPORATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No.: |
| v. | ) ) | 1:17-CV-0431-AT |
| SPINRILLA, LLC, *et al.*, | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## **DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDMGENT ON PLAINTIFFS' CLAIMS OF DIRECT AND SECONDARY COPYRIGHT INFRINGEMENT**

**[CONFIDENTIAL]**

**[FILED UNDER SEAL PER PROTECTIVE ORDER ((DKT. 186)]**

# **TABLE OF CONTENTS**

I.   Introduction ……………………………………………………………1

   A.   Creation and Launch of Spinrilla ……………………………...1

   B.   The Internet and Copyright Infringement ……………………3

II.  Factual Background ……………………………………….………..3

   A.   Spinrilla's Launch ………………………………………....4

   B.   Spinrilla's Business Model ………………………………...4

   C.   Spinrilla's Anti-Infringement Program at Launch ……………5

   D.   As Spinrilla Grew, It Enhanced Its Anti-infringement Program …….7

      i.    Implementation of Audible Magic ……………………….……7

      ii.   Termination of Repeat Infringers ……………………..9

      iii.  Spinrilla Implemented Other Audible Magic Products………...9

      iv.   Back Scans Using Audible Magic …………………...……10

      v.    Audible Magic Alternatives ………………………………11

      vi.   Spinrilla's Anti-Infringement Program Surpasses
            Other Parts of its Business ……….……………………...11

III. Legal Background …………………………………………………12

   A.   Counts in the Complaint ………………………………………12

   B.   Summary Judgment Standard …………………………………12

i

C.      Direct Copyright Infringement ……………………………………...13

D.      Secondary Copyright Infringement …………………………………16

        i.      Contributory Infringement ………………………………...16

                a.      Substantial Non-Infringing Use ………………………17

                b.      Intentional Inducement or Encouragement Required ….18

                c.      Law Specific to Website Operators ……………………19

        ii.     Vicarious Copyright Infringement …………………………...19

        iii.    Inducing Infringement …………………………………….………20

IV.     Application of Law to Facts …………………………………………...21

A.      Defendants Are Not Liable for Direct Copyright Infringement ……..21

        i.      No Volitional Act ……………………………………………22

B.      Defendants Are Not Liable for
        Contributory Copyright Infringement …………………………………24

        i.      Spinrilla Has Substantial Non-Infringing Uses ………………25

        ii.     Spinrilla Does Not Materially Contribute
                To The Infringement by Either Inducing
                Or Encouraging Infringement …………………………...……31

B.      Defendants Are Not Liable for Vicarious Copyright Infringement ….33

        i.      Spinrilla Does Not Directly Profit from
                the Alleged Infringement ………………………………………..33

        ii.     Spinrilla Has Taken Reasonable Steps to

Stop and Limit Infringement ………………………….…..…40

C.    Defendants Are Not Liable for Inducing Infringement ……………..41

i.    Defendants Did Not Have Actual or Constructive
ii.   Knowledge of Specific Infringing Activity …………………..42

iii.  Defendants Did Not Have an
Object to Promote Infringement ……………………………..43

V.    Conclusion ………………………………………………………………45

# TABLE OF AUTHORITIES

*A & M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir.2001) …………………………………...28, 32, 42

*ABC, Inc. v. Aereo, Inc.*,
    134 S. Ct. 2498 (2014) …………………………………………...14, 15

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ……………………………………………….…….12

*Arista Records LLC v. Lime Grp., LLC*,
    784 F. Supp. 2d 398 (S.D.N.Y. 2011) …………………………....*passim*

*Buc Intern. Corp. v. International Yacht Council Ltd.*,
    489 F.3d 1129 (11th Cir. 2007) …………………………………………16, 20

*BWP Media USA, Inc. v. T & S Software Assocs., Inc.*,
    852 F.3d 436 (5th Cir.), *cert. denied*, 138 S. Ct. 236 (2017) ……………..…14

*BWP Media USA, Inc. v. T & S Software Assocs., Inc.*,
    No. 3:13-CV-2961-BF, 2016 WL 1248908 (N.D. Tex. Mar. 25, 2016) ……14

*Cable/Home Commc'n Corp. v. Network Prods., Inc.*,
    902 F.2d 829 (11th Cir. 1990) …………………………………………..17, 18

*Cambridge Univ. Press v. Becker*,
    No. 1:08-CV-1425-ODE, 2010 WL 11507617 (N.D. Ga. Sept. 30, 2010),
    *order clarified on reconsideration*, No. 1:08-CV-1425-ODE, 2010 WL
    11508001 (N.D. Ga. Dec. 28, 2010) ………………………………….. *passim*

*Coach, Inc. v. Swap Shop, Inc.*,
    916 F. Supp. 2d 1271 (S.D. Fla. 2012) …………………………………20

*Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) …………………………………………21, 43

*CoStar Group, Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) ……………………………………………14

*Disney Enterprises, Inc. v. Hotfile Corp.*,
  798 F. Supp. 2d 1303 (S.D. Fla. 2011) …………………………………...13

*Disney Enterprises, Inc. v. Hotfile Corp.*,
  No. 11-20427-CIV, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) …….*passim*

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004) …………………………………………*passim*

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) …………………………………………………….…13

*Greenberg v. Nat'l Geographic Soc.*,
  244 F.3d 1267 (11th Cir. 2001) ……………………………………...……..20

*Greenberg v. Nat'l Geographic Soc.*,
  No. 05–16964, 488 F.3d 1331,
  2007 WL 1693056 (11th Cir. June 13, 2007) ………………………..…..16

*Hydentra HLP Int. Ltd. v. Luchian*,
  No. 1:15-CV-22134-UU, 2016 WL 5951808 (S.D. Fla. June 2, 2016) .*passim*

*Metro-Goldwyn-Mayer Studioes, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ………………………………………………..…19, 32, 43

*Leonard v. Stemtech Int'l Inc.*,
  834 F.3d 376 (3d Cir. 2016) ……………………………………………….14

*Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*,
  496 F.3d 1231 (11th Cir. 2007) ……………………………………...……….19

*Pace v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
  No. 1:12-CV-3096-AT, 2014 WL 11829333 (N.D. Ga. July 30, 2014) ….…12

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) …………………………………….....19, 41

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) …………………………………………..37

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017), cert. denied, 138 S. Ct. 504 (2017) ………..42

*Perfect 10, Inc. v. Giganews, Inc.*,
    No. CV-11-07098-AB,
    2014 WL 8628034 (C.D. Cal. Nov. 14, 2014) ………………………13, 42

*Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*,
    533 F.3d 1287 (11th Cir. 2008) ………………………………...……….13

*S. Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers*,
    756 F.2d 801 (11th Cir. 1985) …………………………………………...20

*Smith v. BarnesandNoble.com LLC*,
    143 F. Supp. 3d 115 (S.D.N.Y. 2015) …………………………………..17, 30

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) …………………………………………………….*passim*

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) ………………………………………..8, 43

*Ventura Content, Ltd. v. Motherless, Inc.*,
    885 F.3d 597 (9th Cir.), *cert. denied*, 139 S. Ct. 419 (2018) …………*passim*

*Venus Fashions, Inc. v. ContextLogic, Inc.*,
    No. 3:16-cv-907-J-39MCR,
    2017 WL 2901695 (M.D. Fla. Jan. 17, 2017) ……………………..…19

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012) ……………………………………………...43

## <u>OTHER AUTHORITIES</u>

Fed. R. Civ. P. 56(c) ……………………………………………………………………...12

17 U.S.C. §512(c) ……………………………………………………………………….7

# I.    <u>Introduction</u>[1]

## A.    *Creation and Launch of Spinrilla*

As a 19-year old computer science student at Georgia State University, Dylan Copeland founded Spinrilla to provide a no cost way for independent, unsigned artists to easily and widely distribute their music. (SMF ¶¶ 2, 6, 7-8, 15-17). Due to the still growing popularity of hip-hop music, Mr. Copeland created Spinrilla to cater to this genre. (SMF ¶¶ 7-8).

Defendants have not wavered from these initial plans, which results in the important point that **Spinrilla does not need or want Plaintiffs' sound recordings on Spinrilla**. (SMF ¶¶ 7-8, 15-20, 57-58). In fact, Plaintiffs' content is incongruous with Spinrilla's purpose. And, indeed, Spinrilla has become an extremely successful platform by catering to *independent artists*.

Despite his age and business inexperience, Mr. Copeland launched Spinrilla with barriers in place to prevent music from major label artists being available on Spinrilla. (SMF ¶¶ 13, 56-58, 62, 64, 68-72, 90-91). While not always perfect, Mr. Copeland was conscientious about this even though he launched Spinrilla with no

---

[1] In its March 1, 2018 Order (Dkt. 186), the Court granted the Parties' Joint Motion requesting leave to file 45-page briefs on the issue of liability. (Dkt. 181).

content and no users. (SMF ¶¶ 10-12). As Spinrilla's business grew, Spinrilla added more barriers to infringement. (SMF ¶¶ 64-141). Even today, Spinrilla's anti-infringement program continues to mature (SMF ¶¶ 13-141) to ensure that Spinrilla continues to cater to independent artists pursuant to its proven successful business model. (SMF ¶¶ 15-21).

Plaintiffs contend that approximately ▮▮▮▮ of the ▮▮▮▮▮ songs that at one-time-or-another have been available on Spinrilla infringe 4,082 of Plaintiffs' sound recordings. (*Compare* Plaintiffs' SMF ¶ 59 (Dkt. 228)[2] and SMF ¶¶ 202). Assuming Plaintiffs' numbers are accurate, at most, ▮▮▮ percent of files once on Spinrilla infringed, meaning ▮▮▮▮ percent did not infringe. **That ▮▮▮▮▮ of Spinrilla's content is non-infringing is *prima facie* evidence that Spinrilla's anti-infringement program is effective.** In comparison, when entertainment companies sued YouTube for copyright infringement, the companies had evidence that between 50 and 80 percent of all content on YouTube was infringing. (*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 33 (2d Cir. 2012)).

---

[2] By citing to Plaintiffs' Statement of Fact (here and throughout the brief), Defendants are merely restating the numbers Plaintiffs allege and not admitting that Plaintiffs are able to prove either infringement or a specific number of infringements. Defendants will respond to Plaintiffs Statement of Material Facts at the appropriate time.

[3] ▮▮▮▮ songs on Spinrilla divided by ▮▮▮ allegedly infringing songs is ▮▮▮

### B. The Internet and Copyright Infringement

Many of the most popular websites in the World are based by user generated content (UGC), which is content (*e.g.*, images, videos, text and audio) posted by users. YouTube, FaceBook, Instagram, Amazon and eBay are examples of widely popular UGC content sites.

A UGC-based website which is completely free of copyrighted material is pure fantasy. The reality is that sites are not expected to be 100% "pure".

The expectation is that such sites will actively work to limit the *quantity* of copyrighted material – there is no expectation that these sites will be completely *free* of copyrighted material. As the Ninth Circuit stated: **"It is unimaginable that any website with hundreds of thousands or millions of user uploads could successfully screen out all of the copyright infringing uploads, or even all of the uploads where infringement was apparent."** (*Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 614 (9th Cir.), *cert. denied*, 139 S. Ct. 419 (2018) (emphasis added)). The law and the expectation are that Spinrilla will do its best to keep copyrighted material off its site. That is exactly what Spinrilla has done.

## II. <u>Factual Background</u>

Given the fact-intensive nature of this case, Defendants provide a general summary here but otherwise refer to the detailed account set forth in their Statement

of Material Facts not in Dispute.

### A.    *Spinrilla's Launch*

At launch, Mr. Copeland positioned Spinrilla as being "[s]pecifically for hip-hop, being at the forefront of the latest technology, and sort of being a voice to the independent crowd who oftentimes gets unheard." (SMF ¶ 17; *see also* ¶¶ 15-16). To the best of his recollection, Spinrilla launched with no music being available. (SMF ¶ 10). Spinrilla initially targeted ███████████████████████

██████████████████████████████████████████

███████████████████████ (SMF ¶¶ 11-12, 237). From the time it launched, Spinrilla did not "want any copyrighted stuff on there" because Spinrilla "wasn't targeted for professional music. It was targeted for individual – emerging artists that were independent that want to get their – their music out there." (SMF ¶ 57).

### B.    *Spinrilla's Business Model*

Spinrilla occupies a distinct, unambiguous niche: *independent* hip-hop artists. (SMF ¶¶ 15-21)). Spinrilla has not veered from this business model; it does not aspire to carry Plaintiffs' sound recordings. (SMF ¶¶ 15-21; 57). Spinrilla also fosters a culture of anti-infringement. Mr. Copeland, Ms. Badenhorst and Ms.

Simon[4] all testified that Plaintiffs' sound recordings are not wanted on Spinrilla. (SMF ¶¶ 16, 20, 57-58). Indeed, as noted above, Spinrilla has no need for those sound recordings as Spinrilla has been highly successful serving its niche. (SMF ¶¶ 7-8, 15-20, 57-58).



(SMF ¶¶ 39-47).

(SMF ¶ 319).

(SMF ¶ 320). Spinrilla does not charge listeners to stream or download any music or sound recording. (SMF ¶¶ 39-43).

Moreover, Spinrilla has always operated openly and domestically. (SMF ¶¶ 170-174). Spinrilla has never attempted to hide itself, make it difficult to contact, or locate itself beyond the reach of United States judicial processes. (*Id.*).

### C.     *Spinrilla's Anti-Infringement Program at Launch*

Despite having no music to offer and no users to offer music to, Spinrilla launched with anti-infringement barriers in place. (SMF ¶¶ 13, 56-58, 62, 64, 68-72, 90-91). Spinrilla made it technically impossible for users to upload music to

---

[4] Spinrilla currently has ▮▮▮ employees, including Mr. Copeland. Three were deposed (Mr. Copeland, Ms. Badenhorst and Ms. Simon).

Spinrilla. Instead, only users who Spinrilla verified had their own "original content" were allowed to upload music. (SMF ¶ 13; *see also* ¶¶ 26, 63, 65-66, 69-71, 86-87). Plaintiffs confirmed that only users with upload rights can upload music to Spinrilla, as did Defendants' expert, Dr. John Strawn. (SMF ¶ 88).

Mr. Copeland believed that people are moral and would not want to upload someone else's music. (SMF ¶ 71). Spinrilla has ███████████ registered users but only ███████████ have upload rights. (SMF ¶ 63). Spinrilla only approves approximately ███████████ applications received for upload rights. (SMF ¶ 69). Also, Spinrilla would remove albums "if there was a new album that came out and I knew that it shouldn't be on there, I'd remove it." (SMF ¶ 101). During the initial period after Spinrilla launched (i.e., ███████████████████████████ ███████████████████████████████████████ ███████████████████████ (SMF ¶ 59).

Spinrilla also launched with "Web Site Terms and Conditions of Use," which users had to agree to create a user account. (SMF ¶¶ 90-91). These terms included acknowledging that the user agreed to be bound by all applicable laws. (SMF ¶ 90). By mid-2015, Spinrilla had grown (in terms of number of users and quantity of content), so on May 22, 2015, Spinrilla added a paragraph to its Web Site Terms and Conditions of Use specifically prohibiting in writing the uploading of copyrighted

music. (SMF ¶¶ 92).

Although prior versions of the terms of use allowed Spinrilla to terminate the accounts of users who violated Spinrilla's terms of use, on July 23, 2017, Spinrilla added a paragraph, titled, "Repeat Infringement," which addressed termination of user accounts due specifically to copyright infringement and provided that "after two strikes, the user's ability to upload music will be revoked." (SMF ¶ 96).

Also, since its March 2013 launch, Spinrilla has promptly responded to any takedown notices[5] from copyright owners. Spinrilla "respond[s] to takedowns in minutes, if even that." (SMF ¶ 183; *see also* ¶¶ 100, 182).

### D. As Spinrilla Grew, It Enhanced Its Anti-infringement Program

As Spinrilla grew as a business, so did its anti-infringement program. (*See generally,* SMF ¶¶ 56-141; 167-218) Dr. Strawn testified, ███████████████

███████████████████████████████████████████████

███████████████████████████████ (SMF ¶¶ 61).

### ii. Implementation of Audible Magic

In a November 24, 2015 email, an in-house lawyer for Plaintiff UMG wrote

---

[5] To be DMCA-compliant, a takedown notice must include, among other things, "information reasonably sufficient to permit the service provider to locate the material." (17 U.S.C. § 512(c)(3)(A)(iii)).

to Spinrilla suggesting Spinrilla implement technology to block publication of Plaintiffs' sound recordings and named Audible Magic[6] and Gracenote as options. (SMF ¶ 107)). Just a few days later, Mr. Copeland began researching both Audible Magic and Gracenote and had implemented Audible Magic's Type 3 by the end of December 2015. (SMF ¶¶ 108-110)).

Audible Magic is a leader in the field. (SMF ¶¶ 142-143). █████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████

Spinrilla implemented Audible Magic to scan and clear audio files uploaded to Spinrilla's system before they are published. (SMF ¶¶ 112, 114-118). Blocked audio files are not published to Spinrilla's users while cleared files are automatically published to users. (SMF ¶¶ 112, 114-118). Dr. Strawn confirmed that Spinrilla properly implemented Audible Magic. (SMF ¶ 121).

---

[6] Audible Magic Corporation ("Audible Magic") is a privately held technology and services company that provides content identification and management services to online service providers. (*UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1012-13 (9th Cir. 2013)).

Sony could not identify a single takedown notice sent to Spinrilla which Spinrilla did not respond to by removing the allegedly infringing content. (SMF ¶ 187). The RIAA received a response from Spinrilla to all 23 of the takedown notices it sent to Spinrilla. (SMF ¶¶ 191-192). In addition, Spinrilla removed content when it received an informal request from a Plaintiff that sound recording be removed. (SMF ¶ 199). If Spinrilla removed content because it had received a takedown notice and that same sound recording was uploaded a second time, Spinrilla would remove the sound recording without waiting to receive a second takedown notice. (SMF ¶ 186).

### ii.     *Termination of Repeat Infringers*

Spinrilla has terminated the accounts of ▇▇ uploaders because they repeatedly uploaded music that was later the subject of a proper takedown notice. (SMF ¶¶ 203-206). For example, on January 9, 2016, Spinrilla terminated the account ▇▇▇▇▇▇▇ ▇▇▇ because he was ▇▇▇▇▇▇▇▇▇▇▇ (SMF ¶ 203) And, on August 5, 2016, Spinrilla terminated the account of ▇▇▇▇ because this user ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (SMF ¶ 204).

### iii.     *Spinrilla Implemented Other Audible Magic Products*

Only during this litigation did Spinrilla learn that Audible Magic offers products beyond its Type 3. (SMF ¶ 131 Copeland Dep., October 2, 2017; 43:21-

24.).). Upon learning of these additional products, Spinrilla proceeded to implement three additional Audible Magic products: Type 4, Private Database and Encore Processing. (SMF ¶¶ 132-140). These products have different ways of identifying and blocking Plaintiffs' sound recordings so those sound recordings are not published on Spinrilla. (SMF ¶¶ 134-140). Although these products are somewhat redundant, Spinrilla uses them all. (SMF ¶¶ 132-133).

### iv.    *Back Scans Using Audible Magic*

In addition to implementing Audible Magic to scan each audio file uploaded to Spinrilla before it is published Spinrilla has also conducted "back scans" of all audio files. (*See generally,* SMF ¶¶ 122-130) In May or June 2016 Universal suggested Spinrilla use Audible Magic to conduct a back scan of all audio files which had been uploaded to Spinrilla, which Spinrilla promptly did. (SMF ¶ 124). Spinrilla conducted two more back scans; one in February 2017 (right after this lawsuit was filed) and again in the Summer of 2017 (using Audible Magic's Type 4 product). (SMF ¶¶ 123). These three back-scan should have blocked any audio files Plaintiffs had registered with Audible Magic that were published on Spinrilla *before* Spinrilla began using Audible Magic. (SMF ¶ 128). Dr. Strawn testified that Spinrilla properly used Audible Magic's technology to conduct these back scans. (SMF ¶¶ 124, 130).

- 10 -

### v. *Audible Magic Alternatives*

In addition to the other infringement barriers, Spinrilla has searched for services similar to Audible Magic for redundant protection. (SMF ¶¶ 167-169). Mr. Copeland has reviewed at least five other services, including Gracenote, but none of these services would work as needed. (SMF ¶¶ 167, 169).

### vi. *Spinrilla's Anti-Infringement Program Surpasses Other Parts of its Business*

In contrast to Spinrilla's robust and evolving anti-infringement program,  (SMF ¶¶ 175-180). Spinrilla has employees (including Mr. Copeland and his girlfriend, Ms. Badenhorst) but . (SMF ¶¶ 103, 180). Spinrilla has . (SMF ¶¶ 177-179). The maturity of Spinrilla's anti-infringement program compared to what Spinrilla does not have reveals that Spinrilla is serious about preventing Plaintiffs' sound recordings from being available on Spinrilla.

In fact, in response to discovery in this case, Plaintiffs did not offer any concrete steps to take make Defendants' anti-infringement program more robust. (SMF ¶¶ 209-213).

**In reality, as noted at the outset of this Brief, Spinrilla's anti-infringement**

program is effective – no more than ███ of content on Spinrilla is infringing.

(*Compare* Plaintiffs' SMF, ¶59 (Dkt. 228)[7] and SMF ¶¶ 202).

## III. Legal Background

### A. Counts in the Complaint

The Complaint, as amended, asserts two Counts. Count I of the Amended Complaint (Dkt. 127) asserts that Defendants have *directly* infringed Plaintiffs' sound recordings and Count II alleges that plaintiffs are liable for secondary copyright infringement. (SMF ¶¶ 312-318).

### B. Summary Judgment Standard

Summary judgment is proper when "there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." (Fed. R. Civ. P. 56(c)). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. (*Id; Pace v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 1:12-CV-

---

[7] By citing to Plaintiffs' Statement of Fact, Defendants are merely restating the numbers Plaintiffs allege and not admitting that Plaintiffs are able to prove either infringement or a specific number of infringements. Defendants will respond to Plaintiffs Statement of Material Facts at the appropriate time.

3096-AT, 2014 WL 11829333, at *1 (N.D. Ga. July 30, 2014)).

### C.  Direct Copyright Infringement

Direct copyright infringement requires a showing that (1) Plaintiffs own a valid copyright in the work(s) and (2) Defendants copied protected elements from the work(s). (*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Peter Letterese & Assocs. v. World Inst, of Scientology Enters.*, 533 F.3d 1287, 1300 (11th Cir. 2008)). When an Internet service provider such as Spinrilla is at issue however, "something more must be shown than mere ownership of a machine used by others to make illegal copies. There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner." (*Disney Enterprises, Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1307-08 (S.D. Fla. 2011) (citing *Religious Technology Center v. Netcom On–Line Communication Services,* 907 F. Supp. 1361, 1370 (N.D. Cal.1995)); *see also*, *Perfect 10, Inc. v. Giganews, Inc.*, No. CV-11-07098-AB, 2014 WL 8628034, at *8 (C.D. Cal. Nov. 14, 2014) ("a claim for direct liability requires evidence that the defendants directly or actively caused the infringement. Perfect 10's continued insistence that defendants allowed its subscribers to upload, download, and view infringing material is the stuff of indirect or secondary liability, not direct liability");

*BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, No. 3:13-CV-2961-BF, 2016
WL 1248908, at *2 (N.D. Tex. Mar. 25, 2016) (granting the defendant summary
judgment as to plaintiff's direct copyright infringement claim because it was
undisputed that the images at issue were posted by third-party users of the website)).

      While the Eleventh Circuit has not expressly adopted the "volitional act"
requirement, the district courts within the Eleventh Circuit have. (*see e.g., Hydentra*
*HLP Int. Ltd. v. Luchian,* No. 1:15-CV-22134-UU, 2016 WL 5951808 (S.D. Fla.
June 2, 2016); *Disney Enterprises, Inc. v. Hotfile Corp.*, No. 11-20427-CIV, 2013
WL 6336286 (S.D. Fla. Sept. 20, 2013)). Moreover, "[e]very Court of Appeals to
have considered an automated-service provider's direct liability for copyright
infringement has adopted" the volitional act requirement. (*ABC, Inc. v. Aereo, Inc.*,
134 S. Ct. 2498, 2512–13 (2014) (Scalia, dissenting) (citing *Fox Broadcasting Co.*
*v. Dish Network LLC*, 747 F.3d 1060, 1066–1068 (9th 2014), *CoStar Group, Inc. v.*
*LoopNet, Inc.*, 373 F.3d 544, 549-550 (4th Cir. 2004); *Cartoon Network LP, LLLP*
*v. CSC Holdings, Inc*., 536 F.3d 121, 131 (2d Cir. 2008)); *see also Leonard v.*
*Stemtech Int'l Inc.*, 834 F.3d 376, 386-87 (3d Cir. 2016); *BWP Media USA, Inc. v. T*
*& S Software Assocs., Inc.*, 852 F.3d 436, 444 (5th Cir.), *cert. denied*, 138 S. Ct. 236
(2017) ("[w]e adopt the volitional-conduct requirement in direct-copyright-
infringement cases" and no liability for defendant that "hosts the [online] forum on

which infringing content was posted" by others)).

In finding that a volitional act was required, the *Hydentra* court undertook an in-depth, meticulous discussion of the topic. Having examined the issue at length, the *Hydentra* court found that: "that in imposing liability upon an internet service provider for third-party users' uploading of copyrighted material, Plaintiff must establish that Defendants engaged in a volitional act to cause the illegal copying. To find otherwise would impose liability upon an otherwise passive internet service provider for conduct that is simply out of its control." (2016 WL 5951808, at *9.)

This Court should conclude, as did the *Hydentra* and *Hotfile* courts, that, in the context of UGC driven websites, like Spinrilla, liability for direct copyright infringement requires a volitional act by the defendant. To do otherwise would be untenable as Justice Scalia recognized: "The distinction between direct and secondary liability would collapse if there were not a clear rule for determining whether the defendant committed the infringing act. The volitional-conduct requirement supplies that rule; its purpose is not to excuse defendants from accountability, but to channel the claims against them into the correct analytical track." (*Aereo*, 134 S. Ct. at 2514 (Scalia, J., dissenting) (citing *Cartoon Network*, 536 F.3d, at 132–133)).

### D.    Secondary Copyright Infringement

It is generally accepted in most circuits, including ours, that there are two types of secondary copyright liability: contributory and vicarious. Contributory copyright infringement refers to the intentional inducement, causation or material contribution to another's infringing conduct. (*Greenberg v. Nat'l Geographic Soc.*, 244 F.3d 1267, 1271 n. 6 (11th Cir. 2001) *as recognized by, Greenberg v. Nat'l Geographic Soc.,* No. 05–16964, 488 F.3d 1331, 2007 WL 1693056 (11th Cir. June 13, 2007)).

Vicarious copyright infringement occurs when the defendant realizes a direct financial benefit from the infringement while declining to mitigate the infringement. (*BUC Intern. Corp., v. International Yacht Council Ltd.,* 489 F. 1129, 1137 n. 19 (2007); *Cambridge Univ. Press v. Becker*, No. 1:08-CV-1425-ODE, 2010 WL 11507617, at *7 (N.D. Ga. Sept. 30, 2010), *order clarified on reconsideration*, No. 1:08-CV-1425-ODE, 2010 WL 11508001 (N.D. Ga. Dec. 28, 2010)).

In their Complaint, Plaintiffs assert both types as well as a third: inducing infringement. (Complaint ¶84 (Dkt. 127)). As demonstrated below, Defendants are entitled to summary judgment as to each type.

### i.    Contributory Infringement

In order to prove that Spinrilla is liable for contributory copyright

infringement, Plaintiffs must show that Spinrilla induced, caused, or materially contributed to the infringing conduct of another with knowledge of the infringing activity. (*Cambridge,* 2010 WL 11507617, at *8). In order to be liable for contributory authority the defendant must have known or had reason to know of the alleged infringement. (*Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845-846 (11th Cir. 1990)). Importantly, contributory copyright infringement cannot exist unless Plaintiffs "establish that the products in question are not capable of substantial 'substantial non-infringing uses.'" (*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984); *Hydentra* 2016 WL 5951808, at *12; *Smith v. BarnesandNoble.com LLC*, 143 F. Supp. 3d 115, 117 (S.D.N.Y. 2015) (granted defendant's motion for summary judgment because it "cannot be held liable for contributory copyright infringement as its [product] was capable of non-infringing uses.").

### a.    *Substantial Non-Infringing Use*

Defendants cannot be liable for contributory copyright infringement if substantial non-infringing uses for the Spinrilla service exist. (*Sony* at 442; s*ee also Arista Records LLC v. Lime Grp., LLC*, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2011)(a defendant who distributes a product that materially contributes to copyright infringement will not be liable for contributory infringement if the product is also

- 17 -

widely used for legitimate, unobjectionable purposes or is merely capable of substantial noninfringing use); *Cambridge,* 2010 WL 11507617, at *11) (finding that defendants could not be liable for contributory copyright infringement because services are capable of significant non-infringing uses)). Under this so-called *Sony* Rule, even "a defendant who distributes a product that materially contributes to copyright infringement will not be liable for contributory infringement if the product is also widely used for legitimate, unobjectionable purposes or is merely capable of substantial noninfringing use." (*Lime Grp.,* 784 F. Supp. 2d 398 at 432).

In *Sony* the Supreme Court held that the distributor of a VCR with no stated or indicated intent to promote infringing uses could not be held contributorily liable for copyright infringements that occurred through the use of the VCR because the VCR was also "capable of commercially significant noninfringing uses". (464 U.S. at 442) Significantly, approximately ten-percent of the usage of defendants' VCRs were for non-infringing activities, which the Supreme Court held this was adequate for "substantial non-infringing use." (*Id.* at 443).

### b. *Intentional Inducement or Encouragement Required*

To prevail on a claim of contributory copyright infringement, a plaintiff must also prove that a defendant intentionally induced or encouraged direct infringement. (*Cable/Home,* 902 F.2d 829 at 845 (citing *Casella v. Morris*, 820 F.2d 362, 365 (11th

Cir. 1987)). A "contributory infringement claim requires, at a minimum, both an allegation of a direct infringement by a third party, and an allegation of an intentional or knowing contribution to that infringement by the defendant" (*Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1245 (11th Cir. 2007)). Thus, "contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement." (*Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1175 (9th Cir. 2007); *see also*, *Sony*, 464 U.S. at 437 (a contributory infringer is one who "was in a position to control the use of copyrighted works by others and had authorized the use without permission from the copyright owner.")).

### c. *Law Specific to Website Operators*

"Absent any specific information which identifies infringing activity, a computer system operator cannot be liable for contributory infringement merely because the structure of the system allows for the exchange of copyrighted material." (*Venus Fashions, Inc. v. ContextLogic, Inc.*, No. 3:16-cv-907-J-39MCR, 2017 WL 2901695, at *11-12 (M.D. Fla. Jan. 17, 2017)).

### ii. *Vicarious Copyright Infringement*

To prevail on their claim for vicarious infringement, Plaintiffs must prove that Defendants "infringe[] vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." (*Metro-Goldwyn-Mayer Studioes,*

*Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930 (2005*)*; *see also*, *S. Bell. Tel. & Tel. Co. v. Associated Tel. Directory Publishers*, 756 F.2d 801, 811 (11th Cir. 1985); *Coach, Inc. v. Swap Shop, Inc*., 916 F. Supp. 2d 1271, 1282 (S.D. Fla. 2012)). To "profit directly from the infringement," "the infringing activity must constitute a draw for subscribers" or provide a "direct financial interest" to Defendants. (*Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004); *Cambridge* 2010 WL 11507617, at *8). If the infringing activity is "just an added benefit," the plaintiff is not considered to have "profited directly from the infringement." (*Ellison,* 357 F.3d 1072 at 1079; *Cambridge,* 2010 WL 11507617, at *8).

### iii.    *Inducing Infringement*

Plaintiffs appear to this Court hold that a third type of secondary copyright liability exists: inducing copyright infringement. (Complaint ¶84 (Dkt. 127)). Defendants, however, are not liable for inducing infringement because this theory of liability is not recognized by the Eleventh Circuit. In fact, the Eleventh Circuit has consistently held that there are only two types of secondary copyright liability: contributory and vicarious. (*Greenberg,* 244 F.3d 1267 at 1271 n. 6; *Buc* 289 F.3d 1129 at 1137 n. 19 ("Even though the Copyright Act does not specifically provide for secondary liability, vicarious and contributory infringement are well established principles derived from common law.")).

In arguing that this Court should recognize inducing infringement, Plaintiffs rely on *Columbia Pictures Indus., Inc. v. Fung,* 710 F.3d 1020 (9th Cir. 2013)*, a case from the Ninth Circuit Court of Appeals, *Lime Grp., LLC,* 784 F. Supp. 2d 398 at 431*, a case from the Southern District of New York, and *Hotfile,* a case from the Southern District of Florida. (Plaintiffs' MSJ Brief, pp. 19-24 (Dkt. 225)). *Fung* and *Lime Grp.* are, of course, outside of this Circuit and this Court is not obligated to follow them. Additionally, the *Hotfile* case does not actually recognize three distinct types of secondary liability. Rather, it analyzes the so-called inducing infringement as a type of contributory infringement. Accordingly, the cases relied upon by Plaintiffs are not persuasive authority given the Eleventh Circuit's consistent recognition of only two types of secondary liability. Because inducing infringement is not recognized in the Eleventh Circuit, Defendants are entitled to summary judgment as to all claims of inducing infringement by Plaintiffs.

## IV.  **Application of Law to Facts**

### A.  *Defendants Are Not Liable for Direct Copyright Infringement*

Plaintiffs claim Defendants are liable for direct copyright infringement of *all 4,082 sound recordings* listed in Plaintiffs' Exhibit A. (Complaint, ¶76 (Dkt. 127) and Exhibit A (Dkt. 222-1)). Specifically, Plaintiffs allege that "Defendants, without permission or consent of Plaintiffs, reproduce and distribute unauthorized

reproductions of Plaintiffs' copyrighted sound recordings, and engage in unauthorized public performances of copyrighted sound recordings, including but not limited to those copyrighted sound recordings identified above and listed in Exhibit A hereto. (*Id.*). These claims fail as a matter of law because Plaintiffs have no evidence that either Defendant committed a volitional act to cause illegal copying as to any of the 4082 allegedly infringing sound recordings.

### i.   *No Volitional Act*

Plaintiffs cannot carry their burden of proving that Defendants are liable for direct copyright infringement because Defendants do not commit a volitional act to cause illegal copying.

Users with upload rights upload audio files to Spinrilla. (SMF ¶¶ 26, 63, 65-66). That is Spinrilla's business model. (*Id.*). As a general matter, Spinrilla does not contribute music to the Spinrilla database. (SMF ¶¶ 230, 233-234). Simply owning the website is not sufficient to create liability for direct copyright infringement. (*See e.g., Hydentra*, 2016 WL 5951808; *Hotfile* 798 F. Supp. 2d 1303 at 1307-08).

In *Hotfile*, the Court granted a Motion to Dismiss finding that "the law is clear that [defendants] are not liable for *direct* copyright infringement because they own and manage Internet facilities that allow others to upload and download copyrighted material." (798 F. Supp. 2d at 1308). The court rejected the plaintiffs' argument that

defendants committed a volitional act by making additional copies once the copyrighted material was uploaded to the defendant's server because "courts have repeatedly held that the automatic conduct of software, unaided by human intervention, is not "volitional." (*Id.* at 1309).

Similarly, the *Hydrenta* court found that a website that hosted the content merely acted as a gatekeeper in prohibiting certain material from being posted on its site. (2016 WL 5951808, at *10). The defendant in *Hydrenta* hosted a website where users uploaded video files. The plaintiff argued that the defendants engaged in volitional conduct when they reviewed each video uploaded to the servers to determine if the video contained prohibited child or animal pornography or spam prior to allowing them to remain displayed for free viewing. (*Id.* at *9). The Court rejected this argument finding that the defendants merely acted as gatekeepers in prohibiting certain material from being posted on the site. In so holding, the Court noted that there was no evidence that the defendants "engaged in any affirmative conduct to cause the copying of Plaintiff's copyrighted materials, which would be necessary" to meet the volitional conduct requirement. (*Id.* at *10).

There is no evidence of record that Spinrilla engages in affirmative conduct to cause the copying of Plaintiff's sound recordings. Spinrilla's users upload audio files and Spinrilla's publication of those files is done automatically by Spinrilla's

software system. (SMF ¶ 26) Even after Spinrilla implemented Audible Magic in December 2015, a Spinrilla user with upload rights uploaded an audio file to Spinrilla's server, the audio file was scanned by Audible Magic and, if not blocked by Audible Magic, the audio file was then automatically published on Spinrilla. This was a fully automated process lacking any "volitional" act by Defendants.

Additionally, while Mr. Copeland would, on occasion, upload an audio file at a user's direction ((SMF ¶¶ 233-234), either because the user was unable to upload the audio file or as a customer service, Plaintiffs cannot link any of those uploaded files to a specific work in allegedly infringed sound recording. Without evidence that Mr. Copeland uploaded one of the works in suit, Plaintiffs' claim of direct infringement fails. Therefore, to the extent Plaintiffs seek to hold Defendants liable for *direct* copyright infringement as to the 4,082 sound recordings allegedly infringed (Dkt. 222-1), Defendants are entitled to summary judgment.

### B. Defendants Are Not Liable for Contributory Copyright Infringement

Plaintiffs cannot carry their burden of proving that Defendants are liable for contributory infringement because there are substantial non-infringing uses of Sprinrilla's site and because Defendants have not induced, caused or materially contributed to any infringing conduct.

### i. *Spinrilla Has Substantial Non-Infringing Uses*

The undisputed evidence of record establishes that Spinrilla has many substantial non-infringing uses, as detailed in Defendants' Statement of Facts. (SMF ¶¶ 237-305). In summary, remarkably, 

████████████████████ (SMF ¶¶ 247-300). ████████

████████████████████████████████████

████████████████████████████ (*Id.*). ████

████████████████████████ (SMF ¶¶ 301-303).

████████████████████████ (SMF ¶¶ 287,

295, 297-300). ████████████████████████

████████████████████████████████

████████████████ (SMF ¶¶ 304-305). With ██

██ registered users and ████████ songs (and growing), Spinrilla provides hip-hop fans with music to listen to. (SMF ¶¶ 63, 202). Also, Spinrilla provides an easy, free way for independent hip-hop artists to distribute and promote their music – allowing them to find an audience (and a potentially massive audience). (SMF ¶¶ SMF ¶¶ 2, 6, 7-8, 15-17, 237-244).

Because Spinrilla has substantial, non-infringing uses, Defendants cannot be liable for contributory infringement as a matter of law under the *Sony* rule. (*Sony,*

- 25 -

464 U.S. 417 at 442; *Hydentra,* 2016 WL 5951808, at *12; *Cambridge,* 2010 WL 11507617, at *11).

This court's *Cambridge* decision (The Honorable Orinda D. Evans) is informative on the issue of substantial non-infringing uses. There, on cross-motions for summary judgment, three book publishers claimed defendant (Georgia State University) were liable for contributory infringement for allowing professors to use electronic systems to reproduce and distribute excerpts from copyrighted books without compensating the publishers. (*Id.* at *1). In denying the book publisher's claim for contributory infringement, the court, citing *Grokster,* reiterated the *Sony* rule, holding that "to the extent [Georgia State] could be considered "distributors" of ERes and uLearn and [was] aware that these programs could be used for copyright infringement, these facts are insufficient to deem them contributorily liable because ERes and ULearn are capable of significant non-infringing uses." (*Id.* at *11). In reaching this conclusion, the *Cambridge* court found that Georgia State's ERs and uLearn electronic systems included: (1) the ability to facilitate distribution of materials protected by fair use; (2) ability to distribute works owned or licensed by the defendant; (3) ability to distribute copyrighted works with permission from copyright holders; and (4) ability to utilize a wide range of tools to manage courses (*i.e.,* discussion forums, quizzes, announcement pages). (*Id.* at *12).

- 26 -

Like the Defendants in *Cambridge,* the Spinrilla service has multiple other uses including (1) the ability to facilitate distribution of non-infringing material owned by the particular Spinrilla account owner; (2) the ability to promote, popularize and distribute works owned by other copyright holders, including Plaintiffs; (3) the ability to monetize Plaintiffs' copyrighted works provided to Spinrilla for that purpose; and (4) the ability to promote and popularize independent hip-hop performers. (SMF ¶¶ 237-305).

Perhaps the most prominent substantial non-infringing use is the use which was the driving force for Spinrilla's creation and continued existence. Specifically, Spinrilla provides a no cost, simple way for independent, unsigned artists to widely distribute their music. (SMF ¶ 241-242; Plaintiffs' SMF ¶¶5 and 6 (Dkt. 228)). This music is owned by the independent artists (*i.e.,* the copyright holders) and the music is theirs to distribute as they wish. As the Plaintiffs admitted, Spinrilla allows open and easy access to material that does not infringe on [its] copyrights." (SMF ¶¶ 241). Thus, this open and easy access is admittedly a substantial non-infringing use.

No reasonable jury could find that this open and easy access is not a substantial non-infringing use. Spinrilla has approximately ██████████ registered users and ██████████. (SMF ¶ 63). Those users have access to ██████████ songs currently available on its site. (SMF ¶¶ 202). In contrast, Plaintiffs contend just a

sliver infringe: ███ songs out of ███████ infringe 4,082 of Plaintiffs' sound recordings. (*Compare* Plaintiffs' SMF, ¶59 (Dkt. 228) and SMF ¶ 202). This minuscule fraction (███) of songs is in stark contrast to cases finding a music platform liable for copyright infringement. (*Lime Grp.* 784 F.Supp.2d 398 at 432) (expert testimony estimated that 98.8% of the files on LimeWire were infringing); *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1014 (9th Cir.2001) (as much as 87% of the files available on Napster may be copyrighted and more than seventy percent may be owned or administered by plaintiffs); *Hotfile* 2013 WL 6336286, at *31 ) (plaintiff's expert opined that 90% of the files were infringing)).

Spinrilla has no desire to compete with iTunes, Spotify, or Pandora (SMF ¶ 7-8, 15-20, 57-58); and, its business model stands in stark contrast to the "typical" peer-to-peer file sharing provider such as Napster and Grokster. (SMF ¶¶ 2, 6, 7-8, 15-17, 237, 241). Knowing the starkness of this contrast, Plaintiffs claim to have not made an effort to determine how many songs are available on Spinrilla.[8] (SMF ¶¶243-244).

The volume of non-infringing content, number of users and number of active

---

[8] Again, this stands in contrast to cases in which a plaintiff has been successful. For example, the Plaintiffs in *Hotfile* relied heavily on their expert's statistical analysis of the amount of infringing material on the site. (*Hotfile,* 2013 WL 6336286, at *4).

users on a daily basis are enough to establish Spinrilla has a "substantial non-infringing use." Thus, Spinrilla is entitled to summary judgment on Plaintiffs' claim for contributory infringement.

A second, substantial non-infringing use of Sprinrilla is providing a non-traditional platform for Plaintiffs to promote their sound recordings. (SMF ¶¶ 245-305).



████████████████████████████████████████████████████████

███████████████████████ (SMF ¶ 245-305). ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ (SMF ¶ 300). ██████

████████████████████████████████████████████████████████

████████████████████████████████████ (SMF ¶ 297).

████████████████████████████████████████████████████████

██████████████ (SMF ¶ 298). ████████████████████████████

████████████████████████████████████████████████████████

█████████ (SMF ¶ 293). ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ (SMF ¶¶ 280-281).

A third substantial non-infringing use is the ability to monetize a sound

recording through links to retailers such as iTunes. At Plaintiffs' request, Spinrilla included a "Purchase" button on Spinrilla.com which drives sales of copies of the works Plaintiffs provide to Spinrilla. (SMF ¶¶ 304). Thus, Spinrilla generates revenue for Plaintiffs. (SMF ¶¶ 304). By clicking on that "Purchase" button, a user of Spinrilla.com leaves the site and is redirected to a separate landing page of a digital retailer, often one of the Plaintiffs' iTunes pages. The Spinrilla user may then purchase sound recordings from Plaintiffs. However, ███████████████████

████████████████████████████████████████████

███████ the revenue generated by Plaintiffs' use of Spinrilla cannot be calculated. (SMF ¶¶ 305). Regardless, the monetization of Plaintiffs' music is a substantial non-infringing use as a matter of law. (*See e.g.,* (*Barnesandnoble.com,* 143 F. Supp. 3d 115 at 124) ("The *Sony-Betamax* rule requires a court to determine whether a product or service is *capable* of substantial noninfringing uses, not whether it is currently used in a noninfringing manner.") (emphasis in original) (citations omitted)). *Hydentra,* 2016 WL 5951808, at *13 (finding a substantial non-infriring use because service was capable of being used for purposes other than copyright infringement).

A fourth substantial non-infringing use is that Spinrilla can help independent artists gain listeners and become popular. Specifically, Spinrilla provides a megaphone for independent artists to publish, distribute and promote their music.

- 30 -

(SMF ¶¶ 237-241; *compare* SMF ¶202 with Plaintiffs' SMF, ¶59 (Dkt. 228)). In contrast, to get their music onto other music platforms which have a meaningfully sized audience, independent artists need an agent. (SMF ¶ 17). This is a substantial non-infringing use and not merely a hypothetical. Using Spinrilla, DJ Louie, helped make popular a then-unsigned (i.e., independent) artist named "Fetty Wap." (SMF ¶¶ 238-239). Fetty Wap soon became a popular artist signed to 300 Entertainment, a record label owned by Plaintiff Atlantic Records. (*Id.*). In addition, Even Sean Diddy Combs asked Spinrilla to publish his son's music. (SMF ¶ 240).

Because there is no question of material fact that Spinrilla is capable of numerous substantial non-infringing uses, Defendants are entitled to summary judgment on Plaintiffs' claims of contributory copyright infringement. (*Sony* 464 U.S. at 442; *Cambridge*, 2010 WL 11507617, at *11-12). Indeed to hold otherwise would stifle invention and innovation.

### ii. *Spinrilla Does Not Materially Contribute To The Infringement By Either Inducing Or Encouraging Infringement*

Independent of the question of substantial non-infringing uses, Defendants are also entitled to summary judgment on Plaintiffs' contributory copyright infringement claims because Spinrilla has not induced, caused or materially contributed to any infringing conduct. Merely being aware that a service could be

- 31 -

used for copyright infringement is insufficient to meet this element as a matter of law. (*Cambridge,* 2010 WL 11507617, at *11-12). A defendant with no stated or indicated intent to promote infringing uses cannot be held contributorily liable for copyright infringement that occurred through the use of its service. (*Id.*). Rather, Plaintiffs must establish that Defendants promoted infringement. (*Id.*).

Spinrilla has successfully discouraged infringement through its robust and constantly evolving anti-infringement program; no infringement claim is made to ████ of Spinrilla's content. A defendant is not required to prevent all the harm that is facilitated by its technology; rather, it need only make a good faith attempt to mitigate large-scale infringement. (*Lime Grp.,* at 429-430).

Moreover, this case is far different from such cases as *Napster and Grokster.* Both of those services were expressly engineered to enable the easy exchange of pirated music. (*Napster,* 239 F.3d at 1020 n. 5 (quoting document authored by Napster co-founder which mentioned "the need to remain ignorant of users' real names and IP addresses 'since they are exchanging pirated music'"); *Grokster,* 545 U.S. at 937 (Grokster advertised itself as an alternative to Napster)).

Unlike the defendants in those cases, Spinrilla was created and promoted as a way for independent hip-hop artists to share their music. (SMF ¶¶ 2, 6, 7-8, 15-17). For these reasons, Plaintiffs cannot prove that Spinrilla induces or encourages

infringement.

## B. Defendants Are Not Liable for Vicarious Copyright Infringement

As described in Section III.D.ii, *supra*, "[a] claim of vicarious copyright infringement arises against one who 'profit[s] from [another's] direct infringement while declining to exercise a right to stop or limit it.'" (*Cambridge*, 769 F.3d at 1242 at n.7 (citation omitted)).

### iii. Spinrilla Does Not Directly Profit from the Alleged Infringement

Plaintiffs cannot prove that Defendants have derived any financial benefit from the alleged infringements; thus, Plaintiffs' claim for vicarious infringement fails as a matter of law. Defendants do not sell any music and are not paid when a file is uploaded. (SMF ¶¶ 39, 44). Defendants do not advertise themselves as a site to download pirated materials. (SMF ¶¶ 50-55). To the contrary, Defendants look to attract "independent and emerging hip-hop artists". (SMF ¶¶ 2, 6, 7-8, 15-17, 237, 241).

Spinrilla's primary revenue ███████████████████████ (SMF ¶¶ 39, 45) Spinrilla does not charge is users to upload content or to listen to content. (SMF ¶ 44)) The ████████████████████████████. (SMF ¶¶ 50-55). In fact, ████████████████████████████████████████████

████████████████████████████████████████ (SMF ¶ 321).

Accordingly, no reasonable jury could find that Spinrilla derived a direct financial

benefit based on ████████████████████████. (*Hydentra*, 2016 WL

5951808, at *14).

In *Hydentra*, the plaintiff argued that all of the defendant's revenue came from

advertising on its websites and, because the amount defendant is paid by advertisers

is based on the number of users directed to the advertisers' sites from the defendant's

websites, the attractiveness of the content on defendant's sites influences the number

of users, which, in turn influences the amount of ad revenue the defendant realized.

(*Hydentra,* 2016 WL 5951808, at *14). The defendant in *Hydentra* argued that the

advertisers are not given the opportunity to appear next to the supposedly more

popular infringing content, therefore, the infringing content does not generate more

revenue for the defendant. (*Id.*). The *Hydentra* court agreed that this scenario does

not mean the defendant "received a direct financial benefit from the uploading of

Plaintiff's videos," particularly because the plaintiff failed to tender evidence that

the infringing content drew additional traffic to the defendant's websites." (*Id.*). The

*Hydentra* court stated that the plaintiff's "argument that the infringed videos

somehow attracted and drew more visitors to Defendants' Websites, which allowed

Defendants to receive more revenue in advertisements, is not supported by record

- 34 -

evidence and highly speculative.' (*Id*.).

As in *Hydentra,* Plaintiffs here have failed to provide any evidence that the allegedly infringing works attracted or drew more visitors to Spinrilla than would have been the case if the allegedly infringing works were not available. As the Ninth Circuit has made clear, it is not sufficient merely to show that Spinrilla derives ███

███████████████████. (*See e.g., Ellison,* 357 F.3d at 1079; *Ventura Content,* 885 F.3d 597).

In *Ellison,* the Ninth Circuit held that "no jury could reasonably conclude that AOL received a direct financial benefit from providing access to the infringing material" because "[t]he record lacks evidence that AOL attracted or retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement." (*Ellison* at 1079). AOL had, without authorization, posted copies of some of Ellison's copyrighted short stories on a peer-to-peer file sharing network. (*Id.* at 1074). That peer-to-peer file sharing network contained other, non-infringing material. Because AOL provided its subscribers with access to that network, Ellison sued AOL for vicarious and contributory copyright infringement. (*Id*.).

Ellison argued that AOL received a direct financial benefit from the infringement because AOL admitted in a securities filing that network access was

important to attract and retain subscribers and that when AOL blocked access to the network at issue, many subscribers called AOL to inquire why it was blocked. (*Ellison* at 1079). The Ninth Circuit acknowledged that AOL offered access to the network that contained some of Ellison's stories, to encourage overall subscription to AOL's services. (*Id.*). The Ninth Circuit also acknowledged that AOL's future revenue depended on maintaining and increasing its subscriber base. (*Id.*). Nevertheless, the Ninth Circuit held that not every benefit is a "direct financial benefit." (*Id.*). Rather, to constitute a "direct financial benefit," the inquiry "is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps . . . . ." (*Id.*).

> The Ninth Circuit concluded:
>
> We note that there is no evidence that indicates that AOL customers either subscribed because of the available infringing material or cancelled subscriptions because it was no longer available. While a causal relationship might exist between AOL's profits from subscriptions and the infringing activity taking place on its servers, Ellison has not offered enough evidence for a reasonable juror so to conclude.

*Id.* at 1079. As in *Ellison,* here there is no causal relationship between the alleged infringement and any financial benefit Defendants receive.

Similarly, the *Ventura Content* court found that a mere desire to increase users is insufficient to prove a direct financial benefit from allegedly infringing works.[9] (*Ventura Content,* 885 F.3d 597). In *Ventura Content,* the defendant was a video sharing website which provided pornographic pictures and video clips to its users. (*Id.* at 600.) The vast majority of the nearly 12.6 million videos and pictures were uploaded by the site's users. (*Id.*) The defendants earned most of their income from advertisements. (*Id.*) When the plaintiff discovered 33 of its video clips on the site, it sued. (*Id.*) Defendants raised the DMCA safe harbor defense; and, the district court granted Defendants' motion for summary judgment. (*Id.*).

In assessing whether the defendants received a direct financial benefit, the Ninth Circuit found that it was significant that the defendants did not advertise the site as a place to get pirated materials. (*Ventura Content* at 613.) While the Court noted that obviously more users would attract more views, and that would lead to more advertising revenue, this was not sufficient to prove a direct financial benefit. (*Id.*) "The words "the" and "directly" in the statute, though, must mean that some

---

[9] While *Ventura Content* is a DMCA "safe harbor" case, its analysis regarding direct financial benefit is applicable to vicarious liability. (*Perfect 10, Inc. v. CCBill LLC,* 488 F.3d 1102, 1117 (9th Cir. 2007) ("we hold that "direct financial benefit" should be interpreted consistent with the similarly-worded common law standard for vicarious copyright liability.")).

- 37 -

revenue has to be distinctly attributable to the infringing material at issue. There is no evidence that Motherless made any money directly from the Ventura clips." (*Id.*)

The *Ellison* and *Ventura Content* courts' reasoning that not every benefit is a direct financial benefit, applies to Spinrilla. Merely showing that Spinrilla's revenue depends on increasing the number of users is not sufficient to demonstrate a direct financial benefit. Rather, Plaintiffs must prove that the allegedly infringing activity acts as a draw rather than being a mere added benefit. And this, Plaintiffs cannot do. For example, Plaintiffs were not able to point to any specific advertisements in which Defendants promoted the allegedly infringing sound recordings. (SMF ¶¶ 50-55).

Plaintiffs have offered no proof that Spinrilla earns revenue directly from any of Plaintiffs sound recordings. Moreover, Plaintiffs have provided no evidence that Spinrilla attracted users because of the availability of Plaintiffs' sound recordings: there is no evidence that Spinrilla's users created accounts (subscribed) because of the allegedly infringing material or canceled their accounts after any particular sound recording was removed. (*See Ellison,* 357 F.3d at 1079.) Nor is there any evidence that the implementation of Audible Magic led to a dramatic drop in income. (*Id.*) Thus, there was no "causal relationship" between the alleged infringing activity and a financial benefit reaped by Spinrilla. Any alleged infringement by Spinrilla's uploaders was not of any direct pecuniary benefit to Spinrilla and no reasonable jury

- 38 -

could find otherwise based on the evidence of record.

Plaintiffs' argument that the presence of their sound recordings attracted more users is mere speculation. Such speculation is insufficient to create a jury question. (*Ventura Content,* 885 F.3d at 613; *Ellison,* 357 F.3d at 1079). In *Cambridge*, the plaintiffs relied on a similar generalized financial benefit argument. The Court rejected this argument holding that the fact that Georgia States' electronic systems may attract students to the university, does not mean Georgia State profited from the alleged unlawful distribution of the publishers' copyrighted works. (*Cambridge*, 2010 WL 11507617, at *9). Specifically, the court found that "the evidence presented does not indicate that Defendants "profited directly from" or "had a direct financial interest in" the infringement alleged by Plaintiffs. At most, if the Court takes the inferential steps suggested by Plaintiffs, any benefit the infringement provides to students constitutes "just an added benefit" rather than a clear "draw" to Georgia State. (*Id.*). As in *Cambridge,* the fact that file sharing may attract users to the Sprinrilla website, the evidence does not suggest that Spinrilla profited from the availability to account holders of any of the allegedly infringing works. Thus, availability of the allegedly infringing works is at most an added benefit of Spinrilla's service, rather than a clear draw to their site.

No reasonable jury could find that Spinrilla derived a direct financial benefit

from any infringement and Defendants are entitled to summary judgement on Plaintiffs' claim of vicarious copyright infringement.

### iv. *Spinrilla Has Taken Reasonable Steps to Stop and Limit Infringement*

Plaintiffs also cannot carry their burden of proof as to the second essential element of vicarious infringement because that cannot show that Spinrilla has declined to exercise a right to stop or limit it. To the contrary the undisputed evidence of record demonstrates that Spinrilla has taken robust steps to stop infringement and works to continuously improve its anti-infringement programs. (SMF ¶¶ 56-220)

Defendants have exercised their right and ability to remove allegedly infringing audio files from accounts as well as terminate user's accounts. In fact, Spinrilla operates a first line of anti-infringement activity by verifying that applicants for upload rights are independent hip-hop artists who create their own sound recordings. Only ▮▮▮▮ of Spinrilla users have upload rights and ▮▮▮▮ of users who have applied to Spinrilla for upload rights were given them. (SMF ¶ 63, 69). Even after granting upload rights to ▮▮▮▮▮▮▮▮ of applicants, Spinrilla continues to limit infringement including by (1) responding promptly to takedown notices; (2) implementation of several Audible Magic services to block possibly infringing content; (3) conducting back-scans of uploaded audio files; (4)

manually removing any music it feels may belong to Plaintiffs; and (5) terminating repeat offenders. This robust anti-infringement program stands in stark contrast to those defendants found to have declined to exercise rights to stop or limit infringement such as the defendant in *Lime Group,* 784 F.Supp.2d at 431. No reasonable jury could find that Defendants have failed to take reasonable steps to limit infringement. Thus, Defendants are entitled to summary judgement on Plaintiffs' claims of vicarious copyright infringement.

### C.    Defendants Are Not Liable For Inducing Infringement

As discussed in Section III.D.iii, *supra,* inducing infringement is not a recognized form of secondary liability in the Eleventh Circuit and Defendants are entitled to summary judgment as to Plaintiffs claims of inducing infringement. However, in an abundance of caution, Defendants demonstrate why they are entitled to summary judgment if this Court adopts inducing infringement liability.

A defendant cannot be liable for inducing infringement if it does not promote the use of its service specifically to infringe copyrights. (*Amazon.com,* 508 F.3d 1146 at 1170 n. 11) ("Google's activities do not meet the 'inducement test explained in *Grokster* because Google has not promoted the use of its search engine specifically to infringe copyrights.")). Like Google in *Amazon.com*, Spinrilla has not promoted the use of its service specifically to infringe copyrights. To the contrary,

the evidence of records demonstrates that Spinrilla has consistently promoted its service as providing only for the sharing of *independent* hip-hop music created by the holders of uploader accounts.

According to the Ninth Circuit, to prove inducing infringement, plaintiffs must establish four elements: four elements: (1) the distribution of a device or product, (2) acts of infringement, (3) an object of promoting its use to infringe copyright, and (4) causation. (*Perfect 10, Inc. v. Giganews, Inc.,* 847 F.3d 657, 672 (9th Cir. 2017)). There is no evidence of record that could support a finding that Defendants had an object of promoting Spinrilla to infringe copyrights.[10] Accordingly, Spinrilla is entitled to summary judgment.

### iv. Defendants Did Not Have Actual or Constructive Knowledge of Specific Infringing Activity

As an initial matter, Defendants cannot be liable for indirect infringement unless Plaintiff can prove that Defendants had actual or constructive knowledge of specific infringing activity of Plaintiffs' copyrights. (*Napster,* 239 F.3d 1021; *Giganews,* 2014 WL 828031, at *7). A "general awareness that infringement may be occurring" is not enough to show whether a particular defendant violated a

---

[10] Defendants do not concede that there is sufficient evidence to support the other three elements. However, because the absence of even one element is sufficient to defeat Plaintiffs' claim, Defendants focus on the third element.

particular copyright held by a particular plaintiff. (*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 at 35 (2d Cir. 2012), cited with approval in *Shelter Capital,* 718 F.3d 1006 at 1023).

### v. Defendants Did Not Have an Object to Promote Infringement

To survive summary judgment, Plaintiffs must show that there is at least a question of fact that Defendants distributed Spinrilla with the object of promoting its use to infringe copyrights, as shown by clear expression or other affirmative steps taken to foster infringement." (*Grokster,* 545 U.S. at 936-937). The Ninth Circuit has held that this element "requires a high degree of proof of the improper object." *Fung,* 710 F.3d at 1034. Plaintiffs cannot make this showing.

In finding that Grokster was liable for secondary copyright infringement, the Supreme Court relied on three specific kinds of evidence: (1) internal communications and advertising efforts; (2) the defendants' failure to develop and implement filtering tools or other means of limiting infringement; and (3) defendants' reliance on infringing activity for the success of their business. *Grokster,* 545 U.S. at 937-40. The evidence of record demonstrates that none of these factors apply to Spinrilla and there can be no question of material fact sufficient to send this issue to a jury. Accordingly, Spinrilla is entitled to summary judgment.

Defendants do not rely on infringing activity for their business. Indeed, they do not derive any financial benefit from the uploading of allegedly infringing audio files as demonstrated in Section IV.B.i, *supra*. Moreover, Defendants have developed a robust anti-infringement program to limit any infringement. (SMF ¶¶ 56-220). Spinrilla does not want or need Plaintiffs' sound recordings - its purpose is to distribute and popularize independent hip-hop music. (SMF ¶¶ 2, 6, 7-8, 15-17)

Spinrilla is in stark contrast to *Lime Grp.*, where the defendant was found liable for inducing infringement. (*Lime Grp.* at 424). The *Lime Grp.* court found that the defendant (1) attempted to attract infringing users by advertisements and solicitations directed to users of Napster and similar programs; (2) enabled and assisted the infringement by distributing and maintaining LimeWire (its website); (3) its business depended on infringement; and, (4) it failed to implement a meaningful anit-infringement program to mitigate infringement. (*Id.* at 424-426). Moreover, there were internal documents openly discussing the great extent to which Limewire users were sharing infringing materials and estimating that "25% of Limewire users were hardcore pirates." (*Id.* at 426). The court's discussion of Lime Group's anti-infringement program is illumination. Lime Group's anti-infringement effort merely consisted of an electronic notice asking users to affirm they were not using the site for copyright infringement and an optional filter capable of blocking

- 44 -

infringement. (*Id.* at 429-430). Importantly, the LimeWire court noted that this was not a meaningful barrier and noted the defendant's failure to use existing technology to prevent infringement was a strong indicator of intent to induce the infringement. (*Id.* at 431). In fact, the court noted that the defendant should have implemented "acoustic fingerprinting". Of course, Audible Magic, employed by Spinrilla, utilizes acoustic fingerprinting.

Based on the evidence of record, no reasonable jury could find that Defendants were liable for inducing infringement; thus, Defendants are entitled to summary judgment on Plaintiffs' claims for inducing infringement.

## V.   <u>Conclusion</u>

For the foregoing reasons, Defendants are entitled to summary judgment on Plaintiffs' claims of direct infringement to the extent that they contend Defendants are liable for direct infringement of all 4,082 sound recordings in suit. Defendants are also entitled to summary judgment on all of Plaintiffs claims of secondary liability.

Respectfully submitted this 7th day of January, 2019.

**LILENFELD PC**

*/s/ David M. Lilenfeld*
David M. Lilenfeld
Georgia Bar # 452399

- 45 -

Lilenfeld PC
3379 Peachtree Road NE, Suite 980
Atlanta, Georgia 30326
Telephone: (404) 201-2520
David@lilenfeld.com
Attorney for Defendants

## <u>CERTIFICATE OF COUNSEL REGARDING FONT SIZE</u>

I, David M Lilenfeld, an attorney, hereby certify that the foregoing has been prepared with a font size and point selection (Times New Roman, 14 pt.) which is approved by the Court pursuant to Local Rules 5.1(C) and 7.1(D).

<u>/s/ David M. Lilenfeld</u>
David M. Lilenfeld

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ATLANTIC RECORDING )
CORPORATION, *et al.,* )
)
    Plaintiffs, )
) Case No.:
v. )
) 1:17-CV-0431-AT
SPINRILLA, LLC, *et al.,* )
)
    Defendants. )
_____)

## **CERTIFICATE OF SERVICE**

The foregoing Defendants' Brief in Support of Their Motion For Summary Judgment on Plaintiffs' Claims of Direct and Secondary Copyright Infringement of was filed today, January 7, 2019, using the Court's *CM/ECF* system, which automatically and contemporaneously sends electronic notification and a service copy of this filing to the following counsel of record:

James A. Lamberth, Esq.          Previn Warren, Esq.
*james.lamberth@troutmansanders.com*    *pwarren@jenner.com*

Kenneth L. Doroshow, Esq.        Ava U. McAlpin, Esq.
*kdoroshow@jenner.com*            *amcalpin@jenner.com*

January 7, 2019

*/s/ David M. Lilenfeld*

David M. Lilenfeld