# Defendants' Brief in Support of Their Motion for Partial Summary Judgment as to Their DMCA Safe Harbor Defense (Dkt. 265)

# Plaintiffs' and Defendants' Redactions

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ATLANTIC RECORDING CORPORATION, *et al.,* | ) ) ) | |
| Plaintiffs, | ) ) | Civil File Action No.: |
| v. | ) ) | 1:17-CV-0431-AT |
| SPINRILLA, LLC, *et al.,* | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO THEIR DMCA SAFE HARBOR DEFENSE**

**[CONFIDENTIAL]**

**[FILED UNDER SEAL PER PROTECTIVE ORDER ((DKT. 186)]**

# TABLE OF CONTENTS

**I.**    **Introduction** ……………………………………………………..1

**II.**   **Facts Related to DMCA Defense** …………………………………..1

**III.**  **Legal Background** ……………………………………………….5

    *A. Summary judgment standard* …………………………...……5

    *B. Policing Copyright Infringement* …………………………….……6

    *C. DMCA's Storage Safe Harbor* ……………………………………..7

    *D. Burden of Proving Entitlement to Storage Safe Harbor* …………….....9

**IV.**   **Application of Law to Facts** ……………………………………….11

    *A. Spinrilla is a "Service Provider"* …………………………….……11

    *B. Any Infringing Material Was Posted "at the direction of the user"* ….12

    *C. Spinrilla Lacked Actual or Red Flag*
    *Knowledge of the*
    *Infringing Material* ……………………………………………...13

    *D. Spinrilla Expeditiously*
    *Removed Infringing Content*
    *When it  Became Aware of It* ……………………………………15

    *E. Spinrilla Did Not Financially Benefit*
    *From Infringements and does not have the right*
    *and ability to control the infringing activity* ……………………….....17

        *i. Defendants do not receive a*
        *financial benefit directly attributable*
        *to the infringing activity* …………………………………….……17

        *ii. Defendants do not have*

i

*the right and ability*
*to control the infringing activity* …………………………………20

**F. Spinrilla's Repeat Infringer Policy** …………………………………22

    *i. Adoption and communication of Repeat Infringer Policy* ……...23

    *ii. Reasonably Implemented that Policy* …………………………...23

**G. Spinrilla Has a DMCA Agent** …………………………………....24

**V.**   <u>**Conclusion**</u> ……………………………………………………..……25

# TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ……………………………………………………5,6

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
    881 F.3d 293 (4th Cir. 2018) ……………………………………….…..9

*Capitol Records, LLC v. Vimeo, LLC*,
    826 F.3d 78 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1374 (2017) …....*passim*

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) …………………………………………………..…..6

*Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) ……………………………………………7

*Disney Enterprises, Inc. v. Hotfile Corp.*,
    No. 11-20427-CIV, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) ….9, 10, 15

*Hydentra HLP Int.'l Ltd. v. Luchian*,
    No. 1:15-CV-22134-UU,
    2016 WL 5951808 (S.D. Fla. June 2, 2016) ………………...……….10, 19

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
    853 F.3d 1020 (9th Cir. 2017) …………………………………………….7

*Milo & Gabby, LLC v. Amazon.com, Inc.*,
    No. 13-1932, 2015 WL 4394673 (W.D. Wa July 16, 2015) ……………..20

*Metro-Goldwyn-Mayer Studioes, Inc. v. Grokster, Ltd.*,
     545 U.S. 913 (2005) …………………………………………….…22

*Ouellette v. Viacom Int'l, Inc.*,
    No. CV 10-133-M-DWM-JCL,
    2012 WL 1435703 (D. Mt. April 25, 2012) ………………………….……..3

*Pace v. Nat'l Union Fire Ins. Co. of Pittsburgh*,

No. 1:12-CV-3096-AT, 2014 WL 11829333 (N.D. Ga. July 30, 2014) …...…6

*Perfect 10, Inc. v. Amazon.com, Inc.*, No. 05-4753-AHM,
2009 WL 1334364 at *8 (C.D. Cal. May, 12, 2009) ………………….…9

*Perfect 10, Inc. v. CCBill LLC,*
488 F.3d 1102 (9th Cir. 2007) …………………………….………….*passim*

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
213 F. Supp. 2d 1146, (C.D. Cal. 2002) …………………………………...21

*Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133 (2000) …………………………………………………………6

*UMG Recordings, Inc. v. Shelter Capital Partners LLC,*
718 F.3d 1006 (9th Cir. 2013) …………………………………….8, 21, 22

*UMG Recordings, Inc. v. Veoh Networks, Inc.,*
665 F. Supp. 2d 1099 (C.D. Cal. 2009), *aff'd sub nom. UMG Recordings,
Inc. v. Shelter Capital Partners LLC,* 71 F.3d 1006 (9th Cir. 2013) ….14, 15

*Ventura Content, Ltd. v. Motherless, Inc.,*
885 F.3d 597 (9th Cir.), *cert. denied*, 139 S. Ct. 419 (2018) …………*passim*

*Venus Fashions, Inc. v. ContextLogic, Inc.,*
No. 3:16-cv-907-J-39MCR,
2017 WL 2901695 (M.D. Fla. Jan. 17, 2017) …………………………..11

*Viacom Int'l, Inc. v. YouTube, Inc.,*
676 F.3d 19 (2d Cir. 2012) …………………………………………...8, 21

**STATUTES**

Fed. R. Civ. P. 56(c) ……………………………………………………….5

17 U.S.C. § 512(a) …………………………………………………………7

17 U.S.C. § 512(b)…. …………………………………………………………7

17 U.S.C. § 512(c) ……………………………………………………..*passim*

17 U.S.C. § 512(d) ………………………………………………………………7

17 U.S.C. § 512(i) ………………………………………………………………8

17 U.S.C. § 512 (k) …………………………….……………………………11

**OTHER AUTHORITIES**

S. Rep. No. 105-190 (1998) …………………………………...…………………..18

## I.    <u>Introduction</u>

Defendants move for partial summary judgment as to their DMCA safe harbor defense. Under 17 U.S.C. § 512 (c)'s safe harbor, Defendants are not liable for monetary, injunctive, or other relief. Summary judgment is appropriate because the applicable safe harbor shields Defendants from liability to Plaintiffs' claims for copyright infringement, if any, occurring after July 29, 2017.

## II.   <u>Facts Related to DMCA Defense</u>

Dylan Copeland is the sole owner of the music streaming service, Spinrilla, which caters to independent hip-hop artists. (SMF ¶¶ 2, 6, 7-8, 17).



(Plaintiffs' SMF ¶59 (Dkt. 228) and SMF ¶ 202). (SMF ¶ 63). Given the volume of content on Spinrilla and the number of audio files added to Spinrilla on a daily basis, Defendants obviously cannot listen to what is uploaded. (SMF ¶ 89). Additionally, Spinrilla does not delete or remove files that were not frequently downloaded (i.e., remove unpopular songs as a way of making it more likely users listen to popular songs). (SMF ¶ 48).

All audio files on Spinrilla are there because they were uploaded by a user

1

with upload rights. (SMF ¶¶ 13, 26, 63, 65-66, 69-71, 86-87). However, on occasion, audio files were uploaded by Defendants at a user's direction, either because the user was unable to upload the audio file or as a customer service. (SMF ¶¶ 233-234). After a user with upload rights has uploaded content, he/she can add art (primarily an album/mixtape cover), titles to the entire album/mixtape and the individual songs within that album/mixtape. (SMF ¶¶ 26, 35). Spinrilla stores the audio files and other user generated content on servers it rents or owns. (SMF ¶ 48).

Spinrilla launched with a number of anti-infringement measures in place and has added other measures as the business has grown. (SMF ¶¶ 56-166; 203-213). One of those measures was its Terms of Use prohibiting the posting of copyrighted material. (SMF ¶¶ 90-98). At Plaintiffs' suggestion, in December 2015, Spinrilla began using Audible Magic, a leading content recognition service. (SMF ¶¶ 105-110; 142-151). Spinrilla has continued to add other Audible Magic products as Spinrilla has learned of them and determined their usefulness. (SMF ¶¶ 131-140). Through its implementation and use of Audible Magic, more than ▮▮▮▮ audio files that were uploaded to Spinrilla were blocked from publication. (SMF ¶¶ 114).

Defendants promptly respond to any takedown notices[1] they receive under the

---

[1] A takedown notice is a complaint under the DMCA from a copyright owner to an online service provider requesting that the service provider remove or black access

DMCA. Defendants ordinarily remove the content within a day or less after receipt of a takedown notice. (SMF ¶¶ 100, 182-183). Defendants also send a response to the complainant to inform him/her that the complained of content was removed. (SMF ¶¶ 183, 191-192). Unfortunately, because some of the takedown notices failed to contain a URL to where the allegedly infringing audio file resided, Defendants could not locate some of the files.[2] (SMF ¶¶ 193). Defendants have also promptly removed audio files which Plaintiffs have contended through this litigation infringe Plaintiffs' sound recordings. (SMF ¶¶ 205).

As part of its anti-infringement program, Spinrilla also began terminating the

_____

to infringing materials. (*Ouellette v. Viacom Int'l, Inc.*, No. CV 10-133-M-DWM-JCL, 2012 WL 1435703 at *2 (D. Mt., April 25, 2012)).

[2] To be DMCA-compliant, a takedown notice must include (1) a physical or electronic signature of a person authorized to act on behalf of the copyright owner, (2) identification of the copyrighted work or, if multiple copyrighted works are covered by a single notification, a representative list of such works at that site, (3) identification of the material that is claimed to be infringing, and information reasonably sufficient to permit the service provider to locate the material, (4) contact information for the complaining party, (5) a statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized, (6) a statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed. (*Ventura Content, Ltd. v. Motherless, Inc*., 885 F. 3d 597, 616 n.75 (9th Cir.), *cert. denied*, 139 S. Ct. 419 (2018)).

accounts of users with upload rights who repeatedly uploaded infringing content. (SMF ¶¶ 203-205; *see also* ¶¶ 96-97). ████████████████████████ ████████████ (*Id.*).

Mr. Copeland personally examines all copyright infringement notices, whether DMCA-compliant or not, and deletes any infringing content he can find. (SMF ¶¶ 100, 182-184, 199). Even when a copyright infringement notice fails to meet the DMCA requirement of including a URL (which occurs frequently), Mr. Copeland removes the content if he can find it based on other information provided in the infringement notice. (SMF ¶¶ 193).

Defendants do not charge users to browse or stream music that is on Spinrilla. (SMF ¶ 44, *see also* ¶ 39). Normally, a user can download an audio file for free although Spinrilla gives users with upload rights the option of requiring a user pay the artist to download that artist's audio file. (SMF ¶¶ 42, 246, 304). When the user with upload rights chooses this option, he/she must include a link to a third-party website (*e.g.,* iTunes) where the songs can be purchased; in other words, in these instances, the song is not downloaded from Spinrilla and Spinrilla does not earn any payment, fees or commissions from the download. (SMF ¶ 44). Spinrilla does not pay users to upload music. (SMF ¶ 44).

Spinrilla offers "premium" subscriptions (which blocks ads) but an



(SMF ¶¶ 39, 43). Spinrilla also offers users with upload rights prominent placement of their music listings in exchange for money. (SMF ¶ 41).

(SMF ¶¶ 39-47).

(SMF ¶¶ 319).

(SMF ¶¶ 320).

(SMF ¶¶ 245-300).

## III.  Legal Background

### A.  *Summary judgment standard*

Summary judgment is proper when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is material if resolving the factual issue might change

5

Case 1:17-cv-00431-AT Document 285 *SEALED* Filed 01/07/19 Page 13 of 34

the suit's outcome under the governing law. *Id.*

When ruling on a motion for summary judgment, courts must view the evidence in the light most favorable to the non-moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; instead, the moving party need only establish the lack of evidentiary support for the non-moving party's position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Pace v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 1:12-CV-3096-AT, 2014 WL 11829333 at *1 (N.D. Ga. July 30, 2014).

### B.    *Policing Copyright Infringement*

The DMCA places the burden of policing copyright infringement on the copyright owner, not on the person or firm storing and hosting the material. (*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007)). Congress could have placed the burden of policing infringement in suspicious circumstances on the provider, but it instead chose to place that burden on the copyright holder. (*Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 610 (9th Cir.), *cert. denied*, 139 S. Ct. 419 (2018)).

The DMCA strikes a balance between the interests of "copyright holders in benefitting from their labor; ... entrepreneurs in having the latitude to invent new

Case 1:17-cv-00431-AT Document 265 *SEALED* Filed 01/07/19 Page 14 of 34

technologies without fear of being held liable if their innovations are used by others in unintended infringing ways; and those of the public in having access [to] both...." (*Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1037 (9th Cir. 2013)). The DMCA balances these interests by requiring service providers to take down infringing materials when copyright holders notify them of the infringement and by limiting service providers' liability for unintentional infringement through several safe harbors. (*Mavrix Photographs, LLC v. LiveJournal, Inc.,* 853 F.3d 1020, 1026-1027 (9th Cir. 2017) (citing *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)).

### C.    *DMCA's Storage Safe Harbor*

The DMCA has a number of safe harbors. (17 U.S.C. § 512(a)-(d)). The safe harbor applicable here is Section 512(c), which shields "service providers" from liability for "information residing on systems or networks at the direction of users." This is often referred to as the "storage safe harbor." The storage safe harbor protects a "service provider" against copyright liability "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider ..." (17 U.S.C. § 512(c)).

A defendant is entitled to the safe harbor provisions of § 512(c) if the defendant:

(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

(17 U.S.C. § 512(c)(1) and (2)).

In addition to the requirements of § 512(c), a defendant must also meet the requirements of §512(i) which requires that a defendant "has adopted and reasonably implemented and informs subscribers and account holders" of a policy that "provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i).

The § 512(c) safe harbor is aimed at the alleged infringements in suit. Other infringing material (i.e., the service as a whole) is immaterial to the defense. (*Ventura Content,* 885 F.d at 614; *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1021–22 (9th Cir. 2013); *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 93 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1374 (2017); *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012)). The repeat infringer policy,

on the other hand, is not specific to the alleged infringements in suit. (*Ventura Content,* 885 F.d at 614).

### D.  Burden of Proving Entitlement to Storage Safe Harbor

"Although an affirmative defense, the DMCA has often been construed in favor of service providers, requiring relatively little effort by their operations to maintain immunity." (*Disney Enterprises, Inc. v. Hotfile Corp.*, No. 11-20427-CIV, 2013 WL 6336286 at *19 (S.D. Fla. Sept. 20, 2013)). Thus, while the defendant has the burden of proving that it properly designated a copyright agent and that it responded to notifications as required,[3] the Second and Ninth Circuits (which are the only circuit courts to address the issue directly[4]) have placed a portion of the burden on plaintiffs. (*Vimeo,* 826 F.3d at 94; *Ventura Content,* 885 F.3d at 610)).

In *Vimeo*, the Second Circuit held that a defendant bears the burden of proving entitlement to safe harbor protection *except* that if a copyright owner accuses the defendant of misconduct (*e.g.*, the defendant's "failure to act as the statute requires

---

[3] *Perfect 10, Inc. v. Amazon.com, Inc*., No. 05-4753-AHM, 2009 WL 1334364 at *8 (C.D. Cal. May, 12, 2009).

[4] The Fourth Circuit ruled that the defendant "bears the burdn of proof on the DMCA safe harbor defense," but that ruling was only after the plaintiff had proffered evidence that the defendant had actual knowledge of infringement. (*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 305 (4th Cir. 2018)). So, it is not clear what burdens the defendant had *initially* with respect to knowledge of infringement.

after receiving the copyright owner's notification or otherwise acquiring actual or red flag knowledge") the burden of proof more appropriately shifts to the plaintiff. (826 F.3d at 94). Similarly, the Ninth Circuit held that the copyright owner has the burden of establishing the service provider's knowledge, actual or red flag, of infringing content which are the subject of the plaintiff's claim. (*Ventura Content,* 885 F.3d at 610). In other words, the service provider does not have the burden to prove lack of knowledge, which would require the service provider to prove a negative.

Plaintiffs assert that "the law" is that the party seeking the benefit of the safe harbor has the burden of proof (Dkt. 227, p. 11) based on some district courts cases within the Eleventh Circuit, which have made a superficial general comment about the burden. (*e.g.*, *Hotfile,* 2013 WL 6336286, at *19; *Hydentra HLP Int'l. Ltd. v. Luchian,* No. 1:15-CV-22134-UU, 2016 WL 5951808, at *19 (S.D. Fla. June 2, 216)). But, significantly, the *Hotfile* court also noted that in many instances, the DMCA serves to relieve service providers of burdens they might otherwise shoulder, even transferring them to the copyright holder." (*Hotfile,* 2013 WL 6336286, at *19).

Moreover, when a deeper analysis of this issue was undertaken, the Middle District of Florida followed the Second Circuit's approach, holding that the "burden of proof with respect to actual or red flag knowledge would be on the plaintiff."

10

(*Venus Fashions, Inc. v. ContextLogic, Inc.*, No. 3:16-CV-907-J-39MCR, 2017 WL 2901695, at *26 (M.D. Fla. Jan. 17, 2017)). Thus, this Court should adopt the Second and Ninth Circuit's reasoning and hold that Plaintiffs bear the burden of proof with respect to actual or red flag knowledge.

## IV.  Application of Law to Facts

### A.  *Spinrilla is a "Service Provider"*

Title 17 section 512(k)(1)(A) and (B) broadly define "service provider." Section 512(k)(1)(A) defines "service provider" as "an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." Pursuant to §512(k)(1)(B), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor."

Spinrilla is a "service provider" under both definitions. Spinrilla provides its users (both registered users and non-registered users) with a means for online communications of the users' choosing. (SMF ¶¶ 26, 35). Spinrilla also provides an online service, namely, an audio file distribution system. (SMF ¶ 13). Thus, there is no question of material fact that Spinrilla meets the first element of the safe harbor defense.

## B. Any Infringing Material Was Posted "at the direction of the user"

There is no question of material fact that all the allegedly infringing material was posted at the direction of the user rather than Defendants. All audio files on Spinrilla were uploaded by users with upload rights. (SMF ¶¶ ¶ 13; 26, 63, 65-66, 69-71, 86-87). ███████ ███████ ██████████████████████████. (SMF ¶ 63 and generally Plaintiffs' SMF ¶12 (Dkt. 228)[6]). On occasion, Defendant would upload a file; but in all instances, they were uploaded at the direction of the user. (SMF ¶¶ 233-234). Neither Defendant has ever contributed audio files/music to the Spinrilla system other than at the direction of a user. (SMF ¶¶ 230, 233).

During the time relevant to this Motion (*i.e.,* July 29, 2017 and after), audio files are published on Spinrilla pursuant to the following procedure: (1) users with upload rights upload audio files to Spinrilla's server; (2) Spinrilla's system then automatically uses Audible Magic to scan each audio file with Audible Magic; and (3) any audio files not blocked by Audible Magic are then automatically published (*i.e.*, made publicly available) on Spinrilla. (SMF ¶¶ 112, 114-118). Accordingly,

---

[5] ████████████████████████████████████████████████████
████████

[6] By referencing Plaintiffs' Statement of Facts ¶ 12, admit only that when Defendants grant an upload account, the user (also called a "DJ") gains the ability to upload mixtapes to Spinrilla. Defendants do not admit as true any other fact contained in Paragraph 12.

Defendants meet the second element of the safe harbor defense.

### C.   *Spinrilla Lacked Actual or Red Flag Knowledge of the Infringing Material*

As discussed, above, Defendants generally have the burden of establishing entitlement to the DMCA safe harbor. However, Defendants need not prove a lack of "red flag knowledge" of infringing material. If Plaintiffs present such evidence, Defendants will respond appropriately. However, because Plaintiffs assert that Defendants bear the burden, in an abundance of caution, Defendants show below that they lack "red flag knowledge" of the infringing material.

The statute requires that Defendants remove infringing content if they had actual or apparent ("red flag") knowledge of specific infringing material. (Section 512(c)). Actual knowledge is "knowledge that is actual, not merely a possible inference from ambiguous circumstances." *Ventura Content,* 885 F.3d at 609.



. (SMF ¶ 202).

(SMF ¶¶ 221). Plaintiffs cannot present evidence that Mr. Copeland actually knew of a specific audio file which was not promptly removed. Thus, there is no genuine issue of material fact that Defendants did not have actual knowledge of the alleged infringement.

13

To have apparent knowledge, merely "hosting material capable of copyright protection, with the general knowledge the that site could be used to share infringing material, is not enough to impute [actual or apparent] knowledge. (*Ventura Content,* 885 F.3d at 610 (citing, *UMG,* 718 F.3d at 1022)). Nor is suspicion of infringement sufficient. (*Vimeo,* 826 F.3d at 93). Rather, Plaintiffs must show that Defendants "had actual knowledge of facts 'that would make the *specific infringement* claimed objectively obvious to a reasonable person." (*Id.* at 610 (quoting, *Vimeo,* 826 F.3d at 98 (emphasis added)). This is a high bar. (*UMG Recordings, Inc. v. Veoh Networks, Inc.,* 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009)).

As the Second Circuit explained, red-flag knowledge is an objective standard based on the reasonable person standard

> The mere fact that an employee of the service provider has viewed a video posted by a user (absent specific information regarding how much of the video the employee saw or the reason for which it was viewed), and that the video contains all or nearly all of a copyrighted song that is "recognizable," would be insufficient for many reasons to make infringement *obvious* to an ordinary reasonable person, who is not an expert in music or the law of copyright.

(*Vimeo,* 826 F.3d at 94). Providing services to websites named "illegal.net" and "stolencelebritypics.com" is not enough to raise a "red flag" from which infringing activity is apparent. (*CCBill,* 488 F.3d at 1114). Even providing services to websites that claim to provide passwords enabling their users to illegally access website with

copyrighted content is insufficient to raise a red flag. (*Id.*)

Here, there are no facts to support a claim that Defendants had knowledge of facts that would make awareness of the specifically claimed infringements objectively obvious to a reasonable person. Moreover, Defendants implementation of Audible Magic after other measures to prevent infringement proved less than optimal does not impute knowledge of the specific infringing activity to Defendants. (*Veoh,* 665 F. Supp. 2d at 1112 (C.D. Cal. 2009)).

Moreover, "the nature of the removal obligation itself contemplates knowledge or awareness of specific infringing material, because expeditious removal is possible only if the service provider knows with particularity which items to remove." (*Hotfile*, 2013 WL 6336286, at *27). Thus, the question is not whether Defendants were aware of the presence of infringing material. Rather, the issue is whether Defendants were aware of specific infringing material and failed to remove it. And, there is no evidence that Defendants were aware of a specific infringing audio file that they then failed to promptly remove as described below.

### D.   *Spinrilla Expeditiously Removed Infringing Content When it Became Aware of It*

There is no question of material fact that Defendants removed infringing content when they became aware of specific audio files that were alleged to infringe. (SMF ¶¶ 59, 62, 100-101, 182-183, 185-186, 187, 191-192, 199). If Defendants

15

happened across such content, they removed it. (SMF ¶¶ 59, 100-101). If they were

informally asked to remove it, they removed it. (SMF ¶¶ 199). If they received a

takedown notice (whether DMCA-compliant or not), they removed it if they could

find it and if they could not locate it asked for additional information. (SMF ¶¶ 187,

192, 193). To trigger the requirement the removal requirement, the notification must

substantially comply with the requirements of Section 512(c)(3)(A)'s requirements.

(*Ventura Content,* 885 F.3d at 612). One of those requirements is "information

reasonably sufficient to permit the service provider to locate the [allegedly infringing

material]." *Id.* at 612 n. 62. Plaintiffs cannot point to any instance in which

Defendants allowed infringing audio files to remain once they became aware of

those files and were adequately provided notice of where the file was located. When

a takedown notice lacks a specific URL for an allegedly infringing file it is nearly

impossible for Spinrilla to locate the specific audio file amongst its approximately

███████████ audio files. Thus, the few times that Spinrilla could not remove a file

because the takedown notice was deficient does not disqualify Defendants from

meeting the safe harbor requirements.

Additionally, Plaintiffs failed to provide URLs of the allegedly infringing

works in suit until late in the litigation. (SMF ¶¶ 301-302). URLs from Plaintiffs

would inform Spinrilla of exactly where on Spinrilla an allegedly infringing audio

file appears. ((SMF ¶¶ 201). Copeland Dep. (Oct. 19), p. 253:15-21 (Dkt. 251). By
failing to include the URLs, Plaintiffs made it nearly impossible for Spinrilla to
locate the allegedly infringing audio file, since there are approximately ████
audio files on Spinrilla. Accordingly, Spinrilla cannot be deemed to have notice of
these audio files until the URLs were made available. (17 U.S.C. § 512(c)(3)(A)
(requiring "information reasonably sufficient to permit the service provider to locate
the [allegedly infringing material]")).

Thus, Defendants meet the fourth element of the safe harbor defense.

**E.** ***Spinrilla Did Not Financially Benefit From Infringements and does not have the right and ability to control the infringing activity***

Pursuant to Section 512(c)(1)(B), a defendant who does not receive a financial
benefit directly attributable to the infringing activity is entitled to protection under
the safe harbor provision even if the defendant had the right and ability to control
the infringement. Here, Defendants neither received a financial benefit or had the
right and ability to control the infringing activity. Thus, there can be no question of
material fact that this element is met.

**i.** ***Defendants do not receive a financial benefit directly attributable to the infringing activity***

Spinrilla does not derive direct financial benefit from infringing material it
controls. "In determining whether the financial benefit criterion is satisfied, courts

17

Case 1:17-cv-00431-AT Document 265 *SEALED* Filed 01/07/19 Page 25 of 34

should take a common-sense, fact-based approach, not a formalistic one." (S. Rep. No. 105-190, at 44 (1998)). In order to derive a financial benefit directly attributable to the infringing activity, there must be some revenue that is distinctly attributable to the infringing material at issue. (*Ventura Content,* 885 F.3d at 613). Deriving revenue from advertisers and a general desire to attract more users and thus more advertising revenue is not sufficient to tie revenue directly to the infringing material at issue. (*Id.*) Plaintiff cannot prove that Defendants have derived any financial benefit from the alleged infringements because there is no evidence that Defendant's financial benefit is attributable to any of the music on Spinrilla which Plaintiffs claim to own.

There is no connection between Spinrilla's revenue and the allegedly infringing audio files. Defendants do not sell any music and are not paid when a file is uploaded. (SMF ¶¶ 39, 44). Defendants do not advertise themselves as a site to download pirated materials. To the contrary, Defendants look to attract "independent and emerging hip-hop artists". ((SMF ¶¶ 2, 6, 7-8, 15-17, 237, 241).

████████████████████████████████████████ (SMF ¶¶ 39, 45 ). Spinrilla does not charge is users to upload content or to listen to content. (SMF ¶¶ 44). The advertisers are not solicited with infringing content. (SMF ¶¶ 50-55). In fact, advertisers do not select what content they appear alongside; indeed, the

████████████████████████████████████ (SMF ¶¶ 321).

Accordingly, there is no material question of fact on this issue and no reasonable jury could conclude that Spinrilla derived a direct financial benefit from the alleged infringement merely based on advertising placement or advertising revenue. (*Ventura Content,* 885 F.3d at 613; *Hydentra*, 2016 WL 5951808, at *14).

Because Defendants do not sell any music and do not pay artists to upload music (SMF ¶¶ 44), they do not receive any revenue directly from the allegedly infringing audio files. Indeed, Defendants business model is not premised on the uploading of infringing materials. (SMF ¶¶ 7-8, 15-20, 57-58). And, they do not advertise themselves as a site to download pirated materials. (SMF ¶¶ 50-55). To the contrary, Defendants look to attract "independent and emerging hip-hop artists". (SMF ¶¶ SMF ¶¶ 2, 6, 7-8, 15-17, 237, 241).

Plaintiffs make no ownership claim to the vast majority of content on Spinrilla. (*Compare* Plaintiffs' SMF ¶ 59 (Dkt. 228)[7] and SMF ¶ 202). Moreover, there is no evidence that any revenue can be tied to music Plaintiffs' claim to own. Even looking at the activity on Spinrilla (namely, streams and downloads), the vast

---

[7] By citing to Plaintiffs' Statement of Fact (here and throughout the brief), Defendants are merely restating the numbers Plaintiffs allege and not admitting that Plaintiffs are able to prove either infringement or a specific number of infringements. Defendants will respond to Plaintiffs Statement of Material Facts at the appropriate time.

majority ███████ of activity is attributable to music to which Plaintiffs make no

claim. (*Compare* Plaintiffs' SMF ¶ 59 (Dkt. 228) and SMF ¶¶ 202). Thus, as in

*Ventura Content,* the evidence of record demonstrates that Defendants do not derive

a direct financial benefit from infringement.

### ii.   *Defendants do not have the right and ability to control the infringing activity*

If, as here, a defendant does <u>not</u> receive a direct financial benefit from the

infringement, it is irrelevant for purposes of the safe harbor provision whether the

defendant also has the right and ability to control the infringing activity. (*Milo &*

*Gabby, LLC v. Amazon.com, Inc.,* No. 13-1932, 2015 WL 4394673, *9 (W.D. Wa

July 16, 2015) ("Both elements must be met for the safe harbor to be denied.") (citing

*See* 3 NIMMER ON COPYRIGHT, § 12 12B.04[A][1], at 12B–50)). Defendants

discuss this prong, however, given Plaintiffs' continued assertion – in the absence

of proof - that Defendants derive a direct financial benefit from the alleged

infringement.

Pursuant to § 512(c)(1)(B), even when a defendant receives a financial benefit

from the infringement, the defendant may still be entitled to claim the safe harbor

defense if he did not have the right and ability to control the infringing activity. (*Milo*

*& Gabby,* 2015 WL 4394673 at * 9). The "right and ability to control" the infringing

activity under 512(c)(1)(B) "'requires something more than the ability to remove or

Case 1:17-cv-00431-AT   Document 263   Filed 04/07/19   Page 28 of 34

block access to materials posted on a service provider's website.'" (*Viacom,* 676
F.3d at 38 (quoting *Capitol Records, Inc. v. MP3Tunes, LLC,* 821 F. Supp. 2d 627,
645 (S.D.N.Y. 2011)) (and collecting cases); *see also, Shelter Capital,* 718 F.3d at
1030). As the *Shelter Capital* court noted, "Congress could not have intended for
courts to hold that a service provider loses immunity under the safe harbor provision
of the DMCA because it engages in acts that are specifically required by the DMCA
to obtain safe harbor protection. (*Shelter Capital* at 1029).

Rather, in order to have the "right and ability to control" under 512(c)(1)(B),
the defendant must "exert [ ] substantial influence on the activities of users" or
purposeful conduct. (*Viacom,* 676 F.3d at 38; *Shelter Capital,* 718 F.3d at 1030
(adopting *Viacom* rule)). Substantial influence may include "high levels of control
over activities of users." (*Viacom,* 676 F.3d at 38). A defendant exerts a high level
of control, for example, when it "prescreens sites, gives them extensive advice,
prohibits the proliferation of identical sites," provides "detailed instructions
regard[ing] issues of layout, appearance, and content," and ensures "that celebrity
images do not oversaturate the content." (*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
213 F. Supp. 2d 1146, 1173; 1182 (C.D. Cal. 2002)). However, a service provider
does not have the practical ability to stop or limit infringing conduct simply because
(1) the infringing content resides on the service provider's system; (2) the service

provider had the ability to remove such material; (3) the service provider could have implemented, and did implement, filtering systems; and (4) the service provider could have searched for potentially infringing content. (*See Shelter Capital,* 718 F.3d at 1030 ("Such circumstances are not equivalent to the activities found to constitute substantial influence in *Cybernet* and *Grokster.*[8]")).

Here, Defendants do not have the right and ability to control the infringers' conduct. Rather, the infringing content merely resides on their system. Defendants do not exert substantial influence on the activities of users. While Defendants will occasionally upload material at a users' direction or control, Defendants do not screen the uploads prior to publication, provide advise on what to upload or provide detailed instructions regarding what to upload. (SMF ¶¶ 233-234, *see also* ¶¶ 26, 35). Accordingly, there is no question of material fact that Defendants do not exercise the requisite right and ability to control the infringement. (*See e.g., Ventura Content,* 885 F.3d at 613).

## F.    *Spinrilla's Repeat Infringer Policy*

Spinrilla (1) adopted a repeat infringer policy that allowed for termination of accounts, (2) communicated that policy to its users and (3) "reasonably implemented" that policy as required under the safe harbor provisions of 17 U.S.C.

---

[8] *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913 (2005).

§ 512(c)(1).

### i.   *Adoption and communication of Repeat Infringer Policy*

As of July 23, 2017, Defendants adopted, communicated to users and reasonably implemented a repeat infringer policy. ((SMF ¶¶ 96-97 and Plaintiffs' SMF ¶111 (Dkt. 228)[9] ("Defendants did not adopt a repeat infringer policy until after this lawsuit was filed.")). Plaintiffs further admit that "[u]sers who are given an artist account must agree to Spinrilla's Terms of Service, which grant Spinrilla the right to "terminate your account with or without prior notice." (Plaintiffs' SMF ¶26 (Dkt. 228)). The adoption of the repeat infringer policy coupled with the posted Terms of Service is sufficient to meet the adoption and communication requirements. (*Ventura Content,* 885 F.d at 615-616)).

### ii.   *Reasonably Implemented that Policy*

A service provider implements a repeat infringer policy if "it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and it does not actively prevent copyright owners from collecting information needed to issue such notifications." (*CCBill,* 488 F.d at 1109). That implementation

---

[9] Defendants adopt *only* the quoted section of Paragraph 111. Defendants do not admit as true any other fact contained in Paragraph 111 of Plaintiffs' Statement of Facts. Defendants will respond to the other representations and facts in Paragraph 147 at the appropriate time.

is reasonable if under appropriate circumstances, the service provider terminates users who repeatedly or blatantly infringe copyright." (*Id.*).

Spinrilla reasonably implemented its repeat infringer policy. Plaintiffs admit that by July 23, 2017, Spinrilla was tracking users with upload rights for the purpose of identifying any users who were "repeat infringers." (Plaintiffs' Brief, p. 21 (Dkt. 227)). Spinrilla enforced the terms of the repeat infringer policy in a meaningful way. By August 5, 2016, Spinrilla had terminated █████████████████ (SMF ¶¶ 203-204)). And by February 3, 2017, Spinrilla had terminated 8 other accounts. (SMF ¶¶ 205). Accordingly, no reasonable jury could find that Spinrilla failed to adopt and implement a repeat infringer policy as of July 23, 2017.

### G. Spinrilla Has a DMCA Agent

Plaintiffs admit that as of July 29, 2017, Spinrilla had a designated agent registered with the Copyright Office. (Plaintiffs' Statement of Facts, ¶147 citing; Wilkens Ex. 21 at 3 (Copyright Office website showing that registration of Spinrilla, LLC's DMCA designated agent became "[e]ffective" on "July 29, 2017") (Dkt. 228)[10]). Accordingly, there is no question of material fact as to this element.

---

[10] By adopting this specific reference to Wilkens Exhibit 21 at 3 in Plaintiffs' Statement of Facts ¶ 147, Defendants do not admit as true any other fact contained in Paragraph 147 of Plaintiffs' Statement of Facts. Defendants will respond to the other representations and facts in Paragraph 147 at the appropriate time.

V.    **Conclusion**

There is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law on their DMCA safe harbor defense as of July 23, 2017. Accordingly, Defendants are entitled to summary judgment that they have no liability to any Plaintiff for any infringement occurring after that date.

Respectfully submitted this 7th day of January, 2019.

**LILENFELD PC**

*/s/ David M. Lilenfeld*
David M. Lilenfeld
Georgia Bar # 452399
3379 Peachtree Road NE, Suite 980
Atlanta, Georgia 30326
Telephone: (404) 201-2520
David@Lilenfeld.com
Attorney for Defendants

25

Case 1:17-cv-00431-AT Document 265 *SEALED* Filed 01/07/19 Page 32 of 34

## CERTIFICATE OF COUNSEL REGARDING FONT SIZE

I, David M Lilenfeld, an attorney, hereby certify that the foregoing has been prepared with a font size and point selection (Times New Roman, 14 pt.) which is approved by the Court pursuant to Local Rules 5.1(C) and 7.1(D).

*/s/ David M. Lilenfeld*
David M. Lilenfeld

26

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ATLANTIC RECORDING          )
CORPORATION, *et al.*,          )
                            )
    Plaintiffs,          )
                            )          Case No.:
v.                          )
                            )          1:17-CV-0431-AT
SPINRILLA, LLC, *et al.*,          )
                            )
    Defendants.          )
_____)

## CERTIFICATE OF SERVICE

The foregoing DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THEIR DMCA SAFE HARBOR DEFENSE was filed today, January 7, 2019, using the Court's *CM/ECF* system, which automatically and contemporaneously sends electronic notification and a service copy of this filing to the following counsel of record:

James A. Lamberth, Esq.
*james.lamberth@troutmansanders.com*

Previn Warren, Esq.
*pwarren@jenner.com*

Kenneth L. Doroshow, Esq.
*kdoroshow@jenner.com*

Ava U. McAlpin, Esq.
*amcalpin@jenner.com*

January 7, 2019

27

*/s/ David M. Lilenfeld*
David M. Lilenfeld