# Defendants' Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. 303)

# Plaintiffs' and Defendants' Redactions

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ATLANTIC RECORDING
CORPORATION, *et al.,*

    Plaintiffs,

v.

SPINRILLA, LLC, *et al.,*

    Defendants.

)
)
)
)
)  Case No.:
)
)  1:17-cv-0431-AT
)
)
)
)

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. 224)

Defendants oppose Plaintiffs' Motion for Summary Judgment as to liability (Dkt. 224) as follows:

## [CONFIDENTIAL]

## [FILED UNDER SEAL PER PROTECTIVE ORDER (DKT. 186)]

## I.  Introduction

Spinrilla's anti-infringement program is extremely effective. And the Court does not have to take Defendants' word for it, but simply look at the math. Plaintiffs contend that approximately ███████████████ songs that were at one-time-or-another available on Spinrilla infringed 4,082 of Plaintiffs' sound recordings. (Plaintiffs' SMF ¶ 59 (Dkt. 228) and Defendants' SMF ¶202 (Dkt. 266)). Assuming Plaintiffs' █████ number is correct, the math████████████ shows that ███ percent of the content on Spinrilla is non-infringing.[1]

There is no better evidence than this of both the effectiveness of Spinrilla's anti-infringement program and the absence of any systemic or pervasive effort by Defendants for Spinrilla to host infringing content. (Defendants' SMF, ¶¶56-218[2] (Dkt. 266)). ██████ also corroborates Defendants' testimony that Spinrilla is meant to provide a platform for *independent* hip-hop artists and their listeners. (Dkt. 266 at ¶¶15-21). If Defendants fostered infringement, Spinrilla would not be ██████ infringement free.

In almost every other case involving a music streaming service sued for

---

[1] "It is unimaginable that any website with hundreds of thousands or millions of user uploads could successfully screen out all of the copyright infringing uploads, or even all of the uploads where infringement was apparent." (*Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 614 (9th Cir.)).

[2] Spinrilla has done so much to prevent infringement that Defendants needed to devote **forty** pages of their SMF to describe it all. (Dkt. 266).

copyright infringement, a huge percentage of the service's content was infringing.[3] Little other than those huge percentages was needed to establish that those services fostered their users' infringement. The reverse should be true . . .  the small percentage of allegedly infringing material on Spinrilla should establish that Spinrilla wants to prevent infringement.

Since the percentage of allegedly infringing content on Spinrilla is so small, how can Plaintiffs support their exaggerated claim that Spinrilla hosts infringing content "on a massive scale"? Plaintiffs' answer is to focus their filing on *a handful* of emails between Spinrilla and different users and then attribute the "mass infringement" to these emails. But these emails only relate to the transactions in the emails. And, when placed in the proper context, many of these emails are actually exculpatory – they show that Defendants do *not* want infringing content on Spinrilla. A few emails do expose Mr. Copeland's misunderstanding of the meaning of a "derivative work," but as Defendants explain below, his misguided advice to a *handful* of users (about thirteen) was harmless. Again, these discrete transactions do not evince an "illicit business model" or otherwise foster mass infringement. (Plaintiffs' Brief, pp. 9 and 23 (Dkt. 225)).

---

[3] As examples, *Grokster:* 90% infringing; *Lime Group:* 98.8% infringing; *Usenet:* 94% infringing; *Fung:* 90-96% infringing; *mp3Tunes*: 95 to 98% and *Escape Media:* 84.5% infringing. (Cites appear later in this Brief).



There is simply no denying the effectiveness of Spinrilla's anti-infringement program. **If Defendants wanted to foster or induce infringement, they have failed miserably at doing so.** The effectiveness of Spinrilla's anti-infringement program proves that Defendants are vigilant enough in stopping infringement that they are not liable to Plaintiffs for direct or secondary infringement.

## II.    <u>Factual Background</u>

Facts relevant to the case are detailed in Defendants' Statement of Facts (Dkt. 266) and, with less detail, in their MSJ Brief. (Dkt. 263). Defendants summarize here only facts particularly important to Plaintiffs' Motion for Summary Judgment as to liability. (Dkt. 224).

At 19 years old, Mr. Copeland launched Spinrilla in 2013. (Defendants' SMF, ¶¶1-14 (Dkt. 266)). Spinrilla was meant to and still does serve a niche; in Mr. Copeland's words, "[s]pecifically, for hip-hop . . . and sort of being a voice to the

independent crowd who oftentimes gets unheard." (Dkt. 266 at ¶17, ¶¶15-21).

Even before Spinrilla launched, Defendants were mindful to prevent infringement, which is why Spinrilla did not give all users the ability to upload music. (Dkt. 266 at ¶¶56-57, 63-89). Instead, only users who Spinrilla confirmed were "artists" (*i.e.*, users who created their own music) were allowed to upload to Spinrilla. (Dkt. 266 at ¶¶56-57, 63-89)). Only ████████████████████ of Spinrilla's registered users have the ability to upload content. (Dkt. 266 at ¶¶63-89)).

Defendants manually removed content they came across if they recognized it as being by a signed artist. (Dkt. 266 at ¶¶99-104). Around 2014, when the site began to grow, Spinrilla occasionally received from Plaintiffs requests to remove content. (Dkt. 266 at ¶¶181-200). In those instances, Spinrilla immediately acknowledged to Plaintiffs receipt of the request and promptly removed the accused content. (Dkt. 266 at ¶¶181-200) and Dkt. 42-2 ¶12 (Dkt. 42-2)). If the request did not contain enough information for Spinrilla to locate the content, Spinrilla did not ignore the request, but asked the Plaintiff for more information so Spinrilla could locate and remove it. (Dkt. 266 at ¶193). As the service became more popular ████████ ████, Spinrilla enhanced its anti-infringement program, including, in December 2015, adding a non-party (Audible Magic) service that automatically scans the files users upload for infringing content (the scan occurs after the user

uploads the file but before the file is publicly available). (Dkt. 266 at ¶¶105-16).[4]

Even today, Spinrilla's anti-infringement program continues to evolve, including adding (within months of learning they existed) three other Audible Magic products, using Audible Magic to conduct back-scans of the audio files on Spinrilla and searching for other technologies that would ensure major-label music is not available on Spinrilla. (Dkt. 266, ¶¶167-169). Defendants have repeatedly asked Plaintiffs to suggest other anti-infringement safeguards Spinrilla could implement but, tellingly, Plaintiffs have suggested nothing. (Dkt. 266 ¶¶209-213 and Defendants' Additional SMF, ¶¶38, 40 and 43)).

And, as mentioned in the Introduction, Plaintiffs' marketing personnel and Spinrilla constantly work together to promote some of Plaintiffs' up-and-coming hip-hop artists and Plaintiffs still want Spinrilla to purchase a license to their sound recordings.

## III. Legal Background

### a. Summary Judgment Standard

The Parties have filed cross-motions for summary judgment on liability for both counts in the Complaint. (Dkts. 224 and 262). And cross-motions as to

---

[4] Spinrilla has done so much to try to stop infringement, Defendants needed **forty** pages in its Statement of Facts (Dkt. 266) to describe its efforts.

Defendants' DMCA safe harbor defense. (Dkts. 226 and 264). The standard of review in such cases does not differ from when only one party files a motion. Given page constraints, Defendants defer to their discussion of the standard for summary judgment in their earlier brief. (Dkt. 263 at 12).

**b.** **Direct Copyright Infringement**

Plaintiffs seek to hold Defendants summarily liable for direct infringement of all 4,082 sound recordings. (Plaintiffs' Brief, p. 9 (Dkt. 225)). To establish direct copyright infringement, Plaintiffs must prove: (1) they own a valid copyright in each of the works, (2) Defendants copied a protected element each work and (3) Defendants performed a volitional act which is the proximate cause of the infringement. (*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

A volitional act is not required in every direct infringement case, but it is here. Defendants explained why a volitional act is required before an online service provider can be liable for direct copyright infringement in their earlier Brief. (Defendants' MSJ Brief, pp. 13-15 (Dkt. 263)). Rather than repeat that discussion and because of page constraints, here Defendants only address Plaintiffs' assertion that a volitional act is *not* required. (Plaintiffs' Brief, p. 14 (Dkt. 225)).

First, citing *Hydentra*, Plaintiffs say the Eleventh Circuit has not considered whether volitional conduct is required for direct infringement. (Plaintiffs' Brief, p.

13 (Dkt. 225)). The *Hydentra* court did make that observation, but, after much discussion, it found that a volitional act is necessary: "in imposing liability upon an internet service provider for third-party users' uploading of copyrighted material, [p]laintiff must establish that [d]efendants engaged in a volitional act to cause the illegal copying. To find otherwise would impose liability upon an otherwise passive internet service provider for conduct that is simply out of its control." (2016 WL 5951808, at *9). *Hydentra* is discussed at length in Defendants' Brief. (Dkt. 263, p. 14-15). Also explained there, is that virtually every court to rule on the issue has required a volitional act for direct infringement. (Dkt. 263, p. 14-15).

To get this Court to discard the volitional act requirement, Plaintiffs also cite *Aereo*. (Plaintiffs' Brief, p. 14, n.5 (Dkt. 225)). Out of respect for the Court's time and because of page constraints, Defendants will not repeat its discussion of *Aereo* here; it can be found in their earlier Brief. (Dkt. 263, pp. 14-15)).

Plaintiffs rely on two others cases: *Spanski Enterprises, Inc.* and *Soc'y of Holy Transfiguration Monastery.* (Plaintiffs' Brief, n. 5 (Dkt. 225)). But Plaintiffs admit that *Spanksi* did not rule on the volitional act requirement. (*Id*.). *Holy Transfiguration* did not take a position either. (*Id*.).

### c.    Secondary Copyright Infringement

Plaintiffs seek summary judgment on all three species of secondary

infringement they assert in their Complaint.

### i.    Inducing Copyright Infringement

Plaintiffs allege that Defendants are secondarily liable for copyright infringement under a theory of inducement. (Dkt. 225 at 19). As discussed in Defendants' MSJ Brief, the Eleventh Circuit has not adopted the theory of inducing liability as a distinct cause of action. (Dkt. 263 at 20-21). Accordingly, this Court should deny summary judgment under this theory. Defendants respond substantively in the event Court allows the theory.

Were it a cause of action, Plaintiffs would only be entitled to summary judgment as to inducement if they prove Spinrilla was created and operated "with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement." (*Grokster*, 545 U.S. 913, 936-37 (2005)). Liability requires "purposeful, culpable expression and conduct" by the defendant. (*Id.*). Mere awareness of infringing content is not enough to create liability for inducing infringement, nor are "ordinary acts incident to product distribution." (*Id.*).

### ii.    Contributory Copyright Infringement

Plaintiffs also seek summary judgment for secondary infringement under the contributory theory. (Dkt. 225 at 24). Liability under the contributory theory,

- 8 -

requires that the defendant knew or had reason to know of the alleged infringement. (*Cable/Home v. Network Prods., Inc.*, 902 F.2d 829, 845-846 (11th Cir. 1990)).

Plaintiffs' discussion of the legal requirements for contributory liability omits the important point that a defendant cannot be held contributorily liable if its product or service is capable of "substantial non-infringing uses." (*Sony Corp. v. Universal City Studios,* 464 U.S. 417, 442 (1984); *Cambridge Univ. Press v. Becker*, 2010 WL 11507617, at *7 (N.D. Ga. Sept. 30, 2010)). For a discussion of these and similar cases see Defendants' MSJ Brief. (Dkt. 263, 17, 18, 24-31). To save the Court time and because of the page limitation, Defendants will not repeat the discussion here.

### iii. *Vicarious Copyright Infringement*

Finally, Plaintiffs seek summary judgment for secondary infringement under the vicarious liability theory. (Dkt. 225, p. 31). "A claim of vicarious copyright infringement arises against one who 'profit[s] from [another's] direct infringement while declining to exercise a right to stop or limit it.'" (*Cambridge*, 769 F.3d at 1242 at n.7). To "profit directly from the infringement," "the infringing activity must constitute a draw for subscribers" or provide a "direct financial interest" to Defendants. (*Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)); *Cambridge* 2010 WL 11507617, at *8). These cases and others addressing the vicarious liability theory are discussed in Defendants' MSJ Brief. (Dkt. 263, pp. 16, 19, 20 and 33-41).

## IV.  Application of Law to Facts

### a.  Plaintiffs Are Not Entitled to Summary Judgment as to Direct Copyright Infringement

#### i.  Users' Uploads and Downloads Through Spinrilla's Servers

Plaintiffs contend that Defendants are liable for *direct* infringement of the 4,082 works-in-suit because Spinrilla's users uploaded and downloaded infringing content through servers Defendants "own or exclusively control." (Dkt. 225, p. 11).

This "server" theory of *direct* copyright infringement has been rejected over-and-over again by courts not only in the Eleventh Circuit but across the country. The case law holds that online businesses that are user generated content (UGC) driven are not liable for direct copyright infringement merely because infringing content passes through their servers. (*Hydentra* at *8)(citing *Netcom*, "making an internet company liable for direct copyright infringement simply because it gave users access to copyrighted material posted by others 'would create unreasonable liability'."); *Disney Enterprises, Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1307 (S.D. Fla. 2011) ("Hotfile and Mr. Titov are not liable for direct copyright infringement because they own and manage internet facilities that allow others to upload and download copyrighted material.")); *CoStar Grp. v. LoopNet Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) ("machine used by others" not enough); and *Perfect 10, Inc. v. Giganews, Inc.*, 2013 WL 2109963, at *7 (no direct liability where plaintiff alleged

- 10 -

online service provider stored infringing material on its servers, programmed its servers to download and distribute infringing content, and controlled which materials were distributed to and downloaded from third-party servers)).

In peddling their "server" theory of direct infringement, Plaintiffs primarily rely on *ReDigi* and *Aereo*. In *Capitol Records, LLC v. ReDigi Inc.,* 934 F. Supp. 2d 640 (S.D.N.Y. 2013), the court imposed direct infringement because the defendants had "built a service where *only* copyrighted work could be sold," since the service consisted "*solely* of protected music purchased on iTunes." (*Id.* at 657). Indeed, the court expressly distinguished the facts of *ReDigi* from other cases in which the online service provider "offered a mix of protected and public content." (*Id.)*. Here, of course, other than Audible Magic blocking content, Spinrilla exercises no control over what music is uploaded. Thus, *ReDigi* does not support Plaintiffs' server theory of direct infringement liability.

Plaintiffs also contend that *Capitol Records, LLC v. Escape Media Grp.,* 2015 WL 1402049 (S.D.N.Y) support their "server" theory. In *Escape Media*, use of its server was the least of the defendants' problems. In *Escape Media*, 84.5% of the content available on the defendant's site was infringing, defendant allowed *all* of its registered users to upload music and the defendant removed metadata which major labels used to detect unauthorized copies of its music. (*Id*. at *31-32). Also, the

founder of the service admitted that "the great majority of content" came "from
illegal networks" and admitted the service was trying to monetize that content. (*Id*.
at *33). Also, once a user uploaded a file, the service took control of it and the user
could not remove it or edit metadata and the defendant removed files *only* if a
takedown notice was received. (*Id*. at *31-33).

So the law does not support Plaintiffs' server theory and Plaintiffs are not
entitled to summary judgment on it.

### ii.   *No Volitional Acts by Defendants*

To hold Defendants directly liable for *all* 4,082 sound recordings, Plaintiffs
also argue that if a volitional act is required, "the volitional nature of Defendants'
conduct is beyond dispute." (Dkt. 225 at 14). According to Plaintiffs, Defendants'
volitional acts which entitle Plaintiffs to summary judgment as to direct infringement
are: (a) Mr. Copeland "personally uploaded ▮▮▮▮▮▮▮ copies" and DJ
Louie "directly uploaded another ▮▮▮▮▮ copies" (Dkt. 225 at 15); (b)
Defendants listed infringing songs in Spinrilla's "Singles"[5] section and "advertised
their availability;" and (c) Defendants "repeatedly advised DJs on how to circumvent

---

[5] It is misleading for Plaintiffs to say Defendants "approved the upload" of songs to
the "Singles" section. (Dkt. 225 at 24). These songs were already uploaded to
Spinrilla, survived an Audible Magic scan and were simply being grouped to make
the content on Spinrilla more accessible.

its copyright protection software." (Dkt. 225 at 24, citing SUF ¶¶63 and 64).

Before getting to the facts Plaintiffs assert, there is a "big picture" issue. Even if these volitional acts (many of which never happened) are true, they would – hypothetically – speak to direct infringement of the sound recordings thereby infringed. That is true because the "volitional act," even Plaintiffs admit, must "proximately cause"[6] the infringement. In other words, with direct infringement, if a volitional act causes infringement of only one sound recording, that act does not support direct infringement liability as to all 4,082 sound recordings.

Plaintiffs have not shown that these volitional acts (even had that actually occurred) proximately caused infringement of *all* 4,082 sound recordings and, therefore, they are not entitled to summary judgment on direct infringement of *all* 4,082 sound recording. This is enough for the Court to deny Plaintiffs' summary judgment as to direct infringement, but, out of an abundance of caution, Defendants address the volitional acts Plaintiffs assert.

### iii. *Uploads by Defendants*

Plaintiffs assert that Mr. Copeland uploaded "▌▌copies of ▌▌distinct works

---

[6] Plaintiffs admit that for direct infringement, the defendants' volitional act must be the "'proximate cause' of the infringement." (Dkt. 225 at 14). For "nexus" and "causal," see, generally, *Disney Enterprises, Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1307 (S.D. Fla. 2011) and many other cases approvingly citing *Netcom*.

in suit." (Dkt. 225 at 40). To try to establish this, Plaintiffs cite to 45 emails between Spinrilla and some of its users. (Dkt. 228, ¶61).

As noted in Defendants' response to Paragraph 61 of Plaintiffs' SMF (Dkt. 228), in eight of these 45 emails the user was not asking Spinrilla to upload a mixtape, but was asking for Spinrilla to include a listing of the mixtape (which the user had already uploaded and Audible Magic already scanned) on Spinrilla's homepage. (Defs. Resp. to SMF ¶45(1)-(4), 45(7), 45(21), 45(38) and 45(45) (filed Jan. 31, 2019)). The 37 other emails identified in Paragraph 61 of Plaintiffs' SMF (Dkt. 228) are mostly the same: various DJs ("DJ" being a Spinrilla user with upload rights) provided Spinrilla with a mixtape and asked Spinrilla to upload it. (Plaintiffs' SMF, ¶61 (Dkt. 228)). Again, uploads by Defendants were infrequent, but when they did occur they were done at the direction of the user – nothing more than an acoustically agnostic customer service – and still had to survive an Audible Magic scan. (Defs' Resp. to SMF ¶61 (filed Jan. 31, 2019)). Also, as explained during his deposition, Mr. Copeland did not have time to listen to these mixtapes or even "look at the name and artist of the sound recording before uploading them."[7] (Dkt. 266, ¶¶

---

[7] Again, Mr. Copeland assumed that a user who had been vetted by Spinrilla and given upload rights would only want to upload his or her own music, since the very purpose of Spinrilla is to give independent hip-hop artists a platform for their music to be heard. (Defendants' SMF, ¶¶ 15-21 (Dkt. 266)).

233 and 235). In any event, even if uploading a mixtape at a user's direction is a "volitional" act by Spinrilla (which Defendants deny), it is only casually linked to the ▇ or so mixtapes Defendants actually uploaded. In other words, there is no nexus between these ▇ uploads and *all* of the 4,082 sound recordings allegedly infringed.

### iv. Uploads by DJ Louie

To try to "bump-up" the numbers, Plaintiffs' argue that Louis Acevedo (aka DJ Louie) was acting as Defendants' agent when he uploaded his ▇ audio files. (Dkt. 225 at 15). Plaintiffs' agency argument is based on their contention that DJ Louie was given a Spinrilla.com email, answered questions from other Spinrilla users (which happened twice), Spinrilla's "control" of DJ Louie's work because Spinrilla could cancel DJ Louie's account and Spinrilla's "ratification" of DJ Louie's actions "by featuring the mixtapes DJ Louie uploaded and sending him encouraging messages about them." (Dkt. 225 at n. 6). Plaintiffs say, DJ Louie "manifested his acceptance of the agency relationship by, among other things, telling Defendants he was "proud to be official staff." (*Id.*).

Plaintiffs' agency argument is a flop. In January 2014, just months after Spinrilla launched, DJ Louie asked Spinrilla if he could have an email address to help promote the Company. (Defs.' Add. SMF, ¶¶8-14 (filed Jan. 31, 2019)). Mr. Copeland testified, "he just asked for an e-mail account, so I said sure;" "h[e] wasn't

authorized by us to do anything." (Defs.' Res. to SMF ¶47 and Def. Add. SMF ¶¶10 and 31 (both filed Jan. 31, 2019)). DJ Louie wanted a Spinrilla email "to be part of the company as far as promoting and efforts that was to answer emails but ended up just being solely for promoting [his] artists on the Web site." (Defs.' Add. SMF, ¶¶8-14). He also testified that at <louie@spinrilla.com> he only received "two or three" business related emails. (*Id*.) Additional facts showing that DJ Louie was nothing more than a big fan of Spinrilla are in Paragraphs 1 through 25 of Defendants' Additional SMF, filed Jan. 31, 2019.

Yes, Spinrilla could terminate any user's account, including DJ Louie's, but that does not mean Spinrilla "controls" his work or that of any other user. Similarly, even if Spinrilla complimented DJ Louie's music, that does not equate to "ratification." DJ Louie was an early adopter and heavy user of Spinrilla. (Defs.' Add. SMF, ¶¶1-25). DJ Louie had never texted, talked to or met Mr. Copeland or any other Spinrilla employee. (*Id*. at ¶¶2-6). He did not even know Mr. Copeland's name until Plaintiffs served him with "deposition papers." (*Id*.). He never participated in a Spinrilla meeting or call and the only thing he received from Spinrilla was a t-shirt and a sticker. (*Id*. at ¶16).

The Court should find that DJ Louie was never Spinrilla's agent and, therefore, his uploads are not attributable to Defendants. And, even if DJ Louie was

- 16 -

Spinrilla's agent, that agency encompassed "promoting Spinrilla" and "answering questions," so uploading music was outside the scope of the purported agency.

### v.   Defendants Listing Content in "Singles"[8] section

For volitional acts, Plaintiffs also offer-up that Defendants "approved the upload" of infringing songs to Spinrilla's "Singles" section and, relatedly, "added mixtapes containing" infringing content to Spinrilla's online "radio stations". (Plaintiffs' Brief, pp. 15-16 (Dkt. 225)).

Aside from what Audible Magic blocks, Defendants have no role in determining what content users upload. While, of course, Defendants encourage users to upload content, since content drives the business, Defendants do not encourage users to upload *infringing* content.

Plaintiffs are correct that once an audio file has been uploaded by a user and passes an Audible Magic scan, Spinrilla may group it in one section or another on Spinrilla's homepage. This is simply an acoustically agnostic way to group and organize content, which is necessary to help users navigate the site. With more than ███████ songs on Spinrilla, without some sort of groupings the site would be a

---

[8] It is misleading for Plaintiffs to say Defendants "approved the upload" of songs to the "Singles" section. (Dkt. 225 at 24). These songs were already uploaded to Spinrilla and, after a user requested that they appear on the Singles section, Spinrilla merely moved some of them to the "Singles" section.

mess. The notion that Spinrilla is liable for direct copyright infringement because it organized massive amount of content is offers is absurd. Who would want to visit a site that has nothing to offer but a list of ██████████ songs?

In *Motherless*, the plaintiff argued that by grouping together user uploaded content, the defendant (service provider) directed how the content was stored, which disentitled the defendant to safe harbor protection. (*Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 604 (9th Cir.)). (*Motherless* is primarily a DMCA safe harbor case, but the reasoning still applies here). The Ninth Circuit rejected this argument, stating that grouping content is needed for the users to find what they want and did not disentitle the defendant to safe harbor protection. (*Motherless* at 606).

Importantly, in making this argument, Plaintiffs include emails and screenshots only for mixtapes Plaintiffs allege contain infringing content. (Dkt. 225, pp. 15-16). This may suggest that Defendants treated infringing audio files differently or more favorably than the ██████ non-infringing content. That is not true -- Spinrilla did not single out Plaintiffs' sound recordings for special treatment – in fact, it constantly removed Plaintiffs' content. (Dkt. 266, ¶¶99-104 and 181-200).

The Court should find that organizing content is not a "volitional" act for purposes of direct copyright infringement. But even if it is a volitional act, the organizing of content is not causally linked to the infringement because users, not

Defendants, uploaded the content in the first place. Even further, if the Court finds that organizing content is a volitional act and that such act is causally linked to the infringement, that ruling would only apply to the specific allegedly infringing copies Defendants place in the Singles and Radio Station sections (rather than applying to all 4,082 allegedly infringing sound recordings).

### vi. Defendants Did Not Advertise Allegedly Infringing Content

Plaintiffs contend that by listing content in certain sections on Spinrilla's homepage, Defendants "advertised the availability" of mixtapes. (Plaintiffs' Brief, p. 16 (Dkt. 225)). Plaintiffs also claim Defendants promoted mixtapes with allegedly infringing content on FaceBook, Twitter and Instagram. (Dkt. 225 at 16). Plaintiffs claim these are volitional act that subject Defendants to direct copyright infringement. (*Id*.).

Placing content in sections on Spinrilla's homepage or in a social media post mostly happens when a user contacts Spinrilla and pays for type of promotion. (Dkt. 266, ¶¶22-38). On some occasions, ███████████████████████

████████████████████████████████████████

███████████████ (Dkt. 266, ¶¶22-38). However, with almost all of these promotions only the mixtape's album cover is show, so seeing it on the homepage or in a social media post does not indicate its contents. (Defs.' Add. SMF, ¶64). Given this, it is a

- 19 -

statistic inevitability that some of the allegedly infringing content – which, it must be remembered, Defendants assumed was on Spinrilla because Audible Magic failed to block it and no one told Defendants it was infringing – will end-up in one of these sections or in a social media post.

But, again, organizing content so it is accessible is not a volitional act for purposes of direct copyright infringement, as discussed in connection with *Motherless*, above. Nor is organizing the content the proximate cause of infringement since users, not Spinrilla, decide what to upload to Spinrilla. And even if the Court rules otherwise, this organizational activity is certainly not the proximate cause of infringement of *all* 4,082 sound recordings.

### vii. Defendants did not repeatedly push through copyrighted material or advise users how to circumvent Audible Magic

Plaintiffs' last assertion of volitional conduct by Defendants is that Defendants allegedly "pushed through infringing content" and "repeatedly advised DJs on how to circumvent" Audible Magic. (Dkt. 225, p. 16).

First, Plaintiffs' broad statement that "Defendants pushed infringing content through" email is based on a grand total of one email with one user and one chat session with a different user. (Dkt. 226, p. 16). In the email, a ███████████ ████████████████████████████████████████████████ (Dkt. 241-6). After investigating, Mr. Copeland determined that the track was blocked by Audible

Magic but that it should not have been blocked; in other words, Audible Magic returned a "false positive." (Defs. Resp. to SMF ¶63; Strawn Report (Dkts. 238-19 and 278-4; Defs. Add. SMF, ¶46)(discussing Audible Magic errors, including false positives) and Plaintiffs' Expert's Report (Defs. Add. SMF, ¶46 (████████

████████████████████████████████████████████████████

████████). Only after determining that Audible Magic should not have blocked the track in the first place, did Defendants "push[] it through." (Dkt. 225, p. 16). Mr. Copeland's explanation is corroborated by the fact that the particular track discussed in this email, which is "Mik Que's" version of *Really Really*, is not included on Plaintiffs' list of infringing audio files. (Plaintiffs' Schedule A (Dkt. 228-1)).

Plaintiffs also accusingly point to a "pushed through" Twitter chat Mr. Copeland had with a user, but the exhibit itself spurns the accusation. (Plaintiffs' Brief, p. 16 (Dkt. 225)). The user inquired to Spinrilla after Audible Magic blocked a track on a mixtape the user uploaded. (*Id*.). As the Exhibit shows, Mr. Copeland responded, "I'm gonna check it out now." (*Id*.). He "checked it out" and determined that Audible Magic returned a "false positive," (*i.e.*, the track should not have been blocked) and only then was the mixtape "pushed through." (Defs. Add. SMF, ¶¶46, 59-63) (filed Jan. 31, 2019)). (Unlike *Really Really* (above), Defendants do not have enough information about this particular mixtape to determine if it is listed on

Plaintiffs' list of infringing audio files).

Next, Plaintiffs point to thirteen emails in which Mr. Copeland acknowledged that files on Spinrilla could be "remixed" or "slowed down or sped-up" to circumvent Audible Magic. (Dkt. 225, p. 24). These thirteen emails and Mr. Copeland's deposition testimony reveal these emails results from his misunderstanding of copyright law, not an intent to induce. When shown one of these emails at Spinrilla's deposition, he explained, ██████████████████ ████████████████████████████████████████████ ███████████████████████████████ (Defs. Resp. to SMF ¶64 (filed Jan. 31, 2019) and Wilkens Ex. 10, pp. 29:21-30:25 (Dkt. 238-10)). Due to page constraints, Defendants cannot quote more of this testimony here, but it is shows that Mr. Copeland genuinely misunderstood this bit of copyright law. (*See* Wilkens Ex. 10, pp. 29:21-30:25 (Dkt. 238-10)).[9]

These very emails also show that Mr. Copeland had no intent to encourage infringement. (Warren Ex. 52 (Dkt. 241-52)(Sept. 2015, ███████████████

---

[9] Actually, Mr. Copeland's intuition was not far off. He was (unknowingly) describing a different copyright law concept, called "transformation." (*Peter Letterese v. World Inst. Of Scientology*, 533 F.3d 1287, 1310 (11th Cir. 2008)(a "transformative work is one that 'adds something new, with a further purpose or different character, altering the first [work] with new expression, meaning or message.'").



████████████████████████████████████████████████████

████████████████████ Warren Ex. 53 (Dkt. 241-53)(Oct. 2015, "[███████

████████████████████████████████████████████████████

██████████████████); Warren Ex. 55 (Dkt. 241-55)(Feb. 2016,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████); Warren Ex. 49 (Dkt. 241-49) ("████████████████

████████████████████████████████████████████████████

██████ Warren Ex. 50 (Dkt. 241-50)(same); (Dkt. 241-51)(same); Warren Ex. 54

(Dkt. 241-54)(Feb. 2016, ████████████████████████████████

███████████████)).

With regard to the two instances content was "pushed through" and the thirteen "evade Audible Magic" emails, these are not "volitional acts" for purposes of direct copyright infringement, particularly because Plaintiffs have not shown that any of the content discussed in them was actually uploaded and infringing. Even if they qualify as "volitional acts," they are not the "proximate cause" of the alleged infringement of *all* 4,082 sound recordings. (*See* Dkt. 225 at 14, where Plaintiffs admit "proximate cause" required)).

In summary, Plaintiffs are not entitled to summary judgment as to direct

infringement of all 4,082 sound recordings. The server theory has been rejected and there is no volitional conduct by Defendants that proximately caused infringement of all 4,082 sound recordings.

**b.  Plaintiffs Are Not Entitled to
        Summary Judgment as to Secondary Liability**

At the outset it is important to note when an online service provider has been held secondarily liable for copyright infringement, the extent of infringement on the service has been way more than ■■■■. Looking at the cases Plaintiffs most like to cite: *Grokster*: 90% infringing; *Lime Group*: 98.8% infringing; *Usenet*: 94% infringing; *Fung*: 90 to 96% infringing; *Escape Media*: 84.5% infringing; *mp3Tunes* 95 to 98% infringing and *ReDigi*: 100% infringing. (*Grokster* at 936; *Lime Grp.* at 412; *Usenet* at 151, *Fung* at 1034; *Escape Media* at *36; *mp3Tunes* at 101 and *ReDigi at* 657). The extent of infringement on Spinrilla is ■■■■ No matter how hard Plaintiffs push, Spinrilla does not fit the mold.

### i.  *Defendants Have Not Induced Infringement*

The evidence Plaintiffs contend supports summary judgment under the inducement theory falls into four categories: (1) advertisements, solicitations and collaboration; (2) alleged 575 uploads of infringing content by Spinrilla and DJ Louie, (3) providing technological assistance to users; and (4) the purported lack of use of anti-infringement measures. (Dkt. 225, pp. 20-23).

- 24 -

### a. *Spinrilla Does Not Advertise or Solicit Infringement, Nor Collaborate With Infringers*

Plaintiffs claim that Defendants advertised the availability on Spinrilla of infringing works and that such advertisement proves that Defendants fostered infringement. (Dkt. 225, pp. 19-20).

First, many of Plaintiffs' SMFs are shifty, especially those on this topic of advertising, soliciting and collaborating. Much of the "evidence" cited by Plaintiffs in their 147-paragraph Statement of Facts (Dkt. 228) does not support the corresponding factual assertion. At much time and expense, Defendants reviewed and addressed these in detail in their responses (filed Jan. 31, 2019). So, when Plaintiffs assert in their Brief (Dkt. 225) a "fact" and cite to their Statement of Facts (Dkt. 228), that "fact," despite the citation, is not necessarily true.

Second, Plaintiffs stretch the meaning of "advertisement" absurdly far. Most of the "advertising" Plaintiffs point to are actually listings of mixtapes on Spinrilla's *homepage*. Plaintiffs makes this stretch because in other cases the courts found inducement at least partly based on the defendant having advertised to the public the availability of infringing content. (*E.g., Grok*ster at 937). When deposed by Defendants, Plaintiffs were unable to identity a single advertisement of infringing content by Defendants. (Dkt. 266, ¶¶ 50-55), but during summary judgment they've decided a mixtape's album cover on Spinrilla's homepage is an "advertisement." In

moving for summary judgment, Plaintiffs also point to a few posts on Spinrilla's social media pages about the availably of certain mixtapes and one mock-up of an advertisement sent to a potential advertiser. (Dkt. 225 at 16).

When a mixtape is on Spinrilla's homepage, all that is shown is the mixtape's cover art, mixtape title and artist's name. Since the song/tracks are not visible, a user viewing a mixtape on the homepage would have no way of knowing what music is on that mixtape. (Defs. Add. SMF, ¶64). Also, Defendants organized the content on the site under the belief that Audible Magic had blocked any infringement. (Dkt. 266, ¶¶105-166). In any event, all mixtapes are treated alike – Spinrilla is acoustically agnostic – it does not pick-out for special handling mixtapes with infringing content.

Spinrilla's acoustically agnostic organization of the mixtapes is in stark contrast to the advertising in *Grokster* and the soliciting in *Fung*. In *Grokster*, the defendants advertised their services as an alternative to Napster, directly solicited Napster users, distributed links to news articles which discussed the availability of copyrighted music and there were internal documents showing the site's purpose was to provide copyrighted music. (*Grokster* at 937). In *Fung,* the service had a section titled "Box Office Movies" which included a list of the 20 highest-grossing movies then playing in the U.S. and when a user clicked on the name of one of the

movies, the user was "asked to upload a file, that once downloaded by other users would lead directly to their obtaining infringing content." (*Fung,* 710 F.3d at 1036). "Fung also posted numerous messages requesting that users upload torrents for specific copyrighted films." (*Id*.).

The "solicitations" Plaintiffs point to sufficient to show that Defendants induced infringement are just normal courteous and complimentary emails any small business owner would send to its customers. (Dkt. 225, pp. 20-21). Plaintiffs have not made any showing that when Defendants told users their mixtapes were "doing crazy well" Defendants knew those mixtapes contained infringing material. (Dkt. 225 at 20). In fact, Mr. Copeland testified he did not and does not have time to listen to mixtapes. (Dkt. 266, ¶¶89 and 220). To be sure, Defendants encouraged uploads, but they did not encourage infringing uploads.

### b. The 575[10] Uploads (Even if True) Do Not Relate to Inducement

Plaintiffs argue that by uploading allegedly infringing works, Defendants intended to infringe. (Dkt. 225, p. 21). First, Defendants only uploads to Spinrilla were at the direction of a user – an acoustically agnostic customer service. As the

---

[10] As discussed earlier in this Brief, DJ Louie was never Spinrilla's agent nor did he act within the scope of any alleged agency when he uploaded content to Spinrilla. Thus, his 399 uploads should not be tacked on to Spinrilla's 176 uploads.

Supreme Court held in *Grokster,* "ordinary acts incident to product distribution, such as offering customers technical support" do not support liability under an inducement theory. (*Grokster*, 545 U.S. at 937). Second, all uploads, even the ones done at users' directions, needed to survive an Audible Magic scan. Uploading a mixtape that you assume will be rejected if it contains infringing content cannot induce infringement. And, prior to implementation of Audible Magic in December 2015, Defendants assumed that the relatively small group of vetted users who were given upload rights would only upload their own music.

Because all uploads by Defendants were at users' directions and Defendants assumed Audible Magic would block it if it contained infringing content, the only reasonable conclusion is that Defendants did not intend to infringe or induce infringement.

> **c.    *Any Technological Assistance Defendants Gave Its Users Was Acoustically Agnostic and the Normal Course of Every Business***

Plaintiffs also claim Defendants "provided technological assistance to users overtly engaging in infringement." (Dkt. 225, pp. 21-22 (citing Dkt. 228, ¶¶61, 65-66 and 68).

Uploading mixtapes, correcting names, fixing typos and providing technical assistance at the request/direction of a user is nothing more than acoustically

agnostic customer service. (*See* Defs. Res. to SMF, ¶¶61, 65). Defendants did not provide technical assistance *only* for a certain population of users – but for all users. Plaintiffs have done nothing more than find, among hundreds of thousands of pages produced by Defendants, instances when the assistance Spinrilla routinely provided happened to be for someone Plaintiffs allege uploaded infringing content. Plaintiffs then use those instances to create a false narrative that Defendants *only* provided assistance to these users.

Furthermore, correcting names and fixing typos just makes the music on Spinrilla more accessible to users, regardless of content. And, at least since December 2015, Defendants have assumed that infringing content would be blocked (which it mostly was) by Audible Magic.

The emails about evading Audible Magic are easily explained. (Defs. Resp. to SMF ¶¶63 and 64). As discussed above in connection with direct infringement, in two of them, Mr. Copeland confirmed that the files should not have been blocked in the first place (*i.e.*, Audible Magic returned a false positive), so circumventing Audible Magic was entirely proper.

With respect to the other "evade Audible Magic" emails, Mr. Copeland testified that he believed that slowing down a sound recording would be a "derivative work" which would not infringe. (Defts. Resp. to SMF, ¶64). Thus, when Mr.

Copeland suggested a user remix a song and re-upload it, he was not encouraging others to infringe. (*Id.*). The fact that Mr. Copeland had not intended to induce infringement is corroborated by two of the emails themselves. In one email Mr. Copeland also wrote, █████████████████████████████████████ ██████████████████████████████████████████ ███████████ (*See* Warren Ex. 54 (Dkt. 241-54), cited by Plaintiffs in (Dkt. 228 at ¶64)). In the other email Plaintiffs rely on, Mr. Copeland wrote, █████████████████ ██████████████████████████████████████████ (*See* Warren Ex. 58 (Dkt. 241-58), cited by Plaintiffs in SMF ¶64 (Dkt. 228)).

Furthermore, Plaintiffs have not shown that any of the audio files discussed in these four emails infringe any of Plaintiffs' works-in-suit, so Mr. Copeland's misguided advice did not result in any infringement. Stated in the negative, if Defendants wanted to induce infringement, wouldn't they widely circulate tips for evading Audible Magic? As the *Grokster* Court noted part of the inducement analysis is "to point to actual violators likely to be found among those who hear or read the message." (*Grokster* at 938).

### d. *Defendants' Anti-Infringement Program*

Plaintiffs next assert that Defendants induced infringement by not "employ[ing] tools to prevent infringement." (Dkt. 225, p. 23). This might be

Plaintiffs' all-time biggest flop.

Defendants have a robust anti-infringement program which is ███████ effective. Defendants have done everything they know to do, including everything Plaintiffs have suggested (except purchasing a ███████████████████ license from them). (Dkt. 266, ¶¶105-108 (implemented Audible Magic) and ¶¶122-132 (conducted three back-scans); Dkt. 225, pp. 1, 24, 43 (Plaintiffs bitter over no license)). Also, during discovery and also informally, Defendants have asked Plaintiffs to tell Defendants what else Defendants can do to prevent infringement and Plaintiffs have suggested nothing. (Dkt. 266 ¶¶209-213) and Defs. Add. SMF, ¶¶38, 40 and 43); *Perfect 10, Inc. v. Rapidshare,* 2010 WL 11509105, at *6 (S.D. Cal. May 18, 2010) (no inducement where defendant responded to takedown notices, terminated repeat infringers and independently searched for infringing content)).

Plaintiffs also criticize Defendants for not implementing Audible Magic earlier than December 2015. (Dkt. 225, p. 23). But Spinrilla had anti-infringement safeguards in place when it launched that were reasonable given the size of the business, primarily that only vetted user would have upload rights. (Dkt. 266, ¶¶63-89 (████████████████████████████████████████)). (It is not intuitive that an independent artist with his/her *own* music would upload *someone else's* music). And when deposed, Mr. Copeland explained, ███████████████

███████████████████████████████████████████████. (Defs Add. SMF, ¶36).

When the need was there, Spinrilla implemented Audible Magic's Type 3 service, used Audible Magic to conduct back-scans and later added three more Audible Magic services as additional safeguards. (Defendants' SMF, ¶¶ 105-166 (Dkt. 266) and Defs. Add. SMF, ¶36). As noted in *Fung*:

> an individual or entity's unlawful objective at time B is not a virus that infects all future actions. People, companies, and technologies must be allowed to rehabilitate, so to speak, through actions actively discouraging the infringing use of their product, lest the public be deprived of the useful good or service they are still capable of producing.

(*Fung*, 710 F.3d at 1038 (9th Cir. 2013)).

Lastly, contrary to what Plaintiffs assert, Defendants have not refused to purchase a license from Plaintiffs because of a competitive reason. (Dkt. 225, p. 24). Rather, **Spinrilla does not want a license because Spinrilla does not want Plaintiffs' sound recordings on Spinrilla, which is corroborated by the fact that ██████ of its content does not belong to Plaintiffs.**

In summary, Plaintiffs are not entitled to summary judgment on their inducement claim because Defendants' conduct was not meant to and in fact did not induce infringement.

ii. *Defendants are Not Liable Under a Contributory Theory*

Plaintiffs want summary judgment as to secondarily liable for copyright infringement under the contributory theory because "Defendants knew or had reason to know of the massive infringement occurring on Spinrilla, and materially contributed" to it. (Dkt. 225, pp. 24-31).

### a.  *Substantial Noninfringing Uses*

Before addressing Plaintiffs' argument, this claim should fail because Spinrilla is capable of substantial non-infringing uses. To save the Court time and given page limitations, Defendants defer to the "substantial non-infringing uses" section of their Brief. (Dkt. 263, pp. 17-18). In their Brief (Dkt. 225), Plaintiffs do not argue that the Spinrilla system does not have a substantial non-infringing use. Because of its substantial non-infringing uses, Plaintiffs are not entitled to summary judgment on its contributory theory of secondary liability.

### b.  *Defendants' "Knowledge of Infringement"*

Even though Spinrilla's non-infringing uses should be enough to reject Plaintiffs' contributory infringement theory, Defendants address Plaintiffs' arguments. Defendants are not aware of "massive infringement" on Spinrilla because there is no "massive infringement" on Spinrilla. Defendants are (painfully) aware that despite their best efforts, unfortunately, some[11] infringing content does

---

[11] *See* Note 2, above.

not get blocked by Audible Magic and therefore becomes available on Spinrilla. (*See* Dkt. 266, ¶¶158-166(Audible Magic's shortcomings and reasons files might occasionally not be blocked) and ¶¶167-169 (Spinrilla's effort to find technologies to replace or supplement Audible Magic)). When this occurs and Defendants find the infringing content (either by coming across it or by receiving a takedown notice), they remove it. (Dkt. 266 at ¶¶99-104 and 181-200).

### c. Defendants Do Not "Materially Contribute" to the Infringement

Defendants have not "materially contributed" to the infringement as Plaintiffs allege. (Dkt. 225, p. 29). There is no need (and not enough pages) for Defendants to repeat all that has been done and continues to be done to stop infringing content from being available on Spinrilla. Suffice to say that Defendants have done everything they know to do to prevent and remove infringing content from being available on Spinrilla (and they have been very effective at doing so). Even Plaintiffs have nothing to suggest. (Dkt. 266, ¶¶209-213; Defs. Add. SMF, ¶¶38, 40, 43). In summary, Plaintiffs are not entitled to summary judgment on their contributory theory of secondary liability.

### iii. Plaintiffs Are Not Entitled to Summary Judgment as to Vicarious Theory

Plaintiffs contend that Defendants are secondarily liable under the vicarious

theory because Defendants have "a significant financial interest in the massive copyright infringement and had both the right and practical ability to stop or limit that infringement, but failed to do so." (Dkt. 225, pp. 31-38).

### a. No direct financial benefit/not a draw

Plaintiffs first claim, incorrectly, that they only need to show that infringing content was available on Spinrilla to establish a "financial benefit from the infringement." (Dkt. 225, p. 33). This isn't correct. "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps . . . ." (*Ellison,* 357 F.3d at 1079 (discussed at length in Defendants' Brief, pp. 35-36 (Dkt. 263)).

Plaintiffs also contend that Defendants "profit" from the infringing content because that content draws-in users and having more users "must" increase the number of times an advertisement is viewed which, in turn, increases the amount of ad revenue paid to Spinrilla. (Dkt. 225, pp. 33-34). In an attempt to show that the infringement was a draw, Plaintiffs submit cherry-picked comments by anonymous people (or bots) in an app store and site analytics from a non-party, Alexa.[12] (*Id.*) Plaintiffs cite the unreliable site analytics to support their assertion that ███

---

[12] While Defendants appreciate that hearsay evidence which can likely be proven at trial may be considered at summary judgment, these app store comments and Alexa analytics are too unrelated and alien to the Parties and they should not be allowed.

████████████████████████████████████████████████

███████████████████████████████ (Dkt. 225 at 34 n.9).

Where the allegedly infringing content makes up only █████ of Spinrilla's

content, infringing content is promptly removed when it is discovered, there are ████

████ non-infringing songs to listen to and Spinrilla markets itself as a platform for

independent artists, it makes no sense that the infringing content is a "draw" for

anyone. Other than anecdotal hearsay, Plaintiffs have no evidence that the tiny

(relative to the ██████████ other songs) population of infringing content drew

additional users to Spinrilla. There is no such evidence and the theory is highly

speculative. The same type of speculation was offered by the plaintiff in *Hydentra*,

but the court obviously rejected it. (*Hydentra* at \*14 (*Hydentra* discussed at length

in Defendants' Brief, pp. 34-35 (Dkt. 263)).

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████ The app store comments are not only hearsay but

Plaintiffs cannot show that the music the users are talking about is Plaintiffs music

or not. Plaintiffs want the Court to interpret the comments in a light that is most

favorable to Plaintiffs, when they must be interpreted in the light most favorable to Defendants.

Furthermore, if the allegedly infringing content was merely "an added benefit," instead of a "draw," Plaintiffs have not met their burden of showing that. (*See e.g., Cambridge* at *8)(the infringing activity must be a draw not just an added benefit) (*Cambridge* discussed at length in Defendants' Brief, p. 39 (Dkt. 263); *see also*, *Ellison* at 1079 and *Ventura Content* at 613 (both requiring a causal relationship between the allegedly infringing content and the financial benefit)).

Plaintiffs are, thus, left with Mr. Copeland's May 2014 statement that ███████ ███████████████████████████████████████ (Dkt. 243-27). Much to their chagrin, independent artists are capable of putting-out "hot, new" music. In addition, Mr. Copeland states in that same email that ██████████████████ ████████████████████████████████████████ This purported evidence of direct financial benefit is not sufficient to show that Plaintiffs' are entitled to judgment as a matter of law.

Plaintiffs also want the Court to assume that Spinrilla has realized a financial benefit from infringement because infringing content has been heard "over a billion and a half times." (Dkt. 225, p. 34). But this is just more rank speculation and does not show that the tiny population of infringing content was anything more than "an

added benefit." (Also, while Spinrilla fully accepts that copyright law requires it to erect reasonable barriers to infringement (which it has) at the same time the law obliges Plaintiffs, as copyright owners, to police the Internet for infringing content. For reasons unbeknownst to Defendants, Plaintiffs stopped sending takedown notices to Spinrilla after this lawsuit was filed (except for approximately eight). (Dkt. 266, ¶200). So, if copies of infringing content have been heard ▮▮▮▮▮ of times, Plaintiffs' failure to police infringement, including bringing the infringing content to Spinrilla's attention, makes Plaintiffs somewhat responsible for the "billions").

### b. *Defendants Have Limited the Infringement*

If Defendants could completely prevent infringing content, they would. Short of that, they have done as an effective job of limiting it as they possibly can. Nothing shows this better than the ▮▮▮▮▮ number.

### c. Defendants Are Not Entitled to Summary Judgment Against Defendant Copeland

#### i. *Plaintiffs Are Not Entitled to Summary Judgment Against Mr. Copeland For Direct Infringement*

Plaintiffs argue that Mr. Copeland is individually liable for direct copyright infringement for his "personal uploads and downloads of works in suit." (Dkt .225, p. 40). First, all of Defendants' uploads were done within the scope of his Spinrilla employment and at the direction of a user, so it is not clear what Plaintiffs mean by

"personal" uploads. Furthermore, as argued earlier in this Brief, an upload the direction of a user is not a "volitional act" for purposes of direct copyright infringement purposes.

And, as explained in Defendants' responses to Paragraph 61 of Plaintiffs' SMF (Dkt. 228), many of the claimed ███ uploads were not uploads at all, but, rather, Defendants were grouping together mixtapes which users had already uploaded, to make the content more accessible. This also is not a "volitional act" for direct copyright infringement purposes.

Lastly, while Plaintiffs contend that Mr. Copeland "personally uploaded to Spinrilla at least ███ copies of ███ distinct works in suit," they have made it impossible for Mr. Copeland to defend himself. To identify the "███ copies" and "███ works", Plaintiffs cite in their Brief to their SMF Paragraph 61 (Dkt. 228). But Paragraph 61 begins a dizzying array of cites to extraordinarily long documents (*e.g.*, Landis Ex. 8 (Dkt. 234-8) is 161-pages of Spinrilla screenshots, "Schedule A" is a ███ list of "Infringing Copies of Works in Suit," Wilkens 1 (Dkt. 238-1) is Defendants "grayed-out" spreadsheet . . .). But nothing explains which of the "███ ███" infringe which of the "███." So, at this stage, Defendants submit that Plaintiffs have failed to prove that anything Mr. Copeland uploaded (which he did not do personally, but as an employee of Spinrilla and was done at the direction of a

user) infringed anything owned by Plaintiffs and, for that reason, summary judgment should be denied.

> ### ii.    Plaintiffs Are Not Entitled to Summary Judgment Against Mr. Copeland to Any Extent

Plaintiffs also argue that Mr. Copeland is personally liable to the same extent Spinrilla is liable since he controls and has a financial stake in Spinrilla. (Dkt. 225 at p. 41). For the reasons in this Brief, Plaintiffs are not entitled to summary judgment on any of its claims against Spinrilla and so Mr. Copeland is equally free from liability.

## V.    <u>Conclusion</u>

Summary judgment as to direct infringement should be denied because Plaintiffs' B-side "server" theory has long been forgotten in the bottom of the discount rack. It should also be denied because there are no volitional acts by Defendants which proximately caused infringement of Plaintiffs' 4,082 sound recordings. Summary judgment as to secondary infringement, under all three theories (inducement, contributory and vicarious), should be denied because it is abundantly clear that Defendants have effectively limited infringement, as shown by its ▬ non-infringement rate.

Respectfully submitted this 31st day of January, 2019.

*s/ David M. Lilenfeld*
David M. Lilenfeld

State Bar of Georgia No. 452399
Lilenfeld PC
3379 Peachtree Road NE, Suite 980
Atlanta, Georgia 30326
(404) 201-2520 – telephone
David@Lilenfeld.com

**<u>CERTIFICATE OF COUNSEL REGARDING FONT SIZE</u>**

I, David M Lilenfeld, an attorney, hereby certify that the foregoing has been prepared with a font size and point selection (Times New Roman, 14 pt.) which is approved by the Court pursuant to Local Rules 5.1(C) and 7.1(D).

<u>/s/ David M. Lilenfeld</u>

David M. Lilenfeld

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ATLANTIC RECORDING CORPORATION, *et al.,* | ) ) ) | |
| Plaintiffs, | ) ) | Case No.: |
| v. | ) ) | 1:17-CV-0431-AT |
| SPINRILLA, LLC, *et al.,* | ) ) | |
| Defendants. | ) ) | |

## CERTIFICATE OF SERVICE

The foregoing DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION

FOR SUMMARY JUDGMENT ON LIABILITY (DKT. 224), using the Court's

*CM/ECF* system, which automatically and contemporaneously sends electronic

notification and a service copy of this filing to the following counsel of record:

James A. Lamberth, Esq.  
*james.lamberth@troutmansanders.com*

Previn Warren, Esq.  
*pwarren@jenner.com*

Kenneth L. Doroshow, Esq.  
*kdoroshow@jenner.com*

Ava U. McAlpin, Esq.  
*amcalpin@jenner.com*

January 31, 2019

*/s/ David M. Lilenfeld*
David M. Lilenfeld