# Defendants' Opposition to Plaintiffs' Renewed Motion for Partial Summary Judgment on Defendants' DMCA Defense (Dkt. 305)

# Plaintiffs' and Defendants' Redactions

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ATLANTIC RECORDING CORPORATION, *et al.,* | ) ) ) | |
| Plaintiffs, | ) ) | Case No.: |
| v. | ) ) | 1:17-CV-0431-AT |
| SPINRILLA, LLC, *et al.,* | ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' DMCA DEFENSE (DKT. 226)

## [CONFIDENTIAL]

## [FILED UNDER SEAL PER PROTECTIVE ORDER (DKT. 186)]

# TABLE OF CONTENTS

I. **Introduction**…………………………………………………………...1

II. **Facts Relevant To Plaintiffs' DMCA Motion** ……………………………2

III. **Legal Background** …………………………………………………………8

    **A.** *Summary Judgment Standard* ……………………………………………..8

    **B.** *The DMCA and Policing Copyright Infringement* ……………………...8

    **C.** *DMCA's Storage Safe Harbor* …………………………………………..9

IV. <u>Application of Law to Facts</u> …………………………………………………10

    *A.* *Spinrilla Has a DMCA Agent*……………………………………………11

    *B.* *Spinrilla has adopted and communicated a Repeat Infringer Policy* ….12

    *C.* *Spinrilla reasonably implemented its Repeat Infringer Policy no later than July 29, 2017* …………………………………………………...13

        **a.** **Spinrilla has reasonably implemented its repeat infringer policy** ………………………………………14

        **b.** **Defendants have received no takedown notices since July 2017 and no users have accumulated two strikes under Spinrilla's policy** …………………………………………………15

        **c.** **The case law relied upon by Plaintiffs does not compel summary judgment in their favor** …………………………………18

V. **Conclusion** …………………………………………………………..21

i

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) …………………………………………………...8

*Arista Records LLC v. Myxer, Inc*,
    No. 08-03935, 2011 WL 11660773 (C.D. Cal. April 1, 2011) ……………13

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
    149 F. Supp. 3d, 634 (E.D. Va. 2015), *aff'd in part, rev'd in part* 881 F.3d
    293 (4th Cir. 2018)) ……………………………………………….18,19

*BWP Media USA Inc. v. Hollywood Fan Sites LLC*,
    115 F. Supp. 3d 397 (S.D.N.Y. 2015) …………………………………11

*Capitol Records, LLC vs. Escape Media*,
    No. 12-CV-6646, 2015 WL 1402049 (S.D.N.Y. March 25, 2015) ……18,19

*Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) ………………………………………...8

*Corbis Corp. v. Amazon.com, Inc.*,
    351 F. Supp. 2d 1090 (W.D. Wash. 2004) ………………………………...12

*Costar Grp. Inc. v. Loopnet, Inc.*,
    164 F. Supp. 2d 68 (D. Md. 2001) ………………………………………...11

*Disney Enterprises, Inc. v. Hotfile Corp.*,
    No. 11-20427, 2013 WL 6336286 (S.D. Fl. Sept. 20, 2013) ……….18,19,20

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) …………………………………………9

*Klim v. DS Services of America, Inc.*,
    225 F. Supp. 3d 1373 (N.D. Ga. 2015) ………………………………..8

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
    853 F.3d 1020 (9th Cir. 2017) ……………………………………………9

*Ouellette v. Viacom Int'l, Inc.*,
    No. CV 10-133-M-DWM-JCL,
    2012 WL 1435703 (D. Mt., April 25, 2012) ….....…………………………...3

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) …………………………………….…...9,13

*Ventura Content, Ltd. v. Motherless, Inc.*,
    885 F.3d 597 (9th Cir.), *cert. denied*, 139 S. Ct. 419 (2018) …....……*passum*

## STATUTES

Fed. R. Civ. P. 56(c) ……………………………………………………….8

17 U.S.C. § 512(c) ……………………………………………..….9,12

17 U.S.C. § 512(c)(2) ………………………………………………...9

17 U.S.C. § 512(i)) …………………………………………………10,12

Defendants oppose Plaintiffs' Motion for Summary Judgment (Dkt. No. 226).

## I. <u>Introduction</u>

Plaintiffs have moved for summary judgment on Defendants' DMCA safe harbor defense (Dkt. 226). Plaintiffs contend Defendants do not qualify for protection of the safe harbor because (1) Defendants failed to meet the requirement to register a designated agent and (2) failed to adopt, reasonably implement and inform users of a repeat infringer policy. (Dkt. 227, p. 1-2). According to Plaintiffs, they are entitled to summary judgment on Defendants' DMCA safe harbor defense.

However, the evidence and the law entitle Defendants to the safe harbor protection for infringement occurring on or after July 29, 2017. In fact, Defendants moved for summary judgment on this issue. (Dkt. 264).

Plaintiffs admit that as of July 29, 2017, Defendants had a designated agent registered with the Copyright Office. (Dkt. 227, p. 10-11; Dkt. 228 at ¶ 147). Plaintiffs also admit that as July 23, 2017, Spinrilla adopted and communicated to users its repeat infringer policy. (Dkt. 227, p. 14,18; Dkt. 228 at ¶ 111). Additionally, Spinrilla's repeat infringer policy has been adequately implemented. (Dkt. 266 at ¶¶ 96-98).

Plaintiffs essentially acknowledge as much when they contend that the facts make it "clear that Defendants are ineligible for the safe harbor from the founding

of Spinrilla in 2013 until at least July 23, 2017." (Dkt. 227, p. 18). Accordingly, to the extent that Plaintiff seeks summary judgment on Defendants' DMCA safe harbor defense for infringements occurring after July 29, 2017, their motion must be denied and Defendants' granted.

Also, to avoid burdening the Court with these cross-motions and because the cross-motions were congruent with each other, Defendants offered to consent to Plaintiffs' DMCA MSJ if Plaintiffs would consent to Defendants' DMCA MSJ. This would resolve any dispute over the safe harbor, giving Defendants protection from July 29, 2017 forward. Plaintiffs refused.

## II.   Facts Relevant to Plaintiffs' DMCA Motion

Dylan Copeland is the sole owner of the music streaming service, Spinrilla, which caters to independent hip-hop artists. (Dkt. 266 at ¶¶ 2, 6, 7-8, 17). Spinrilla contains approximately ▮▮▮▮▮ songs, ▮▮▮▮▮▮▮ of which Plaintiffs claim infringe 4,082 of Plaintiffs' registered sound recordings. (Dkt. 228 at ¶ 59 and Dkt. 266 at ¶ 202). Spinrilla has ▮▮▮▮▮ registered users but only ▮▮▮▮▮▮ have the ability to upload audio files to Spinrilla. (Dkt. 266 at ¶ 63). Given the volume of content on Spinrilla and the number of audio files added to Spinrilla on a daily basis, Defendants obviously cannot listen to everything uploaded by ear. (Dkt. 266 at ¶ 89). Additionally, Spinrilla does not delete or remove files that were not

2

frequently downloaded (i.e., remove unpopular songs as a way of making it more likely users listen to popular songs). (Dkt. 266 at ¶ 48).

Spinrilla launched with a number of anti-infringement measures in place and has added other measures as the business has grown. (Dkt. 266 at ¶¶ 56-166; 203-213). One of those measures was its Terms of Use prohibiting the posting of copyrighted material. (Dkt. 266 at ¶¶ 90-98). At Plaintiffs' suggestion, in December 2015, Spinrilla began using Audible Magic, a leading content recognition service. (Dkt. 266 at ¶¶ 105-110; 142-151). Spinrilla has continued to add other Audible Magic products as Spinrilla has learned of them and determined their usefulness. (Dkt. 266 at ¶¶ 131-140). Through its implementation and use of Audible Magic, more than ██████ audio files that were uploaded to Spinrilla were blocked from publication. (Dkt. 266 at ¶¶ 114).

Defendants promptly respond to any takedown notices[1] they receive under the DMCA. Defendants ordinarily remove the content within a day or less after receipt of a takedown notice. (Dkt. 266 at ¶¶ 100, 182-183). Defendants also send a response to the complainant to inform him/her that the complained of content was removed.

---

[1] A takedown notice is a complaint under the DMCA from a copyright owner to an online service provider requesting that the service provider remove or black access to infringing materials. (*Ouellette v. Viacom Int'l, Inc.*, No. CV 10-133-M-DWM-JCL, 2012 WL 1435703 at *2 (D. Mt., April 25, 2012)).

(Dkt. 266 at ¶¶183, 191-192). Unfortunately, because some of the takedown notices failed to contain a URL to where the allegedly infringing audio file resided, Defendants could not locate some of the files.[2] (Dkt. 266 at ¶¶ 193). Defendants have also promptly removed audio files which Plaintiffs have contended through this litigation infringe Plaintiffs' sound recordings. (Dkt. 266 at ¶¶ 205).

When Spinrilla launched in 2013, it had a three-page document titled Web Site Terms and Conditions of Use which included the following provision:

> By accessing this web site, you are agreeing to be bound by these web site Terms and Conditions of Use, all applicable laws and regulations, and agree that you are responsible for compliance with any applicable local laws. If you do not agree with any of these terms, you are prohibited from using or accessing this site.

---

[2] To be DMCA-compliant, a takedown notice must include (1) a physical or electronic signature of a person authorized to act on behalf of the copyright owner, (2) identification of the copyrighted work or, if multiple copyrighted works are covered by a single notification, a representative list of such works at that site, (3) identification of the material that is claimed to be infringing, and information reasonably sufficient to permit the service provider to locate the material, (4) contact information for the complaining party, (5) a statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized, (6) a statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed. (*Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 616 n.75 (9th Cir.), *cert. denied*, 139 S. Ct. 419 (2018)).

(Dkt. 266 at ¶¶ 90-91). Spinrilla revised these terms and conditions in March 2015. The March 2015 Terms and Conditions informed users that Spinrilla reserved "the right to remove any User Content from Spinrilla at its discretion." (Dkt. 266 at ¶ 92). The 2015 Terms and Conditions further stated that:

> By transmitting and submitting any User Content while using Spinrilla, you agree as follows:
>
> - You will not submit content that is copyrighted or subject to third party proprietary rights . . . unless you are the owner of such rights or have the appropriate permission from their rightful owner to specifically submit such content; and
>
> - You hereby affirm that we have the right to determine whether any of your User Content submissions are appropriate and comply with these Terms of Service, remove any and/or all of your submissions, and terminate your account without prior notice.

(Dkt. 266 at ¶ 92).

On May 22, 2015, Spinrilla added an additional paragraph to its Web Site Terms and Conditions of Use that informed users: "By accessing this web site, you are agreeing to be bound by these web site Terms and Conditions of Use, all applicable laws and regulations, and agree that you are responsible for compliance with any applicable local laws. If you do not agree to these terms, you are prohibited from using or accessing this site." (Dkt. 266 at ¶ 93). Spinrilla updated its Terms of Service on June 1, 2017 (including renaming it from "Web Site Terms and

Conditions of Use" to "Terms of Service"). This version's additions included (1) a more detailed "Content" provision, (2) a "Copyright Policy," (3) a description of its "DMCA Notice and Procedure for Copyright Infringement Claims" and (4) a separate paragraph about suspension and termination of user accounts. (Dkt. 266 at ¶ 95).

Although prior versions allowed Spinrilla to terminate the accounts of users who violated Spinrilla's terms of use, on July 23, 2017, Spinrilla added to its Terms of Service, a paragraph, titled, "Repeat Infringement," which specifically addressed termination of user accounts due to copyright infringement. (Dkt. 266 at ¶ 96). This July 23, 2017 update also added a "two strike" rule; "after two strikes, the user's account would be terminated. (Dkt. 266 at ¶ 96). Spinrilla's "Repeat Infringement" policy provides "[e]ach copyright infringement notice against a user's account constitutes a 'strike.' After two strikes, the user's ability to upload music will be revoked." (Dkt. 266 at ¶ 97). Also, around July 23, 2017, Mr. Copeland began tracking claims of copyright infringement himself, including the Spinrilla user who uploaded the allegedly infringing content. (Dkt. 266 at ¶ 98).

Spinrilla has terminated ████ accounts based on their repeated posting of infringing material. On January 19, 2016, Spinrilla terminated the account of Mo City Rich because he was "posting copyrighted content." (Dkt. 266 at ¶ 203). On

6

August 5, 2016, Spinrilla terminated the account of ████ because this user
████████████████████████████████████████ (Dkt. 266 at ¶
204). On February 3, 2017 – the day this lawsuit was filed – ████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████. (Dkt.
266 at ¶ 205).

Spinrilla has always operated openly and domestically. (Dkt. 266 at ¶¶ 170-
174). Spinrilla has never attempted to hide itself, make it difficult to contact, or
locate itself beyond the reach of United States judicial processes. (*Id.*). In fact, long
before it registered a DMCA agent with the U.S. Copyright Office, Plaintiffs were
able to send takedown notices to Spinrilla. (Plaintiffs' First SMF, ¶¶ 11 and 12 (*e.g.*,
Spinrilla sent the RIAA an email message confirming its receipt of each of the 59
takedown notices" the RIAA sent during its investigation of Spinrilla)).

Consistent with its policy of operating openly and domestically, Defendants
registered a designated agent at the Copyright Office on July 29, 2017. (Dkt. 228;
Plaintiffs' Statement of Facts, ¶147 (Copyright Office website showing that
registration of Spinrilla, LLC's DMCA designated agent became "[e]ffective" on
"July 29, 2017"); (Dkt. 227, p. 10-11)).

## III. Legal Background

### A. Summary Judgment Standard

Summary judgment is proper when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. (*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* In determining whether a party is entitled to judgment as a matter of law, the Court is required to draw all reasonable inferences in the favor of the non-movant and resolve all factual disputes in the non-movant's favor. (*Klim v. DS Services of America, Inc.,* 225 F. Supp. 3d 1373, 1376 (N.D. Ga. 2015)).

### B. The DMCA and Policing Copyright Infringement

The DMCA strikes a balance between the interests of "copyright holders in benefitting from their labor; ... entrepreneurs in having the latitude to invent new technologies without fear of being held liable if their innovations are used by others in unintended infringing ways; and those of the public in having access [to] both...." (*Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1037 (9th Cir. 2013)). The

8

DMCA balances these interests by requiring service providers to take down infringing materials when copyright holders notify them of the infringement and by limiting service providers' liability for unintentional infringement through several safe harbors. (*Mavrix Photographs, LLC v. LiveJournal, Inc.,* 853 F.3d 1020, 1026-1027 (9th Cir. 2017) (citing *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)). Thus, the DMCA places the burden of policing copyright infringement on the copyright owner, not on the person or firm storing and hosting the material. (*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007)). Although Congress could have placed the burden of policing infringement in suspicious circumstances on the service provider, Congress, instead, chose to place the burden on the copyright holder. (*Ventura Content,* 885 F.3d at 610 (9th Cir.)).

### C. DMCA's Storage Safe Harbor

The Section 512(c) safe harbor shields "service providers" from liability for "information residing on systems or networks at the direction of users." This is often referred to as the "storage safe harbor." 17 U.S.C. § 512(c). Included among the requirements to qualify for the protections of the § 512(c) safe harbor, a service provider must, *inter alia,* (1) designate "an agent to receive notifications of claimed infringement" . . . (17 U.S.C. § 512(c)(2)) and (2) have adopted and reasonably implemented and informs subscribers and account holders" of a policy that

9

"provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." (17 U.S.C. § 512(i)). The Section 512(c) has other requirements; however, Plaintiffs have chosen not to address those requirements in their Motion, arguing only that Defendants have failed to meet the designated agent and repeat infringer policy. Accordingly, Defendants respond only as to those elements.

## IV.   <u>Application of Law to Facts</u>

Defendants qualified for the DMCA safe harbor defense on July 29, 2017 when they registered a designated agent with the Copyright Office and continue to meet the requirements for the defense. (*See* Dkt. 265). Plaintiffs, however, request that the Court "hold that Defendants are ineligible for the DMCA safe harbor" full stop without providing for a carve out from July 29, 2017 forward, despite admitting that Defendants now have a designated agent registered with the Copyright Office (Dkt. 227, p. 10-12) and admitting that Defendants have implemented a repeat infringer policy (Dkt. 227, p. 14). Because Plaintiffs' have not demonstrated that they are entitled to judgment as a matte of law, they are not entitled to the relief requested. Viewing the facts in the light most favorable to Defendants, a reasonable jury could return a verdict finding that Defendants are entitled to the safe harbor defense for any infringement occurring on July 29, 2017 or thereafter. Indeed, as set

Case 1:17-cv-00431-AT Document 305 *SEALED* Filed 01/31/19 Page 13 of 27

forth in Defendants' Motion for Partial Summary Judgment on its Safe Harbor Defense, no reasonable jury could find otherwise.

### A. Spinrilla Has a DMCA Agent

Plaintiffs admit that as of July 29, 2017, Spinrilla had a designated agent registered with the Copyright Office. (Dkt. 227, p. 10-11; Dkt. 228 (Plaintiffs' Statement of Facts, ¶147 citing; Wilkens Ex. 21 at 3 (Dkt. 238-21) (Copyright Office website showing that registration of Spinrilla, LLC's DMCA designated agent became "[e]ffective" on "July 29, 2017")).

Case law demonstrates that a party is entitled to claim the DMCA safe harbor defense as of the date of its registration of a designated agent. (*Costar Grp. Inc. v. Loopnet, Inc.,* 164 F. Supp. 2d 68, 697 n. 4 (D. Md. 2001) ("It is undisputed that [the defendant] did not designate an agent until December 8, 1999. Therefore, the safe harbor is only available to [the defendant] with regard to its liability (if any) arising after that date."); *BWP Media USA Inc. v. Hollywood Fan Sites LLC,* 115 F. Supp. 3d 397 (S.D.N.Y. 2015) ("Defendants cannot assert a DMCA safe harbor defense for any infringement by HFS that is shown to have occurred before December 5, 2013—the date on which HFS filed its own DMCA agent designation."). Accordingly, Defendants are entitled to claim the DMCA safe harbor for any infringement that is alleged to have occurred on July 29, 2017 or later.

11

## B. Spinrilla has adopted and communicated a Repeat Infringer Policy

Plaintiffs admit that as of at least July 23, 2017 Defendants adopted, communicated to users and reasonably implemented a repeat infringer policy. (Dkt. 266 ¶¶ 96-97 and Dkt. 228 ¶111 (Dkt. 228)[3] ("Defendants did not adopt a repeat infringer policy until after this lawsuit was filed."). Plaintiffs further admit that "[u]sers who are given an artist account must agree to Spinrilla's Terms of Service, which grant Spinrilla the right to "terminate your account with or without prior notice." (Dkt. 228 ¶26 and DRPSF ¶ 26). The adoption of the repeat infringer policy coupled with the posted Terms of Service is sufficient to meet the adoption and communication requirements. (*Ventura Content,* 885 F.3d at 615-616)).

Based on these admissions, a reasonable juror could find that Defendants adopted and communicated a repeat infringer policy as required by Section 512(i) and is thus qualified to the Section 512(c) safe harbor. Indeed, as set forth in Defendants' Motion for Summary Judgment, no reasonable juror could find otherwise. (Dkt. 265, p. 22-24). Thus, Plaintiffs are not entitled to summary judgment that "defendants are ineligible for the DMCA safe harbor" as they request

---

[3] See Defendants Response to Plaintiffs' Statement of Facts ("DRPSF") ¶ 111 filed contemporaneously herewith.

the Court to find. (Dkt. 227, p. 21).

### C. *Spinrilla reasonably implemented its Repeat Infringer Policy no later than July 29, 2017*

A service provider implements a repeat infringer policy if "it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and it does not actively prevent copyright owners from collecting information needed to issue such notifications." (*CCBill,* 488 F.3d at 1109). That implementation is reasonable if under appropriate circumstances, the service provider terminates users who repeatedly or blatantly infringe copyright." (*Id.*). Maintaining a DMCA log, blocking a user's name and email address from uploading files, placing email addresses from terminated accounts on a banned list and prohibiting a banned user from reopening a terminated account are all factors that indicate that a defendant has reasonably implemented a repeat infringer policy. (*Ventura Content,* 885 F.3d at 617-18). Reasonably implementing a repeat infringer policy does not require perfection. (*Id.* at 618 ("Safe harbor eligibility does not require perfection, just 'reasonable' implementation of the policy 'in appropriate circumstances.'"); *Corbis Corp. v. Amazon.com, Inc.,* 351 F. Supp. 2d 1090, 1104 (W.D. Wash. 2004) ("An infringement policy need not be perfect; it need only be reasonably implemented."); *Arista Records LLC v. Myxer, Inc,* No. 08-03935, 2011 WL 11660773, *18 (C.D.

Cal. April 1, 2011) (defendant's repeat infringer policy must be implemented in a reasonable manner, "it is incorrect that [defendant] must have an exhaustive and perfectly-crafted policy.")).

### a. Spinrilla has reasonably implemented its repeat infringer policy

From July 2017 forward, Defendants have reasonably implemented their repeat infringer policy. Defendants' policy provides that "[e]ach copyright infringement notice against a user's account constitutes a 'strike.' After two strikes, the user's ability to upload music will be revoked." (Dkt. 266 at ¶ 97). Courts have found that two strike policies are reasonable. (*Ventura Content,* 885 F.3d at 618). In addition, Spinrilla keeps a DMCA log. Around, July 2017, Mr. Copeland began tracking claims of copyright infringement himself, including the Spinrilla user who uploaded the allegedly infringing content. (Dkt. 266 at ¶ 98). If a user accumulates two strikes, that user's account is terminated and the user may not reactivate his account. (Dkt. 266 at ¶ 96).

Plaintiffs have, however, as an apparent litigation strategy, stopped sending takedown notices to Spinrilla since the instigation of this lawsuit. (Dkt. 266 at ¶¶ 158, 308). Accordingly, no users have been terminated because no users have accumulated two strikes since implementation of the July 2017 policy. However, Spinrilla terminated ▮ repeat infringers prior to the instigation of this lawsuit and

14

terminated ▮ repeat infringers identified in the Complaint the day the lawsuit was filed. (Dkt. 266 at ¶¶ 203-05). Spinrilla's willingness to terminate users for repeat infringement prior to the introduction of the July 2017 policy is evidence that it will also terminate repeat infringers under the July 2017 policy. Accordingly, Spinrilla has met the requirements set forth in *Ventura Content* and has reasonably implemented the policy. (*Ventura Content,* 885 F.3d at 617-18). Accordingly, Plaintiffs are not entitled to summary judgment as to Defendants' DMCA defense.

### b. Defendants have received no takedown notices since July 2017 and no users have accumulated two strikes under Spinrilla's policy.

In arguing that Plaintiffs have failed to reasonably implement Spinrilla's repeat infringer policy, Plaintiffs ignore the accounts that have been the subject of termination. Instead, Plaintiffs focus on a few infringers and users identified as having "noncompliant" uploads. (Dkt. 227, p. 19-20).

First, the "noncompliant" users are not repeat infringers under the DCMA. In an attempt to inflate the number of "repeat infringers" that Defendants have allegedly failed to terminate, Plaintiffs argue that users who were flagged by Audible Magic as attempting to upload "noncompliant" files are "repeat infringers." (Dkt. at 227 citing (Dkt. 228) at 114, 120). But, if Audible Magic "flags" an upload that means it was uploaded by a user but *not* published on Spinrilla, so there is no

infringement. And, when Audible Magic "flags" an upload, Spinrilla is not alerted – the upload is simply blocked from being published. Thus, Plaintiffs are contending that Defendants have the burden of reviewing Audible Magic data and terminating users based on their *failed attempts* to upload infringing audio files. The DCMA safe harbor provision do not impose this type of burden on Defendants; rather, the burden is on Plaintiff to identify users who successfully post infringing content to Spinrilla and then notify Spinrilla of that infringement. And since before July 2017, Plaintiffs have declined to exercise that burden.[4] Thus, none of the users have accumulated two strikes under Spinrilla's policy.

Second, Plaintiffs have failed to identify any users who have received two strikes based on takedown notices since the implementation of the July 2017 repeat infringer policy. Plaintiffs have sent no takedown notices since this lawsuit was filed. So, the two users identified by name in Plainitffis' brief: ██████████████

██████ (Dkt. 227, p. 20 n. 4) have not received two strikes under the policy. Spinrilla

---

[4] Plaintiff identified these "noncompliant" users based on a document produced by Defendants that showed audio files that were flagged and blocked by Audible Magic. (*See* Def. Res. to Pla. SMF. at ¶ 120). The users appear to have attempted to upload some of those noncompliant files since Spinrilla had a registered DMCA agent. Assuming any of those files that were noncompliant were not blocked by Audible Magic and appeared on Spinrilla, Spinrilla has not received a takedown notice for those files. (*See* Def. Res. to Pla. SMF. at ¶¶ 114; 120) Thus, none of those users have accumulated two-strikes under Spinrilla's repeat infringer policy.

Case 1:17-cv-00431-AT Document 353-7 Filed 04/15/19 Page 22 of 28

has not received any takedown notices as to these two users since it implemented the two-strike policy in July 2017.  Plaintiffs make no attempt to parse out sound recordings that are "allegedly infringing" from ones posted on Spinrilla with permission.

Moreover, these few alleged repeat infringers are not sufficient to find that Spinrilla has failed to reasonably implement its repeat infringer policy. "The absence of any significant number of repeat infringers who escaped termination compels the conclusion that a trier of fact could not conclude, on the record before us, that [defendants] failed to meet the repeat infringer eligibility requirement for safe harbor." (*Ventura Content,* 885 F.3d at 619.)

The DMCA obliges Spinrilla to erect reasonable barriers to prevent infringement. The DMCA obliges Plaintiffs, as copyright owners, to police the online marketplace for content that is infringing their sound recordings. Therefore, if an infringing audio file evades Spinrilla's barriers, that file should be caught by Plaintiffs' policing activities. Plaintiffs are then obliged to send a takedown notice as to that activity. So, an infringing copy being heard "▮▮▮▮" of times only reveals

inadequacies in Plaintiffs' policing, not inadequacies in Spinrilla's infringement barriers. Accordingly, Plaintiffs are not entitled to summary judgment based on their allegation that Defendants have not reasonably implemented a repeat infringer policy.

### c. The case law relied upon by Plaintiffs does not compel summary judgment in their favor

Plaintiffs' exaggerate the holdings of the cases it cites in an attempt to support its argument that Defendants implementation of its repeat infringer policy is not reasonable. Each of the cases relied upon by Plaintiffs (*BMG Rights Mgmt, Escape Media,* and *Hotfile*) found that the defendants did not qualify for the DMCA safe harbor because repeat infringers were never terminated.

In *BMG Rights Mgmt,* the court found that the defendant was not entitled to the safe harbor defense because in spite of its public termination policy, the internal policy that it followed allowed repeat infringer accounts to be "reactivated upon request. (*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.,* 149 F. Supp. 3d, 634, 655-656 (E.D. Va. 2015), *aff'd in part, rev'd in part* 881 F.3d 293 (4th Cir. 2018)). Once these accounts were reactivated, customers were given clean slates, meaning the next notice of infringement [defendant] received linked to these accounts would be considered the first in *Cox's* graduate response program." (*Id.*). Here, Plaintiffs do not allege that Defendants have reactivated the accounts of

18

users it has terminated nor have they produced any evidence that would support such a conclusion. Rather, as required by the *BMG Rights Mgmt.* court, when Defendants terminate a user's account, they put an end to the account and do not attempt to skirt the DMCA requirements by doing something short of termination.

In *Escape Media,* the court found that the defendant was not entitled to the safe harbor defense because while its written policy provided for termination, the defendant admitted that it *never* followed that policy. (*Capitol Records, LLC vs. Escape Media,* No. 12-CV-6646, 2015 WL 1402049 at *10 (S.D.N.Y. March 25, 2015). Instead, in practice, the defendant used a "one strike policy" which according to the court meant that "Escape has not and will not terminate a repeat infringer's account regardless of the level of repeat infringement." (*Id.*). Moreover, the defendant in *Escape* did not track repeat infringers. (*Id.)*. Here of course, the facts are different. Spinrilla has previously terminated repeat infringers, as Plaintiffs admit. (Dkt. 227, p. 19) Moreover, Spinrilla tracks users who have uploaded infringing material so that it may identify repeat infringers. (Dkt. 227, p. 19) Plaintiffs have adduced no facts that would suggest that Spinrilla will not continue to terminate the accounts of repeat infringers as appropriate.

In *Hotfile,* the court found that the defendants' repeat infringer policy was not tied to takedown notices. (*Hotfile,* 2013 WL 6336286, *8). Despite receiving

19

*over 10 million* takedown notices, the defendants did not terminate any users

accounts based on the notices. (*Id.*) Moreover, during deposition, defendant

admitted that its public claims that it deleted accounts of any user reported two

times was untrue. (*Id.*) In fact, at the time the Compliant in the case 24,790 users

had accumulated more than three notices and over 1,200 had over 100 notices. (*Id.*

at *10). And, the court found that those users who were the subject of more than

three infringement notices were responsible for posting 50 million files (15.6

million which were the subject of a takedown notice) representing 44 percent of

the files ever uploaded to *Hotfile*. (*Id.*) Based on these numbers the court found

that the defendant did not have any meaningful policy to combat infringement. (*Id.*

at *24). Here, as discussed above, the vast majority of files on Spinrilla's system

are non-infringing. Plaintiffs have failed to send any takedown notices since the

implementation of Spinrilla's repeat infringer notices as a litigation strategy. Thus,

the failure is theirs – not Spinrilla's. Had Plaintiffs sent takedown notices for any

user and the user accumulated two strikes since July 29, 2017, Spinrilla would

have terminated that users' account.

## V.    CONCLUSION

Plaintiffs are not entitled to summary judgement on Defendants' DMCA

safe harbor defense from July 29, 2017 forward because Spinrilla has a registered

designated and reasonably implemented its repeat infringer policy. Accordingly,

Defendants respectfully request that this Court deny Plaintiffs' Motion.

Respectfully submitted this 31st day of January, 2019.

**LILENFELD PC**

*/s/ David M. Lilenfeld*
David M. Lilenfeld
Georgia Bar # 452399
Lilenfeld PC
3379 Peachtree Road NE, Suite 980
Atlanta, Georgia 30326
Telephone: (404) 201-2520
David@lilenfeld.com
Attorney for Defendants

## <u>CERTIFICATE OF COUNSEL REGARDING FONT SIZE</u>

I, David M Lilenfeld, an attorney, hereby certify that the foregoing has been

prepared with a font size and point selection (Times New Roman, 14 pt.) which is

approved by the Court pursuant to Local Rules 5.1(C) and 7.1(D).


<u>/s/ David M. Lilenfeld</u>

David M. Lilenfeld

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| ATLANTIC RECORDING CORPORATION, *et al.,* | ) ) ) | |
| Plaintiffs, | ) ) | Case No.: |
| v. | ) ) | 1:17-CV-0431-AT |
| SPINRILLA, LLC, *et al.,* | ) ) | |
| Defendants. | ) ) ) | |

## CERTIFICATE OF SERVICE

The foregoing DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' DMCA DEFENSE (DKT. 226), using the Court's *CM/ECF* system, which automatically and contemporaneously sends electronic notification and a service copy of this filing to the following counsel of record:

James A. Lamberth, Esq.
*james.lamberth@troutmansanders.com*

Previn Warren, Esq.
*pwarren@jenner.com*

Kenneth L. Doroshow, Esq.
*kdoroshow@jenner.com*

Ava U. McAlpin, Esq.
*amcalpin@jenner.com*

January 31, 2019

*/s/ David M. Lilenfeld*
David M. Lilenfeld