# Plaintiffs' Reply Brief in Support of Both Plaintiffs' Motion for Summary Judgment on Liability and Renewed Motion for Partial Summary Judgment on Defendants' DMCA Safe Harbor Defense (Dkt. 338)

# Plaintiffs' and Defendants' Redactions

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ATLANTIC RECORDING CORPORATION, LAFACE RECORDS LLC, SONY MUSIC ENTERTAINMENT, UMG RECORDINGS, INC., WARNER BROS. RECORDS INC., ARISTA MUSIC, ARISTA RECORDS LLC, BAD BOY RECORDS LLC, CAPITOL RECORDS, LLC, ELEKTRA ENTERTAINMENT GROUP INC., ROC-A-FELLA RECORDS, LLC, SONY MUSIC ENTERTAINMENT US LATIN LLC, and ZOMBA RECORDING LLC, | Civil Action No. 1:17-CV-00431-AT |

     Plaintiffs,

     v.

SPINRILLA, LLC and JEFFERY DYLAN COPELAND,

     Defendants.

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF BOTH
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY
AND RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DEFENDANTS' DMCA SAFE HARBOR DEFENSE**

**[CONFIDENTIAL]
[FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER]**

# TABLE OF CONTENTS

CITATION LEGEND.................................................................................vi

PRELIMINARY STATEMENT ................................................................1

LEGAL STANDARD................................................................................6

ARGUMENT ............................................................................................7

I.    DEFENDANTS DIRECTLY INFRINGED PLAINTIFFS' COPYRIGHTS. ........................................................................................7

    A.    Defendants Violated 17 U.S.C. § 106(6) By Publicly Performing The Works In Suit. ....................................................7

    B.    Defendants Violated 17 U.S.C. §§ 106(1) & 106(3) By Reproducing And Distributing The Works In Suit. ............................10

        1.    Copeland Uploaded and Downloaded Copies of the Works in Suit in Violation of 17 U.S.C. § 106(1)...............................10

        2.    Defendants Caused Uploads, Downloads, and Streams of the Works in Suit in Violation of 17 U.S.C. §§ 106(1) & 106(3). ..................................................................................14

II.    DEFENDANTS ARE SECONDARILY LIABLE FOR INFRINGING THE WORKS IN SUIT.............................................19

    A.    Defendants Are Vicariously Liable For Their Users' Infringements.................................................................................19

        1.    Defendants Have The Right And Ability To Control Infringing Activity, But Have Declined To Do So..................19

        2.    Infringing Content Has Served As a Draw for Users of Spinrilla and Defendants Have Profited From It ......................22

    B.    Defendants Are Contributorily Liable For Their Users' Infringements.................................................................................24

i

C.   Defendants Are Liable for Inducing Infringement. ...........................27

III.   DEFENDANT   COPELAND   IS   PERSONALLY   LIABLE   AS
SPINRILLA'S CEO AND OWNER. ...........................................................30

IV.   DEFENDANTS ARE NOT ENTITLED TO DMCA SAFE HARBOR
PROTECTION. ...........................................................................................30

CONCLUSION .....................................................................................................34

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ...........................................................20

*ABC v. Aereo, Inc.*,
573 U.S. 431 (2014)................................................................................9

*Arista Records LLC v. Usenet.com, Inc.*,
633 F. Supp. 2d 124 (S.D.N.Y. 2009) ...................................16, 17, 26

*Blue Cross & Blue Shield of Alabama v. Weitz*,
913 F.2d 1544 (11th Cir. 1990) ..........................................................27

*BMG Rights Management (US) LLC v. Cox Communications, Inc.*,
149 F. Supp. 3d 634 (E.D. Va. 2015),
*aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018) ..................32

*Camacho v. Nationwide Mutual Insurance Co.*,
13 F. Supp. 3d 1343 (N.D. Ga. 2014)....................................................6

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)..............................................................................15

*Capitol Records, LLC v. Escape Media Group, Inc.*,
No. 12-CV-6646 (AJN), 2015 WL 1402049
(S.D.N.Y. Mar. 25, 2015) ...........................................................passim

*Capitol Records, LLC v. ReDigi, Inc.*,
934 F. Supp. 2d 640 (S.D.N.Y. 2013),
*aff'd*, 910 F.3f 649 (2d Cir. 2018) ......................................................17

*Columbia Pictures Industries, Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ......................................................28, 33

*CoStar Group, Inc. v. LoopNet Inc.*,
373 F.3d 544 (4th Cir. 2004) .................................................................8

*Disney Enterprises, Inc. v. Hotfile Corp.*,
798 F. Supp. 2d 1303 (S.D. Fla. 2011) ...............................................................8

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
76 F.3d 259 (9th Cir. 1996) ...............................................................................24

*GDG Acquisitions LLC v. Government of Belize*,
849 F.3d 1299 (11th Cir. 2017) .........................................................................18

*Hilburn v. Murata Electronics North America, Inc.*,
181 F.3d 1220 (11th Cir. 1999) ...............................................................6, 20, 34

*Hydentra HLP International Ltd. v. Luchian*,
No. 15-cv-22134, 2016 WL 5951808 (S.D. Fla. June 2, 2016) ..........................8

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)..............................................................................21, 26, 27

*Montgomery v. Noga*,
168 F.3d 1282 (11th Cir. 1999) ........................................................................14

*Office of Thrift Supervision v. Paul*,
985 F. Supp. 1465 (S.D. Fla. 1997) ....................................................................6

*Perfect 10, Inc. v. Giganews, Inc.*,
No. CV 11-07098, 2013 WL 2109963 (C.D. Cal. Mar. 8, 2013),
*aff'd*, 847 F.3d 657 (9th Cir.), *cert. denied*, 138 S. Ct. 504 (2017).....................8

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir.), *cert. denied*, 138 S. Ct. 504 (2017) ...........................16

*Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*,
982 F. Supp. 503 (N.D. Ohio 1997) .............................................................16, 17

*Southern Pilot Insurance Co. v. CECS, Inc.*,
52 F. Supp. 3d 1240 (N.D. Ga. 2014)........................................................6, 8, 30

*Scott v. Harris*,
550 U.S. 372 (2007)..........................................................................................29

iv

*Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*,
    883 F.3d 904 (D.C. Cir. 2018).............................................................7, 9, 10, 16

*UMG Recording, Inc. v. Escape Media Group, Inc.*,
    No. 11 CIV. 8407, 2014 WL 5089743 (S.D.N.Y. Sept. 29, 2014) ........6, 7, 9, 13

*Ventura Content, Ltd. v. Motherless, Inc.*,
    885 F. 3d 597 (9th Cir.), *cert. denied*, 139 S. Ct. 419 (2018) ...........................17

STATUTES

17 U.S.C. § 106(1) ...............................................................................10, 14

17 U.S.C. § 106(2) ......................................................................................14

17 U.S.C. § 106(3) ...............................................................................10, 14

17 U.S.C. § 106(6) .......................................................................................8

17 U.S.C. § 114(b) .....................................................................................14

17 U.S.C. § 512(i) ..........................................................................24, 31, 33

OTHER AUTHORITIES

*Restatement (Third) of Agency* (2006)...................................................18

v

## CITATION LEGEND

The following citation forms shall apply in this brief:

1.    "Defs.' Liability Opp'n" shall refer to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment on Liability that Defendants filed at Dkt. 303.

2.    "Defs.' DMCA Opp'n" shall refer to Defendants' Opposition to Plaintiffs' Renewed Motion for Partial Summary Judgment on Defendants' DMCA Safe Harbor Defense that Defendants filed at Dkt. 305.

3.    "Exhibit A" shall refer to Revised Exhibit A to the Amended Complaint that Plaintiffs filed on December 3, 2018 at Dkt. 221-1.

4.    "Pls.' Liability Br." shall refer to the Brief in Support of Plaintiffs' Motion for Summary Judgment on Liability that Plaintiffs filed at Dkt. 225.

5.    "Pls.' Liability Opp'n" shall refer to Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment on Plaintiffs' Claims of Direct and Secondary Copyright Infringement filed at Dkt. 319.

6.    "Pls.' Reply SUF __" shall refer to specific paragraph numbers of undisputed facts in Plaintiffs' Reply Statement of Undisputed Facts in Support of Plaintiffs' Motion for Summary Judgment, filed herewith.

7.     "Pls.' Response to Defs.' SAMF __" shall refer to specific paragraph numbers in Plaintiffs' Response to Defendants Statement of Additional Material Facts, filed herewith.

8.     "Schedule A" shall refer to a summary of undisputed facts concerning sound recordings that were uploaded to Spinrilla, downloaded from Spinrilla, and streamed from Spinrilla which, for organizational convenience, is presented as a table appended to Pls.' SUF at Dkt. 228-1.  *See* Fed. R. Evid. 1006.  Plaintiffs also filed an Excel version of Schedule A (which can be sorted and filtered) on a portable hard drive.

9.     "Warren Ex. __" shall refer to exhibits, at Dkts. 241-1–100, 242, 242-1–99, 243, 243-1–99, 244, 244-1–110, 245, 245-1–104, attached to the Declaration of Previn Warren dated December 14, 2018, and filed as an attachment to Plaintiffs' Motion for Summary Judgment on Liability at Dkt. 241, and, if appropriate, pinpoint citations to the page number(s) internal to the cited document.  In some instances where exhibits were not paginated, page numbers have been added manually for ease of the Court's reference.  Warren Exs. 1-4 are spreadsheets containing private (or "direct") messages sent on Twitter between Spinrilla and its users. Warren Decl. ¶ 2.  Citations to these exhibits reference the relevant conversation thread through

"record" numbers corresponding to column "A" of the spreadsheets. These spreadsheets may be sorted and filtered for ease of reference.

10.     "Wilkens Ex. __" shall refer to exhibits, at Dkts. 238-1–21, attached to the Declaration of Scott Wilkens dated November 30, 2018, and filed as an attachment to Plaintiffs' Motion for Summary Judgment on Liability at Dkt. 238, and, if appropriate, pinpoint citations to the page number(s) internal to the cited document. In some instances where exhibits were not paginated, page numbers have been added manually for ease of the Court's reference. The parentheticals indicate the nature of the item cited—*e.g.*, deposition transcripts ("Dep."). Thus, by way of illustration, "Wilkens Ex. 12 (Badenhorst Dep.) at 90:1-10" would refer to the deposition of Ilandi Badenhorst, at page 90 of the transcript, lines 1 through 10.

11.     "WIS" or "works in suit" shall refer to the sound recordings identified in Exhibit A, the copyrights to which are owned or exclusively controlled by Plaintiffs, as detailed in Bauman Ex. 1, Leak Ex. 1, and Sinclair Ex. 1.

# PRELIMINARY STATEMENT

The undisputed facts clearly establish that Defendants are liable for copyright infringement. Plaintiffs own or control the copyrights, or exclusive rights under copyright, to the 4,082 works in suit.  Pls.' Reply SUF ¶¶ 54-58.  Plaintiffs did not authorize Defendants to reproduce, distribute, or publicly perform those recordings. *Id.* ¶¶ 54-60.  Yet each one was uploaded to and downloaded and/or streamed from Spinrilla.  *Id.* ¶ 60.  Indeed, ████ unique copies of the works in suit were downloaded over ███████ and streamed ██████████ from Spinrilla. *Id.* ¶¶ 59-60.

Defendants cannot rely on the "safe harbor" of the Digital Millennium Copyright Act ("DMCA") to circumvent their liability for this rampant infringement.  Defendants failed to register a DMCA agent until months after this lawsuit was filed.  Pls.' Reply SUF ¶ 147; Defs.' DMCA Opp'n 1-2, 7.  Accordingly, as a matter of law, they do not qualify for the safe harbor prior to that point in time. Indeed, Defendants do not dispute this point.  Nor can Defendants claim protection under the DMCA at *any later* point in time.  Despite instituting a "two-strike" repeat infringer policy (also after this lawsuit was filed), Defendants abjectly failed to implement that policy.  To this day, they allow repeat infringers to use Spinrilla with impunity.  Pls.' Reply SUF ¶¶ 115-117, 119-120.

Without access to the safe harbors, Defendants' liability is manifest.  Each of Defendants' more than ███████████ of the works in suit constitutes a direct violation of Plaintiffs' public-performance right—a point Defendants do not even bother to address.  Defendants are also directly liable due to the personal uploads and downloads of the works in suit by Defendant Jeffery Dylan Copeland ("Copeland"), Spinrilla's CEO, manager, and sole owner.  *Id.* ¶¶ 61-62, 73, 143-144.  Additionally, Defendants are directly liable because they actively promoted and facilitated the publication and distribution of the works in suit.

Defendants' secondary liability is equally clear.  Defendants concededly *could have* controlled infringing activity on Spinrilla.  *Id.* ¶¶ 101-106, 141-146.  They did not do so.  Instead, they took active measures to increase the public's access to infringing copies of the works in suit—for instance, helping users upload infringing copies and promoting plainly infringing mixtapes on Spinrilla's homepage. *Id.* ¶¶ 62-66, 69, 70, 72.  And they profited ███████████.  Defendants have earned ████████████████████████████, *id.* ¶¶ 90, 144, ████████████████████████████████████████, *id.* ¶¶ 92-94.  Mixtapes containing works in suit ████████████████████ ████████████████████████████.  *Id.* ¶¶ 94, 97.

While Defendants self-servingly describe themselves as naïve, "acoustically

agnostic" entrepreneurs focused on independent hip-hop recordings, that narrative is fiction. The simple fact is that Defendants had every incentive to encourage infringement, and that is exactly what they did. Indeed, the undisputed evidence shows that Defendants knew (or, at the very least, had every reason to know) about widespread infringement on the Spinrilla service. *Id.* ¶¶ 61-73, 75-89, 98, 108-110, 114-117, 119-120, 123-127. Moreover, Defendants recognized and intended that popular infringing content on Spinrilla ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ Pls.' Liability Opp'n 29-30 (citing Pls.' Counterstatement (Dkt. 321) ¶ 10). It also explains why Defendants ██████████████████████████████████████████████████████████████ ████████ Pls.' Reply SUF ¶ 64; *see also id.* ¶ 63.

Defendants' business decision to capitalize on the value of infringing recordings further explains why they failed to meet the basic prerequisites for DMCA safe harbor protection—registering a DMCA agent and adopting a repeat infringer policy—until years after Spinrilla launched and several months after this lawsuit was filed. Those basic measures are required of all online service providers and alleged naiveté is no excuse for their failure to comply. Of course, it is clear that Defendants did not forget these steps out of naiveté. Rather, Defendants made

a conscious business decision not to take such steps.  *See* Defs.' Liability Opp'n 31-32 (███████████████████████████████████████████████████████

███████████████████████████████  For the same reason, Defendants delayed implementing copyright filtering technology until long after they learned such services were available.  *See* Pls.' Reply SUF ¶¶ 134-135.

To this day, Defendants continue to turn a willfully blind eye to infringing activity.  After finally adopting a repeat infringer policy on July 29, 2017, Defendants have not terminated a single user for repeat infringement and instead have allowed notorious repeat infringers to remain active on the site.  Pls.' Reply SUF ¶¶ 114-117, 119-120.  For example, Defendants have been unwilling to terminate ███████████████ who individually uploaded over one thousand infringing sound recordings (171 of which were copies of works in suit) and whose infringing mixtapes Defendants ███████████████████████████.  Pls.' Reply SUF ¶¶ 115, 123 & n.19, 127 (Warren Ex. 352 (Dkt. 244-51)).  Non-terminations like this prove the obvious:  Defendants rely on infringing content to lure users.

Defendants have no rebuttal or rejoinder to any of these undisputed facts.  Instead, they offer up digressions based on unsubstantiated allegations and logical fallacies, none of which create any genuine issue for trial.  A primary example is their repeated and unsupported assertion that over ███ of the material on Spinrilla

is non-infringing.  Defendants fixate on the fact that Plaintiffs elected to sue on 4,082 works in suit, contrast that number to the total number of audio files Defendants claim are available on Spinrilla ███████████ and simply assert that all the remaining works are non-infringing.  However, as an initial matter, the decision to select specific works in suit is the basic right of any plaintiff based on issues of cost and economy and is not an admission as to the legality of any other work.

Moreover, this argument is riddled with further logical fallacies.  First, Defendants offer no proof that ████████████████ beyond the ██████ at issue were uploaded to Spinrilla.  Defendants aggressively resisted the production of this information during discovery claiming it was irrelevant; having done so, they cannot now rely on it to support their case.  Second, even assuming the existence of such files, Defendants offer no proof that they are non-infringing (as they may very well infringe on *others'* copyrights or, indeed, Plaintiffs' copyrights).  Third, Defendants offer no proof that any of the ██████████ files they claim were on the site were ever downloaded or streamed. By contrast, there is *no* dispute that Plaintiffs' works in suit were █████████████████████.

Plaintiffs are entitled to judgment on liability and on Defendants' affirmative defenses.  The Court should grant Plaintiffs' motions and this case should proceed to the damages phase.

## LEGAL STANDARD

Once Plaintiffs have met their initial burden as movants to establish a factual basis for direct and secondary liability, it falls on Defendants to "present competent evidence beyond the pleadings to show that there is a genuine issue for trial" in order to survive summary judgment. *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1242 (N.D. Ga. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-26 (1986)). Conclusory allegations, unsubstantiated speculation, or unsupported alternative explanations, such as those scattered throughout Defendants' briefs, cannot raise a material issue of fact. *See Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1227-28 (11th Cir. 1999); *Camacho v. Nationwide Mut. Ins. Co.*, 13 F. Supp. 3d 1343, 1349 (N.D. Ga. 2014).

Additionally, "[o]n a plaintiff's motion for summary judgment, the defendant bears the initial burden of showing that [an] affirmative defense is applicable." *Office of Thrift Supervision v. Paul*, 985 F. Supp. 1465, 1470 (S.D. Fla. 1997) (*citing Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990)). "Where a non-moving party fails to introduce any evidence sufficient to support an essential element of a defense, the court may properly grant summary judgment dismissing such a defense as a matter of law." *UMG Recording, Inc. v. Escape*

*Media Grp., Inc.*, No. 11 CIV. 8407, 2014 WL 5089743, at *18 (S.D.N.Y. Sept. 29, 2014) ("*Grooveshark*").

## ARGUMENT

### I. DEFENDANTS DIRECTLY INFRINGED PLAINTIFFS' COPYRIGHTS.

#### A. Defendants Violated 17 U.S.C. § 106(6) By Publicly Performing The Works In Suit.

Defendants admit they streamed copies of the works in suit from their servers to users over ▮▮▮▮▮▮ without Plaintiffs' authorization. Pls.' Reply SUF ¶¶ 1-3, 8, 15, 57, 59-60. Defendants' unauthorized streams violate Plaintiffs' exclusive right of public performance. Pls.' Liability Br. 11 (citing *ABC v. Aereo, Inc.*, 134 S. Ct. 2498, 2507, 2510, 573 U.S. 431, 439-40, 448-49 (2014); *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 (AJN), 2015 WL 1402049, at *38-39 (S.D.N.Y. Mar. 25, 2015)); *see Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 910 (D.C. Cir. 2018).

Defendants do not address these ▮▮▮▮▮▮ anywhere in their opposition brief. In fact, the term "stream" only appears once in Defendants' brief, Defs.' Liability Opp'n 1, and Defendants do not use the phrases "public performance" and "publicly perform" at all, *see id.* at 10-17 (addressing uploads and downloads only). Because Plaintiffs have met their burden to present evidence in support of their claim

7

for direct infringement pursuant to 17 U.S.C. § 106(6) and Defendants have failed to oppose that claim, summary judgment must be granted on these violations. *See S. Pilot Ins. Co.*, 52 F. Supp. 3d at 1242-43.

Defendants do argue that the presence of infringing copies of Plaintiffs' recordings on the Spinrilla server is insufficient to establish direct liability for uploads and downloads. But that argument, and the cases cited by Defendants in support, apply only to violations of the exclusive rights to reproduce and distribute works under the Copyright Act. The cases have no bearing on violations of the right to publicly perform works under the Act—*e.g.*, streams of sound recordings. *See Hydentra HLP Int'l Ltd. v. Luchian*, No. 15-cv-22134, 2016 WL 5951808, at *8 (S.D. Fla. June 2, 2016) (analyzing direct infringement on the basis of uploads and downloads); *Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1308 (S.D. Fla. 2011) (uploads and downloads); *CoStar Grp., Inc. v. LoopNet Inc.*, 373 F.3d 544, 547 (4th Cir. 2004) (uploads); *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098, 2013 WL 2109963, at *7 (C.D. Cal. Mar. 8, 2013), *aff'd*, 847 F.3d 657 (9th Cir.), *cert denied*, 138 S. Ct. 504 (2017) (uploads).

As a matter of law, an infringing stream that emanates from Defendants' servers to their users is a public performance by Defendants in violation of Plaintiffs' exclusive right under 17 U.S.C. § 106(6)—regardless of who hits the play button.

8

*See ABC v. Aereo, Inc.*, 573 U.S. 431, 448-49 (2014); *Spanski Enters.*, 883 F.3d at 910 ("Nowhere does the Act state that a work so [played] is performed only if a third-party user plays no role in the [playing]"); *Escape Media*, 2015 WL 1402049, at *38-39 (defendant directly infringed plaintiff's public performance right by streaming infringing files uploaded by users to the public);[1] *Grooveshark*, 2014 WL 5089743, at *20 ("Each time Escape streamed one of plaintiffs' song recordings, it directly infringed upon plaintiffs' exclusive performance rights.").

Furthermore, to the extent "volitional conduct" remains a requirement for direct liability after *ABC v. Aereo, Inc.*, 573 U.S. 431 (2014), *see* Pls.' Liability Opp'n 10-13, there is no question that streaming content to Spinrilla users qualifies

---

[1] It should be noted that Defendants grossly misrepresent the holding in *Escape Media* by stating that 84.5% of the content available on that service was infringing. *See* Defs.' Liability Opp'n 11-12. In fact, the *Escape Media* court found that the presence of infringing content was a substantial draw to the users of that service, based on "the fact that approximately 84.5% of the website's ***streams*** are of works belonging to major labels with whom Escape has no license." 2015 WL 1402049, at *43 (emphasis added). In that regard, *Escape Media* stands for the proposition that the relevant metric for the court's liability analysis was the number of streams of infringing content, ***not*** the total number of sound recordings made available on the defendant's platform. *Id.*; *see also infra* 22-24. In any event, Defendants' purported distinction is irrelevant, as the overall amount of infringing content did not factor into the *Escape Media* court's finding that defendants were directly liable for violating plaintiffs' exclusive right to public performance. *See* 2015 WL 1402049, at *38-39.

9

as such conduct.  *See Spanski Enters.*, 883 F.3d at 908 (upholding district court ruling that, "even if the Copyright Act requires volitional conduct by the Defendant for direct infringement to have occurred, [Defendant] had satisfied that requirement by streaming copyrighted content to United States viewers through its website" (internal quotation marks omitted)).

With only *de minimis* exceptions, all of the 4,082 works in suit ████████████ ██████████████████████████████████████████████████████████████.[2]  Pls.' Reply SUF ¶ 60.  As to these works, the above analysis is sufficient to support a finding of liability in Plaintiffs' favor.

### B. Defendants Violated 17 U.S.C. §§ 106(1) & 106(3) By Reproducing And Distributing The Works In Suit.

*1. Copeland Uploaded and Downloaded Copies of the Works in Suit in Violation of 17 U.S.C. § 106(1).*

It is undisputed that Copeland, Spinrilla's CEO, uploaded mixtapes containing copies of ████ works in suit, and that he downloaded an additional mixtape containing copies of an additional eight works in suit.[3]  Pls.' Reply SUF ¶¶ 61, 73, 143.  Having

---

[2] ████████████████████████████████████████████████████████████████  *See* Pls.' Reply SUF ¶ 60 & Schedule A (Excel version, tallied based on unique combinations of artist and track).

[3] Defendants dispute whether Copeland uploaded seven mixtapes identified by Plaintiffs, which contained copies of additional works in suit.  *See* Defs.' Liability

no factual rejoinder to this undisputed evidence of direct infringement, Defendants offer four digressions, none of which affects or limits Copeland's liability.

First, Defendants assert that Plaintiffs have not identified which works in suit Copeland uploaded. *See* Defs.' Liability Opp'n 39. That is demonstrably false. Plaintiffs provided a meticulously detailed spreadsheet from which it is readily apparent which works in suit Copeland uploaded and downloaded. *See* Schedule A (Excel version, filtered by column F ("Mixtape") for mixtape titles identified in Pls.' Reply SUF ¶¶ 61, 73). Defendants' failure to engage with the evidence Plaintiffs cited does not make the evidence vanish, nor does it create a factual dispute. *Cf.* Sept. 28, 2018 Order (Dkt. 214) at 63-64 (rejecting Defendants' "baffling" assertion that Plaintiffs had not provided evidence that Defendants copied any work owned or controlled by Plaintiffs).

Second, Defendants assert that Copeland uploaded and downloaded copies of works in suit "at the direction of a user." *See* Defs.' Liability Opp'n 14, 27, 38-39.

---

Opp'n 14; Defs.' Counter-SUF ¶ 61 (while in their brief Defendants claim to dispute uploading eight of the infringing mixtapes Plaintiffs cite, they only dispute seven mixtapes in their Counter-SUF). As detailed in Plaintiff's attached Reply Statement of Undisputed Facts, the only reasonable inference from the evidence is that Copeland uploaded these mixtapes as well. Pls.' Reply SUF ¶ 61. In any event, Defendants' dispute over a small handful of mixtapes does not affect the overall direct liability analysis, given the many uploads and downloads Defendants do not even attempt to dispute.

However, the buzzwords "at the direction of a user" come from the DMCA, have no legal consequence outside of that statutory context, and have no relevance to an analysis of direct liability. *See* Pls.' Liability Opp'n 7 n.1. Indeed, those words have a completely different meaning within the DMCA context than as used by Defendants here. *Id.* Whether someone else might have asked Copeland to infringe is no defense to a claim of direct infringement, and it is therefore unsurprising that Defendants are unable to cite any case that supports their *ipse dixit*. *See* Defs.' Liability Opp'n 14, 27, 38-39.

Third, Defendants claim that Copeland did not know what he was copying. *Id.* at 14 & n.7. But direct infringement is a strict liability offense. Pls.' Liability Br. 11-13 (citing, *e.g.*, *Metal Morphosis, Inc. v. Acorn Media Publ'g, Inc.*, 639 F. Supp. 2d 1367, 1372-73 (N.D. Ga. 2009)). Accordingly, Copeland's knowledge, assumptions, and beliefs about the infringing files he uploaded are immaterial.[4] *Id.*

Fourth, Defendants suggest that Copeland's uploads were somehow non-infringing because they "had to survive an Audible Magic scan." Defs.' Liability Opp'n 14. However, that argument is manifestly irrelevant since the majority of

---

[4] Regardless, Copeland had either actual or constructive knowledge regarding the files he uploaded. *See* Pls.' Reply SUF ¶ 61; *see also infra* 24-27.

Copeland's uploads *pre-date* Defendants' implementation of Audible Magic in December 2015.[5]  *See* Schedule A (Excel version, filtered by column F ("Mixtape") for mixtape titles identified in Pls.' Reply SUF ¶ 61).

The straightforward and undisputed facts show that Copeland directly infringed Plaintiff's copyrights:  he uploaded and downloaded the files himself, reproducing the works in suit in violation of Plaintiffs' exclusive rights.  "[A] finding of infringement against [individual corporate officer defendants] for their own uploads only requires that they uploaded works-in-suit . . . without authorization." *Grooveshark*, 2014 WL 5089743, at *25.  Because it is beyond dispute that Copeland reproduced ▮ works in suit, ▮▮▮▮▮▮▮▮▮▮▮, Pls.' Reply SUF ¶¶ 61, 73, 143, summary judgment must be granted against Defendants for directly infringing Plaintiffs' copyrights.[6]

---

[5] The Court should disregard Defendants' many attempts to rely on Audible Magic scans without regard to whether Audible Magic was in place at the time the infringements in question occurred.  *See, e.g.*, Defs.' Liability Opp'n 17, 20, 26.

[6] Defendants do not contest that Spinrilla can be held liable for Copeland's actions as CEO of Spinrilla.  They do, however, suggest that Copeland cannot be held personally liable because he uploaded files within the scope of his employment.  *See* Defs.' Liability Opp'n 38-39.  Defendants do not cite any cases to support this contention.  Rather than immunize him, Copeland's role as Spinrilla's CEO, manager, and sole owner exposes him to additional liability.  *See infra* 30.

2. *Defendants Caused Uploads, Downloads, and Streams of the Works in Suit in Violation of 17 U.S.C. §§ 106(1) & 106(3).*

Defendants fail to meaningfully contest the evidence that they proximately caused Spinrilla users' reproduction and distribution of Plaintiffs' sound recordings.

Defendants assisted users with their infringement, advising them to remix, slow down, or speed up files to get past Audible Magic's filter. *See* Defs.' Liability Opp'n 22. Recognizing that this is a damning, dispositive, and indisputable fact, Defendants unsuccessfully cast about for an excuse. Copeland testified that he was advising users to create a derivative work. *Id.* Of course, that is no defense at all since the owner of a copyrighted work has the exclusive right to create a derivative work. *See* 17 U.S.C. § 114(b) (a derivative work is one "in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality"); 17 U.S.C. § 106(2) (copyright owner has "the exclusive rights" to "prepare derivative works based upon the copyrighted work"); *Montgomery v. Noga*, 168 F.3d 1282, 1293 (11th Cir. 1999) (copyright owner of registered underlying work may "maintain a copyright infringement suit against a defendant who reproduces the derivative work—and thus the underlying work contained therein—without authorization" (citing 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 7.16[B][2])).

Needing to pivot once again, Defendants now suggest that Copeland was recommending that users engage in fair use. *See* Defs.' Liability Opp'n 22 n.9. That is not a credible claim. Copeland suggested that users change the speed of an existing copyrighted recording to get past a filtering system. The notion that the resulting modification was fair use is absurd on its face. *Cf. Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). Indeed, no less an authority than Defendants' employee █████████████████████████████████████████████ ████████████████████████████████████ Pls. Reply SUF ¶ 64 (citing Wilkens Ex. 13 (Dkt. 238-13) (Simon Dep.) 65:11-23). The unavoidable conclusion is that Copeland was advising users how to upload Plaintiffs' copyrighted works without getting caught.

Defendants also affirmatively tried to ensure that infringing copies of the works in suit would be seen more often, and hence streamed and downloaded more. ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Defs.' Liability Opp'n 12 n.5 & 39; *see also* Pls.' Reply SUF ¶¶ 16-24, 62, 67. ████████████ ████████████████████████████████████████.' Liability Opp'n 29, Pls.' Reply SUF ¶ 65. And they directed users' attention to mixtapes containing copies of the works in suit through promotions that put them front and center on the

15

Spinrilla homepage. Pls.' Reply SUF ¶¶ 35-38, 69-70, 72. Defendants would even time such promotions ███████████████████████. *Id.* ¶ 70(32) (Warren Ex. 142 (Dkt. 242-41) at 1); *see id.* ¶ 70(3) (Warren Ex. 112 (Dkt. 242-11); *id.* ¶ 70(56) (Warren Ex. 168 (Dkt. 242-67) at 1).

Defendants acknowledge that their role in organizing content served a critical function: "Who would want to visit a site that has nothing to offer but a list of ███ ███ songs?" Defs.' Liability Opp'n 18. Defendants' efforts to separate the wheat from the chaff led to the distribution and performance of Plaintiffs' works in suit ████████████████████. *Cf. Spanski Enters.*, 883 F.3d at 911; *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148-49 (S.D.N.Y. 2009); *Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 513 (N.D. Ohio 1997).

Despite the holding in *Aereo*, Defendants repeatedly assert that there is a need for evidence of volitional conduct to establish direct infringement. While Plaintiffs dispute that contention, even if it were true, Defendants' undisputed practice of making infringing mixtapes and sound recordings more readily available to users— including by coaching users on how to evade Audible Magic—is unquestionable evidence of volitional conduct. Pls.' Liability Br. 8-17. "[V]olitional conduct" stands for nothing more than proximate causation. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir.), *cert. denied*, 138 S. Ct. 504 (2017). As a matter

of well-established law, manual human interventions like those employed by Defendants qualify as volitional conduct when assessing liability for uploads and downloads. *See, e.g.*, *Usenet.com, Inc.*, 633 F. Supp. 2d at 148-49; *Playboy Enters.*, 982 F. Supp. at 513; *Capitol Records, LLC v. ReDigi, Inc.*, 934 F. Supp. 2d 640, 657 (S.D.N.Y. 2013).[7]  The above facts, all of which Defendants concede, are sufficient to establish that Defendants served as the proximate cause of users' infringement. In an attempt to avoid liability, Defendants rely on *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F. 3d 597 (9th Cir.), *cert. denied*, 139 S. Ct. 419 (2018) for the proposition that curation does not qualify as direct infringement.  Defs.' Liability Opp'n 18.  However, as Defendants acknowledge, that case addressed the legally distinct and inapposite question of when a defendant may qualify for DMCA safe harbor protection. *Ventura*, 885 F.3d at 604.

---

[7] Defendants' attempt to distinguish *ReDigi* fails.  Defs.' Liability Opp'n 11.  That decision turned on the fact that the service provider's founders "programmed their software to choose copyrighted content," and it expressly noted that these manual, volitional actions "render[ed] [the] case indistinguishable from those where human review of content gave rise to direct liability."  *ReDigi*, 934 F. Supp. 2d at 657.  Similarly, Plaintiffs rely on Defendants' manual human review and organization of the works in suit in establishing Defendants' liability for users' uploads and downloads, not the automated nature of the Spinrilla service.

Finally, Defendants are also directly liable for the infringements of Spinrilla's agent, Luis Acevedo (aka DJ Louie Styles), who uploaded ▮ mixtapes that contained copies of ▮works in suit, each and every one of which Defendants sponsored.  Pls.' Reply SUF ¶ 72.  Acevedo's status as an agent is a straightforward matter of federal common law agency principles that can be resolved on summary judgment based on the undisputed facts.[8]  *See* Pls.' Liability Br. 15 n.6; Pls.' Reply SUF ¶¶ 46-48, 50-52; *see, e.g.*, *GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1308 (11th Cir. 2017).  Even if the Court were to find that Defendants have raised a material dispute as to Acevedo's agency relationship, by promoting Acevedo's mixtapes and thereafter distributing copies of the works in suit he

---

[8] By giving Acevedo an official Spinrilla email account and directing users with questions to Acevedo, Defendants manifested their assent that Acevedo would act on Spinrilla's behalf.  Pls.' Reply SUF ¶¶ 46, 50; *Restatement (Third) of Agency* § 1.01 (2006); *id.* § 1.01 cmt. d (principal's acknowledgment may be "informal, implicit, and nonspecific").  By telling Defendants he was "proud to be official staff," Acevedo manifested his acceptance of the undertaking.  Pls.' Reply SUF ¶ 49 (Warren Ex. 398 at 72); *Restatement (Third) of Agency* §§ 1.01, 1.03.  Because Defendants could revoke Acevedo's Spinrilla account at any time, Pls.' Reply SUF ¶ 46, they had the right to control the means by which he performed his work—and it is the right and not the actual exercise of control that is the determining element.  *Restatement (Third) of Agency* § 1.01 cmt. f(1).  Finally, Defendants ratified Acevedo's actions by featuring the mixtapes he uploaded to Spinrilla and sending him encouraging messages about them.  Pls.' Reply SUF ¶ 52, 72; *Restatement (Third) of Agency* § 4.01; *GDG Acquisitions LLC*, 849 F.3d at 1308-09.  The additional assertions that Defendants raise are immaterial to, or support, this straightforward agency law analysis.  *See* Pls.' Response to Defs.' SAMF ¶¶ 1-33.

uploaded, Defendants inserted themselves as the proximate cause of that infringement. *Supra* 15-17. Furthermore, Defendants also directly infringed the works by publicly performing them. *Supra* 7-10.

Based on the foregoing, Defendants directly infringed each of the works in suit at least once—and in many instances, numerous times—as a matter of law.

## II. DEFENDANTS ARE SECONDARILY LIABLE FOR INFRINGING THE WORKS IN SUIT.

### A. Defendants Are Vicariously Liable For Their Users' Infringements.

#### 1. Defendants Have The Right And Ability To Control Infringing Activity, But Have Declined To Do So.

Defendants concede that they have the right and ability to control their users' infringing activity. Defs.' Liability Br. (Dkt. 263) at 40-41; *see also, e.g.*, Pls.' Reply SUF ¶¶ 1-45, 102-103. That Defendants have failed to do so is evidenced by the uncontested fact that copies of the works in suit were downloaded or streamed from Spinrilla ███████████ *See* Pls.' Reply SUF ¶ 59.

Before this lawsuit was filed, Defendants failed to register a DMCA agent and failed to adopt, let alone implement, a repeat infringer policy. Defs.' DMCA Opp'n 1-2; *see infra* 30-34. And for nearly the first three years of Spinrilla's existence, Defendants failed to implement basic filtering technology. Pls.' Reply SUF ¶¶ 133-134. Those failures to exercise control to limit infringement are undisputed,

and they are fatal to Defendants' claim that they effectively policed infringement during this period.  Pls.' Liability Opp'n 16-20; *see also A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) (defendant's "reserved right to police" its service for infringement "must be exercised to its fullest extent").

Defendants' purported, partial efforts to curtail infringement *after* this lawsuit was filed, meaning *after* the vast majority of the infringement at issue took place, *see* Defs.' Liability Opp'n 30-32; Defs.' DMCA Opp'n 13-15, are insufficient to defeat summary judgment.  Indeed, Defendants do not cite any case that has ever held that anti-infringement activities should apply retroactively to erase unexcused infringing conduct.  And in fact, even since this lawsuit was filed, Defendants still have not reasonably implemented a repeat infringer policy.  *See infra* 30-34.

Defendants also argue that they have somehow controlled the amount of infringement because a majority of content on Spinrilla is allegedly non-infringing.  *See* Defs.' Liability Opp'n 38.  This argument is supported neither by factual evidence nor legal precedent.  Defendants' gratuitous assertion that every file on Spinrilla other than the works in suit is non-infringing is the kind of "conclusory statement [that] is insufficient to create a genuine issue of material fact" concerning Defendants' policing of infringement.  *Hilburn*, 181 F.3d at 1227-28.  There is no evidence in the record to support this claim.  Indeed, the only available evidence on

20

this issue points in the opposite direction: █████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████ *See* Pls.' Response to Defs.' SAMF ¶ 47 (Wilkens Ex. 1).

More important than the total number of files is the frequency with which infringing recordings were downloaded or streamed. The works in suit were streamed and downloaded ██████████████. While this number is █████████ large, it is hardly surprising given the common-sense (and, in this case, quantitatively supported) proposition that people enjoy "free access to copyrighted work[s]" and will seek them out on the Internet. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 926 (2005) ("Users seeking Top 40 songs . . . are certain to be far more numerous than those seeking a free Decameron . . ."); *cf. Escape Media*, 2015 WL 1402049, at *43. No similar data is in the record for any other works on Spinrilla. Indeed, Defendants went to great lengths to convince the Court that it need not produce such information. *See infra* note 9.

Defendants' numbers game does not change the bottom line—Defendants could have, but did not, prevent the works in suit from being downloaded and streamed a billion and a half times. *See* Pls.' Liability Br. 35-40; Pls.' Liability Opp'n 15-22.

### 2. Infringing Content Has Served As a Draw for Users of Spinrilla and Defendants Have Profited From It.

Defendants admit that their profits ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████    Pls.' Reply SUF ¶¶ 90, 94, 97, 144.   Those

admissions satisfy the remaining element of the vicarious liability analysis—that

Plaintiffs' content drew in users and Defendants had a financial interest in that draw.

Unable to address the objective proof of the draw of the works in suit,

Defendants resort once again to a numbers game to try to differentiate their service

from prior cases where infringing content was held to be a draw.  *See* Defs.' Liability

Opp'n 11-12, 24, 37.  In making this argument, Defendants brazenly misstate the

facts of *Escape Media*—the only streaming case Defendants cite.  As discussed

above, *supra* 9 & note 1, the 84.5% infringement number in *Escape Media* did not

relate to the number of uploaded infringing files but rather to the number of

infringing ***streams*** from the platform.[9]  On that basis, the court concluded that

"infringing content is a substantial draw."  2015 WL 1402049, at *43.

---

[9] The quoted figure in *Escape Media* demonstrates that the plaintiff in that case was able to obtain discovery that allowed the parties to estimate the total number of streams on the platform and whether or not each of those streams was infringing. The 84.5% figure represented not only streams of the plaintiff's works in suit, but also streams of infringing content owned by other record labels who were not

Comparing the numbers in this case to *Escape Media* demonstrates that the scale of infringement on Spinrilla is ***even worse*** than the infringement problem in that earlier case. In *Escape Media*, there were ▮▮▮▮▮ infringing copies at issue, which were streamed ▮▮▮▮▮▮▮. 2015 WL 1402049, at *3. Here, there are ▮▮▮▮▮ copies of the works in suit at issue, which have been streamed over ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. That means that each infringing copy in this case was streamed, on average, over ▮▮▮▮▮ ***more*** than the infringing copies in *Escape*—not to mention the additional downloads.[10] That is all the more striking given that the defendant in *Escape Media* had even more users than Spinrilla.[11] The unavoidable conclusion is that infringing content—and not "indie" content—has been the overwhelming draw for Spinrilla's user base. Pls.' Reply SUF ¶¶ 88, 95-98, 101.

Finally, without citing any relevant precedent, Defendants suggest that Plaintiffs are partly responsible for the billions of streams and downloads of the

---

plaintiffs in that case. Here, Defendants stonewalled similar discovery, objecting on relevancy grounds and claiming that production would be overly burdensome. Pls.' Liability Opp'n 36 n.13 (citing Third Joint Disc. Statement (Dkt. 79) ¶ 3).

[10] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[11] "There are approximately 24,748,078 user accounts registered on Grooveshark.com." *Escape Media*, 2015 WL 1402049, at *50. By contrast, there are ▮▮▮▮▮ registered users and ▮▮▮▮▮ daily active users on Spinrilla. Pls.' Reply SUF ¶ 7.

works in suit because Plaintiffs purportedly only sent approximately eight takedown notices after filing this case. Defs.' Liability Opp'n 37-38. As an initial matter, the bulk of the infringement at issue occurred prior to the filing of this lawsuit. *See* Schedule A (Excel version, filtered by Column G "Upload Date"). And while it is true that, when an ISP qualifies for a safe harbor, the DMCA shifts a portion of the burden to police for infringement to copyright holders by creating a takedown notice procedure, *see* 17 U.S.C. §§ 512(c)(1)(C), (3), that shift is irrelevant since Defendants fail to qualify for the safe harbor. *See infra* 30-34. Services like Spinrilla, which are not eligible for a DMCA safe harbor, are under an affirmative duty to police infringing activity. *Cf. Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262-63 (9th Cir. 1996). Defendants cannot point to a single case holding that a defendant who does not qualify for the DMCA safe harbor is excused from vicarious liability because of a plaintiff's failure to send a certain number of takedown notices.

## B. Defendants Are Contributorily Liable For Their Users' Infringements.

Defendants knew or at the very least had reason to know of infringing activity on Spinrilla sufficient to establish the first element of contributory liability. *See* Pls.' Liability Br. 25-29. As detailed at length in Plaintiffs' previous submissions, Defendants were repeatedly alerted to the presence of infringing content on Spinrilla by record labels, artists, artist representatives, users, advertisers, and uploading DJs.

*See, e.g.*, Pls.' Reply SUF ¶ 84 (user to Spinrilla: "How is this not illegal via copyright issues?"); *id.* ¶¶ 79-89, 111-125.  Defendants repeat the manufactured mantra that they were "acoustically agnostic," but this self-serving expression has no meaning in copyright law.  Indeed, if a defendant remains "agnostic" when presented with facts demonstrating infringement, copyright law defines that as being "willfully blind."  Pls.' Liability Br. 25-29; Pls.' Liability Opp'n 26-29.

Nor do Defendants meaningfully dispute their material contribution to infringing activity.  Defendants supplied the online platform for infringement and granted uploading privileges to users who infringed.  *See supra* 7-19; Pls.' Liability Br. 29-31; Pls.' Liability Opp'n 29-32.  On that basis, it is clear that Defendants materially contributed to users' infringement.

In response to this dispositive showing, Defendants suggest that there can be no material contribution because Defendants had some anti-infringement measures in place at some point in time.  *See* Defs.' Liability Opp'n 34.  However, Defendants cite no cases holding that a defendant's partial implementation of anti-infringement measures is relevant to, let alone dispositive of, the issue of material contribution.  Because Defendants' anti-infringement measures were insufficient to comply with the DMCA's requirements, the safe harbor does not apply, and the contributory

liability analysis must proceed without reference to Defendants' half-measures.  Pls.'
Liability Opp'n 30-32.

Lacking any legitimate basis to challenge the factual record, Defendants
suggest they are immune from contributory liability because Spinrilla is allegedly
capable of substantial non-infringing uses.[12]  Defs.' Liability Opp'n 9, 33.  However,
this so-called *Sony* defense applies only to a situation where a defendant ships a
product into the stream of commerce and subsequently has no contact with its users.
*Usenet.com*, 633 F. Supp. 2d at 156; *see also Grokster*, 545 U.S. at 934.  It is plainly
inapplicable to the situation where the supplier of the service remains in constant
interaction with the user.  Clearly, Defendants are intimately involved in their users'
experience with Spinrilla—as evidenced by Defendants' frequent communications
with users, *see, e.g.*, Pls.' Reply SUF ¶¶ 63-70, 84-87, 123-124; *see generally*
Warren Exs. 1-505 (Dkts. 241-1–245-104) (over ▇▇▇ emails and ▇▇▇ Twitter DM
communications with users regarding ▇▇▇▇▇▇▇▇), their control over who

---

[12] Contrary to Defendants' suggestion, Plaintiffs were not required to argue
preemptively that Spinrilla lacks substantial noninfringing uses in their opening
papers, in order to succeed on their motion for summary judgment on contributory
liability.  The *Sony* "substantial noninfringing uses" defense is an affirmative
defense to contributory liability.  It is Defendants' burden to raise and establish a
factual basis for their affirmative defense.  *Supra* 6-7.

receives uploading privileges, *id.* ¶¶ 11-13, and their ability to terminate users' accounts, *id.* ¶¶ 26-27.

Regardless, Defendants have not met their burden to introduce evidence that any non-infringing uses of Spinrilla are substantial. Defendants refused to produce their database of sound recordings and, as a result, there is no evidence in the record regarding the corpus of non-infringing uses on Spinrilla. *See supra* note 9. Where, as here, a party fails to introduce any evidence sufficient to support an essential element of an affirmative defense, the Court may properly grant summary judgment dismissing such defense as a matter of law. *See Weitz*, 913 F.2d at 1552.

### C. Defendants Are Liable for Inducing Infringement.

Finally, the undisputed evidence makes clear that Defendants were incentivized to encourage—and did in fact encourage—their users to infringe, rendering Defendants liable for inducing infringement. Pls.' Liability Br. 19-24; Pls.' Liability Opp'n 37-40; *supra* 22-24. Advertisements and solicitations of infringement are paradigmatic evidence of inducement, *Grokster*, 545 U.S. at 937, and Plaintiffs have presented an abundance of such evidence. Indeed, apart from empty and irrelevant allegations, Defendants ultimately admit that they promoted all

of the infringing mixtapes identified by Plaintiffs.[13]  Pls.' Reply SUF ¶¶ 69-70, 72.

Defendants raise many of the same conclusory arguments to challenge their liability for inducement as they do for direct infringement. *See* Defs.' Liability Opp'n 25-32.  Defendants suggest that because their promotions consisted of mixtape covers and hyperlinks, Defendants did not actually advertise the underlying infringing content. *Id.* at 25-26.  But it is irrelevant whether specific tracks were advertised.  What matters is whether advertising the links had the obvious purpose and necessary result of driving traffic to those mixtape pages, where the infringing content could be streamed and downloaded.  It is beyond dispute that Defendants placed infringing mixtapes front and center on the service, making sure users could easily find Plaintiffs' content. *See supra* 15-16; Pls.' Reply SUF ¶¶ 69-70.

While Defendants try to distinguish themselves from the defendants in *Fung*, whose website included a section titled "Box Office Movies," *see* Defs.' Liability Opp'n 26-27 (citing *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1036 (9th Cir. 2013)), the section of Defendants' website called "Top Hits Radio" is

---

[13] Defendants try to dilute the power of Plaintiffs' evidence by falsely suggesting that Defendants' promotion of infringing mixtapes is a new theory Plaintiffs have only just recently developed.  Defs.' Liability Opp'n 25.  In fact, Plaintiffs identified these types of advertisements to Defendants during the course of discovery over a year ago.  Pls.' Counterstatement (Dkt. 321) ¶¶ 50-55 (citing McAlpin Exs. 9-11 (Dkts. 323-9–11).

substantively the same.  Pls.' Reply SUF ¶ 67(1) (citing Warren Ex. 72 (Dkt. 241-72) at 1).  And Defendants featured on their homepage mixtape series titled "This Weeks Bangers," "Hot This Week," and "Tracks of the Month," all of which repeatedly included multiple copies of Plaintiffs' works in suit.  Pls.' Reply SUF ¶¶ 70, 72; Schedule A (Excel version, filtered by column F "Mixtape Title" for mixtapes referenced in Pls.' Reply SUF ¶¶ 70, 72).

Defendants also suggest that Plaintiffs have only cited a "*handful* of emails" concerning promotion of infringing mixtapes, Defs.' Liability Opp'n 2, and that their emails were "just normal courteous and complimentary emails any small business owner would send to its customers," *id.* at 27.  In fact, Plaintiffs have introduced over ███ such communications.  *See generally* Warren Exs. 1-505 (Dkts. 241-1–245-104).  Moreover, Defendants ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In short, Defendants are liable for copyright infringement under multiple theories of secondary liability.

## III.  DEFENDANT COPELAND IS PERSONALLY LIABLE AS SPINRILLA'S CEO AND OWNER.

Plaintiffs have met their initial burden to establish a sufficient evidentiary basis for Copeland's joint and several liability with Spinrilla as the company's CEO and owner.  *See* Pls.' Reply SUF ¶¶ 3-6, 10, 61, 73, 141-146; Pls.' Liability Br. 41-45.  Defendants have failed to raise any issue of material fact regarding Copeland's ability to supervise the infringing activity, his financial interest in the activity, or his personal participation in the infringing activity.  Defs.' Liability Opp'n 40.  Accordingly, Copeland must be held jointly and severally liable.  *See S. Pilot Ins. Co.*, 52 F. Supp. 3d at 1242 ("[I]n order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial.").

## IV.  DEFENDANTS ARE NOT ENTITLED TO DMCA SAFE HARBOR PROTECTION.

Defendants admit they did not have a registered DMCA agent before July 29, 2017.  *See* Defs.' DMCA Opp'n 1-2; Defs.' DMCA Br. (Dkt. 265) at 1, 12, 24.  By doing so, they effectively concede they are not entitled to DMCA safe harbor protection prior to that date.  Accordingly, it is undisputed that the Court should grant judgment to Plaintiffs denying Defendants access to the DMCA safe harbor at

least up until July 29, 2017, which covers the period when the bulk of the infringing activity at issue occurred.  *See* Schedule A.

Further, Defendants are not entitled to DMCA safe harbor protection from July 29, 2017 to the present because they still have not reasonably implemented a repeat infringer policy pursuant to 17 U.S.C. § 512(i).[14]  "The purpose of subsection 512(i) is to deny protection to websites that tolerate users who flagrantly disrespect copyrights." *Escape Media Grp.*, 2015 WL 1402049, at *6 (quotation marks omitted).  The fact that notorious repeat infringers such as DJ Dirty Dollarz, DJ Miles, and DJ 837 still have active accounts is powerful evidence of Defendants' tolerance of users who flagrantly disrespect copyrights.  Pls.' Reply SUF ¶¶ 115-117; *see also id.* ¶¶ 119-120.

Defendants attempt to gloss over their failure to terminate these infringers by suggesting that the mere implementation of a "two strike policy" on July 23, 2017 somehow negated or erased the knowledge they had of their users' infringement (*i.e.*,

---

[14] Defendants appear to suggest that registering an agent is sufficient to qualify for the DMCA safe harbor. Defs.' DMCA Opp'n 10-11.  It is not.  Pls.' DMCA Br. (Dkt. 227) at 1-2, 8.  Defendants also falsely state that Plaintiffs have admitted that Defendants reasonably implemented a repeat infringer policy as of July 23, 2017. Defs.' DMCA Opp'n 12.  Plaintiffs certainly have not made any such admission. Pls.' DMCA Br. at 12 n. 3, 18-21; Pls.' DMCA Opp'n (Dkt. 320) at 6-12.

strikes) prior to that date. *See* Defs.' DMCA Opp'n 14-18. That is an objectively unreasonable argument. Defendants were provided with ▮ takedown notice strikes against ▮▮▮▮▮▮, ▮ takedown strikes against ▮▮▮▮, and ▮takedown strikes against ▮▮▮, but have failed to terminate any of these users on the grounds that these strikes predate the "magical" date of July 23, 2017.[15] Pls.' Reply SUF ¶¶ 115-117. The fact that Defendants did not consider Plaintiffs' takedown notices in implementing their "policy" is dispositive. *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 655-56 (E.D. Va. 2015) (rejecting repeat infringer policy that gave users clean slates), *aff'd in part*, *rev'd in part*, 881 F.3d 293 (4th Cir. 2018). Defendants do not cite a single case suggesting that infringing activity that predates a policy can simply be ignored after the policy is adopted.

Further, Defendants' records prove that these same DJs have uploaded infringing sound recordings *since* the policy was supposedly adopted on July 23, 2017. Pls.' Reply SUF ¶¶ 115-117. ▮▮▮▮▮▮▮▮ uploaded four sound recordings that were published to Spinrilla, downloaded and streamed, and

---

[15] The disingenuous nature of this argument is underscored by the fact that Defendants rely on July 23, 2017 as the operative date to count strikes, despite arguing elsewhere that they had a repeat infringer policy prior to July 23, 2017 based solely on their preexisting Terms of Service—which prohibited posting of copyrighted material and gave Defendants the right to terminate users who violated the Terms of Service. *See* Defs.' DMCA Opp'n 3-6.

subsequently flagged by Audible Magic and removed. *Id.* ¶ 115 (Wilkens Ex. 1 at rows 168037, 183631, 194849, 195399).  Similarly, ████ and ████ each uploaded multiple tracks that were published to Spinrilla, download and streamed, and subsequently flagged by Audible Magic and removed. *Id.* ¶¶ 116-117 (citing Wilkens Ex. 1).  Even accepting Defendants' bogus "clean slate" theory of repeat infringement, Defendants still should have terminated these users.  Moreover, they should have terminated these users even if the files they uploaded were never even successfully published, as the users infringed by simply reproducing the copyrighted files in order to upload copies. *See Fung*, 710 F.3d at 1034; Pls.' Reply SUF ¶ 114 n. 16.

Nothing in the statutory text or the case law provides that the only way a service can be put on notice of repeat infringement is via a DMCA takedown notice. *See* 17 U.S.C. § 512(i).  Indeed, Defendants have suggested that they relied on Audible Magic to perform a similar function as DMCA takedown notices. *See* Pls.' Reply SUF ¶ 82 (citing Wilkens Ex. 9 (Dkt. 238-9) (Copeland Dep.) 329:11-331:3); *id.* ¶¶ 112, 114.  Here, Defendants' own data identifying infringing tracks flagged by Audible Magic show that they possess red flag knowledge of repeat infringers successfully uploading infringing content to Spinrilla. *See* Pls.' DMCA Opp'n (Dkt. 320) at 11 (citing Wilkens Ex. 1).  Of course, Defendants were also put on notice of

33

specific repeat infringers by Plaintiffs' court filings from well over a year ago. *See* Dkt. 42 *et seq.*

Defendants have refused to terminate uploaders like ███████████ because their infringing mixtapes have served as an important draw for other users, helping drive up Defendants' revenue.[16] *See, e.g.*, Pls.' Reply SUF ¶ 127 (quoting Warren Ex. 352 (Dkt. 244-51)); *id.* ¶ 123 (quoting Warren Ex. 329 (Dkt. 244-28)). To this day, Defendants reap the benefits of repeat infringement, even while falsely insisting that they are entitled to the safe harbor protections of the DMCA.

## CONCLUSION

For the foregoing reasons and based upon all of Plaintiffs' papers in support of their motions for summary judgment and in opposition to Defendants' motions for summary judgment, Plaintiffs' motions for summary judgment should be granted and Defendants' cross-motions for summary judgment should be denied.



34

March 11, 2019                          Respectfully submitted,

JENNER & BLOCK LLP                      TROUTMAN SANDERS LLP

/s/ Previn Warren
PREVIN WARREN                            JAMES A. LAMBERTH
(Admitted *Pro Hac Vice*)                james.lamberth@troutmansanders.com
1099 New York Ave., N.W. Suite 900       Georgia Bar No. 431851
Washington, DC 20001                     600 Peachtree Street, N.E.
Telephone: (202) 637-6361                Suite 5200, Bank of America Plaza
Facsimile: (202) 639-6066                Atlanta, GA 30308-2216
                                         Telephone: (404) 885-3362
ANDREW H. BART                           Facsimile: (404) 962-6611
(Admitted *Pro Hac Vice*)
AVA U. McALPIN                           *Attorneys for Plaintiffs*
(Admitted *Pro Hac Vice*)
919 Third Avenue
New York, NY 10022
Telephone: (212) 891-1600
Facsimile: (212) 891-1699

## CERTIFICATE OF COUNSEL REGARDING FONT SIZE

I, Ava U. McAlpin, an attorney, hereby certify that the foregoing has been prepared with a font size and point selection (Times New Roman, 14 pt.) which is approved by the Court pursuant to Local Rules 5.1(C) and 7.1(D).

/s/ Ava U. McAlpin_____
AVA U. McALPIN

## CERTIFICATE OF SERVICE

I, Ava U. McAlpin, an attorney, hereby certify that on this 11th day of March 2019, the foregoing papers were electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification and a service copy of this filing to all counsel of record who have appeared in this matter.

/s/ Ava U. McAlpin_____
AVA U. McALPIN