IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ATLANTIC RECORDING :
CORPORATION, et al., :
 :
 Plaintiffs, :
 :
 v. :
 :
SPINRILLA, LLC, and JEFFERY :  CIVIL ACTION NO.
DYLAN COPELAND, :  1:17-CV-00431-AT
 :
 Defendants. :

## OPINION AND ORDER

This action for copyright infringement is before the Court on the parties'
Cross Motions for Summary Judgment [Doc. 224, 226, 262, 264][1] and Plaintiff's
Motion to Strike Expert Testimony [Doc. 322].  The Court's rulings are set forth
below.

## I. FACTUAL BACKGROUND

Defendant, Jeffery Dylan Copeland ("Copeland") is the founder, manager,
and sole member of Spinrilla, LLC ("Spinrilla"). (*See* Pl.'s Statement of
Undisputed Material Facts ("Pl. SMF") ¶¶ 2, 3, 41.) Copeland launched the
Spinrilla website in early 2013 as a streaming and downloading service for hip-
hop music. (*Id.* ¶¶ 1, 4.) Spinrilla, "the 800-lb gorilla of hip-hop mixtapes,"

---

[1] These motions include: Plaintiffs' Motion for Summary Judgment on Liability [Doc. 224],
Plaintiffs' Renewed Motion for Partial Summary Judgment on Defendants' DMCA Safe Harbor
Defense [Doc. 227], Defendant's Cross Motion for Summary Judgment on Plaintiffs' Claims of
Direct and Secondary Copyright Infringment [Doc. 262], and Defendants' Cross Motion for
Partial Summary Judgment as to Their DMCA Safe Harbor Defense [Doc. 264].

launched as a music app on the iOS platform in May 2013 and on the Android platform in early 2014. (*Id.* ¶¶ 5, 6). Defendants claim to have created Spinrilla as a platform for users to listen to and discover "independent and emerging hip-hop artists." (Def.'s Statement of Material Facts ("Def. SMF") ¶¶ 15, 16.) Since its inception, Spinrilla has grown to include approximately 19 million registered users and 1.5 million daily active users, 14,000 of whom have the ability to upload audio files. (Pl. SMF ¶ 7; Def. SMF ¶ 63.) As of October 2017, there were approximately 1.4 million songs on Spinrilla. (Def. SMF ¶ 99; J. Copeland Dep. 141:19-25, Oct. 19, 2017.)

Plaintiffs, a collection of the largest record companies in the U.S., filed suit against Spinrilla on February 3, 2017, claiming that Spinrilla has allowed and participated in copyright infringement of thousands of Plaintiff's sound recordings. In an Amended Complaint filed on October 19, 2017, Plaintiffs listed approximately 2,000 copyright infringing sound recordings. (Am. Compl., Ex. A.) Plaintiffs last amended their complaint on December 18, 2018 to include 4,082 total works in suit for which Plaintiffs own the copyrights and which Plaintiffs allege were infringed by Defendants. (Unopposed Amendment to Ex. A to Am. Compl.) Defendants admit that the 4,082 sound recordings listed were uploaded to and downloaded or streamed from Spinrilla. (Def. Resp. Pl. SMF ¶ 60.)

General users of Spinrilla's website and apps may stream and download songs and mixtapes that have been uploaded by "DJ[s]" with "artist account[s]." (Pl. SMF ¶¶ 8, 9, 12.) Defendants grant artist accounts to users who submit

applications and are approved by Spinrilla for upload rights. (*Id.* ¶ 9.) DJs who have artist accounts can directly upload "mixtapes" that contain mp3 files of sound recordings to the Spinrilla site. (*Id.* ¶¶ 12, 14, 15.) Defendant Copeland has at times helped users upload mixtapes when users requested such help. (*Id.* ¶ 25; J. Copeland Dep. at 122:3-123:10, Oct. 19, 2017.) Plaintiffs identified forty-five mixtapes containing 165 works in suit for which Plaintiffs own the copyrights that were uploaded directly by Copeland, the last of which was uploaded on July 5, 2016. (Pl. SMF ¶ 61.) Defendants concede that Copeland uploaded thirty-eight of the forty-five mixtapes but deny knowing that those mixtapes contained Plaintiffs' works in suit. (Def. Resp. Pl. SMF ¶ 61.) Copeland testified that he did not listen to the mixtapes prior to uploading them and did not look at the track names or artists. (*Id.*; J. Copeland Dep. 314:15-315:2, Oct. 19, 2017.)

Copeland also promotes certain mixtapes by placing them on "Sponsored" or "Featured" sections or under "special banners" on the Spinrilla website and apps. (Pl. SMF ¶¶ 36-38.) Plaintiffs contend that Defendants promoted, advertised, and directed users to multiple mixtapes containing copyright infringing sound recordings.  (*Id.* ¶¶ 68-72.) Defendants assert that Copeland only promotes mixtapes at the request of users and without listening to the content of the recordings. (Def. Resp. Pl. SMF ¶ 72; J. Copeland Dep. at 201:7-12, Oct. 19, 2017.) Therefore, Copeland denies having knowledge that the mixtapes identified by Plaintiffs contained the copyright infringing works in suit. (Def. Resp. Pl. SMF ¶ 72).  Copeland also, at times, communicated with DJs directly

and gave them feedback on their mixtapes. However, Copeland states that he typically did not listen to the mixtapes on which he would comment. Defendants claim that when Copeland communicated with users who uploaded copyright infringing sound recordings and "told users their mixtape 'sounded great,' he was saying that as customer service rather than a factual statement." (*Id.* ¶ 89.)

In March 2015, Plaintiffs, through the Recording Industry Association of America ("RIAA"), began sending notices of copyright infringement to Spinrilla. Between March 4, 2015 and February 6, 2017, a team of investigators under the direction of Carlos Linares, Vice President of Anti-Piracy Legal Affairs at RIAA, sent fifty-nine "takedown notices" requesting that Spinrilla remove 407 identified sound recordings from its website and apps. (C. Linares Declaration ¶ 9.) Defendants claim that they removed each identified infringing sound recording immediately upon receipt of a "takedown notice." (J. Copeland Dep. 66:14-15, Oct. 31, 2017.) According to Defendants, Spinrilla also "manually monitored" the site a few times a week by directly reviewing which songs were on the site and removed content that was sold on iTunes or Spotify. (Def. SMF ¶ 100; J. Copeland Dep. at 67:13-24, Oct. 31, 2017.)[2] However, Copeland also stated that he does not listen to mixtapes after they are posted on Spinrilla. (*Id.* ¶ 89; J. Copeland Dep. at 116:4-7, Oct. 19, 2017.) Plaintiffs dispute the assertion that Defendants took expeditious action in response to every takedown notice, and Plaintiffs identify particular sound recordings that were not removed from

---

[2] Defendants thus imply that if a sound recording is sold on iTunes or Spotify then it is a copyrighted work.

Spinrilla in response to takedown notices from RIAA. (Pl. Resp. Def. SMF ¶ 100.)[3] Defendants assert that they only failed to remove a sound recording identified in a takedown notice if the notice did not contain a URL which would allow Defendants to identify the infringing item on its site. (Def. SMF ¶ 193.) Plaintiffs also claim that infringing sound recordings that were removed in response to their takedown notices were subsequently re-uploaded to Spinrilla. (Pl. SMF ¶ 130.)[4]

In January 2015, UMG Recordings, Inc. ("UMG"), one of the Plaintiffs, informed Defendants about the availability of the content recognition software Audible Magic. (Pl. SMF ¶ 134.)[5] Spinrilla first implemented Audible Magic in December 2015, almost three years after it launched. (Pl. SMF ¶ 134; Def. SMF ¶ 112.) Defendants assert that they have used Audible Magic to scan every audio file uploaded since December 2015 and more than 100,000 files that were uploaded have been blocked from publication on Spinrilla. (*Id.* ¶¶ 112, 114.) In May 2016, six months after implementing Audible Magic and at Plaintiffs' suggestion, Defendants performed a back scan of the already existing Spinrilla catalog of

---

[3] *See e.g.* Pl.'s Resp. Def. SMF ¶ 100 (Plaintiffs specify five infringing mixtapes that were included in a takedown notice delivered to Spinrilla on November 3, 2016 that were still available on the Spinrilla site as of January 19, 2017).

[4] E.g. Plaintiffs claim that they identified sixteen copies of "Campaign" by Ty Dolla $ign which were uploaded to, downloaded from, and streamed from Spinrilla after RIAA sent a takedown notice identifying this work in suit on July 29, 2016. (Pl. SMF ¶ 130.) Defendants dispute this claim, stating that some of the files containing the name "Ty Dolla $ign" and "Campaign" could not be copies of the sound recording owned by Plaintiffs because the files were not blocked by Audible Magic, which should have recognized the commercial version of the song. Defendants also state that other files containing those names were uploaded before "Campaign" was publicly released.

[5] Audible Magic is a filtering technology that identifies and blocks copyrighted audio files before they are published on the site. (Def. SMF ¶ 107)

sound recordings and found over one thousand copies of Plaintiffs' works in suit. (Def. Resp. Pl. SMF ¶ 135.) Spinrilla performed two additional back scans in February and August 2017, finding over one thousand additional copies of Plaintiffs' works in suit. (Pl. SMF ¶ 136; Def. SMF ¶ 123.) Plaintiffs note that, based on data from the back scans, 98,675 files were blocked by Audible Magic *after* the files had already been published on Spinrilla and had been streamed or downloaded by users as of October 2017. (Pl. Resp. Def. SMF ¶ 114.)

On several occasions, Copeland communicated with Spinrilla DJs about mixtape tracks that were blocked by Audible Magic's filter. While Copeland informed users that Spinrilla does not allow copyright infringing sound recordings on its platform,[6] he also at times instructed users to modify sound recordings in order to get past Audible Magic's filter.[7] Copeland claims that by telling a DJ to slow down a track to get past copyright detection software he was instructing the user to "create a derivative work that is so different that it's not the same as what's being flagged." (J. Copeland Dep. at 30:20-22, Oct. 31, 2017.) On at least two occasions, Copeland listened to a sound recording blocked by

---

[6] *See* P. Warren Decl., Ex. 54 (email from "Spinrilla Support" to "DJ Papito" (Feb. 17, 2016, 15:36)) ("If the copyrighted material is detected, we cannot allow the music on Spinrilla." "Please make sure that none of the tracks you are attempting to upload are from albums, or paid projects, as that music is not allowed on Spinrilla."); P. Warren Decl., Ex. 58 (email from "Spinrilla Support" to "DJ Donny P" (Feb. 9, 2016)) ("If the tracks are infringing on owners copyright, you will not be able to upload those tracks.")

[7] *See* P. Warren Decl., Ex. 54 (email from "Spinrilla Support" to "DJ Papito" (Feb. 17, 2016, 21:36)) ("You'll need to remix, or slow down these tracks for them to pass by the copyrighted detection software."); P. Warren Decl., Ex. 55 (email from "Spinrilla Support" to "DjBSki Mixtapes" (Feb. 23, 2016, 16:44)) ("You may need to remix, slow down, or speed up these tracks to get past the filter."); P. Warren Decl., Ex. 57 (email from "Spinrilla Support" to "Shaun Berry" (Feb. 15, 2016, 20:22) ("As far as how other Djs are getting tracks up, they may be slowing tracks down or speeding them up to evade the copyright filters").

Audible Magic, determined that it was a "remix" which was different than the commercial version, and "pushed it through" to be available on a user's mixtape. (Def. Resp. Pl. SMF ¶ 63.)

When Spinrilla launched in 2013, the "Web Site Terms and Conditions of Use" included a notification that users must agree to be bound by "all applicable laws and regulations." (Def. SMF ¶ 90.) In March 2015, the "Terms and Conditions" were updated to include the statement: "[y]ou will not submit content that is copyrighted or subject to third party proprietary rights." (Def. SMF ¶ 92.) Spinrilla updated its "Terms of Service" again in June 2017 to include a "Copyright Policy" and a description of its "DMCA Notice and Procedure for Copyright Infringement Claims." (*Id.* ¶ 95.) The updated "Terms of Service" also contained a separate paragraph about suspension and termination of user accounts for violation of Spinrilla's terms of use. (*Id.*) On July 23, 2017, Spinrilla added a paragraph entitled "Repeat Infringement" to its Terms of Service, which addressed termination of user accounts due specifically to copyright infringement. (*Id.* ¶ 96; *see* S. Wilkens Decl., Ex. 17 at 25 ("Users may not upload music or other content owned by someone else in a manner that violates copyright law. Each copyright infringement notice against a user's account constitutes a 'strike.' After two strikes, the user's ability to upload music will be revoked.")) At that time, Copeland also created a spreadsheet to track all claims of copyright infringement and repeat infringers. (*Id.* ¶ 98.)

Defendants have removed upload privileges for ten accounts due to repeated copyright infringement. (Def. Resp. Pl. Interrogatory No. 6.) Spinrilla terminated two accounts in 2016 before Plaintiffs filed suit. (*Id.*) Spinrilla terminated seven accounts of users who were mentioned in the suit or whose songs were included in the suit on February 3, 2017, which was the day that Plaintiffs filed the complaint. (*Id.*) One additional account was terminated on June 29, 2017 because the "user was impersonating another artist." (*Id.*)

RIAA conducted a "Repeat Infringer Study" by sending twenty-three targeted takedown notices identifying 286 sound recordings to Defendants between July 27, 2016 and November 27, 2016. (C. Lineras Decl. ¶ 12.) Defendants responded to all twenty-three takedown notices but did not remove some of the sound recordings from five of the takedown notices. (Def. SMF ¶ 192; Pl. Resp Def. SMF ¶ 192.) Defendants assert that they removed any infringing audio files if the takedown notice included a URL or defendants were otherwise able to locate the infringing files. (Def. SMF ¶ 193.)

From July to November 2016, RIAA identified nine specific accounts that were listed in multiple takedown notices. (*Id.*)[8] Spinrilla terminated one of the accounts, HurricaneMixtapes.com, on February 3, 2017, which is the day that Plaintiffs filed their complaint. (Def. Resp. Pl. Interrogatory No. 6.) Defendants

---

[8] Accounts identified were "DJ Dirty Dollarz," "DJ Miles," "DJ HyDef," "DJ Creative Mind," "DJ ASAP," "HurricaneMixtapes.com," "DJ Trey Cash," "DJ 837," and "DJ Fiestaboii." (Lineras decl. ¶ 12). E.g. Sound recordings uploaded by DJ Dirty Dollarz were identified in 23 of the takedown notices and sound recordings uploaded by DJ miles were identified in 21 of the takedown notices.

admit that they have not terminated the other eight accounts, which remain active on Spinrilla. (Pl. SMF ¶¶ 115-117, 119.) Plaintiffs did not send any further takedown notices to Defendants after filing their complaint on February 3, 2017, and therefore Defendants have not received any takedown notices for these users since implementing their "two strike" policy on July 23, 2017. (Def. Resp Pl. SMF ¶¶ 115-117, 119.) Plaintiffs have identified multiple infringing tracks uploaded by some of these users after July 23, 2017 but have not sent any takedown notices to Defendants regarding these tracks (*See* Pl. Reply to Def. Resp. Pl. SMF ¶¶ 115-117.)[9]

Until July 2017, Spinrilla received notifications of claimed copyright infringement directly by email at legal@spinrilla.com, but did not have a registered agent listed with the U.S. Copyright Office. (C. Linares Decl. ¶¶ 6, 7.) Spinrilla registered a DMCA designated agent with the U.S. Copyright Office on July 29, 2017, which was one day after Plaintiffs filed their motion for summary judgment and five months after Plaintiffs filed suit. (Pl. SMF ¶ 147.)

## II.   STANDARD FOR SUMMARY JUDGMENT

The Court must grant summary judgment if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual issue is genuine if

---

[9] Plaintiffs list four sound recordings uploaded by DJ Dirty Dollarz, six infringing sound recordings uploaded by DJ Miles, and eleven sound recordings uploaded by DJ 837 which were published to Spinrilla, downloaded and streamed, and subsequently flagged by Audible Magic and removed. (Pl.'s Reply to Def. Resp. Pl. SMF ¶¶ 115-117.) These sound recordings are not included in Plaintiff's listed works in suit. (*See* Wilkens Ex. 001; Pl. SMF, Schedule A.)

there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324-26. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a

matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). However, cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555-56.

## III.   Cross Motions for Summary Judgment on Liability

Plaintiffs and Defendants have cross-moved on the issue of Defendants' liability for copyright infringement.

Plaintiffs assert[10] the Defendants are directly liable under the Copyright Act as a matter of law for their admitted streaming of 4,082 of Plaintiffs' copyrighted sound recordings[11] from their servers to their users without Plaintiffs' authorization. According to Plaintiffs, streaming of sound recordings over the internet constitutes a public performance; therefore by making the

---

[10] While the argument was raised in the Motion and Reply, it was most clearly presented in by counsel during the oral argument on June 27, 2019.
[11] Also referred to as the "works in suit."

recordings available for streaming without a license, Defendants have infringed Plaintiffs' exclusive right of performance.

In response, Defendants argue that Plaintiffs have failed to point to any actual infringing conduct by Defendants, as opposed to Spinrilla's customers, relying on a line of cases holding that an internet service provider is not liable for third-party users uploading of copyrighted material merely because of the structure of its server system.

A copyright owner has certain exclusive rights in its works. These rights include the right to reproduce the copyrighted work, the right to prepare derivative works, the right to distribute copies to the public, and the right to publicly perform the work. 17 U.S.C. §§ 106(1)-(5). The Copyright Act has long granted to creators of music and audiovisual works the exclusive right to perform their copyrighted musical works publicly. 17 U.S.C. § 106(4). In 1995, Congress passed the Digital Millennium Copyright Act or "DMCA" granting the right to perform copyrighted sound recordings publicly by means of digital audio transmissions. 17 U.S.C. § 106(6) ("In the case of sound recordings," the copyright owner has the exclusive right "to perform the copyrighted work publicly by means of a digital audio transmission."). The right of public performance includes the right to **"**to transmit or otherwise communicate a performance. . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times." *Id.* §

101 (referred to as the "transmit clause").[12]   The Copyright Act provides that "[a]nyone who violates any of [these] exclusive rights of the copyright owner . . . is an infringer of the copyright . . . ."   17 U.S.C. § 501; *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 842 (11th Cir. 1990) ("The Copyright Act "provides a fair return to authors and inventors by protecting their works from exploitation by others.") (citing *Harper & Row, Publishes, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985)).

To prevail on a claim for direct copyright infringement, a plaintiff must show (1) that he owns a valid copyright and (2) that the defendant copied, distributed, reproduced, and/or performed protected elements of that work. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991) ("To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are

---

[12] As explained by the district court in *United States v. Am. Soc. of Composers, Authors & Publishers*:

> There are two separate copyrights implicated in Applicants' digital audio performances of songs through their Internet properties: (a) the right in the musical works, which comprises the melodies and/or lyrics that underlie all songs, and which are written by songwriters and generally licensed in the United States by performing rights organizations . . .; and (b) the right in the sound recordings, which is the particular recording of the work by a particular artist or band, the copyright in which is typically owned by record companies. Similarly, [the] performances of music videos require licenses of two copyrights: (a) the performance right in the musical work, generally licensed by performing rights organizations; and (b) the performance right in the audiovisual work, generally licensed by the record companies. *See* 17 U.S.C. § 106(4). Ordinarily, where a right exists, the copyright owner is free to choose to license that right to others or not.

*United States v. Am. Soc. of Composers, Authors & Publishers*, 559 F. Supp. 2d 332, 403 (S.D.N.Y. 2008), *vacated and remanded on other grounds sub nom. United States v. Am. Soc. of Composers, Authors, Publishers*, 627 F.3d 64 (2d Cir. 2010).

original."); *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011) ("To make out a prima facie case of copyright infringement, a plaintiff must show that (1) it owns a valid copyright in the [work] and (2) defendants copied protected elements from the [work]."); *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 843 (11th Cir. 1990) ("Public distribution of a copyrighted work is a right reserved to the copyright owner, and usurpation of that right constitutes infringement."); *Disney Enterprises, Inc. v. Hotfile Corp.*, 798 F.Supp.2d 1303, 1307 (S.D. Fla. 2011).

"Direct infringement does not require intent or any particular state of mind, although willfulness is relevant to the award of statutory damages. 17 U.S.C. § 504(c)." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1367, 1372 (N.D. Cal. 1995) (citing 17 U.S.C. § 504(c), describing the Copyright Act as imposing strict liability, and noting that knowledge is irrelevant to a theory of direct infringement). "The absence of intent to infringe is no defense; a defendant who directly infringes upon the exclusive rights of a copyright owner is liable even if the infringement was 'innocent' or 'accidental'." *Live Face on Web, LLC v. Tweople, Inc.*, 2014 WL 12611358, at *2 (M.D. Fla. June 23, 2014) (citing *Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 829 (8th Cir. 1992) and *M.L.E. Music Sony/ATV Tunes, LLC v. Julie Ann's, Inc.*, 2008 WL 2358979, at *2 (M.D. Fla. June 9, 2008); *Cable/Home Commc'n Corp.*, 902 F.2d at 846 ("Even if he could prove that he did not know

that the subject computer program was copyrighted, actual knowledge is not required. All that must be shown is that [he] had reason to know.")

While knowledge or intent is irrelevant in the context of direct copyright infringement, courts have held that a claim for direct liability requires evidence that the defendant directly or actively caused the infringement.  *See, e.g., CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) ("While the Copyright Act does not require that the infringer know that he is infringing or that his conduct amounts to a willful violation of the copyright owner's rights, it nonetheless requires *conduct* by a person who causes in some meaningful way an infringement.") (emphasis in original).  Some courts describe this as requiring evidence of "volitional" conduct by the defendant.  *E.g., Perfect 10, Inc. v. Gignews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) ("In addition, direct infringement requires the plaintiff to show causation (also referred to as 'volitional conduct') by the defendant.").  But "the word 'volition' in this context does not really mean 'an act of willing or choosing' or an 'act of deciding' . . . it 'simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability.'"  *Id.* The requirement of volition "is not a judicially-created element of intent or knowledge; it is a basic requirement of causation.  As its name suggests, *direct* liability must be premised on conduct that can reasonably be described as the *direct* cause of the infringement."  *Id.* (emphasis in original).  Recently, the district court for the Southern District of Florida noted that the "Eleventh Circuit has not considered

whether 'volitional' conduct is a necessary element for finding an internet company liable for direct copyright infringement." *Hydentra HLP Int. Ltd. V. Luchian*, 2016 WL 5951808, at *8-9 (S.D. Fla. June 2, 2016) (agreeing with the Second, Third, Fourth, and Ninth Circuits (and other district courts) and finding that "in imposing liability upon an internet service provider for third-party user's uploading of copyrighted material, Plaintiff must establish that Defendants engaged in a volitional act to cause the illegal copying [because to] find otherwise would impose liability upon an otherwise passive internet service provider for conduct that is simply out of its control").

Plaintiffs assert that Defendants directly infringed Plaintiffs' exclusive rights to "reproduce," "distribute," and "perform" their works in suit each time one of their sound recordings was uploaded to Spinrilla and downloaded or streamed by Spinrilla users. *See* 17 U.S.C. § 106(1) (right to reproduction); *id.* § 106(3) (right to distribution); *id.* § 106(4) (right to public performance). "Both uploading and downloading copyrighted material are infringing acts. The former violates the copyright holder's right to distribution, the latter the right to reproduction." *Columbia Pictures Indus. v. Fung,* 710 F.3d 1020, 1034 (9th Cir. 2013). Unauthorized online streaming of copyright protected content, Plaintiffs argue, infringes the copyright owner's exclusive right of performance.

Plaintiffs rely on *ABC v. Aereo, Inc.,* 573 U.S. 431 (2014) and a handful of other federal court decisions to support their argument that the operator of an online service platform is directly liable for infringing content streamed over the

internet at the request of its users. *See Spanski Enters., Inc.*, 883 F.3d 904, 908-910 (D.C. Cir. 2018) (affirming district court's ruling that web-based video-on-demand provider was liable for direct infringement by streaming copyrighted content through its website); *Capitol Records, LLC v. Escape Media*, 2015 WL 1402049, at *38-39 (S.D.N.Y. 2015) ("By streaming a song on Grooveshark.com, a user is only able to listen to the song contemporaneously with the stream; a user cannot receive delivery of the file of the recording. This constitutes a performance under the Copyright Act."); *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 652 (S.D.N.Y. 2013), *aff'd*, 910 F.3d 649 (2d Cir. 2018) ("[A]udio streams are performances because a "stream is an electronic transmission that renders the musical work audible as it is received by the client-computer's temporary memory.") (citing *United States v. Am. Soc. of Composers, Authors, Publishers*, 627 F.3d 64, 74 (2d Cir. 2010)); *UMG Recording, Inc. v. Escape Media Grp., Inc.*, 2014 WL 5089743, at *20 (S.D.N.Y. Sept. 29, 2014) ("Each time Escape streamed one of plaintiffs' song recordings, it directly infringed upon plaintiffs' exclusive performance rights.").

In *ABC v. Aereo, Inc.,* Aereo sold its subscribers "a technologically complex service that allows them to watch television programs over the Internet at about the same time as the programs are broadcast over the air." 573 U.S. at 436-37 (noting that "streaming" is defined as "the process of providing a steady flow of audio or video data so that an Internet user is able to access it as it is transmitted"); *see also id*. at 445 ("Here the signals pursue their ordinary course

of travel through the universe until ... a click on a website activates machinery that intercepts and reroutes them to Aereo's subscribers over the internet."). In general terms, Aereo used a system made up of servers, transcoders, and thousands of dime-sized antennas to intercept over-the-air broadcast television programming signals and transmit the program to its subscribers. Specifically, the system "works roughly as follows":

> First, when a subscriber wants to watch a show that is currently being broadcast, he visits Aereo's website and selects, from a list of the local programming, the show he wishes to see.
>
> Second, one of Aereo's servers selects an antenna, which it dedicates to the use of that subscriber (and that subscriber alone) for the duration of the selected show. A server then tunes the antenna to the over-the-air broadcast carrying the show. The antenna begins to receive the broadcast, and an Aereo transcoder translates the signals received into data that can be transmitted over the Internet.
>
> Third, rather than directly send the data to the subscriber, a server saves the data in a subscriber-specific folder on Aereo's hard drive. In other words, Aereo's system creates a subscriber-specific copy— that is, a " personal" copy—of the subscriber's program of choice.
>
> Fourth, once several seconds of programming have been saved, Aereo's server begins to stream the saved copy of the show to the subscriber over the Internet. (The subscriber may instead direct Aereo to stream the program at a later time, but that aspect of Aereo's service is not before us.) The subscriber can watch the streamed program on the screen of his personal computer, tablet, smart phone, Internet-connected television, or other Internet-connected device. The streaming continues, a mere few seconds behind the over-the-air broadcast, until the subscriber has received the entire show.

*Id.* at 436–37.

The plaintiffs in *Aereo*, owners of the copyrights to the streamed programs, brought suit for copyright infringement on the basis that Aereo was infringing their right to "perform" their works "publicly" under the Copyright Act's "transmit clause." *Id.* at 437.  Aereo argued that by supplying equipment that emulates the operation of a home antenna and digital video recorder, the equipment simply responds to its subscriber's directives.  *Id.* at 438.  Thus, according to Aereo, it did not perform.  *Id.*  Rather, "it is only the subscribers who "perform" when they use Areo's equipment to stream television programs to themselves."  *Id.*  Aereo also disputed that its service transmits to the public, arguing that the system makes a personal copy of the subscriber's selected broadcast program and streams the content of the copy to that subscriber and no one else.  "The fact that each transmission is to only one subscriber, in Aereo's view, means that it does not transmit a performance "to the public." *Id.* at 446.

The Supreme Court considered whether Areo "performs" in violation of the Copyright Act by posing the following question: "does Areo 'transmit . . . a performance' when a subscriber watches a show using Areo's system, or is it only the subscriber who transmits?"  *Id.*  According to the Court, the language of the Copyright Act "does not clearly indicate when an entity 'performs' or 'transmits' and when it merely supplies equipment that allows others to do so."  *Id.* at 438-39.  *See* 17 U.S.C. § 101 ("To perform . . . a work 'publicly' means [among other things] to transmit a . . . performance . . . of the work . . . to the public").  "But when read in light of its purpose," the Supreme Court held, "the Act is

unmistakable: An entity that engages in activities like Areo's performs." *Id.* at 439.

As the Court in *Aereo* explains, the Copyright Act was amended in 1976 to reach conduct like Aereo's after the Supreme Court had previously held that community antenna television (CATV) systems (the precursors of modern cable systems) fell outside the scope of the Copyright Act.  In *Fortnightly Corp. v. United Artists Television, Inc.*, the Court had considered a CATV system that provided local television broadcasting to its subscribers through antennas and coaxial cables that carried signals to their home television sets. 392 U.S. 390 (1968). A subscriber "could choose any of the ... programs he wished to view by simply turning the knob on his own television set." *Id.* at 392.  In deciding whether the CATV provider infringed copyright holders' exclusive right to perform their works publicly, the Court in *Fortnightly* drew a line: "Broadcasters perform. Viewers do not perform" and held that a CATV provider "falls on the viewer's side of the line." *Id.* at 398-99.  The Court reasoned that CATV providers were unlike broadcasters because "[b]roadcasters select the programs to be viewed; CATV systems simply carry, without editing, whatever programs they receive.  Broadcasters procure programs and propagate them to the public; CATV systems receive programs that have been released to the public and carry them by private channels to additional viewers." *Id.* at 400. On the other hand, the Court reasoned that CATV providers were more like viewers because "the basic function [their] equipment serves is little different from that served by the equipment

generally furnished by" viewers and "a CATV system no more than enhances the viewer's capacity to receive the broadcaster's signals [by] provid[ing] a well-located antenna with an efficient connection to the viewer's television set." *Id.* at 399-400.

Congress subsequently amended[13] the Copyright Act in response to the *Fortnightly* decision, "enact[ing] new language that erased the Court's line between broadcaster and viewer, in respect to 'performing' a work." *Id.* at 441 ("Under this new language, both the broadcaster and the viewer of a television program "perform," because they both show the program's images and make audible the program's sounds.") Congress also enacted the transmit clause to provide that an entity peforms publicly when it "transmits a performance to the public," defining "[t]o transmit a performance as" "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." *Aereo*, 573 U.S. at 441 (citing 17 U.S.C. § 101).

The Court in *Aereo* concluded that cable system activities lie at the heart of the activities that Congress intended to cover. *Id.* at 440-442 (citing H.R. Rep., at 63 ("[A] cable televeion system is performing when it retransmits [a network] broadcast to its subscribers. . . [T]he concep[t] of public performance . . . cover[s] not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public."). Thus the

---

[13] Congress also created a detailed compulsory licensing scheme that sets out conditions, including the payment of compulsory fees, under which cable systems may retransmit broadcasts. *See* 17 U.S.C. § 111.

*Aereo* Court found that "Aereo is not simply an equipment provider" but "uses its own equipment" and technology to "receive programs that have been released to the public and carries them by private channels to additional viewers." *Id.* The Court rejected the argument in dissent that Aereo is "like a copy shop that provides its patrons with a library card" and should not be directly liable whenever its customers use its equipment to "transmit" copyrighted television programs to their screens. *Id.* at 444. While the Court acknowledged that the subscribers, not Aereo, selected the copyrighted content they wanted to stream, it nonetheless found that Aereo was liable for transmitting copyrighted television programs in violation of the Copyright Act. *Id.* at 443. It noted, however, that "[i]n other cases involving different kinds of service or technology providers, a user's involvement in the operation of the provider's equipment and selection of the content transmitted may well bear on whether the provider performs within the meaning of the Act. *Id.* at 444.

Areo performed the programs publicly within the meaning of the Copyright Act's transmit clause:

> When an Aereo subscriber selects a program to watch, Aereo streams the program over the Internet to that subscriber. Aereo thereby 'communicates' to the subscriber, by means of a 'device or process,' the work's images and sounds. § 101 And those images and sounds are contemporaneously visible and audible on the subscriber's computer (or other Internet-connected device). So Aereo transmits a performance whenever its subsribers watch a program.

*Id.* at 445-46.  The Court rejected Aereo's argument that its transmission of personal copies of the programs was not a public transmission.  The "subscribers to whom Aereo transmits television programs constitutes 'the public' because:

> The Act applies to transmissions 'by means of any device or process.'
> And retransmitting a television program using user-specific copies is
> a 'process' of transmitting a performance.  A 'copy' of a work is
> simply 'a material object . . . in which a work is fixed . . . and from
> which the work can be perceived, reproduced, or otherwise
> communicated.'  So whether Aereo transmits from the same or
> separate copies, it performs the same work; it shows the same
> images and makes audible the same sounds.  Therefore, when Aereo
> streams the same television program to multiple subscribers, it
> 'transmits . . . a performance' to all of them.

*Id.* at 448.

Finally, the Court cabined its holding in response to arguments that an application of the Ttransmit clause to Aereo's conduct would "impose copyright liability on other technologies, including new technologies, that Congress could not possibly have wanted to reach."  *Id.* at 459 ("[W]e do not believe that our limited holding today will have that effect. . .  For one thing, the history of cable broadcast transmissions that led to the enactment of the Transmit Clause informs our conclusion that Aereo 'perform[s]', but does not determine whether different kinds of providers in different contexts also 'perform.'  For another, an entity only transmits a performance when it communicates contemporaneously perceptible images and sounds of a work.")[14]  Although the Court would not "answer more

---

[14] For example, "if a distributor . . . sells [multiple copies of a digital video disc] by mail to consumers . . . [its] distribution of the DVDs merely makes it possible for the recipients to perform the work themselves – it is not a 'device or process' by which the *distributor* publicly performs the work."  *Id.* at 450 (quoting Brief for Respondent at 31.)

precisely how the transmit clause or other provisions of the Copyright Act" would apply to "technologies not before it," the Court did point to examples of activities that it viewed as . not clearly covered by the Act.[15]  *Id.* at 450-51.  These included cloud computing, remote storage options, and digital video recorders.

Despite the characterization of its holding as limited, the *Aereo* Court's reasoning and interpretation of the language and underlying purpose of the Copyright Act apply equally to online music streaming services such as Spinrilla's, and is consistent with a number of Circuit and district court decisions. *Accord Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 911 (D.C. Cir. 2018) (dismissing the defendant's argument that "*Aereo*'s interpretation of the Copyright Act was a one-time deal, good for that case only . . . as every first-year law student learns, a judicial decision resolves only the case before it, so it is unsurprising that the Court declined to hypothesize about how its holding would apply to future cases. Such judicial restraint, though, hardly means that *Aereo*'s holding has no applicability outside that case's narrow factual circumstances. As our first-year law student also learns, judicial opinions establish precedential principles that apply to materially similar factual scenarios arising in future cases") (internal citations omitted); *see also Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 652 (S.D.N.Y. 2013), *aff'd*, 910 F.3d 649 (2d Cir. 2018) (finding that an audio stream "like a television or radio broadcast,

---

[15] The Court did not consider "whether the public performance right is infringed when the user of a service pays primarily for something other than the transmission of copyrighted works, such as the remote storage of content" that allows the user a means of playing back copies that the user has already lawfully acquired.  *Id.* at 450.

is a performance because there is a playing of the song that is perceived simultaneously with the transmission"); *United States v. Am. Soc'y of Composers, Authors & Publishers*, 485 F. Supp. 2d 438, 446 (S.D.N.Y. 2007), *aff'd sub nom. United States v. Am. Soc. of Composers, Authors, Publishers*, 627 F.3d 64 (2d Cir. 2010) ("The broadcasting of television signals is closely analogous to the streaming of music over the internet. In each case, the digital data are transmitted in a form designed to permit real-time perception of the subject performance and, absent some type of recording device, results in the recipient obtaining no physical or digital copy of the data.")  Indeed, online music streaming services are not among the specific examples of activities the *Aereo* Court expressly noted fell outside the reach of its holding.

In *United States v. Am. Soc'y of Composers, Authors, Publishers*, the Second Circuit Court of Appeals explained why the online streaming of music constitutes a public performance under the Copyright Act.  627 F.3d 64, 74 (2d Cir. 2010).   The American Society of Composers, Authors and Publishers ("ASCAP") licenses the public performance rights in copyrighted musical works. More than 295,000 composers, songwriters, lyricists, and music publishers in the United States participate exclusively in licensing their music through ASCAP. ASCAP licenses approximately 45% of all of the musical works that are played on-line.  *Id.* at 69-70.  Yahoo! Inc. and RealNetworks, Inc. (collectively, "the Internet Companies") sought a blanket license to publicly perform the entirety of the millions of musical compositions in the ASCAP repertory for a single fee.

The Internet Companies provide access to online music performances through their websites and online music subscription services. *Id.* at 69. For example, Yahoo! users can enjoy the specific song or music video they desire from an "on-demand" stream in Yahoo! Search or listen to a radio-style webcast in Yahoo! Music. *Id.* In addition to performing music on websites and through services, i.e. streaming, the Internet Companies offer their users copies of recordings of musical works through downloads. "A download is a transmission of an electronic file containing a digital copy of a musical work that is sent from an on-line server to a local hard drive. With a download, the song is not audible to the user during the transfer. Only after the file has been saved on the user's hard drive can he listen to the song by playing it using a software program on his local computer." *Id.* (citing *United States v. Am. Soc'y of Composers, Authors & Publishers*, 485 F.Supp.2d 438, 441-42, 446 (S.D.N.Y. 2007)).

The Internet Companies did not dispute that these downloads create copies of the musical works, for which the parties agree the copyright owners must be compensated. Rather, the dispute was "whether these downloads are also public performances of the musical works, for which the copyright owners must separately and additionally be compensated." *Id.* at 71. In affirming the district court's determination that downloads are not public performances, the Second Circuit found that the right of public performance under the Copyright Act necessarily entails contemporaneous perceptibility. *Id.* at 72 (citing 17 U.S.C. § 101) ("To 'perform' ... a motion picture or other audiovisual work ... [is] to show

its images in any sequence or to make the sounds accompanying it audible.")

Moreover, the Second Circuit reasoned:

> The Internet Companies' stream transmissions, which all parties agree constitute public performances, illustrate why a download is not a public performance. A stream is an electronic transmission that renders the musical work audible as it is received by the client-computer's temporary memory. This transmission, like a television or radio broadcast, is a performance because there is a playing of the song that is perceived simultaneously with the transmission. In contrast, downloads do not immediately produce sound; only after a file has been downloaded on a user's hard drive can he perceive a performance by playing the downloaded song. Unlike musical works played during radio broadcasts and stream transmissions, downloaded musical works are transmitted at one point in time and performed at another. Transmittal without a performance does not constitute a 'public performance.'

*Id.* at 74 (internal citations omitted).

Drawing from the Second Circuit's underlying decision in *Aereo*,[16] and *United States v. Am. Soc'y of Composers, Authors, Publishers*, the district court for the Southern District of New York expressly found the operator of an online music streaming website directly liable for copyright infringement. *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 (AJN), 2015 WL 1402049, at *3, *38-39 (S.D.N.Y. Mar. 25, 2015) (adopting Magistrate Judge's Report and Recommendation on summary judgment and finding "there is evidence from which copyright infringement can be found" where plaintiff's "copyrighted works were streamed 12,224,567 times" from Grooveshark's

---

[16] The Magistrate Judge's decision in *Escape Media* (adopted by the district court in 2015) was issued in 2014 shortly before the Supreme Court's decision in *Aereo*. The discussion of the Second Circuit's analysis in *Aereo* that a digital transmission is not "public" if received by "only one subscriber" is not applicable as that portion of the decision has been overturned by the Supreme Court as noted above.

system).  The plaintiff, EMI, established its claim of direct copyright infringement against Escape Media on summary judgment through evidence that: (1) EMI owned the exclusive right to enforce copyrights in 2,807 sound recordings at issue; and (2) Escape Media infringed EMI's right to perform those works by storing a copy of each recording in its online library and allowing its users to share access to those recordings through streaming, without authorization, over 12 million times on its website. *Id.* The court relied on the Court of Appeals' interpretation that "'to perform' a musical work entails contemporaneous perceptibility," meaning that a recording is performed when it is actually played for a listener, as opposed to when "a recording … is simply delivered to a potential listener." *Id.* at *38 (quoting *United States v. Am. Soc'. of Composers, Authors, Publishers*, 627 F.3d at 72–73); *see also Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 134 (2d Cir. 2008) ("[A] transmission of a performance is itself a performance"). "Generally, a digital transmission is 'public' under the Copyright Act if the source of that transmission (e.g., the MP3 file) is capable of producing transmissions that are 'received by the public.'" *Id.* (citing *WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 689 (2d Cir. 2013)). "Files streamed over the internet are typically public under this definition, and the Court of Appeals has found 'internet streaming' to 'produce[ ] public performances.'" *Id.* (citing *Aereo*, 712 F.3d at 692); *see also Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 652 (S.D.N.Y.2013) (finding "audio streams" to be public performances). Thus, the court held that "[b]y streaming a song on

Grooveshark.com, a user is only able to listen to the song contemporaneously with the stream; a user cannot receive delivery of the file of the recording. This constitutes a performance under the Copyright Act. And that performance is public under the Copyright Act because Grooveshark streams content to users . . . Between March 23, 2012, and October 2013, Grooveshark streamed EMI's copyrighted recordings, without authorization, to its users over 12 million times." *Id.* at *39. Therefore, because the Copyright Act and the DMCA grant a copyright owner the exclusive right, "in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission," the court found EMI was entitled to summary judgment on its claim that the defendant's music streaming website directly infringed its right to public performance of its copyrighted audio recordings. *Id.*; 17 U.S.C. § 106(6).

Here, Defendants admit that at least one copy of each of the 4,082 copyrighted sound recordings at issue was streamed from Spinrilla. (Defs.' Resp. to SMF ¶ 60.)  Notably, however, Defendants offer no response to counter Plaintiffs' argument that such streaming constitutes direct infringement of Plaintiffs' exclusive right to public performance of their works.  Rather, Defendants argue that "[w]hen an Internet service provider such as Spinrilla is at issue however, 'something more must be shown than mere ownership of a machine used by others to make illegal copies. There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive

domain of the copyright owner." (Defs.' Mot. for Summ. J., Doc. 263 at 21) (quoting *Disney Enterprises, Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1307-08 (S.D. Fla. 2011)).

Neither *Hotfile* nor any of the other cases on which Defendants rely involved a music streaming service or alleged infringement of the right of public performance.  These cases are inapplicable and are insufficient to outweigh the authority supporting Plaintiffs' motion.

In *Hotfile,* the district court found that the owners of copyrights to motion pictures[17] uploaded by users of the file-sharing website www.hotfile.com could not sue the website operator who profited from its users' uploads and downloads of copyrighted movies for direct infringement of their rights of reproduction, distribution, and display under the Copyright Act absent allegations that the website operator uploaded copyrighted material or some other volitional conduct on the part of the operator.  798 F. Supp. 2d 1303, 1307-08.

In *Pefect 10, Inc. v. Giganews, Inc.*, the owner of the copyright to thousands of adult images of nude or semi-nude female models sued to enforce its rights under the Copyright Act to (1) reproduce, (2) create derivative works, (3) distribute, and (4) publicly display its copyrighted works.  2014 WL 8628034 (N.D. Cal. 2014).  These copyrighted images were made widely available on the internet through Usenet "an international collection of organizations and individuals (known as 'peers') whose computers connect to one another and

---

[17] The plaintiffs included major motion-picture movie studios Disney, Twentieth Century Fox, Universal Studies, Columbia Pictures, and Warner Bros.

exchange messages posted by Usenet users." *Id.* at *1. Users gain access to Usenet through a commercial Usenet provider, such as Giganews, or an internet service provider. *Id.* Defendant Giganews owns and operates numerous Usenet servers, providing its subscribers access to the content stored on Giganews' servers and to the content stored on the servers of other Usenet providers. *Id.* The content on Usenet to which Giganews offers access "is primarily user-driven" meaning the content that is stored on a Usenet provider's server is generally uploaded by its users. *Id.* *2. The district court reasoned that "[i]nherent in any claim for direct liability under the Copyright Act, then, is a plaintiff's need to prove the defendant was the direct cause of the injury. Put another way, to establish causation on a claim for direct liability, "defendants must actively engage in one of the activities recognized in the Copyright Act." *Id.* at *7. Thus, the Court in *Perfect 10* held that "[w]here, as here, the plaintiff fails to show that the defendant "himself uploaded or downloaded the files, or directly caused such uploading or downloading to occur," there can be no liability for direct infringement." *Id.* Because a claim "for direct liability requires evidence that the Defendants directly or actively caused the infringement, Perfect 10's continued insistence that Defendants allowed its subscribers to upload, download, and view infringing material is the stuff of indirect or secondary liability, not direct liability." *Id.* at *9.

Similarly, in *BWP Media USA, Inc. v. T&S Software Associates*, the registered owners of copyrights for photographs of the musician ke$ha, the actress Julianne Hough, and the musician Ashlee Simpson, sued the host of

hairboutique.com, a website which includes a public forum called HairTalk where users can post content, share comments, ask questions, and engage in other on-line interactions with other users on topics such as hair, beauty, celebrities, current events, politics, and dating.  2016 WL 1248908 (N.D. Tex. 2016).  The plaintiffs claimed that their rights were infringed because the photos were posted by users of the HairTalk website without plaintiffs' permission.  The district court granted the defendant's summary judgment motion, finding "no genuine issue as to whether Defendant is liable for direct copyright infringement, because Defendant was not personally involved in the infringing conduct."  *Id.* *2.

In *Religious Technology Center v. Netcom On-Line Comm. Svcs.*, the plaintiffs held the copyrights in the unpublished and published works of Church of Scientology founder L. Ron Hubbard.  907 F. Supp. 1361 (N.D. Cal. 1995).  They sued the operator of an online bulletin board service and an internet service provider for direct infringement of their exclusive rights to reproduce the copyrighted work, the right to prepare derivative works, the right to distribute copies to the public, and the right to publicly display the works after a former minister of Scientology turned vocal critic of the Church, posted portions of their works to an on-line forum for discussion and criticism of Scientology.  The district court held that the defendants, by providing a forum for their subscribers to upload and download newsgroup postings, were not directly liable for copies of copyrighted works "automatically made on their computers using their software as part of a process initiated by a third party." *Id.* at 1367-68.  Instead, the court

compared "Netcom's act of designing or implementing a system that automatically and uniformly creates temporary copies of all data sent through it" to "the owner of a copying machine who lets the public make copies with it." *Id.* at 1368-69. Although Netcom has been cited by some courts as setting forth the standard in cases alleging that an internet company is infringing a plaintiff's copyright, the Supreme Court in *Aereo* rejected the application of the copy shop analogy in the context of a cases such as this involving infringement of the right of performance by an online streaming service.

As noted above, the Copyright Act is a strict liability statute and the Eleventh Circuit has not considered whether "volitional" conduct is a necessary element for direct copyright infringement. But even if volitional conduct is required to prove direct infringement, the cases on which Plaintiffs rely have all held that the affirmative act of streaming constitutes direct infringement of the copyright holder's exclusive right of performance regardless of the fact that the the streaming occurs at the request of the user. *See Spanksi Enterprises, Inc. v. Telewizja Polska, S.A.,* 883 F.3d at 910, 912 ("Nowhere does the Act state that a work so shown is performed only if a third-party end user plays no role in the showing. Here, because TV Polska "show[ed]" the fifty-one copyrighted episodes "to the public" through its video-on-demand system—"a[ ] device or process" that rendered "members of the public capable of receiving the performance ... in separate places and ... at different times,"– it has violated Spanski's undisputed public performance right. . . TV Polska's conduct – "us[ing] its own equipment"

to "allow[ ] [users] to watch television programs, many of which are copyrighted," by transmitting content upon a user's request, constitutes infringement under *Aereo*'s binding authority) (citing *Aereo*, 134 S.Ct. at 2506).  Here, Plaintiffs do not rely solely on uploads and downloads of their music to and from Spinrilla. Defendants have created an interactive internet player that streams copyrighted content directly from its website and mobile app.  In doing so, Defendants have infringed Plaintiffs' exclusive right "to perform" their copyrighted sound recordings "publicly by means of a digital audio transmission." 17 U.S.C. 106(6). Therefore, Plaintiffs are entitled to summary judgment on their claim of direct infringement of the 4,082 works in suit.  Accordingly, the Court **GRANTS IN PART** Plaintiffs' Motion for Summary Judgment on Liability [Doc. 224] and **DENIES** Defendant's Cross Motion for Summary Judgment on Plaintiffs' Claims of Direct and Secondary Copyright Infringement [Doc. 262].

Having found that Plaintiffs are entitled to summary judgment for direct infringement, it is not necessary to consider Plaintiffs' claims for secondary or contributory infringement.

## IV.  Cross Motions for Summary Judgment on Defendants' Safe Harbor Defense

Plaintiffs and Defendants have cross-moved on Defendants' assertion of the "safe harbor" defense under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512. *See* Amended Answer, Affirmative Defenses ¶ 17 [Doc. 154.]  The DMCA provides a limitation on liability for online service providers against

claims of copyright infringement. 17 U.S.C. § 512. Specific to this case, 17 U.S.C. § 512 (c) provides that when certain criteria are met, "A service provider shall not be liable for monetary relief . . . for infringement of copyright by reason of storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." Neither party disputes that Spinrilla is a service provider within the meaning of 17 U.S.C. § 512 (c).[18]

To qualify for the safe harbor defense under the DMCA, the service provider must satisfy certain criteria regarding the storage and transfer of copyright infringing material. Because § 512(c) provides an affirmative defense, the defendant "must establish 'beyond controversy every essential element,' and failure to so will render the [defendant] ineligible for the § 512(c) safe harbor's protection." *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1052 (9th Cir. 2017). Although the service provider has the burden of demonstrating entitlement to its protections, "the DMCA has often been construed in favor of service providers requiring little effort by their operations to maintain immunity." *Disney Enters., Inc. v. Hotfile Corp.*, No. 11-20427-CIV, 2013 WL 6336286 at *19 (S.D. Fla. Sept. 20, 2013). To qualify for safe harbor protection, the service provider must not have actual or "red flag" knowledge of content or activity on its site that infringes copyrights owned by others, or must act "expeditiously to remove, or disable access to" the infringing content "upon

---

[18] As it pertains to 17 U.S.C. § 512(c) (subsection entitled "Information Residing on Systems or Networks at Direction of Users"), a service provider is defined as "a provider of online services or network access, or the operator of facilities therefor." 17 U.S.C. § 512(k)(1)(B).

obtaining such knowledge or awareness." 17 U.S.C. § 512 (c)(1)(A)(i)-(iii). Red flag knowledge means that the service provider is "aware of facts or circumstances from which infringing content is apparent." 17 U.S.C. § 512(c)(1)(ii). In addition, when the service provider has "the right and ability to control such activity" on its site, the provider must not receive "a financial benefit directly attributable to infringing activity." 17 U.S.C. § 512 (c)(1)(B).

Both actual and red flag knowledge relate to *specific* instances of copyright infringement. *Viacom Int'l. v. YouTube*, 676 F.3d 19, 31 (2nd Cir. 2012). A general awareness that infringing activity occurs on the provider's site does not preclude use of the safe harbor defense. *Id.* Actual knowledge is present when the service provider actually or subjectively knew of specific infringement. *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1043 (9th Cir. 2013). "Red flag" knowledge "turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person." *Viacom*, 676 F.3d at 31. Therefore, the difference between actual and red flag knowledge is "between a subjective and an objective standard." *Id.*

Importantly, if a service provider is otherwise eligible for the safe harbor defense, the burden of proof is on the copyright owner to show that the service provider failed to respond appropriately to actual or red flag knowledge. *Capitol Records v. Vimeo*, 826 F.3d 78, 95 (2d Cir. 2016). Moreover, the service provider holds no duty to search or monitor for copyright infringement. *Id.* at 98; *Viacom*

676 F.3d at 35.[19] The copyright holder has the responsibility of policing for infringement. *See Ventura Content v. Motherless*, 885 F.3d 597, 610 (9th Cir. 2018). Therefore, Plaintiffs in a copyright infringement suit must point to evidence that Defendants knew of infringing activity or knew of facts or circumstances that would make copyright infringement obvious to an ordinary person. *Vimeo*, 826 F.3d at 94.

However, a service provider is not completely absolved of any responsibility. Willful blindness to specific infringement is a proxy for knowledge that would negate the safe harbor defense. *Id.* at 99.  In addition, while the DMCA places primary responsibility for policing copyright infringement on the copyright owner, the service provider "must respond expeditiously and effectively to the policing" in order to invoke the safe harbor defense. *Ventura Content*, 885 F.3d at 604; *see* 17 U.S.C. § 512 (1)(c).

To qualify for the safe harbor defense, a service provider must also have a designated agent to receive notifications of claimed copyright infringement. *See* 17 U.S.C. § 512 (c)(2) ("The limitations on liability established in this subsection apply to a service provider *only* if the service provider has designated an agent to receive notifications of claimed infringement") (emphasis added). The designated agent must be accessible to the public both through the service provider's website

---

[19] *See* 17 U.S.C. § 512 (m)(1) (applicability of the safe harbor defense cannot be conditioned on "a service provider monitoring its services or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure").

and by being registered with the U.S. Copyright Office.[20] Lack of a registered designated agent to receive copyright infringement notices disqualifies the service provider from using the safe harbor shield. *BWP Media USA, Inc. v. Hollywood Fan Sites LLC*, 115 F. Supp. 3d 397, 402 (S.D.N.Y. 2015). Moreover, a service provider does not "retroactively" qualify for the safe harbor defense for copyright infringement that occurred prior to registering a designated agent. *Id.* at 400.

Use of the safe harbor defense under 17 U.S.C. § 512 is also conditioned upon meeting the eligibility requirement of 17 U.S.C. § 512 (i), which requires that the service provider "has adopted and reasonably implemented" a repeat infringer policy.[21] To fulfill this requirement, "a service provider must (i) adopt a policy that provides for the termination of service access for repeat copyright infringers; (ii) inform users of the service policy; and (iii) implement the policy in a reasonable manner." *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 (AJN), 2015 WL 1402049, at *45 (S.D.N.Y. Mar. 25, 2015). The purpose of requiring a repeat infringer policy is to prevent internet sites "from becoming safe havens or conduits for known repeat copyright infringers" and "to deny protection to websites that tolerate users who flagrantly disrespect copyrights."

---

[20] Both sources to identify the designated agent are required under 17 U.S.C. § 512 (c) (*see BMP Media v. Hollywood Fan Sites LLC*, 115 F. Supp. 3d 397, 402 (S.D.N.Y. 2015) ("§ 512(c) makes clear that it contemplates two parallel sources—the provider's website and the USCO directory—where each service provider's DMCA agent is readily available to the public.").

[21] *See* 17 U.S.C. § 512 (i)(A) ("The limitations on liability established by this section shall apply to a service provider only if the service provider—(A) has adopted and reasonably implemented, and informs subscribers and account holders . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers.")

*Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 637 (S.D.N.Y. 2011). The term "repeat infringer" refers to all users "who engage in infringing activity, not just the narrow subset of those who have been adjudicated by a court." *BMG Rights Mgmt., LLC v. Cox Commc'n, Inc.*, 881 F.3d 293, 301 (4th Cir. 2018).  Thus, "infringer" means a user who the service provider knows to violate one of the exclusive rights of a copyright, however such knowledge is gained. *See id.* at 302-03; *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 89 (2d. Cir. 2016). Importantly, a repeat infringer policy that satisfies the requirement for the safe harbor defense requires nothing short of termination of users who violated the policy. *BMG Rights Mgmt.*, 881 F.3d at 305; *Hotfile*, 2013 WL 6336286, at *21; *Escape Media Grp.*, 2015 WL 1402049 at *9-11.

Along with maintaining a repeat infringer policy, 17 U.S.C. 512 (i) requires that service providers "reasonably implement" the policy. The statute does not define what it means for a policy to be "reasonably implemented." *See Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007). Broadly, under the DMCA, a service provider must "do what it can reasonably be asked to do to prevent the use of its service by 'repeat infringers.'" *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003). In addition, the repeat infringer policy must be effectively communicated to users. *Escape Media Grp.,* 2015 WL 1402049, at *47. While courts leave the service provider some discretion in crafting a repeat infringer policy, the provider has not "reasonably implemented" the policy if it "fails to enforce the terms of its policy in any meaningful fashion."

*BMG Rights Mgmt. LLC*, 881 F.3d at 303; *see also Aimster*, 334 F.3d at 655 (holding that a service provider did not reasonably implement a repeat infringer policy when it didn't do "anything to discourage repeat infringers of plaintiff's copyrights"). To quality for safe harbor, the service provider bears the burden of showing that it reasonably implemented a repeat infringer policy. *Id.* at 305.

However, "reasonable implementation" of a repeat infringer policy does not mean that the policy must be perfect. *Ventura Content*, 885 F.3d at 618; *Hotfile*, 2013 WL 6336286, at *21. A service provider "need not affirmatively police its users for evidence of repeat infringement." *CCBill*, 488 F.3d at 1102. One court has held that a provider has "reasonably implemented" a repeat infringer policy simply by having a system in place for receiving and dealing with copyright infringement notifications and "not actively prevent[ing] copyright owners from collecting information needed to issue such notifications." *Id.* at 1109. At a minimum, a service provider must respond to notifications or red flag knowledge of recurrent instances of specific infringement. *Id.* More clearly, a service provider loses the safe harbor defense if it enables users to evade detection of copyright infringement. *See Aimster*, 334 F.3d at 655 (holding that the defendant did not reasonably implement a repeat infringer policy when it invited users to infringe plaintiff's copyrights and showed them how to encrypt their files for distribution in order to evade detection of copyright infringement). Service providers must also keep adequate records of users who commit

copyright infringement in order to adequately implement a repeat infringer policy. *Escape Media Grp.*, 2015 WL 1402049, at *48.

In this case, Plaintiffs claim that Defendants have failed to comply with the DMCA's safe harbor requirements. Starting in March 2015, Plaintiffs sent fifty-nine takedown notices over a two-year period identifying more than 400 infringing copies of Plaintiff's sound recordings on Spinrilla's system. Within that timeframe, Plaintiffs also sent targeted notices over the four-month period between July and November 2016, which identified nine specific user accounts that had uploaded Plaintiffs' copyrighted sound recordings to Spinrilla on multiple occasions. Plaintiffs allege that one particular user uploaded a new mixtape weekly for over that time period, which contained copyright infringing sound recordings by major label artists such as Bruno Mars, The Weeknd, Missy Elliot, Common, and Ludacris.

After Plaintiffs filed suit on February 3, 2017, Spinrilla terminated one of the nine repeat infringer accounts that were identified by Plaintiffs. Plaintiffs allege, and Defendants do not dispute, that the other eight accounts continue to operate on Spinrilla. Plaintiffs have identified copyright infringing sound recordings that were uploaded by some of these accounts in October 2017. For example, Plaintiffs listed twenty-one sound recordings uploaded by DJ Dirty Dollarz, DJ Miles, or DJ 837 that were published to Spinrilla after July 23, 2017 and collectively downloaded over 2 million times before being removed. Although these particular sound recordings are not listed as works in suit, Plaintiffs use

them as evidence that Defendants have not terminated the accounts of users who continue to repeatedly infringe Plaintiffs' copyrights.

Defendants acknowledge that they did not have a stated policy to terminate users' accounts for repeat copyright infringement until July 23, 2017 and did not have a mechanism for tracking repeat infringers. On that day, Spinrilla updated its Terms of Service to include for the first time a "Repeat Infringement" section, which stated that "after two strikes, the user's ability to upload music will be revoked." (Def. SMF ¶ 96). Copeland also began tracking instances of copyright infringement on a spreadsheet. Therefore, prior to July 23, 2017, Defendants did not have a repeat infringer policy that would satisfy the element stated in 17 U.S.C. § 512(i).

The parties also do not dispute that Spinrilla first registered a DMCA agent with the U.S. Copyright Office on July 29, 2017, which was five months after Plaintiffs filed their complaint. (*see* Br. Supp. of Pl.'s Mot. for Partial Sum. J. at 11; Br. Supp. of Def.'s Mot. for Partial Sum. J. at 24.) Prior to July 29, 2017, Spinrilla received takedown notices through the email address, legal@spinrilla.com, made available on Spinrilla's website. However, it is clear that the safe harbor defense cannot be invoked unless a designated DMCA agent is also listed in the "Register of Copyrights" with the U.S. Copyright Office. *See* 17 U.S.C. § 512 (c)(2)(B).  Moreover, "a service provider cannot retroactively qualify for the safe harbor for infringements occurring before the proper designation of an agent under the statute." *BWP Media*, 115 F.Supp.3d at 400; *see also Hotfile*,

2013 WL 6336286 at *26 (holding that defendant could not invoke the safe harbor defense prior to the date that it had a registered agent with the Copyright Office and had published the agent's contact information on its website). A defendant "may not invoke the safe harbor defense with respect to infringing conduct that occurred prior to [the defendant's] designating a DMCA-related agent with the Copyright Office." *Id.* (quoting *Oppenheimer v. Allvoices, Inc.*, No. C 14-00499(LB), 2014 WL 2604033, at *5). Indeed, Defendants only assert they are entitled to safe harbor protection for infringement occurring on or after July 29, 2017. (Defs.' Resp., Doc. 305 at 5.)

Consequently, the undisputed facts demonstrate that Defendants did not satisfy all of the required elements to be eligible for safe harbor defense until July 29, 2017, which is when they first designated an agent with the U.S. Copyright Office and had adopted a repeat infringer policy. Therefore, Defendants cannot invoke the safe harbor defense for their acts of infringement up to July 29, 2017.

Plaintiffs also contend that Defendants are not entitled to DMCA safe harbor protection after July 29, 2017 because Defendants have not "reasonably implemented" the repeat infringer policy in accord with 17 U.S.C. § 512(i). Plaintiffs argue that Defendants have failed to terminate the accounts of several DJs who repeatedly infringed copyrighted sound recordings. The RIAA sent takedown notices on behalf of Plaintiffs to Spinrilla prior to July 2017, which listed several particular DJs who infringed copyrights on multiple occasions. In addition, Plaintiffs identify several copyright infringing sound recordings that

were uploaded by these DJs after Defendants implemented a repeat infringer policy in July 2017. Finally, Plaintiffs allege that Defendants have notification of continued repeat infringement by these particular DJs because many of the audio files they have uploaded since July 2017 have been blocked by Audible Magic.

The Court need not determine whether Defendants are entitled to protection from liability under the DMCA safe harbor provision for alleged infringing content available on Sprinrilla after July 29, 2017. Plaintiffs' claims for infringement are limited to the 4,082 works in suit identified in Amended Exhibit A to the Second Amended Complaint. (*See* Order on Mot. to Amend, Doc. 214 at 62-63)(allowing amendment to add 2,000 additional sound recordings to list of works in suit but finding that as "there must be some end in sight to the potential extent of the Defendants' alleged liability, the Court will not allow further amendments and will hold Plaintiffs to this final list").[22]  The works in suit identified in Plaintiffs' Amended Exhibit A consist of thousands of Plaintiffs' copyrighted sound recordings uploaded to Spinrilla through October 22, 2017. Notably, however, the works in suit do not include any infringing sound recordings uploaded by any of the DJs who Plaintiffs had identified as repeat infringers in their prior takedown notices.

---

[22] Plaintiff's original Complaint, filed on February 3, 2017, identified only 201 sound recordings out of over 21,000 Plaintiffs' claimed had been identified as available on Spinrilla.   On September 19, 2017, the Court granted Plaintiffs leave to amend the complaint to identify an additional 2,043 sound recordings to their illustrative list of the works in suit.  After discovery revealed another 2,000 sound recordings that had been available on Sprinrilla prior to the Defendant's implementation of Audible Magic, the Court allowed Plaintiffs a final amendment to their list of works in suit to include these additional 2,000 or so recordings.

There is no dispute that Spinrilla and Copeland were aware that nine DJs had repeatedly infringed Plaintiffs' copyrights prior to July 2017 and had failed to terminate the user accounts of all but one of these DJs.[23]  Plaintiffs assert that Defendants have not reasonably implemented their repeat infringer policy after its adoption in July 2017 because Defendants have allowed known repeat infringers to continue to upload content to Spinrilla.  More specificially, Plaintiffs contend that Defendants failed to reasonably implement a repeat infringer policy because 1) DJs who had been identified as repeat infringers continued to upload copyright infringing content to Spinrilla after July 23, 2017, and 2) Defendants had knowledge of DJs' attempts to infringe copyrights that were blocked by Audible Magic from being published on Spinrilla.  Plaintiffs identify twenty-one sound recordings that were uploaded by DJ Dirty Dollarz, DJ Miles, and DJ 837 after Defendants implemented their July 2017 repeat infringer policy. However, Plaintiffs did not send takedown notices to Defendants regarding these sound recordings and did not include them as works in suit. (Pl.'s Reply to Def. Resp. Pl. SMF ¶¶ 115-117; Wilkens Ex. 001; Pl. SMF, Schedule A.)

Accordingly, the Court **GRANTS IN PART** Plaintiffs' Motion for Summary Judgment on Defendant's DMCA Safe Harbor Defense [Doc. 227] up to July 29, 2017, and **DENIES AS MOOT** Plaintiffs' Motion for Summary Judgment on Defendant's DMCA Safe Harbor Defense after July 29, 2017. For

---

[23] *See* Lineras decl. ¶ 14 (Between July 27, 2016 and November 11, 2016, RIAA sent 23 takedown notices identifying 286 copyright infringing sound recordings by nine specific DJs. Each of the nine DJs was identified in at least six separate takedown notices.).

the same reasons, the Court **DENIES** Defendant's Motion for Summary Judgment as to Their DMCA Safe Harbor Defense.

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Plaintiffs' Motion for Summary Judgment on Liability [Doc. 224], **DENIES** Defendant's Cross Motion for Summary Judgment on Plaintiffs' Claims of Direct and Secondary Copyright Infringement [Doc. 262], **GRANTS IN PART** Plaintiffs' Motion for Summary Judgment on Defendant's DMCA Safe Harbor Defense [Doc. 226], and **DENIES** Defendants' Cross Motion for Partial Summary Judgment as to Their DMCA Safe Harbor Defense [Doc. 264].

Moreover as the Court has not considered the expert testimony of Defendants' expert regarding Defendants' implementation of Audible Magic in its ruling on liability, it is not necessary to rule on Plaintiffs' Motion to Strike Expert Testimony [Doc. 322].  In the event this testimony is relevant to any further proceedings on damages, the Court will take up the motion at a later time if necessary. Accordingly,  Plaintiff's Motion to Strike Expert Testimony [Doc. 322] is **DENIED WITHOUT PREJUDICE** at this time.

The parties are **DIRECTED** to file their Consolidated Pretrial Order on Plaintiffs' claim for damages **NO LATER THAN JANUARY 13, 2021**. Alternatively, if the parties would rather attempt to resolve the case through a mediation with former discovery Special Master Carlos A. González before going through the expense of preparing for trial, they are **DIRECTED** to notify the

Court in writing on the docket **NO LATER THAN DECEMBER 16, 2020**.[24]
In the event the parties agree to pursue mediation, the Court will stay the
deadline for filing the Consolidated Pretrial Order pending the outcome of the
mediation.

     **IT IS SO ORDERED** this 30th day of November, 2020.


**Amy Totenberg**
**United States District Judge**

---

[24] If parties determine they wish to proceed with another mediator, they are free to do so, but
shall notify the Court of the mediator's name, mediation firm affiliation (if any), and location
**NO LATER THAN DECEMBER 16, 2020**.