# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ATLANTIC RECORDING
CORPORATION, LAFACE
RECORDS LLC, SONY MUSIC
ENTERTAINMENT, UMG
RECORDINGS, INC., WARNER
BROS. RECORDS INC., ARISTA
MUSIC, ARISTA RECORDS LLC,
BAD BOY RECORDS LLC,
CAPITOL RECORDS, LLC,
ELECTRA ENTERTAINMENT
GROUP INC., SONY MUSIC
ENTERTAINMENT US LATIN LLC,
ZOMBA RECORDING LLC, ROC-A-
FELLA RECORDS, LLC,

      Plaintiffs,


      v.

SPINRILLA, LLC and JEFFERY
DYLAN COPELAND,

      Defendants.

Civil Action No.
1:17-CV-00431-AT

# REPLY BRIEF IN SUPPORT OF PLAINTIFFS' THIRD MOTION IN LIMINE TO PRECLUDE EVIDENCE OR ARGUMENT RELATED TO PLAINTIFFS' LICENSING AGREEMENTS WITH THIRD PARTIES

Defendants' exhibit list includes *232* exhibits comprised of complex licensing agreements between Plaintiffs and nine digital service providers ("DSPs") like Spotify, Apple, and Amazon (the "DSP agreements").  Defendants assert that these exhibits are relevant so they can respond to *one* opinion (expressed in a single sentence) offered by Plaintiffs' expert, Dr. Catherine Tucker.  Dkt. 484-1 (Defs.' Opp'n).   Dr. Tucker will testify, among many other things, that the massive infringement on unlicensed streaming services like Spinrilla ███████████

███████████████████████████████████████████

███████████.  To be clear, Dr. Tucker did not base that opinion on the specific rates or other terms contained in the DSP agreements.  Moreover, those rates and terms are entirely irrelevant to her opinion for the simple reason that no comparable agreements exist from a world that did not include unlicensed streaming services like Spinrilla.  Since there is no "control group" of agreements against which to compare the DSP agreements, neither Dr. Tucker nor Defendants can use the DSP agreements to support or challenge Dr. Tucker's opinion.  As Defendants do not assert any other purpose for which they seek to admit the DSP agreements, those agreements should be excluded under Rule 402.

Moreover, introducing all 232 exhibits at trial would grind the proceedings to a crawl, needlessly expose the terms of each Plaintiff's highly confidential business

deals to other Plaintiffs, other DSPs, and the public, and confuse the jury about how to interpret the DSP agreements and evaluate their relevance to determining a statutory damages award.  Thus, any minimal relevance the DSP agreements may have is outweighed by the likelihood that their introduction will waste time and confuse the jury, and they should be excluded under Rule 403.

## ARGUMENT

### I.    The DSP Agreements Are Irrelevant.

Defendants claim the DSP agreements are relevant to one issue and one issue only: to respond to Dr. Tucker's testimony regarding ████████████████

████████████████████████████████████████████████

████████████████.  Dkt. 484-1 (Defs.' Opp'n) at 2-3 (citing Dkt. 450-4 (Tucker Dep.) 96:6-97:19; Dkt. 450-2 (Tucker Report) at ¶ 37).  Dr. Tucker's expert report—which is 36 pages—devotes exactly one sentence to that issue.  Dkt. 480-1 (Tucker Report) at ¶ 37.  Critically, Dr. Tucker did not cite to any of the specific terms of any DSP agreement to support her opinion, but instead relied on industry data and the deposition testimony of Plaintiffs' representatives who had personal knowledge of the dynamics of their companies' negotiations of licenses with their digital partners.  *Id.* at ¶ 37 & n.61.  Thus, the specific terms of the DSP agreements have no relevance to any of Dr. Tucker's opinions or testimony.  Defendants are free to

cross-examine Dr. Tucker about those bases for her opinion and the materials she considered in forming it.

Moreover, the specific terms contained in the DSP agreements are clearly not relevant to any cross-examination of Dr. Tucker.  For Defendants to be able to use those terms to challenge Dr. Tucker's opinion, Defendants would need to be able to compare them to an alternate set of agreements that sound recording owners negotiated with DSPs in a world where unlicensed streaming services did not exist and thus ██████████████████████████████ did not exist.  Of course, no such "control group" exists.  Tellingly, Defendants do not explain how the terms of the 232 DSP agreements cast doubt on Dr. Tucker's opinion or how their ability to question Plaintiffs' witnesses about those terms will demonstrate that the presence of the market of unlicensed streaming services did not affect Plaintiffs' negotiations with DSPs—because there is no credible explanation for Defendants' position.

As Defendants have not articulated any other relevant purpose for which they seek to introduce the DSP agreements, the Court should grant Plaintiffs' motion and exclude those agreements as irrelevant.

## II.   Even If The DSP Agreements Were Relevant, They Should Be Excluded Under Rule 403.

Even if the DSP agreements had some minimal relevance (and they do not), their probative value is substantially outweighed by the risk that they will confuse

the issues, prejudice Plaintiffs, mislead the jury, and cause undue delay.  Thus, they should alternatively be excluded under Rule 403.

As noted above, Defendants seek to introduce the DSP agreements only to respond to one opinion Dr. Tucker will offer at trial.  That minimal relevance (at best) to potentially rebut a single sentence in Dr. Tucker's report does not warrant admitting 232 lengthy and complex licensing agreements.  Some of the DSP agreements are hundreds of pages long and cover nuanced topics such as the different rate structures that will apply for each DSP's ad-supported, subscription, or download services, as well as various terms and exhibits related to service functionality, delivery specifications, reporting requirements, and source code.  The complexity of these terms and exhibits are not necessary to respond to Dr. Tucker's testimony and would only serve to confuse the jury.

Additionally, admitting the DSP agreements into evidence would expose the rates and terms of each of the Plaintiffs' highly confidential and competitively sensitive agreements to the public and to each company's competitors, thus causing massive commercial prejudice to Plaintiffs.  It would also create significant logistical challenges at trial.  In particular, it would require some of Plaintiffs' corporate representatives to leave the courtroom when another label group's agreements are

presented to the jury.[1]   It would also require the sealing of the exhibits, related

testimony, and arguments.   Admitting the DSP agreements will inevitably slow

down the trial and waste time so these peripheral issues can be addressed, all without

addressing any substantive or relevant issues in the case.

## CONCLUSION

For the foregoing reasons and those shown in Plaintiffs' initial brief, the Court

should grant Plaintiffs' motion in limine and preclude Defendants from introducing

the 232 DSP agreements, and any related testimony, at trial.

---

[1] As explained in Plaintiffs' opening brief, due to obvious competitive and antitrust considerations, the major record label groups cannot and do not share the rates and terms of their DSP agreements with other major label groups.

This 29th day of March, 2023.                   Respectfully submitted,


JENNER & BLOCK LLP                          TROUTMAN PEPPER HAMILTON
                                            SANDERS LLP

/s/ *Andrew H. Bart*
                                            JAMES A. LAMBERTH
ANDREW H. BART                              james.lamberth@troutman.com
(Admitted Pro Hac Vice)                     Georgia Bar No. 431851
JACOB TRACER                                600 Peachtree Street, N.E.
(Admitted Pro Hac Vice)                     Suite 5200, Bank of America Plaza
OWEN W. KEITER                              Atlanta, GA 30308-2216
(Admitted Pro Hac Vice)                     Telephone: (404) 885-3362
KARA V. BRANDEISKY                          Facsimile: (404) 962-6611
(Admitted Pro Hac Vice)
1155 Avenue of the Americas                 *Attorneys for Plaintiffs*
New York, NY 10036
Telephone: (212) 891-1600
Facsimile: (212) 891-1699


LOREAL R. ROCK
(Admitted Pro Hac Vice)
1099 New York Ave., N.W. Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

## CERTIFICATE OF COUNSEL REGARDING FONT SIZE

I, Andrew H. Bart, an attorney, hereby certify that the foregoing has been prepared with a font size and point selection (Times New Roman, 14 pt.), which is approved by the Court pursuant to Local Rules 5.1(C) and 7.1(D).

/s/ *Andrew H. Bart*
ANDREW H. BART

## CERTIFICATE OF SERVICE

I, Andrew H. Bart, hereby certify that on this 29th day of March, 2023, the foregoing papers were electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification and a service copy of this filing to all counsel of record who have appeared in this matter.

/s/ *Andrew H. Bart*
ANDREW H. BART